**VOLUME III OF III - Appx1268-1839**

**2024-2226**

---

**IN THE**
**United States Court of Appeals for the Federal Circuit**

---

VDPP, LLC,

*Plaintiff-Appellant*

v.

VOLKSWAGEN GROUP OF AMERICA, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the Southern District of Texas in Case No. 4:23-cv-02961, Judge Lee H. Rosenthal.

---

# CORRECTED NONCONFIDENTIAL JOINT APPENDIX

---


William P. Ramey, III,
Ramey LLP
5020 Montrose Boulevard
Houston, TX 77006
(713) 426-3923

*Counsel for Plaintiff-Appellant*

Elliot C. Cook
Daniel C. Tucker
Joseph M. Schaffner
Taylor L. Stark
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

*Counsel for Defendant-Appellee*

## TABLE OF CONTENTS


| Dkt. No. | Description | Appx No. |
|---|---|---|
| **VOLUME I** | | |
| N/A[1] | Default Protective Order | i |
| 52 | MEMORANDUM AND ORDER. For the reasons stated, Volkswagen's motion to recover $207,543.60 in fees is granted. (Signed by Judge Lee H Rosenthal) (Entered: 08/13/2024) | Appx0001-Appx0004 |
| 47 | MEMORANDUM AND ORDER entered: The court finds VDPP and its counsel, William P. Ramey, III of Ramey LLP, jointly and severally liable for the reasonable attorneys fees that Volkswagen incurred in defending this case. No later than July 29, 2024, Volkswagen must submit proof of the amount and reasonableness of the fees it incurred in support of its request for fees. VDPP and its counsel may respond no later than August 19, 2024. (Signed by Judge Lee H Rosenthal) (Entered: 07/11/2024) | Appx0005-Appx0011 |
| 34 | FINAL JUDGMENT entered: This case is dismissed with prejudice. Case terminated on 3/27/24.(Signed by Judge Lee H Rosenthal) Parties notified. (lle4) (Entered: 03/27/2024) | Appx0012 |
| 33 | MEMORANDUM AND OPINION entered: Volkswagen's motion to dismiss, (Docket Entry No. 13), is granted, with prejudice. VDPPs motion for leave to amend, (Docket Entry No. 22), is denied because amendment would be futile. Final judgment is separately entered.(Signed by Judge Lee H Rosenthal) 03/27/2024) | Appx0013-Appx0024 |
| 1-1 | US Patent 9,426,452 B2 | Appx0025-Appx0079 |
| Fed. Cir. R. 30(a)(1) | Docket for case #: 5:20-cv-07273 | Appx0080-Appx0084 |
| 1 | COMPLAINT | Appx0085-Appx0089 |
| 1-2 | Ex B US Patent 9,426,452 B2 Claim Analysis | Appx0090- |


[1] The district court’s protective order became operative through Dkt. 6 and thus did not include a separate ECF designation.

| Dkt. No. | Description | Appx No. |
|---|---|---|
| | | Appx0096 |
| 6 | Patent Case Order Setting Initial Case Management Conference and Scope of Discovery | Appx0098-Appx0101 |
| 13 | MOTION to Dismiss *UNDER FED. R. CIV. P. 12(b)* by Volkswagen Group of America, Inc. | Appx0136-Appx0153 |
| 13-1 | Ex A – Finnegan Letter to Ramey dated September 29. 2023 | Appx0154-Appx0162 |
| 13-2 | Ex B | Appx0163-Appx0173 |
| 22 | RESPONSE in Opposition to 13 MOTION to Dismiss UNDER FED. R. CIV. P. 12(b), filed by VDPP, LLC. | Appx0174-Appx0184 |
| 22-1 | Plaintiff's First Amended Complaint | Appx0185-Appx0253 |
| 23 | REPLY in Support of [13] MOTION to Dismiss UNDER FED. R. CIV. P. 12(b) filed by Volkswagen Group of America | Appx0254-Appx0260 |
| 23-3 | Ex C | Appx0281-Appx0296 |
| 23-4 | Ex D | Appx0297-Appx0301 |
| 23-5 | Ex E | Appx0302-Appx0664 |
| 23-6 | Ex F | Appx0665-Appx0669 |
| **VOLUME II** | | |
| 23-7 | Ex G | Appx0670-Appx0910 |
| 23-8 | Ex H | Appx0911-Appx0914 |
| 35-20 | 12/8/2023 Transcript from Initial Conference and Hearing on Motion to Dismiss | Appx0930-Appx0943 |
| 35 | Motion for Attorney Fees | Appx0944-Appx0971 |
| 35-1 | Ex A | Appx0972-Appx0980 |
| 35-2 | Ex AA | Appx0981-Appx0984 |
| 35-3 | Ex AB | Appx0985-Appx0987 |

| Dkt. No. | Description | Appx No. |
|---|---|---|
| 35-4 | Ex B | Appx0988-Appx0998 |
| 35-5 | Ex C | Appx0999-Appx1004 |
| 35-6 | Ex D | Appx1005-Appx1008 |
| 35-7 | Ex E | Appx1009-Appx1015 |
| 35-8 | Ex F | Appx1016-Appx1029 |
| 35-9 | G – FILED UNDER SEAL | Appx1030-Appx1041 |
| 35-10/ 36-1 | H – FILED UNDER SEAL | Appx1042-Appx1054 |
| 35-11/ 36-2 | I – FILED UNDER SEAL | Appx1055-Appx1083 |
| 35-12/ 36-3 | J – FILED UNDER SEAL | Appx1084-Appx1093 |
| 35-13/ 36-4 | K – FILED UNDER SEAL | Appx1094-Appx1103 |
| 35-14/ 36-5 | L – FILED UNDER SEAL | Appx1104-Appx1110 |
| 35-15/ 36-6 | M – FILED UNDER SEAL | Appx1111-Appx1129 |
| 35-16/ 36-7 | N – FILED UNDER SEAL | Appx1130-Appx1139 |
| 35-17/ 36-8 | O – FILED UNDER SEAL | Appx1140-Appx1155 |
| 35-18/ 36-9 | P – FILED UNDER SEAL | Appx1156-Appx1166 |
| 35-19/ 36-10 | Q – FILED UNDER SEAL | Appx1167-Appx1178 |
| 35-20 | Ex R | Appx1179-Appx1193 |
| 35-21 | Ex S | Appx1194-Appx1197 |
| 35-22 | Ex T | Appx1198-Appx1207 |
| 35-23 | Ex U | Appx1208- |

| Dkt. No. | Description | Appx No. |
|---|---|---|
| | | Appx1226 |
| 35-24 | Ex V | Appx1227-Appx1228 |
| 35-25 | Ex W | Appx1229-Appx1237 |
| 35-26 | Ex X | Appx1238-Appx1256 |
| 35-27 | Ex Y | Appx1257-Appx1259 |
| 35-28 | Ex Z | Appx1260-Appx1267 |
| **VOLUME III** | | |
| 37 | Motion to Alter Judgment | Appx1268-Appx1281 |
| 37-2 | Affidavit of William P. Ramey, III | Appx1282-Appx1283 |
| 37-3 | Ex A | Appx1284-Appx1402 |
| 37-4 | Ex B | Appx1403-Appx1409 |
| 37-5 | Ex C | Appx1410-Appx1412 |
| 37-6 | Ex D | Appx1413-Appx1415 |
| 37-7 | Ex E | Appx1416-Appx1418 |
| 40 | Volkswagen's Response to VDPP's Motion to Amend the Judgment and for Reconsideration Under Rule 59(E) | Appx1419-Appx1440 |
| 44 | RESPONSE to [35] MOTION for Attorney Fees filed by VDPP LLC | Appx1451-Appx1476 |
| 44-2 | Affidavit of William P. Ramey III | Appx1477-Appx1479 |
| 44-5 | Ex C | Appx1494-Appx1496 |
| 44-6 | Ex D | Appx1497-Appx1499 |
| 44-7 | Ex E | Appx1500-Appx1502 |
| 44-9 | Affidavit of Ron Karpf | Appx1508- |

| Dkt. No. | Description | Appx No. |
|---|---|---|
| | | Appx1509 |
| 44-10 | Affidavit of Simon Sunatori | Appx1510-Appx1512 |
| 45 | REPLY in Support of [35] MOTION for Attorney Fees filed by Volkswagen Group of America Inc | Appx1513-Appx1544 |
| 48 | SEALED Defendant's Attorneys' Submission w/ Exhibits A-E | Appx1545-Appx1654 |
| 50 | Notice of Appeal | Appx1658-Appx1659 |
| 53 | Amended Notice of Appeal | Appx1660-Appx1661 |
| N/A[2] | 11/3/23 Email exchange William Ramey and Elliot Cook | Appx1662-Appx1663 |
| N/A[2] | 11/3/23 Email exchange William Ramey and Elliot Cook | Appx1664 |
| 58 | MOTION Emergency Motion to Set Bond and Stay Enforcement of Judgment Pending Appeal by Ramey LLP VD | Appx1665-Appx1673 |
| 58-2 | Affidavit of William P. Ramey III | Appx1674-Appx1675 |
| 70 | Amended NOTICE OF APPEAL to US Court of Appeals for the Federal Circuit by Ramey LLP VDPP LLC filed | Appx1836-Appx1837 |
| 71 | Amended NOTICE OF APPEAL to US Court of Appeals for the Federal Circuit by Ramey LLP VDPP LLC filed | Appx1838-Appx1839 |

**CONFIDENTIAL MATERIAL OMITTED**

Appx1031-1041, Appx1043-1054, Appx1056-0183, Appx1085-1093, Appx1095-1103, Appx1105-1110, Appx1112-1122, Appx1124-1128, Appx1131-1139, Appx1141-1155, Appx1157-1166, and Appx1168-1178 contain confidential contract terms of licensing agreements. Appx1554 and Appx1566-1654 contain confidential billing and banking information, such as confidential routing numbers, account numbers, addresses, receipts, billing entries, and protected reports.

[2] These documents have been added to the appendix by party agreement to provide context to other documents.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **VDPP, LLC,**<br>**Plaintiff,** | |
| **v.** | **Case No. 4:23-cv-02961** |
| **VOLKSWAGEN GROUP OF AMERICA, INC**<br>**Defendant** | **Jury Trial Demanded** |

**PLAINTIFF VDPP, LLC'S MOTION TO AMEND THE JUDGMENT AND FOR RECONSIDERATION UNDER RULE 59(E)**

**TABLE OF CONTENTS**

**I. INTRODUCTION......1**

**II. LEGAL STANDARD......2**

**III. RELEVANT BACKGROUND FACTS......2**

**IV. ARGUMENT......3**

**A. VDPP's Proposed Amended Complaint Alleges Compliance with §287(a)......3**

**B. VDPP's Compliance with §287(a) is a Fact Question......4**

**C. There is no Evidence to Support the Court's Conclusion that the Three Identified Settlement Licenses were to Produce a Patented Article......5**

**D. The Policy Reasons for Requiring Marking under §287(a) are Balanced with Encouraging Settlement Without Admitting Infringement and the Damage Provision of §286......7**

**E. Alternatively, VDPP Drops its Claims for U.S. Pat. No. 9,426452 and Asserts only the Method Claims of U.S. Pat. No. 10,021,380......9**

**V. CONCLUSION......10**

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593 (5th Cir. 2017)........................2

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523 (Fed. Cir. 1993)...................9

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.,* 876 F.3d 1350 (Fed. Cir. 2017)..........................................................................................................5

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860 (Fed. Cir. 2020)....................................................................................................1, 8

*Condominium Ass'n Inc. v. Fidelity Nat'l Ins. Co.*, 542 F.3d 1053 (5th Cir. 2008)..........................................................................................................2

*DivX, LLC v. Hulu, LLC*, 2021 WL 4459368 (C.D. Cal. June 11, 2021).............1, 3

*DP Wagner Mfg. Inc. v. Pro Patch Sys., Inc.*, 434 F. Supp. 2d 445 (S.D. Tex. 2006)..........................................................................................................6

*Edward H. Bohlin Co. v. The Banning Co.*, 6 F.3d 350 (5th Cir. 1993)..................2

*Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322550 (E.D. Tex. Apr. 6, 2017).............................................................8

Express Mobile, Inc. v. DreamHost LLC, 2019 WL 2514418 (D. Del. June 18, 2019)....................................................................................................1, 3

*Fenner Invs ., Ltd. v. Hewlett–Packard Co.,* No. 6:08–CV–273, 2010 WL 1727916 (E.D.Tex. Apr. 28, 2010)........................................................................8

*Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167 (5th Cir. 1990)..........................................................................................................2

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996)....................................1, 4

*Ow v. Metro. Life Ins. Co.*, 224 F.3d 601 (7th Cir. 2000).......................................2

*REALTIME DATA, LLC, Plaintiff, v. ACTIAN CORPORATION ET AL., Defendants. Additional Party Names: Blue Coat Sys., Inc., F5 Networks, Inc., Riverbed Tech., Inc.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662033 (E.D. Tex. Apr. 4, 2017)......................................................... 1, 5, 6

*ResQNet,* 594 F.3d at 872.........................................................................................8

*Rude v. Westcott*, 130 U.S. 152, 9 S.Ct. 463 [468] ....................................................8

Sentry Prot. Prod., Inc. v. Eagle Mfg. Co., 400 F.3d 910 (Fed. Cir. 2005)...............3

*Solas Oled Ltd. v. Samsung Elecs. Co.*, No. 2:21-CV-105-JRG-RSP, 2022 WL 1912873 (E.D. Tex. May 30, 2022) .......................................................................6

*St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336 (5th Cir. 1997).....2

*Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989) .......................................2

**Constitutional Provisions & Statutes**

35 U.S.C. § 286 .........................................................................................................9

35 U.S.C. § 287 .........................................................................................................7

Plaintiff VDPP, LLC ("VDPP") files this motion to amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure showing the Court that the Order granting Defendant's Motion to Dismiss ("Court's Order")[1] contains manifest errors of law and results in manifest injustice at the pleading stage of the case.

## I. INTRODUCTION

The Court committed a manifest error in law when it dismissed, without leave to amend, VDPP's complaint against Defendant Volkswagen Group of America, Inc. ("Volkswagen") because leave to amend would not have been futile. By amendment, VDPP would have:

1) amended the complaint and alleged that all conditions precedent for collecting pre-suit damages had been met;[2]
2) alleged that once VDPP plead compliance with §287, actual compliance is a fact question and not therefore proper for dismissal at the pleading stage;[3]
3) alleged that there is no evidence that any of the three-litigations identified by Volkswagen were a license by VDPP to manufacture a patented article for or under VDPP's patents to support dismissal at the pleading stage as these are settlement licenses;[4]
4) alleged that the policy reasons for requiring patent marking are met when balanced with the need for parties to be able to settle cases without admitting infringement;[5] and,

---

[1] Doc. Nos. 33 and 34.
[2] *Express Mobile, Inc. v. DreamHost LLC*, 2019 WL 2514418 at *4 (D. Del. June 18, 2019); *DivX, LLC v. Hulu, LLC*, 2021 WL 4459368 at *5 (C.D. Cal. June 11, 2021).
[3] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).
4 *REALTIME DATA, LLC, Plaintiff, v. ACTIAN CORPORATION ET AL., Defendants. Additional Party Names: Blue Coat Sys., Inc., F5 Networks, Inc., Riverbed Tech., Inc.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662033, at *3 (E.D. Tex. Apr. 4, 2017).
[5] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860, 865 (Fed. Cir. 2020).

5) alternatively, if the Court does not find substantial compliance with §287, VDPP would have dropped its claims for U.S. Pat. No. 9,426452 and instead asserted only the method claims of U.S. Pat. No. 10,021,380.[6]

## II. LEGAL STANDARD

A Federal Rule of Civil Procedure 59(e) motion "calls into question the correctness of a judgment."[7] Such a motion "must clearly establish either a manifest error of law or fact or must present newly discovered evidence"[8] or "where there has been an intervening change in the controlling law."[9] It is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment.[10] Such a motion "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence."[11] Manifest error is not shown by the disappointment of the losing party; rather, the movant must point to obvious error—such as wholesale disregard, misapplication, or failure to recognize controlling precedent.[12] Manifest error might also be shown in the court's failure to apprehend the issue presented. The district court has considerable discretion in deciding whether to grant a Rule 59(e) motion.[13] This discretion should be guided by the need to "strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts."[14]

## III. RELEVANT BACKGROUND FACTS

---

[6] *Am*. Med. Sys., Inc. v. Med. Eng'g Corp*., 6 F.3d 1523, 1538 (Fed. Cir. 1993) (patent marking does not apply to method claims).*

*7* In re: Transtexas Gas Corp*., 303 F.3d 571, 581 (5th Cir. 2002).*

*8* Marseilles Homeowners *Condominium Ass'n Inc. v. Fidelity Nat'l Ins. Co.*, 542 F.3d 1053, 1058 (5th Cir. 2008).

[9] *Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593, 597 (5th Cir. 2017).

[10] *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473-474 (5th Cir. 1989).

[11] *Waltman, 875 F.2d at 473.*

[12] *Ow v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

[13] *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir. 1990); *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997) .

[14] *Edward H. Bohlin Co. v. The Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993) (citing Lavespere, 910 F.2d at 174).

VDPP filed its Complaint in this case on August 11, 2023.[15] VDPP alleges that Volkswagen infringes the claims of U.S. Patent No. 9,46,452 (the "'452 patent"). The '452 patent, entitled "Faster State Transitioning for Continuous Adjustable 3Deeps Filter Spectacles Using Multi-Layered Variable Tint Materials" was duly and legally issued by the U.S. Patent and Trademark Office on August 23, 2016.[16] 7. The '452 patent relates to an electrically controlled spectacle frame and optoelectronmic lenses housed in the frame.

Volkswagen filed a motion to dismiss alleging that VDPP failed to comply with the marking statute, §287(a).[17] VDPP responded in opposition, specifically requesting leave to amend on November 18, 2023[18] and attaching a proposed amended complaint.[19] The Court dismissed, with prejudice, VDPP's complaint on March 27, 2024.[20]

## IV. ARGUMENT

Dismissal of VDPP's complaint with prejudice and without leave to amend is a manifest error in law as compliance with §287 is a fact question after properly pleaded and no evidence is present at the pleading stage, thus resulting in manifest injustice as the facts will show substantial compliance.

### A. VDPP's Proposed Amended Complaint Alleges Compliance with §287(a)

VDPP is at the pleading stage of this case. At the pleading stage, VDPP only need allege that it has complied with the marking requirement.[21] The Court's finding that allowing such

[15] Doc. No. 1.
[16] Doc. No. 1-1.
[17] Doc. No. 13 (VDPP is only asking the Court to modify its judgment based on §287(a)).
[18] Doc. No. 22.
[19] Doc. No. 22-1.
[20] Doc. No. 33.
[21] *Sentry Prot. Prod., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005); *Express Mobile, Inc. v. DreamHost LLC*, 2019 WL 2514418 at *2 (D. Del. June 18, 2019); *DivX, LLC v. Hulu, LLC*, 2021 WL 4459368 at *5 (C.D. Cal. June 11, 2021).

amendment would be futile does not allow VDPP to present evidence during discovery of its substantial compliance with the marking statute in the three litigations identified by Volkswagen. Here, VDPP's proposed amended complaint specifically alleges:

> **I. CONDITIONS PRECEDENT**
>
> Plaintiff is a non-practicing entity, with no products to mark. Plaintiff has pled all statutory requirements to obtain pre-suit damages. Further, all conditions precedent to recovery are met." [22]

In discovery, VDPP would have presented evidence of substantial compliance with §287(a) by showing at least that it was not required to mark due to the facts of the three litigations identified by Volkswagen. However, the dismissal prevents VDPP from producing its facts and argument that it has complied.

**B. VDPP's Compliance with §287(a) is a Fact Question**

The Court's dismissal with prejudice of Plaintiff's complaint at the pleading stage without allowing leave to amend requires Plaintiff to marshal its evidence in its pleadings. However, compliance with §287 is a fact question and not proper, if plead, for dismissal.[23] If allowed to amend, VDPP will properly plead compliance as it has informed the Court with the draft amended pleading. When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. The rule of reason is consistent with the purpose of the constructive notice provision—to encourage patentees to mark their products in order to provide notice to the public of the existence of the patent and to prevent innocent infringement.[24] Here, VDPP will present

---

[22] Doc. No. 22-1 at 2/69.
[23] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).
[24] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111–12 (Fed. Cir. 1996).

evidence that establishes, under the facts of this case, that it did comply with the express language of §287. VDPP should be allowed to present that evidence.

VDPP's evidence will show that under the rule of reason analysis, the facts surrounding the three litigations identified by Volkswagen establish that VDPP used reasonable efforts to ensure substantial compliance with §287.[25] Dismissal with prejudice at the pleading stage is improper as no evidence has been taken.

**C. There is no Evidence to Support the Court's Conclusion that the Three Identified Settlement Licenses were to Produce a Patented Article**

Volkswagen points to three cases that did in fact result in settlement licenses to support that this case should be dismissed. However, the licenses are not in evidence. There is no way for the Court to determine compliance with §287, if required. Moreover, there is no evidence that *a patented article* was produced under any of the settlement licenses, *VDPP LLC v. Facebook Techs., LLC*, No. 3:19-cv-4597 (N.D. Cal.); *VDPP LLC v. Acer Am. Corp.*, 3:19-cv-4571 (N.D. Cal.); *VDPP LLC v. TTE Tech., Inc.*, No. 5:19-cv-02019 (C.D. Cal.). There simply is no evidence that any of the three litigations identified by Volkswagen were a license by VDPP to manufacture a patented article for or under VDPP's patents to support dismissal at the pleading stage.[26] Perhaps most importantly, Volkswagen fails to identify any *patented article*.

At least one other district court has recognized that consistent with the usual burden of proof for affirmative defenses, [] it is the defendant's responsibility to affirmatively identify and prove that a product is a patented article, particularly when the product is manufactured by a third

[25] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.,* 876 F.3d 1350, 1366 (Fed. Cir. 2017).
[26] *REALTIME DATA, LLC, Plaintiff, v. ACTIAN CORPORATION ET AL., Defendants. Additional Party Names: Blue Coat Sys., Inc., F5 Networks, Inc., Riverbed Tech., Inc.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662033, at *3 (E.D. Tex. Apr. 4, 2017).

party under a settlement license agreement rather than a product manufactured by the plaintiff. Otherwise, a defendant's general allegations could easily instigate a fishing expedition for the patentee in order to stave off pursuit of damages for infringement."[27] Here, Volkswagen make no effort to identify a patented article allegedly manufactured for or under any of the prior litigations. In short, Volkswagen failed to put VDPP on notice that the three settlement licenses sold specific unmarked products which the alleged infringer believes practice the patent, as no product was identified.[28] Therefore, as this is the pleading stage, VDPP should be allowed to amend its complaint and address Volkswagen's deficient motion.

Volkswagen's motion asks the Court to make the evidentiary leap that the defendants in each of the three litigations agreed that they were producing a patented article for or under VDPP's patents. Such a leap at the pleading stage would require VDPP to marshal its evidence and is improper. VDPP anticipates the evidence will show that each of the three defendants in the three settlement licenses denied that they infringed VDPP's patent and would not have agreed to mark any product. As courts in this district have noted, false patent marking is met when "(1) an article was marked with the word patent or any word or number that imports that the article is patented; (2) the article so marked was an unpatented article; and (3) the marking was for the purposes of deceiving the public."[29] Therefore, unless the three defendants in the three settlement licenses believed they needed to mark a product it is highly unlikely the three defendants would have marked when faced with a potential false marking claim. Requiring marking for a company that

---

[27] *REALTIME DATA, LLC, Plaintiff, v. ACTIAN CORPORATION ET AL., Defendants. Additional Party Names: Blue Coat Sys., Inc., F5 Networks, Inc., Riverbed Tech., Inc.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662033, at *2 (E.D. Tex. Apr. 4, 2017).
[28] *Solas Oled Ltd. v. Samsung Elecs. Co.*, No. 2:21-CV-105-JRG-RSP, 2022 WL 1912873, at *2 (E.D. Tex. May 30, 2022).
[29] *DP Wagner Mfg. Inc. v. Pro Patch Sys., Inc.*, 434 F. Supp. 2d 445, 451 (S.D. Tex. 2006).

does not admit infringement does not further the purposes of §287(a) but rather subjects parties to settled litigation to potential false marking claims.

VDPP has notified on or about the filing date of this response each of defendants in the three litigations identified by Volkswagen; Meta Platforms, Inc. (formerly Facebook, Inc.),[30] Acer America Corporation[31] and TTE Corporation[32] of its understanding that it has complied with §287(a), the marking statute. Each of the letters serves to illustrate substantial compliance with the marking statute as each provides that it is VDPP's understanding that

1. the end of litigation between the defendant and VDPP was not a license where the defendant was looking to sell a product under any of the VDPP Patents;
2. the end of litigation between defendant and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and defendant for patent infringement;
3. Defendant does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287; and,
4. VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.[33]

At the pleading stage, before any evidence is taken, these letters further establish substantial compliance. VDPP should be allowed to amend its complaint and develop its evidence that proves substantial compliance.

**D. The Policy Reasons for Requiring Marking under §287(a) are Balanced with Encouraging Settlement Without Admitting Infringement and the Damage Provision of §286**

[30] Ex. C to the Declaration of William P. Ramey, III ("Ramey Decl.")
[31] Ex. E to the Ramey Decl.
[32] Ex. D to the Ramey Decl.
[33] Exs. C, D and E at 1.

The policy of § 287 "serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented."[34] These policy considerations are advanced when parties are allowed to freely settle cases without admitting infringement and thus not require marking. Volkswagen has offered no evidence that the three settlement licenses it identifies were entered into because any of the Defendants believed they infringed VDPP's patents. Rather, discovery will likely show that none of the Defendants admitted to infringement and thus none of the Defendants would have marked a product as such marking would be false marking.

Further, license fees negotiated in the face of a threat of high litigation costs "may be strongly influenced by a desire to avoid full litigation."[35] Such licenses may therefore have little to do with whether the parties to the settlement agreed there was infringement. In fact, the courts have long recognized the differences between settlement licenses and other licenses.[36] In the past, settlement agreements were generally not relevant in a royalty analysis "because in the usual course they do not provide an accurate reflection of what a willing licensor would do in an arm's length transaction."[37] District courts routinely exclude settlement licenses because the potential prejudice and jury confusion substantially outweigh whatever probative value they may have.[38]

---

[34] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860, 865 (Fed. Cir. 2020).

[35] *Rude v. Westcott,* 130 U.S. 152, 164, 9 S.Ct. 463 [468], 32 L.Ed. 888 (1888).

[36] *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322550, at *4 (E.D. Tex. Apr. 6, 2017) (While settlement licenses have been used to assess damages in patent litigation, their admittance is never obtained without scrutiny because of the inherent risk they pose in skewing a reasonable royalty calculation. *See ResQNet,* 594 F.3d at 872 (noting that "the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation").

[37] *Fenner Invs ., Ltd. v. Hewlett–Packard Co.,* No. 6:08–CV–273, 2010 WL 1727916, at *1 (E.D.Tex. Apr. 28, 2010).

[38] *See, e,g,, id.*

Thus, settlement licenses are not a typical license between parties to product a patent article for or under a patent.

Therefore, as there is no evidence that the three settlement licenses were anything more than a desire to end litigation, the policies of §287 are not violated. Such a result is further warranted by 35 U.S.C. §286 which allows for the recovery of damages for six years prior to the filing of the complaint.[39] Here, if allowed to amend its complaint and plead compliance, there is no record evidence that shows a failure to substantially comply with §287.

**E. Alternatively, VDPP Drops its Claims for U.S. Pat. No. 9,426452 and Asserts only the Method Claims of U.S. Pat. No. 10,021,380**.

The Federal Circuit has long recognized that there is no requirement to patent mark for a method claim.[40] Thus, if the Court determines that VDPP must mark for its apparatus claims, VDPP will dismiss all claims except for the method claims in U.S. Pat. No. 10,021,380 ("the '380 patent"). Claims 1-5, 11-15, and 21-25 of the '380 patent are directed to methods. Exhibit B to this motion for a new trial is a draft claim chart asserting Claim 1 of the '380 patent against Volkswagen that VDPP would have added to an amended complaint if allowed to amend. As the claim is not directed towards a product, its pleading removes the marking requirement. As such, if the Court disagrees with VDPP's arguments against the requirement to mark for damages, an amendment in the alternative would allow VDPP to comply with the Court's marking requirement.

[39] 35 U.S.C.A. § 286 (West) ("Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action").
[40] *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993) (patent marking does not apply to method claims).

## V. CONCLUSION

VDPP respectfully prays for a modified judgment that VDPP is allowed to amend its complaint.

Respectfully submitted,

**Ramey LLP**

By: *<u>/s/ William P. Ramey, III</u>*

William P. Ramey, III
Texas Bar No. 24027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923 (telephone)
(832) 900-4941 (fax)
wramey@rameyfirm.com

***Attorneys for VDPP, LLC***

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that all counsel of record who have appeared in this case are being served today, April 18, 2024, with a copy of the foregoing via the Court's CM/ECF system.

*<u>/s/ William P. Ramey, III</u>*
William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **VDPP, LLC,**<br>**Plaintiff,** | |
| **v.** | **Case No. 4:23-cv-02961** |
| **VOLKSWAGEN GROUP OF AMERICA, INC**<br>**Defendant** | **Jury Trial Demanded** |

**DECLARATION OF WILLIAM P. RAMEY III**

1. My name is William P. Ramey, III. I am over the age of 21. I have never been convicted of a felony, and I have personal knowledge of the facts contained herein, which are true and correct. If called as a witness, I could competently testify to these statements.

2. I am licensed to practice law in the state of Texas and am an attorney with the law firm of Ramey LLP. I represent the Plaintiff in the above-captioned lawsuit.

3. Exhibit A to this Declaration is a true and correct copy of United States Patent No. 10,021,380.

4. Exhibit B to this Declaration is a true and correct copy of a draft claim chart for claim 1 of the ‘380 patent.

5. Exhibit C to this Declaration is a true and correct copy of a letter to Meta Platforms, Inc.

6. Exhibit D to this Declaration is a true and correct copy of a letter to TTE Corporation.

7. Exhibit E to this Declaration is a true and correct copy of a letter to Acer America Corporation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 18, 2024.

________________

William P. Ramey, III

# EXHIBIT A

US010021380B1

(12) **United States Patent**
**Jacobs et al.**

(10) **Patent No.: US 10,021,380 B1**
(45) **Date of Patent: Jul. 10, 2018**

(54) **FASTER STATE TRANSITIONING FOR CONTINUOUS ADJUSTABLE 3DEEPS FILTER SPECTACLES USING MULTI-LAYERED VARIABLE TINT MATERIALS**

(71) Applicant: **VISUAL EFFECT INNOVATIONS, LLC**, Plano, TX (US)

(72) Inventors: **Kenneth Martin Jacobs**, New York, NY (US); **Ronald Steven Karpf**, Corvallis, OR (US)

(73) Assignee: **VISUAL EFFECT INNOVATIONS, LLC**, Plano, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/907,614**

(22) Filed: **Feb. 28, 2018**

**Related U.S. Application Data**

(60) Continuation of application No. 15/683,623, filed on Aug. 22, 2017, now Pat. No. 9,948,922, which is a (Continued)

(51) **Int. Cl.**
***G02B 27/22*** (2018.01)
***H04N 13/334*** (2018.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... ***H04N 13/334*** (2018.05); ***G02B 26/026*** (2013.01); ***G02B 27/017*** (2013.01); ***G02B 27/0172*** (2013.01); ***G02B 27/2207*** (2013.01); ***G02B 27/2221*** (2013.01); ***G02B 27/2228*** (2013.01); ***G02B 27/2264*** (2013.01); ***G02C 7/00*** (2013.01); ***G02C 7/101*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. G02B 27/0101; G02B 27/017; G02B 27/0179; G02B 27/22
USPC ........ 351/158, 159.39; 349/13, 96; 359/464, 359/465, 490
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,991,266 A 11/1976 Baer
4,049,339 A 9/1977 Ledan
(Continued)

FOREIGN PATENT DOCUMENTS

CA 2276190 A1 7/1998
EP 0840522 B1 7/2008
(Continued)

OTHER PUBLICATIONS

"Crystal Eyes 3 User's Guide", StereoGraphics Corporation (2000), 2 pages.
(Continued)

*Primary Examiner* — Hung Dang
(74) *Attorney, Agent, or Firm* — Ascenda Law Group, PC

(57) **ABSTRACT**

An electrically controlled spectacle includes a spectacle frame and optoelectronic lenses housed in the frame. The lenses include a left lens and a right lens, each of the optoelectrical lenses having a plurality of states, wherein the state of the left lens is independent of the state of the right lens. The electrically controlled spectacle also includes a control unit housed in the frame, the control unit being adapted to control the state of each of the lenses independently.

**30 Claims, 54 Drawing Sheets**

100



### Related U.S. Application Data

continuation of application No. 15/606,850, filed on May 26, 2017, now Pat. No. 9,781,408, which is a continuation-in-part of application No. 15/217,612, filed on Jul. 22, 2016, now Pat. No. 9,699,444, which is a continuation of application No. 14/850,750, filed on Sep. 10, 2015, now Pat. No. 9,426,452, which is a continuation of application No. 14/451,048, filed on Aug. 4, 2014, now Pat. No. 9,167,235, which is a continuation of application No. 14/155,505, filed on Jan. 15, 2014, now Pat. No. 8,864,304, which is a continuation of application No. 13/746,393, filed on Jan. 22, 2013, now Pat. No. 8,657,438, which is a continuation of application No. 12/938,495, filed on Nov. 3, 2010, now abandoned, which is a division of application No. 12/555,545, filed on Sep. 8, 2009, now Pat. No. 7,850,304, which is a continuation-in-part of application No. 12/274,752, filed on Nov. 20, 2008, now Pat. No. 7,604,348, which is a continuation-in-part of application No. 11/928,152, filed on Oct. 30, 2007, now Pat. No. 7,508,485, which is a continuation-in-part of application No. 11/373,702, filed on Mar. 10, 2006, now Pat. No. 7,405,801, and a continuation-in-part of application No. 10/054,607, filed on Jan. 22, 2002, now Pat. No. 7,030,902, said application No. 11/928,152 is a continuation-in-part of application No. 11/372,723, filed on Mar. 10, 2006, now Pat. No. 7,522,257, and a continuation-in-part of application No. 10/054,607, filed on Jan. 22, 2002, now Pat. No. 7,030,902, said application No. 15/606,850 is a continuation-in-part of application No. 14/850,629, filed on Sep. 10, 2015, now Pat. No. 9,942,487, which is a continuation of application No. 14/268,423, filed on May 2, 2014, now Pat. No. 9,167,177, which is a continuation of application No. 13/168,493, filed on Jun. 24, 2011, now Pat. No. 8,750,382, and a continuation-in-part of application No. 12/938,495, filed on Nov. 3, 2010, now abandoned, which is a division of application No. 12/555,545, filed on Sep. 8, 2009, now Pat. No. 7,850,304, which is a continuation-in-part of application No. 12/274,752, filed on Nov. 20, 2008, now Pat. No. 7,604,348, which is a continuation-in-part of application No. 11/928,152, filed on Oct. 30, 2007, now Pat. No. 7,508,485, which is a continuation-in-part of application No. 11/373,702, filed on Mar. 10, 2006, now Pat. No. 7,405,801, and a continuation-in-part of application No. 10/054,607, filed on Jan. 22, 2002, now Pat. No. 7,030,902, said application No. 13/168,493 is a continuation-in-part of application No. 12/555,482, filed on Sep. 8, 2009, now Pat. No. 7,976,159, said application No. 15/606,850 is a continuation-in-part of application No. 15/212,114, filed on Jul. 15, 2016, now Pat. No. 9,716,874, which is a division of application No. 14/566,205, filed on Dec. 10, 2014, now Pat. No. 9,426,442, which is a continuation of application No. 14/333,266, filed on Jul. 16, 2014, now Pat. No. 8,941,919, which is a continuation of application No. 14/149,293, filed on Jan. 7, 2014, now Pat. No. 8,913,319, which is a continuation of application No. 13/632,333, filed on Oct. 1, 2012, now Pat. No. 8,657,439, which is a continuation of application No. 13/151,736, filed on Jun. 2, 2011, now Pat. No. 8,303,112, which is a continuation of application No. 12/555,482, filed on Sep. 8, 2009, now Pat. No. 7,976,159, which is a division of application No. 12/274,752, filed on Nov. 20, 2008, now Pat. No. 7,604,348, which is a continuation-in-part of application No. 11/928,152, filed on Oct. 30, 2007, now Pat. No. 7,508,485, which is a continuation-in-part of application No. 11/372,723, filed on Mar. 10, 2006, now Pat. No. 7,522,257, and a continuation-in-part of application No. 11/373,702, filed on Mar. 10, 2006, now Pat. No. 7,405,801, said application No. 11/372,723 is a continuation-in-part of application No. 10/054,607, filed on Jan. 22, 2002, now Pat. No. 7,030,902, said application No. 11/373,702 is a continuation-in-part of application No. 10/054,607, filed on Jan. 22, 2002, now Pat. No. 7,030,902.

(60) Provisional application No. 60/661,847, filed on Mar. 15, 2005, provisional application No. 60/664,369, filed on Mar. 23, 2005, provisional application No. 60/263,498, filed on Jan. 23, 2001, provisional application No. 61/398,981, filed on Jul. 2, 2010.

(51) **Int. Cl.**

| | |
|---|---|
| ***G02B 27/01*** | (2006.01) |
| ***G02C 7/10*** | (2006.01) |
| ***H04N 13/04*** | (2006.01) |
| ***G02C 7/00*** | (2006.01) |
| ***G02C 11/00*** | (2006.01) |
| ***G02B 26/02*** | (2006.01) |
| ***H04N 13/144*** | (2018.01) |
| ***H04N 13/324*** | (2018.01) |
| ***H04N 13/327*** | (2018.01) |
| ***H04N 13/332*** | (2018.01) |
| ***H04N 13/337*** | (2018.01) |
| ***H04N 13/341*** | (2018.01) |
| ***H04N 13/359*** | (2018.01) |
| ***H04N 13/398*** | (2018.01) |
| *H04N 13/00* | (2018.01) |
| *H04N 13/02* | (2006.01) |
| *H04N 13/261* | (2018.01) |

(52) **U.S. Cl.**

CPC ......... ***G02C 11/10*** (2013.01); ***H04N 13/0033*** (2013.01); ***H04N 13/0422*** (2013.01); ***H04N 13/0425*** (2013.01); ***H04N 13/0429*** (2013.01); ***H04N 13/0431*** (2013.01); ***H04N 13/0434*** (2013.01); ***H04N 13/0438*** (2013.01); ***H04N 13/0454*** (2013.01); ***H04N 13/0497*** (2013.01); ***H04N 13/144*** (2018.05); ***H04N 13/324*** (2018.05); ***H04N 13/327*** (2018.05); ***H04N 13/332*** (2018.05); ***H04N 13/337*** (2018.05); ***H04N 13/341*** (2018.05); ***H04N 13/359*** (2018.05); ***H04N 13/398*** (2018.05); *G02B 2027/014* (2013.01); *H04N 13/026* (2013.01); *H04N 13/261* (2018.05); *H04N 2013/0077* (2013.01); *H04N 2013/0096* (2013.01); *H04N 2213/002* (2013.01); *H04N 2213/008* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,429,951 | A | 2/1984 | Hirano |
| 4,528,587 | A | 7/1985 | Jones, Jr. |
| 4,562,463 | A | 12/1985 | Lipton |
| 4,597,634 | A | 7/1986 | Steenblik |
| 4,705,371 | A | 11/1987 | Beard |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,717,239 | A | 1/1988 | Steenblik | |
| 4,805,988 | A | 2/1989 | Dones | |
| 4,893,898 | A | 1/1990 | Beard | |
| 4,907,860 | A | 3/1990 | Noble | |
| 4,968,127 | A | 11/1990 | Russell et al. | |
| 5,002,364 | A | 3/1991 | Steenblik | |
| 5,015,086 | A | 5/1991 | Okaue et al. | |
| 5,113,270 | A | 5/1992 | Fergason | |
| 5,144,344 | A | 9/1992 | Takahashi et al. | |
| 5,184,156 | A | 2/1993 | Black et al. | |
| 5,264,877 | A | 11/1993 | Hussey | |
| 5,353,391 | A | 10/1994 | Cohen et al. | |
| 5,365,278 | A | 11/1994 | Willis | |
| 5,510,831 | A | 4/1996 | Mayhew | |
| 5,512,965 | A | 4/1996 | Snook | |
| 5,552,841 | A | 9/1996 | Gallorini et al. | |
| 5,598,231 | A | 1/1997 | Lin | |
| 5,619,256 | A | 4/1997 | Haskell et al. | |
| 5,649,032 | A | 7/1997 | Burt et al. | |
| 5,654,786 | A | 8/1997 | Bylander | |
| 5,692,117 | A | 11/1997 | Berend et al. | |
| 5,717,412 | A | 2/1998 | Edwards | |
| 5,717,415 | A | 2/1998 | Iue et al. | |
| 5,717,929 | A | 2/1998 | Furukawa et al. | |
| 5,721,692 | A | 2/1998 | Nagaya et al. | |
| 5,796,373 | A | 8/1998 | Ming-Yen | |
| 5,808,588 | A | 9/1998 | Lin | |
| 5,821,989 | A | 10/1998 | Lazzaro et al. | |
| 5,835,264 | A | 11/1998 | Tandler et al. | |
| 5,844,540 | A | 12/1998 | Terasaki | |
| 5,907,659 | A | 5/1999 | Yamauchi et al. | |
| 5,920,374 | A | 7/1999 | Vaphiades et al. | |
| 5,933,150 | A | 8/1999 | Ngo et al. | |
| 5,991,085 | A * | 11/1999 | Rallison | G02B 27/017 345/8 |
| 5,999,195 | A | 12/1999 | Santangeli | |
| 6,057,811 | A | 5/2000 | Edwards | |
| 6,061,103 | A | 5/2000 | Okamura et al. | |
| 6,078,701 | A | 6/2000 | Hsu et al. | |
| 6,088,052 | A | 7/2000 | Guralnick | |
| 6,108,005 | A | 8/2000 | Starks et al. | |
| 6,115,177 | A | 9/2000 | Vossler | |
| 6,163,337 | A | 12/2000 | Azuma et al. | |
| 6,166,712 | A | 12/2000 | Hoffman et al. | |
| 6,198,524 | B1 | 3/2001 | Osgood | |
| 6,220,709 | B1 | 4/2001 | Heger | |
| 6,268,843 | B1 | 7/2001 | Arakawa | |
| 6,269,122 | B1 | 7/2001 | Prasad et al. | |
| 6,278,501 | B1 | 8/2001 | Lin | |
| 6,314,211 | B1 | 11/2001 | Kim et al. | |
| 6,314,248 | B1 | 11/2001 | Ohmura et al. | |
| 6,327,000 | B1 | 12/2001 | Auld et al. | |
| 6,333,757 | B1 | 12/2001 | Faris | |
| 6,381,373 | B1 | 4/2002 | Suzuki et al. | |
| 6,385,245 | B1 | 5/2002 | De Haan et al. | |
| 6,392,689 | B1 | 5/2002 | Dolgoff | |
| 6,429,881 | B1 | 8/2002 | Olsen, IV | |
| 6,449,005 | B1 | 9/2002 | Faris | |
| 6,452,582 | B1 | 9/2002 | Rolston | |
| 6,456,432 | B1 | 9/2002 | Lazzaro et al. | |
| 6,456,745 | B1 | 9/2002 | Bruton et al. | |
| 6,496,598 | B1 | 12/2002 | Harman | |
| 6,510,002 | B1 | 1/2003 | Tsang | |
| 6,529,175 | B2 | 3/2003 | Tserkovnyuk et al. | |
| 6,573,882 | B1 | 6/2003 | Takabayashi | |
| 6,598,968 | B1 | 7/2003 | Davino | |
| 6,628,355 | B1 | 9/2003 | Takahara | |
| 6,678,091 | B2 | 1/2004 | Tropper | |
| 6,741,304 | B2 | 5/2004 | Nauta et al. | |
| 6,744,440 | B1 | 6/2004 | Nakamura | |
| 6,819,311 | B2 | 11/2004 | Nose et al. | |
| 6,853,385 | B1 | 2/2005 | Macinnis et al. | |
| 6,882,473 | B2 | 4/2005 | Geier et al. | |
| 7,030,902 | B2 | 4/2006 | Jacobs | |
| 7,086,735 | B1 | 8/2006 | Provitola | |
| 7,133,015 | B1 | 11/2006 | Yoshida et al. | |
| 7,218,339 | B2 | 5/2007 | Jacobs | |
| 7,405,801 | B2 | 7/2008 | Jacobs | |
| 7,436,568 | B1 | 10/2008 | Kuykendall, Jr. | |
| 7,508,485 | B2 | 3/2009 | Jacobs et al. | |
| 7,522,257 | B2 | 4/2009 | Jacobs et al. | |
| 7,922,321 | B2 | 4/2011 | Howell et al. | |
| 8,864,304 | B2 | 10/2014 | Jacobs et al. | |
| 9,167,235 | B2 | 10/2015 | Jacobs et al. | |
| 2003/0112507 | A1 | 6/2003 | Divelbiss et al. | |
| 2006/0244907 | A1 | 11/2006 | Simmons | |
| 2007/0103424 | A1 | 5/2007 | Huang | |
| 2007/0147671 | A1 | 6/2007 | Di Vincenzo et al. | |
| 2010/0157425 | A1 | 6/2010 | Oh | |
| 2011/0007132 | A1 | 1/2011 | Redmann et al. | |
| 2011/0279450 | A1 | 11/2011 | Seong et al. | |
| 2012/0281961 | A1 | 11/2012 | Forbes | |
| 2014/0125890 | A1 | 5/2014 | Xie et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 7287191 | A | 10/1995 |
| JP | H7-287191 | A | 10/1995 |
| JP | 2000-4451 | A | 1/2000 |
| JP | 2000284224 | A | 10/2000 |

OTHER PUBLICATIONS

"G-Sync High Dynamic Range", Nvidia, Whitepaper (Mar. 2017), 8 pages.
"In Short: The 3D Printing Process", Wicked3D.com (Apr. 28, 2017), downloaded from: http://www.wicked3d.com/, 22 pages.
"Leave the Competition in you Wake with Stereo3D", StereoGraphics Corporation (2000), Crystal Eyes Product Sheet, 2 pages.
"NuVision: About Us", NuVision Technologies, Inc., Stereoscopic Viewing Solutions: Home Page (1998), retrieved from: https://web.archive.org/web/19980613032748/http://www.nuvision3d.com:80/aboutnvt.html, 3 pages.
"NuVision: the Future is Now", NuVision Technologies, Inc., Stereoscopic Viewing Solutions: Home Page (1997), retrieved from: https://web.archive.org/web/19980206083804/http://nuvision3d.com:80/, 2 pages.
"StereoGraphics Developers' Handbook", StereoGraphics Corporation (1997), 66 pages.
"StereoGraphics E-2 Emitter for Workstations with VESA 3-pin mini-DIN stereo connector", StereoGraphics Corporation (1997), Setup and Installation Guide (0420071-001 Rev. A), 5 pages.
"Unofficial H3D/Wicked3D Eyewear Page", Stereo3D.com (last updated Dec. 28, 1998), retrieved from: https://web-beta.archive.org/web/20001204080700/http://www.stereo3d.com80/h3d.htm, 14 pages.
"Wicked3D eyeSCREAM Steroscopic Eyewear System", Metabyte, Inc., Quickstart Guide (ESQS Ver 1.0, Jan. 25, 1999), 11 pages.
"Wicked3D eyeSCREAM Steroscopic Eyewear System", Metabyte, Inc., User Guide (ES Nov. 10, 1998), 32 pages.
Bradford, "StereoGraphics Products and Modern Displays", StereoGraphics Corporation (2000), White Papers, retrieved from: https://web.archive.org/web/20010212015732fw_/http://www.stereographics.com:80/html/lcd-paper.htm, 1 page.
Fisher, "Viewpoint Dependent Imaging: An Interactive Stereoscopic Display", Massachusetts Institute of Technology, Thesis paper (Oct. 8, 1981), 29 pages.
Kunz; et al., "Modified shutter glasses for projection and picture acquisition in virtual environments", IEEE Computer Society, Proceedings of the Virtual Reality 2001 Conference (VR'01), 3 pages.
MacNaughton, "NuVision: 60GX Stereoscopic Wireless LCD Glasses", MacNaughton, Inc., NuVision 60GX Data Shed (1997), 2 pages.
May, "Perceptual Principles and Computer Graphics", Computer Graphics forum (2000), 19(4):271-279.
Rambler, "How They Put the Motion in Motion Pictures", The Washington Post (Sep. 10, 1997), retrieved from: https://www.

(56) **References Cited**

OTHER PUBLICATIONS

washingtonpost.com/archive/1997/09/10/how-they-put-t...es/abae7c0e-dc66-4889-a52d-f25e363657b4/?utm_term=.99b5977ccd83, 7 pages.
Smeltzer, et al., "Design Model Image Presentation", In Experiences with CAAD in Education and Practice: eCAADe Conference Proceedings (1991), Munich, Germany, pp. 195-210.
Sueoka; et al., "Improving the Moving-Image Quality of TFT-LCDs", Conference Record of the 17th International Display Research Conference (1997), ISSN 1083-1312, pp. 203-206.
Wisnieff; et al., "Electronic displays for information technology", IBM J. Res. Develop (May 2000), 44(3):409-22.
"Nvidia Corporation's Invalidity Contentions and P.R. 3-4 Document Production Accompanying Invalidity Contentions", May 8, 2017, *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 2:16-cv-1345-JRG, 37 pages.
"Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions", Oct. 6, 2017, *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 57 pages.
"Exhibit A1—Japanese Patent Application No. JP2000284224 (A) to Kuma ("Kuma")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 122 pages.
"Exhibit A2—U.S. Pat. No. 5,717,412 to Edwards ("Edwards '412")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 138 pages.
"Exhibit A3—U.S. Pat. No. 5,796,373 to Lin ("Lin '373")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 87 pages.
"Exhibit A4—U.S. Pat. No. 5,808,588 to Lin ("Lin '588")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 45 pages.
"Exhibit A5—U.S. Pat. No. 5,821,989 to Lazzaro ("Lazzaro")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 125 pages.
"Exhibit A6—U.S. Pat. No. 6,057,811 to Edwards ("Edwards '811")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 176 pages.
"Exhibit A7—U.S. Pat. No. 6,088,052 to Guralnick ("Guralnick")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 64 pages.
"Exhibit A8—U.S. Pat. No. 6,278,501 to Lin ("Lin '501")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 74 pages.
"Exhibit A9—U.S. Pat. No. 6,314,248 to Ohmura ("Ohmura")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 59 pages.
"Exhibit A10—U.S. Pat. No. 6,529,175 to Tserkovnyuk ("Tserkovnyuk")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 74 pages.
"Exhibit A11—Metabyte's Wicked3D Eyewear", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 35 pages.
"Exhibit A12—Stereographics CrystalEyes", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 34 pages.
"Exhibit A13—NuVision 60GX", Claim Chart from Nvidia Corporation's Invalidity Contentions and Oatent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 38 pages.
"Exhibit B1—Japanese Patent Application No. JP2000284224 (A) to Kuma ("Kuma")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 69 pages.
"Exhibit B2—U.S. Pat. No. 5,717,412 to Edwards ("Edwards '412")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 75 pages.
"Exhibit B3—U.S. Pat. No. 5,796,373 to Lin 373 ("Lin '373")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 50 pages.
"Exhibit B4—U.S. Pat. No. 5,808,588 to Lin ("Lin '588")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 28 pages.
"Exhibit B5—U.S. Pat. No. 5,821,989 to Lazzaro ("Lazzaro")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 73 pages.
"Exhibit B6—U.S. Pat. No. 6,057,811 to Edwards ("Edwards '811")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 97 pages.
"Exhibit B7—U.S. Pat. No. 6,088,052 to Guralnick ("Guralnick")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 42 pages.
"Exhibit B8—U.S. Pat. No. 6,278,501 to Lin ("Lin '501")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 47 pages.
"Exhibit B9—U.S. Pat. No. 6,314,248 to Ohmura ("Ohmura")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 35 pages.
"Exhibit B10—U.S. Pat. No. 6,529,175 to Tserkovnyuk ("Tserkovnyuk")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 43 pages.
"Exhibit B11—Metabyte's Wicked3D Eyewear", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4

(56) **References Cited**

OTHER PUBLICATIONS

Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 23 pages.
"Exhibit B12—Stereographics CrystalEyes", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 21 pages.
"Exhibit B13—NuVision 60GX", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 23 pages.
"Exhibit C1—U.S. Pat. No. 5,353,391 to Cohen ("Cohen")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 30 pages.
"Exhibit C2—U.S. Pat. No. 6,327,000 to Auld ("Auld")", Claim Chart from Nvidia Corporation'S Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-Vc, 38 pp.
Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 28 pages.
Exhibit 1—Invalidity Chart for '444 Patent based on U.S. Pat. No. 6,628,355 (2000) ("Takahara"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 45 pages.
Exhibit 2—Invalidity Chart for '444 Patent based on U.S. Pat. No. 6,333,757 (1999) ("Faris"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 50 pages.
Exhibit 3—Invalidity Chart for '444 Patent based on U.S. Pat. No. 6,061,103 (1996) ("Okamura"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 40 pages.
Exhibit 4—Invalidity Chart for '444 Patent based on U.S. Pat. No. 7,133,015 (2000) ("Yoshida"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 63 pages.
Exhibit 5—Invalidity Chart for '444 Patent based on U.S. Pat. No. 6,853,385 (2000) ("MacInnis"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 35 pages.
Exhibit 6—Invalidity Chart for '444 Patent based on U.S. Pat. No. 6,108,005 ("Starks"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 62 pages.
Exhibit 7—Invalidity Chart for '444 Patent based on U.S. Pat. No. 6,744,440 (2000) ("Nakamura"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 20 pages.
Exhibit 8—Invalidity Chart for the '874 Patent based on U.S. Pat. No. 6,628,355 (2000) ("Takahara"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 20 pages.
Exhibit 9—Invalidity Chart for the '874 Patent based on U.S. Pat. No. 6,061,103 (1996) ("Okamura"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 15 pages.
Exhibit 10—Invalidity Chart for the '874 Patent based on U.S. Pat. No. 6,741,304 ("Nauta"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 16 pages.
Exhibit 11—Invalidity Chart for the '874 Patent based on U.S. Application No. 2011/0279450A1 (2011) ("Seong"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 17 pages.
Exhibit 12—invalidity Chart for the '874 Patent based on Tsutomu Furuhashi et al., High Quality TFT-LCD System for Moving Picture, SID 02 Digest (2002) ("Furuhashi"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 18 pages.
Exhibit 13—Invalidity Chart for the '874 Patent based on U.S. Patent App. No. 2007/0103424 A1 (2007) ("Huang"), from Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.'s Invalidity Contentions, filed Apr. 16, 2018, *Visual Effect Innovations, LLC* v. *Samsung Electronics America, Inc.; et al.*, Civil Action No. 2:17-cv-0645-JRG-RSP, 15 pages.
Coles, Charles, "Single Stage CCFL Backlight Resonant Inverter Using PWM Dimming Methods", 1998 Society for Information Display (May 1998), 29(1):165-168.
Furuhashi; et al., "48.3: Invited Paper: High Quality TFT-LCD System for Moving Picture", SID Symposium Digest of Technical Papers (May 2002), 33(1):1284-1287.
Jack, Keith, "Video Demystified: A Handbook for the Digital Engineer", 2nd Edition (1995), published by LLH Technology Publishing, Eagle Rock, Virginia, pp. 388-393 and 412-421.
Kazuo; et al. "6.4: Image Scaling at Rational Ratios for High-Resolution LCD Monitors", 2000 Society for Information Display (May 2000), 31(1):50-53.
Suzuki; et al., "An Inverter with a Quasi-Synchronous Dimming Function", 1999 Society for Information Display (Sep. 1999), 7(3):167-170.
Whitaker, R.T., "A Level-Set Approach to Image Blending", IEEE Transactions on Image Processing (Nov. 2000), 9 (11)1849-1861.
"The IEEE Standard Dictionary of Electrical and Electronics Terms, Sixth Edition", Institute of Electrical and Electronics Engineers, Inc. (1996), Excerpt from Textbook, 5 pages.
Declaration of Richard A. Kramer (Exhibit 1004) filed Mar. 13, 2018, *Sony Corporation* v. *Visual Effect Innovations, LLC*, IPR No. IPR2018-00772, 91 pages.
Declaration of Richard A. Kramer (Exhibit 1004) filed Mar. 13, 2018, *Sony Corporation* v. *Visual Effect Innovations, LLC*, IPR No. IPR2018-00773, 107 pages.
Joint Claim Construction and Prehearing Statement filed Dec. 5, 2017, *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case 3:17-cv-03187-VC, Document 91, 7 pages.
Mooney, William J., "Optoelectronic Devices and Principles", Prentice-Hall, Inc. (1991), Excerpt from Textbook, 4 pages.
Petition for Inter Partes Review of U.S. Pat. No. 8,864,304 filed Mar. 13, 2018, *Sony Corporation* v. *Visual Effect Innovations, LLC*, IPR No. IPR2018-00773, 103 pages.

(56) **References Cited**

OTHER PUBLICATIONS

Petition for Inter Partes Review of U.S. Pat. No. 9,167,235 filed Mar. 13, 2018, *Sony Corporation* v. *Visual Effect Innovations, LLC*, IPR No. IPR2018-00772, 85 pages.
"Moving Picture Experts Group", Wikipedia, The Free Encyclopedia, last modified on May 5, 2011, retrieved from: http://en.wikipedia.org/wiki/Moving_Picture_Experts_Group on Jun. 22, 2011, 10 pages.
"MPEG-1", Wikipedia, The Free Encyclopedia,last modified on Apr. 22, 2011, retrieved from: http://en.wikipedia.org/wiki/MPEG-1 on Jun. 22, 2011, 22 pages.
"Video compression", Wikipedia, The Free Encyclopedia, last modified on May 22, 2011, retrieved from: http://en.wikipedia.org/wiki/Video_compression on Jun. 22, 2011, 4 pages.
Dipert, B., "Video improvements obviate big bit streams", EDN: Information, News & Business Strategy for Electronics Design Engineers (Mar. 15, 2001), pp. 83-102.
Dipert, B., "Video quality: a hands-on view", EDN: Information, News, & Business Strategy for Electronics Design Engineers (Jun. 7, 2001), pp. 83-96.
Koenen, "Overview of the MPEG-4 Standard," International Organisation for Standardisation Organisation Internationale De Normalisation ISO/IEC JTC1/SC29/WG11 Coding of Moving Pictures and Audio, Mar. 2002, retrieved from: http://mpeg.chiariglione.org/standards/mpeg-4/mpeg-4.htm on Jun. 22, 2011, 74 pages.
Lit, A., "The magnitude of the pulfrich stereo-phenomenon as a function of target velocity", Journal of Experimental Psychology (1960), 59(3):165-175.
Lit et al., "Simple reaction lime as a function of luminance for various wavelengths", Perception & Psychophysics (1971), 10(6)1-7.
Philips semiconductors MELZONIC chip-Technology backgrounder, Press Release by NXP, Mar. 3, 1997, pp. 1-5.
Photonics. com: Optics, Lasers, Imaging & Fiber Information Resource. Web. Jan. 12, 2012, retrieved from Wayback Machine May 22, 2017, https://web.archive.org/web/20120112083259/http://www.photonics.com/, pp. 1-5.
"Exhibit C3—U.S. Pat. No. 5,907,659 to Yamauchi ("Yamauchi")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 43 pages.
"Exhibit C4—U.S. Pat. No. 4,528,587 to Jones Jr. ("Jones Jr.")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 24 pages.
"Exhibit C5—U.S. Pat. No. 5,365,278 to Willis ("Willis")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 37 pages.
"Exhibit C6—U.S. Pat. No. 6,456,745 to Bruton ("Bruton")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 28 pages.
"Exhibit C7—U.S. Pat. No. 6,429,881 to Olsen ("Olsen")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 46 pages.
"Exhibit C8—Canadian Application No. 2,276,190 to Davidson ("Davidson")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 62 pages.
"Exhibit D1—U.S. Pat. No. 6,166,712 to Hoffman ("Hoffman")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 48 pages.
"Exhibit D2—U.S. Pat. No. 6,269,122 to Prasad ("Prasad")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 37 pages.
"Exhibit D3—U.S. Pat. No. 5,999,195 to Santangeli ("Santangeli")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 59 pages.
"Exhibit D4—Improving the Moving-Image Quality of TFT-LCDs ("Sueoka")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 47 pages.
"Exhibit D5—U.S. Pat. No. 5,933,150 to Ngo ("Ngo")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 37 pages.
"Exhibit D6—U.S. Pat. No. 5,692,117 to Berend ("Berend")", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 27 pages.
"Exhibit E1—"Bridge Frame" References", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 62 pages.
"Exhibit F1—"Bridge Frame" References", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 159 pages.
"Exhibit F2—"Stereoscopic Display" References", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 102 pages.
"Exhibit G1—"Bridge Frame" References", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 62 pages.
"Exhibit H1—"Bridge Frame" References", Claim Chart from Nvidia Corporation's Invalidity Contentions and Patent L.R. 3-4 Document Production Accompanying Invalidity Contentions (Oct. 6, 2017), *Visual Effect Innovations, LLC* v. *Nvidia Corporation*, Case No. 3:17-cv-03187-VC, 33 pages.

* cited by examiner




FIG 1




FIG 2b




FIG 2a


300
301
Power Unit 104
305
Right Lens 105
Control Unit 103
Left Lens 106
303
Signal Receiving Unit 102
302
110

FIG 3


400
103
302
401
Read & Store 3Deeps Signal
403
LIFO Signal Stack
405
Store & Manage 3Deeps Signal
407
3Deeps Signal
409
Parse & Store Left and Right OD
411
Left OD
413
Right OD
415
Left Lens Control
417
Right Lens Control
303
305

FIG 4




FIG 5




FIG 6b




FIG 6a


700
301
Power Unit 104
Control Unit 503
704
Multi-Right Lens 505
Multi -Left · Lens 506
703
Signal Receiving Unit 102
302
110

FIG 7


800
503
302
401
Read & Store 3Deeps Signal
403
LIFO Signal Stack
405
Store & Manage 3Deeps Signal
407
3Deeps Signal
409
Parse & Store Left and Right OD
411
Left OD
413
Right OD
815
Left Lens Multilayer Control
817
Right Lens Multilayer Control
505
506

FIG 8


900
901
902
903
904
905
906
915
921
922
923
Potential V=2.0V
0% Dark
20%
40%
60%
70%
80%
Clear / 100%
Transmissivity (% Transmission of Light)
Transition Time (sec)
2.0
1.5
1.35
1.0
0.5
0.25
0.0

FIG 9


1000
Transition Time (sec)
2.0
1.5
1.35
1.0
0.75
0.5
0.25
0.0
Clear / 100%
80%
70%
60%
40%
20%
0%
Dark
Transmissivity (% Transmission of Light)
Potential V=2.0V
44% increase in Transmission Time
1% loss in the Clear State
901
902
903
904
905
921
922
923
1003
1011
1012
1015

FIG 10




FIG 11


1200
301
Power Unit 104
Switch 1101
1202
Control Unit 1103
1205
Right Lens 105
Left Lens 106
1203
Signal Receiving Unit 102
302
110

FIG 12


1300
103
1203
302
1202
1103
1370
Switch 1
Or
Switch 2?
Sw1
Sw2
1313
Right OD
1317
Right
Lens
Control
Left OD
1311
1315
Left
Lens
Control
1205
1240

FIG 13




FIG 14




FIG 15b




FIG 15a


1600
301
Power Unit 104
Switch 1101
1202
Control Unit 1403
1605
Right Lens 1405
1603
Left Lens 1406
Signal Receiving Unit 102
302
110

FIG 16


1700
1603
103a
1202
Change both right and left lens of layer 1 and 2 to clear
Switch 1 Or Switch 2?
=2
=1
1761
1763
1403
1605
302
103

FIG 17




Fig. 18A




Fig. 18B




Fig. 18C




Fig. 19A




Fig. 19B




Fig. 19C

INDIVDUAL




Fig. 20A

SERIES




Fig. 20B

REPEATING SERIES




Fig. 20C




Fig. 21A




Fig. 21B




Fig. 22A




Fig. 22B




Fig. 22C




Fig. 23A




Fig. 23B




Fig. 23C




Fig. 24A




Fig. 24B




Fig. 24C

INDIVIDUAL




Fig. 25A

SERIES




Fig. 25B

REPEATING SERIES




Fig. 25C




Fig. 26A




Fig. 26B

INDIVDUAL




Fig. 27A

SERIES




Fig. 27B

REPEATING SERIES




Fig. 27C

8 FRAME SERIES




Fig. 28

EXAMPLE OF COMPOUND ACTIVITY




Fig. 29




Fig. 30


Video Display Manager
3100
Processor
3110
Decompression
Module
3120
Bridge Frame
Generator
3130
Storage 3140
Compressed
Video File 2500
Frame Display
Module
3150

Fig. 31


3210
Receive data comprising a compressed image frame and temporal redundancy information
3220
Decompress the image frame
3230
Generate a plurality of bridge frames that are visually dissimilar to the image frame
3240
Blend the image frame and the plurality of bridge frames, generating a plurality of blended frames
3250
Display the blended frames

Fig. 32




Fig. 33




Fig. 34A




Fig. 34B




Fig. 35A




Fig. 35B




Fig. 35C




Fig. 35D



Computer 3600
Processor 3601
Storage 3602
Network Interface 3604
Memory 3603
Input/Output 3605


Fig. 36


Retinal Reaction Time (msec)
700
600
500
400
300
200
100
3703
3700
3710
3701
-4
-3
-2
-1
0
+1
+2
+3
+4
Night sky
Cloudy without moon
Night sky -
Full moon
3704
Clear sky
3713
Grey sky
at noon
3702
Clear sky
at noon
Luminance - - log[candela per square metre (cd/m2)]

Fig. 37




Fig. 38A Fig. 38B Fig. 38C



Retinal Reaction Time (msec)
3703
700
600
500
400
300
200
100
3900
(Δ2)
3925
3933
3930
3710
3990
3701
(Δ1)
3915
-4
-3
-2
-1
0
+1
+2
+3
+4
3920
3910
Luminance - - log[candela per square metre (cd/m2)]
(c)


Fig. 39


Retinal Reaction Time (msec)
4000
3703
700
600
500
400
300
200
100
4013
4014
4011
3710
42 msec 4018
4012
4015
0.6
4010
3701
-4
-3
-2
-1
0
+1
+2
+3
+4
Luminance - - log[candela per square metre (cd/m2)]

Fig. 40

4100

| Algorithm to Calculate Optimal Optical Density of Neutral Density Lens | |
|---|---|
| Step | Operation |
| 1 | (i) As a surrogate for background motion take the horizontal component of the most prominent motion vector in an upper portion of the frame and set to $LatScrMotion_{Top}$ <br> (ii) As a surrogate for foreground motion take the horizontal component of the most prominent motion vector in a bottom portion of the frame and set to $LatScrMotion_{Bot}$ <br> Left to right motion has a negative sign and right to left motion has a positive sign |
| 2 | $LatScrMotion = LatScrMotion_{Bot} - LatScrMotion_{Top}$ |
| 3 | Luminance = Avg brightness of Pixels in Frame n |
| 4 | Calculate $f_{Pulfrich}$(luminance, LatScrMotion) |
| 5 | If -10dpi <LatScrMotion < 10dpi then <br> set RightLens to ClearStateOD and set LeftLens to ClearStateOD <br> Else if LatScrMotion <= - 10dpi then <br> set LeftLens to $f_{Pulfrich}$(luminance, LatScrMotion) and RightLens to ClearStateOD <br> Else if LatScrMotion >= 10dpi then <br> set RightLens to $f_{Pulfrich}$(luminance, LatScrMotion) and LeftLens to ClearStateOD <br> End if |




4110

4120

4130

4140

4150

Fig. 41


4221
4222
4210
4231
UL
4232
UR
- 0 +
4242
4245
424
3
4223
4224
4234
LL
4233
LR
4200

Fig. 42



4300
Retinal Reaction Time (msec)
3703
700
600
500
400
300
200
100
4313
4314
100 msec (Δ)
4320
4311
3710
3701
4312
-1.3
-4
-3
-2
-1
0
+1
+2
+3
+4
4315
4310
Luminance - - log[candela per square metre (cd/m2)]


Fig. 43

Fig. 44


101
4400
110
Rx
102
CU
103
105
Photodiode
106
104
4420


Retinal Reaction
Time (msec)
4500
3703
700
600
500
400
300
200
100
4514
4513
166 msec (Δ) - 4518
4511
3710
4512
-1.7
3701
-4
-3
-2
-1
0
+1
+2
+3
+4
4515
4510
Luminance - - log[candela per square metre (cd/m2)]

Fig. 45



4690
4610
4621
4622
4630
4600
Video Input
Motion Vector Detection and Luminosity
Reformat Video
Reformatted Video Output
4620
4654
4660
4662
4651
4653
Read and Store List of Motion Vectors (MV) And Luminosity (L) From Video Format Conversion Chip
Read all Motion Vectors (MV) and Calculate Lateral Screen Motion (LatScrMotion) and Optical Density (OD)
<0
LatScrMotion ?
>0
4671
=0
4661
Clr-Clr
1180 Formulate & Tx Signal
4670
OD-Clr
4672
Clr-OD
4652
MV, L
4695


Fig. 46


4700
4790
4701
Analog A/V In
4705
A to D Converter
4715
f1
f2
f3
f4
4725
Motion Vector Detection
4740
Analog A/V Out
4695
3Deeps OD & Synch
4735
Memory Control In
Memory Control Out
Luminance
4780
Reformat Video
Digital A/V In
4702
4710
4720
4730
Digital A/V Out
1259

Fig. 47

4801 4803 4805 4807 4809 4811

4820

| Frame # | Left Lens OD | Right Lens OD | Motion Vector | Direction | Luminance |
|---|---|---|---|---|---|
| ⋮ | | | | | |
| n | | | | | |
| n+1 | | | | | |
| n+2 | | | | | |
| n+3 | | | | | |
| n+4 | | | | | |
| n+5 | | | | | |
| n+6 | | | | | |
| ⋮ | | | | | |

4800

Fig. 48




Fig. 49



5002
5000
2.0
Potential V=2.0V
5003
1.5
Transition Time (sec)
1.0
5022
0.8
5021
5012
0.5
0.4
5011
5010
5020
5001
0.0
0.0
Clear
0.3
0.6
0.9
1.2
1.5
Dark
5004
Optical Density
5005


Fig. 50



5002
5100
2.0
Potential V=2.0V
5103
1.5
5122
1.35
5121
Transition Time (sec)
1.0
0.5
5112
5111
0.25
5110
5120
5001
0.0
0.0
Clear
0.3
0.6
0.9
1.2
1.5
Dark
5004
Optical Density
5005


Fig. 51


Start
5201
5221
Next Frame signal
Signal Receiving Unit
5203
5200
5222
Left Potential
Set Left Lens Potential
5205
Set Right Lens Potential
5209
5232
Right Potential
5223
Left Duration
Calculate Left Lens Duration
5207
Calculate Right Lens Duration
5211
5233
Right Duration
Left Lens Control
5215
Right Lens Control
5213

Fig. 52


5300
Time
Video Frame
Video/3Deeps Processing
Display Video
3Deeps Sync/Control
$t_n$
5301
Frame n 1902
5303
5304
Display Frame n
5305
110
5309
5321
4695
5313
Video and 3Deeps Processing 1920
5314
$t_{n+1}$
5311
Frame n+1
5312
5322
Display Frame n+1
5315
110
101
5319
$t_{n+2}$
5321
Frame n+2
5322
5323
5324
Display Frame n+2
5325
110
5329

Fig. 53


5400
5485
Power
5401
5402
A/V
Frame In
5450
Sync
Unit
5461
A/V
Frame Out
5403
Algorithm
Parms
5410
Non
Volatile
Memory
5440
Optical
Density
Calc Unit
Sync
Signal
5462
5451
5431
Vel
5421
Frame Search
/ Parms
5420
Alg
OD
R
Right R
Lens OD
5463
5404
Motion
Vector Values
5421
Lateral
Motion
Determining
Unit
5441
Volatile
Memory
5432
Dir
Alg
5407
Luminance
Value
5405
Lum
OD
L
Left (L)
Lens OD
5412
5433
Algorithm
Select
5442
5452
5464
5406

Fig. 54



5500
5501
5485
Power
5403
Algorithm Parms
5510
Non Volatile Memory
5530
Optical Density Calc Unit
5520
Volatile Memory
5540
Delta (Δ) Lens OD
Alg
5505
Direction Value
5522
Dir 1
5521
Luminance Value
Lum 1
5531
Lens Change Indicator
5542
5405
5523
OD Last
OD Current
5525


Fig. 55



101
110
Rx
102
5600
5602
CU
ODIC
5501
103
105
104
Photodiode
4420
106


Fig. 56



Video Display Manager
5700
Processor
5710
Storage 5740
Video File
47000
Bridge Frame
Generator
5730
Frame Display
Module
5750


Fig. 57



Receive data comprising an image frame
5810
Generate a plurality of bridge frames that are visually dissimilar to the image frame
5820
Blend the image frame and the plurality of bridge frames, generating a plurality of blended frames
5830
Display the blended frames
5840


Fig. 58


Acquire a source video comprised of a sequence of 2D image frames
5910
Determine a value for an inter-ocular distance of a viewer
5920
Obtain an image frame from the source video that includes two or more motion vectors that describe motion in the image frame where each of the motion vectors is associated with a region of the image frame
5830
Calculate a single parameter for each of the following:
(a) a lateral speed of the image frame, using the two or more motion vectors, and
(b) a direction of motion of the image frame, using the two or more motion vectors
5840
Generate a deformation value by applying an algorithm that uses inter-ocular distant and both of the parameters
5850
Apply the deformation value to the image frame to identify a modified image frame
5860

Fig. 59A


Blend the modified image frames with a first bridge frame that is different from the modified image frame to generate a first blended frame
5970
Blend the modified image frames with a second bridge frame that is different from the modified image frame and different from the first bridge frame to generate a second blended frame
5980
Display the first blended frame and the second blended frame to the viewer, wherein the direction of motion and velocity of motion parameters in the calculation step are calculated only from the motion vectors input along with the image frame
5990

Fig. 59B

# FASTER STATE TRANSITIONING FOR CONTINUOUS ADJUSTABLE 3DEEPS FILTER SPECTACLES USING MULTI-LAYERED VARIABLE TINT MATERIALS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Continuation of U.S. patent application Ser. No. 15/683,623, filed Aug. 22, 2017, now U.S. Pat. No. 9,948,922, which is a Continuation of U.S. patent application Ser. No. 15/606,850, filed May 26, 2017, now U.S. Pat. No. 9,781,408, which is (I) a Continuation-In-Part application of U.S. patent application Ser. No. 15/217,612, filed Jul. 22, 2016, now U.S. Pat. No. 9,699,444, which is a Continuation of U.S. patent application Ser. No. 14/850750, filed Sep. 10, 2015, now U.S. Pat. No. 9,426,452, which is a Continuation of U.S. patent application Ser. No, 14/451, 048, filed Aug. 4, 2014, now U.S. Pat. No. 9,167,235, which is a Continuation of U.S. patent application Ser. No. 14/155, 505, filed Jan. 15, 2014, now U.S. Pat. No. 8,864,304, which is a Continuation of U.S. patent application Ser. No. 13/746, 393, filed Jan. 22, 2013, now U.S. Pat. No. 8,657,438, which is a Continuation of U.S. patent application Ser. No. 12/938, 495, filed Nov. 3, 2010, which is a Divisional of U.S. patent application Ser. No. 12/555,545, filed Sep. 8, 2009, now U.S. Pat. No. 7,850,304, which is a Continuation-in-Part application of U.S. patent application Ser. No. 12/274752, filed Nov. 20, 2008, now U.S. Pat. No. 7,604,348, which is a Continuation-In-Part application of U.S. patent application Ser. No. 11/928,152, filed Oct. 30, 2007, now U.S. Pat. No. 7,508,485, which is (a) a Continuation-In-Part of U.S. patent application Ser. No. 11/373,702, filed Mar. 10, 2006, now U.S. Pat. No. 7,405,801, which (1) is a nonprovisional of and claims priority to U.S. Provisional Application No. 60/661,847filed Mar. 15, 2005, and (2) is a Continuation-in-Part application of U.S. application Ser. No. 10/054,607, filed Jan. 22, 2002, now U.S. Pat. No. 7,030,902, which is a nonprovisional of and claims priority to U.S. Provisional Application No. 60/263,498 filed Jan. 23, 2001; and (b) a Continuation-In-Part of U.S. patent application Ser. No. 11/372,723, filed Mar. 10, 2006, now U.S. Pat. No. 7,522, 257, which (1) is a nonprovisional of and claims priority to U.S. Provisional Application No. 60/664,369, filed Mar. 23, 2005, and (2) is a Continuation-In-Part application of U.S. application Ser. No. 10/054,607, filed Jan. 22, 2002, now U.S. Pat. No. 7,030,902, which is a nonprovisional of and claims priority to U.S. Provisional Application No. 60/263, 498 filed Jan. 23, 2001; (II) a Continuation-In-Part application of U.S. patent application 14/850,629, filed Sep. 10, 2015, which is a Continuation of U.S. patent application Ser. No. 14/268,423, filed May 2, 2014, now U.S. Pat. No. 9,167,177, which is a Continuation of U.S. patent application Ser. No. 13/168,493, filed Jun. 24, 2011, now U.S. Pat. No. 8,750,382, which is (a) a Continuation-in-Part application of U.S. patent application Ser. No. 12/938,495, filed Nov. 3, 2010, the priority information for which is recited above, (b) a Continuation-In-Part application of U.S. patent application Ser. No. 12/555,482, filed Sep. 8, 2009, now U.S. Pat. No. 7,976,159, which is a Divisional of U.S. patent application Ser. No. 12/274,752, filed Nov. 20, 2008, now U.S. Pat. No. 7,604,348, the priority information for which is recited above, and (c) a nonprovisional of and claims priority to U.S. Provisional Application No. 61/398,981, filed Jul. 2, 2010; and (III) a Continuation-In-Part application of U.S. patent application Ser. No. 15/212,114, filed Jul.



15, 2016, now U.S. Pat. No. 9,716,874, which is a Divisional of U.S. patent application Ser. No. 14/566,205, filed Dec. 10, 2014, now U.S. Pat. No. 9,426,442, which is a Continuation of U.S. patent application Ser. No. 14/333,266, filed Jul. 16, 2014, now U.S. Pat. No. 8,941,919, which is a Continuation of U.S. patent application Ser. No. 14/149,293, filed Jan. 7, 2014, now U.S. Pat. No. 8,913,319, which is a Continuation of U.S. patent application Ser. No. 13/632,333, filed Oct. 1, 2012, now U.S. Pat. No. 8,657,439, which is a Continuation of U.S. patent application Ser. No.13/151,736, filed Jun. 2, 2011, now U.S. Pat. No. 8,303,112, which is a Continuation of U.S. patent application 12/555,482, filed Sep. 8, 2009, now U.S. Pat. No. 7,976,159, the priority information for which is recited above, the entire contents of each of which are herein incorporated by reference for all purposes.

## FIELD OF THE INVENTION

This invention relates to the field of motion pictures and to a system called 3Deeps that will allow almost any motion picture filmed in 2D (single image) to be viewed with the visual effect of 3-dimensions when viewed through 3Deeps Filter Spectacles. More specifically, the invention relates to (i) the presentation of motion pictures and to the use of multiple layers of electronically controlled variable tint materials to fabricate the right and left lenses of the 3Deeps Filter Spectacle to achieve faster transition times than may be achieved by the use of only a single layer, (ii) various means by which a motion vector and/or luminance measure that are associated with frames of the movie can be used to select an optimal optical density for the neutral density lens of the 3Deeps Filter Spectacles, and (iii) visual art and, more particularly, to systems, apparatus, and methods for producing an appearance of continuous movement using a finite number of images, i.e., as few as two images.

## BACKGROUND

This invention is, in part, directed to Continuous Adjustable 3Deeps Filter spectacles for viewing 2D movies as 3D movies. 3Deeps Filter Spectacles provide a system by which ordinary 2-dimensional motion pictures can be viewed in part as a 3-dimensional motion pictures. They however were a sub-optimal solution. In the presence of screen motion, they only developed 3D from a 2D movie by a difference in optical density between the right and left lens, but did not describe any objective optimal target for those optical densities. Neither did the previous version or 3Deeps Filter spectacles address optimization of the spectacles to account for the materials from which the lenses are fabricated.

3Deeps Filter Spectacles that incorporate such double optimization are called Continuous Adjustable 3Deeps Filter Spectacles. Previously, related patent applications for Continuous Adjustable 3Deeps Filter spectacles have been disclosed that use electronically controlled variable tint materials for fabrication of the right and left lenses of the viewing spectacles. Generally, electronically controlled variable tint materials change the light transmission properties of the material in response to voltage applied across the material, and include but are not limited to electrochromic devices, suspended particle devices, and polymer dispersed liquid crystal devices. Such material provides precise electronic control over the amount of light transmission.

3Deeps spectacles adjust the optical properties so that the left and right lenses of the 3Deeps spectacles take on one of 3 states in synchronization to lateral motion occurring within the movie; a clear-clear state (clear left lens and clear right

lens) when there is no lateral motion in successive frames of the motion picture; a clear-darkened state when there is left-to-right lateral motion in successive frame of the motion picture; and, a darkened-clear state when there is right-to-left lateral motion in successive frames of the motion picture.

We note that clear is a relative term and even clear glass will block a small percentage of light transmission. A clear lens is then one that transmits almost all light through the material.

Continuous Adjustable 3Deeps Filter spectacles are improved 3Deeps spectacles in that the darkened state continuously changes to take an optical density to provide the maximum Pulfrich stereoscopic 3D illusion optimized for (a) the speed and direction of lateral motion, and (b) the transition time of the electrochromic material from which the lenses are fabricated. Thus, Continuous Adjustable 3Deeps Filter Spectacles doubly optimize 3Deeps Filter Spectacles to maximize the target optical densities of the lenses, and to account for the lens material. Double optimization of the 3Deeps Filter Spectacles has substantial benefits and Continuous Adjustable 3Deeps Filter Spectacles solves substantial problems that 3Deeps Filter Spectacles could not address.

One problem addressed by this invention is that of slow transition time when transitioning between different optical densities of the lenses of the Continuous Adjustable 3Deeps Filter spectacles. Optimal control of Continuous Adjustable 3Deeps Filter spectacles is achieved by adjusting the right- and left-lenses to the optimal optical density synchronized to maximize the 3D effect of the Pulfrich illusion between frames of the motion picture with respect to the transition time properties of the electrochromic material. As an example, a movie that is shown on a 100 Hz digital TV may require as many as 100 different optical density controlled lens transitions per second to optimally synchronize to the speed and direction of lateral motion in the motion picture. Most often the transitions in synchronization to the movie are small minor adjustments to the optical density of the lens that can be accomplished in the allotted time. A problem arises when 3Deeps Filter spectacles are fabricated from electronically controlled variable tint materials that are incapable of the fast transition times that are sometimes required as for instance between scene changes. While electronically controlled variable tint materials may be able to achieve fast transitions from one optical density state to another optical density state that are near or close to each other, it may be incapable of transition between optical density states that are far apart. However, faster transition times using any electronically controlled variable tint material can be achieved by the simple expedient of using 2 or more layers—or multi-layers—of such material. Using multiple layers of material does result in a darker clear state, but the difference is minimal and barely perceptible, so the tradeoff between a slightly darker clear state and faster transition time is considered and warranted.

Another problem relates to the cycle life (number of clear-dark cycles before failure) of some optoelectronic materials that may be limited. The cycle life may be increased by using multiple layers of optoelectronic materials since the electric potential applied to the material to achieve a target optical density will be for a shorter period of time.

Another problem addressed by an alternate embodiment of this invention is that different methods of 3D require distinct viewing spectacles. However, with electronically controlled viewing spectacles, a single viewing spectacle can be switch selectable for different optical effects. For instance, to view a 3D movie that uses the anaglyph method to achieve 3D stereoscopy requires use of a different pair of spectacles (red-blue lenses) than that used for 3Deeps viewing. Other preferred embodiments of the invention relate to multi-use of the spectacles. The use of multi-layers of electronically controlled variable tint materials where different layers relate to different viewing methods, allow a single spectacle to be selectable to achieve different optical effects. For instance, while one or more layers of electronically controlled variable tint materials may be used for Continuous Adjustable 3Deeps Filter spectacles, another layer of materials may be used for anaglyph 3D spectacles. This would extend the use of a single pair spectacles so it can be selectively used for either Continuous Adjustable 3Deeps Filter spectacles viewing of 2D filmed movies or for anaglyph viewing of 3D filmed movies. It would also allow switching within any motion picture between 2D and 3D for a specific method, and/or switching within any motion picture between different methods of 3D. Till now a 3D motion picture may have been filmed in its entirety as anaglyph. With this invention the motion picture could have been filmed in part 2D with the multi-layer specs then set by signalization to a clear-clear state, and another part of the motion picture could have been filmed in 3D anaglyph with the multi-layer spectacles then set by signalization to a red-blue state. In another embodiment the picture may be filmed in part in 2D and 3D anaglyph, and shown to viewers in 2D, 3D using 3Deeps spectacle, and 3D anaglyph with the spectacles set accordingly.



Movies are generally made from a series of single, non-repetitive pictures which are viewed at a speed that provides the viewer with the appearance of continuous movement. These series of single pictures are positioned in adjacent picture frames, in sequential order, wherein adjacent pictures are substantially similar to each other and vary only slightly from each other. Usually, movies are created using movie cameras, which capture the actual movement of the object; with animated movies, a series of individual pictures or cells are created, usually by hand or computer, and assembled in sequential order where adjacent pictures of a scene are substantially similar to each other and vary only slightly. Standard film projection is 24 frames per second, American video standard NTSC is 30 f.p.s.

The appearance of continuous movement, using only two substantially similar pictures, has been accomplished in live performance by simultaneous projection of both images onto a screen, wherein one picture may be slightly off-set from the other picture as they appear on the screen, and by rotating a two-bladed propeller, wherein the propeller blades are set off from one another by 180 degrees, in front of and between the two projectors such that the two images are made to both alternate and overlap in their appearances, with both images in turn alternating with an interval of complete darkness onscreen when both projections are blocked by the spinning propeller. A viewer, using no special spectacles or visual aids, perceives a scene of limited action (with a degree of illusionary depth) that can be sustained indefinitely in any chosen direction: an evolving yet limited action appears to be happening continually without visible return-and-start-over repetition. Thus the viewer sees a visual illusion of an event impossible in actual life. Similarly, the manner in which things appear in depth are likely to be at odds, often extremely so, with the spatial character of the original photographed scene. Further, the character of movement and of depth has been made malleable in the hands of the projectionist during performance (so much so that such

film-performance has been likened to a form of puppetry); the physical shifting of one of the two projections changes the visual relationship between them and thereby the character of the screen event produced. Similarly, small changes during performance in speed, placement and direction of propeller spin will cause radical changes in the visual event produced onscreen.

Other visual arts which relate to the present invention are the Pulfrich filter. For one program, titled Bitemporal Vision: The Sea, viewers were invited to place a Pulfrich light-reducing filter before one eye to both enhance and transform the already apparent depth character of the presentation.

Limited to presentation in live performance, such unique visual phenomena as described has been transient theater. Attempts to capture the phenomena by way of video-camera recording of the screen-image have been disappointingly compromised, so that—in over 25 years of such presentation (of so-called Nervous System Film Performances) no attempt has been made to commercialize such recordings.

In addition, a number of products and methods have been developed for producing 3-D images from two-dimensional images. Steenblik in U.S. Pat. Nos. 4,597,634, 4,717,239, and 5,002,364 teaches the use of diffractive optical elements with double prisms, one prism being made of a low-dispersion prism and the second prism being made of a high-dispersion prism. Takahaski, et al in U.S. Pat. No. 5,144,344 teaches the use of spectacles based on the Pulfrich effect with light filtering lens of different optical densities. Beard in U.S. Pat. No. 4,705,371 teaches the use of gradients of optical densities going from the center to the periphery of a lens.

Hirano in U.S. Pat. No. 4,429,951 teaches the use of spectacles with lenses that can rotate about a vertical axis to create stereoscopic effects. Laden in U.S. Pat. No. 4,049,339 teaches the use of spectacles with opaque temples and an opaque rectangular frame, except for triangular shaped lenses positioned in the frame adjacent to a nosepiece.

Davino, U.S. Pat. No. 6,598,968, 3-Dimensional Movie and Television Viewer, teaches an opaque frame that can be placed in front of a user's eyes like a pair of glasses for 3-D viewing to take advantage of the Pulfrich effect. The frame has two rectangular apertures. These apertures are spaced to be in directly in front of the user's eyes. One aperture is empty; the other opening has plural vertical strips, preferably two, made of polyester film. Between the outer edge of the aperture and the outermost vertical strip is diffractive optical material. The surface of the strips facing away from the person's face might be painted black. Images from a television set or a movie screen appear three dimensional when viewed through the frame with both eyes open.

Dones, U.S. Pat. No. 4,805,988, Personal Viewing Video Device, teaches a personal video viewing device which allows the simultaneous viewing of a stereoscopic external image as well as a monoscopic electronic image. This is accomplished using two optical systems which share particular components. The relative intensity of both images may be adjusted using a three-iris system where each iris may be a mechanical diaphragm, an electronically controlled liquid crystal device, or a pair of polarized discs whose relative rotational orientation controls the transmissivity of the disc pair.

Beard in U.S. Pat. No. 4,893,898 teaches a method for creating a 3-D television effect in which a scene is recorded with a relative lateral movement between the scene and the recording mechanism. The recording is played back and viewed through a pair of viewer glasses in which one of the lenses is darker and has a spectral transmission characterized by a reduced transmissivity in at least one, and preferably all three, of the television's peak radiant energy wavebands. The lighter lens, on the other hand, has a spectral transmission characterized by a reduced transmissivity at wavelengths removed from the television energy peaks. The result is a substantially greater effective optical density differential between the two lenses when viewing television than in normal ambient light. This produces a very noticeable 3-D effect for television scenes with the proper movement, while avoiding the prior "dead eye" effect associated with too great a density differential in ordinary light. Further enhancement is achieved by providing the darker lens with a higher transmissivity in the blue and red regions than in the yellow or green regions.

Other patents deal with image processing to measure motion in a moving picture and include Iue U.S. Pat. No. 5,717,415, Nagaya U.S. Pat. No. 5,721,692 and Gerard De Haan U.S. Pat. No. 6,385,245.

Iue in U.S. Pat. No. 5,717,415 teaches a method of converting two-dimensional images into three-dimensional images. A right eye image signal and a left eye image signal between which there is relatively a time difference or a luminance difference are produced from a two-dimensional image signal, thereby to convert two-dimensional images into three-dimensional images.

In U.S. Pat. No. 5,721,692, Nagaya et al present a "Moving Object Detection Apparatus". In that disclosed invention, a moving object is detected from a movie that has a complicated background. In order to detect the moving object, there is provided a unit for inputting the movie, a display unit for outputting a processed result, a unit for judging an interval which is predicted to belong to the background as part of a pixel region in the movie, a unit for extracting the moving object and a unit for calculating the moving direction and velocity of the moving object. Even with a complicated background in which not only a change in illumination condition, but also a change in structure occurs, the presence of the structure change of the background can be determined so as to detect and/or extract the moving object in real time. Additionally, the moving direction and velocity of the moving object can be determined.

De Haan U.S. Pat. No. 6,385,245 teaches a method of estimating motion in which at least two motion parameter sets are generated from input video data. A motion parameter set is a set of parameters describing motion in an image, and by means of which motion can be calculated.

Visual effects are important in motion pictures and have the potential to expand the viewing enjoyment of moviegoers. For example, the movement effect "Bullet Time" utilized in the movie "The Matrix" was critical to the appeal of the movie.

Visual effects for 3-dimensional motion pictures include such motion pictures as "Charge at Feather River", starring Guy Madison. The Vincent Price movie "House of Wax" was originally released as a 3-D thriller. The 3-D movie fad of the early to mid-1950s however soon faded due to complexity of the technologies and potential for improper synchronization, and misalignment of left and right eye images as delivered to the viewer.

TV 3-D motion pictures have been attempted from time-to-time. Theatric Support produced the first TV Pulfrich event in 1989 for Fox Television-"The Rose Parade in 3D Live." In order to sustain the illusion of realistic depth these 3-D Pulfrich effect TV shows require all foreground screen action to move in one consistent direction, matched to the fixed light-diminishing lens of special spectacles provided to

viewers for each broadcast. This enormous constraint (for all screen action to proceed in one direction) placed on the producers of the motion picture is due to the realistic expectation that viewers were not going to invert their spectacles so as to switch the light-diminishing filter from one eye to another for each change in screen-action direction. For the great majority of viewers the limitation of spectacles with a fixed filter, either left or right, meant the 3D effect would be available only with movies produced specifically for that viewing spectacles design.

With the exception of Sony I-max 3-D presentations, which require special theater/screening facilities unique to the requirements of I-Max technology, 3-dimensional motion pictures remain a novelty. Despite the wide appeal to viewers, the difficulties and burden on motion picture producers, distributors, TV networks, motion picture theaters, and on the viewers has been a barrier to their wide scale acceptance. Among the problems and constraints involving the production, projection, and viewing of 3-dimensional motion pictures are:

Production: The commonly used anaglyph 3-dimensional movie systems require special cameras that have dual lenses, and capture 2-images on each frame. To have a version of the motion picture that can be viewed without special glasses requires that a separate version of the motion picture be shot with a regular camera so there is only one image per video frame and not simply the selection of one or the other perspective. Similarly, IMAX and shutter glass systems require special cameras and processing with separate versions of the motion picture for 2D and 3D viewing. Filming movies in 3D add as much as $10 million dollars to production costs, it has been reported.

Projection: Some 3-dimensional systems require the synchronization and projection by more than 2 cameras in order to achieve the effect. "Hitachi, Ltd has developed a 3D display called Transpost 3D which can be viewed from any direction without wearing special glasses, and utilize twelve cameras and rotating display that allow Transpost 3D motion pictures that can be seen to appear as floating in the display. The principle of the device is that 2D images of an object taken from 24 different directions are projected to a special rotating screen. On a large scale this is commercially unfeasible, as special effects in a motion picture must be able to be projected with standard projection equipment in a movie theater, TV or other broadcast equipment.

Viewing: As a commercial requirement, any special effect in a motion picture must allow viewing on a movie screen, and other viewing venues such as TV, DVD, VCR, PC computer screen, plasma and LCD displays. From the viewer's vantage, 3-dimensional glasses, whether anaglyph glasses or Pulfrich glasses, which are used in the majority of 3-dimensional efforts, if poorly made or worn incorrectly are uncomfortable and may cause undue eyestrain or headaches. Experiencing such headache motivates people to shy away from 3-D motion pictures.

Because of these and other problems, 3-dimensional motion pictures have never been more than a novelty. The inconvenience and cost factors for producers, special equipment projection requirements, and viewer discomfort raise a sufficiently high barrier to 3-dimensional motion pictures that they are rarely produced. One object of this invention is to overcome these problems and constraints.

The Human Eye and Depth Perception

The human eye can sense and interpret electromagnetic radiation in the wavelengths of about 400 to 700 nanometers—visual light to the human eye. Many electronic instruments, such as camcorders, cell phone cameras, etc., are also able to sense and record electromagnetic radiation in the band of wavelengths 400-700 nanometer.

To facilitate vision, the human eye does considerable image processing before the brain gets the image.

When light ceases to stimulate the eyes photoreceptors, the photoreceptors continue to send signals, or fire for a fraction of a second afterwards. This is called "persistence of vision", and is key to the invention of motion pictures that allows humans to perceive rapidly changing and flickering individual images as a continuous moving image.

The photoreceptors of the human eye do not "fire" instantaneously. Low light conditions can take a few thousands of a second longer to transmit signals than under higher light conditions. Causing less light to be received in one eye than another eye, thus causing the photoreceptors of the right and left eyes to transmit their "pictures" at slightly different times, explains in part the Pulfrich 3-D illusion, which is utilized in the invention of the 3Deeps system. This is also cause of what is commonly referred to as "night vision".

Once signals are sent to the eyes, the brain processes the dual images together (images received from the left and right eye) presenting the world to the mind in 3-dimensions or with "Depth Perception". This is accomplished by several means that have been long understood.

Stereopsis is the primary means of depth perception and requires sight from both eyes. The brain processes the dual images, and triangulates the two images received from the left and right eye, sensing how far inward the eyes are pointing to focus the object.

Perspective uses information that if two objects are the same size, but one object is closer to the viewer than the other object, then the closer object will appear larger. The brain processes this information to provide clues that are interpreted as perceived depth.

Motion parallax is the effect that the further objects are away from us, the slower they move across our field of vision. The brain processes motion parallax information to provide clues that are interpreted as perceived depth.

Shadows provide another clue to the human brain, which can be perceived as depth. Shading objects, to create the illusions of shadows and thus depth, is widely used in illustration to imply depth without actually penetrating (perceptually) the 2-D screen surface.

## SUMMARY OF THE INVENTION

A method has now been discovered for originating visual illusions of figures and spaces in continuous movement in any chosen direction using a finite number of pictures (as few as two pictures) that can be permanently stored and copied and displayed on motion picture film or electronic media. The method of the present invention entails repetitive presentation to the viewer of at least two substantially similar image pictures alternating with a third visual interval or bridging picture that is substantially dissimilar to the other substantially similar pictures in order to create the appearance of continuous, seamless and sustained directional movement.

Specifically, two or more image pictures are repetitively presented together with a bridging interval (a bridging picture) which is preferably a solid black or other solid-colored picture, but may also be a strongly contrasting image-picture readily distinguished from the two or more pictures that are substantially similar. In electronic media, the bridge-picture may simply be a timed unlit-screen pause between serial re-appearances of the two or more similar image pictures. The rolling movements of pictorial forms

thus created (figures that uncannily stay in place while maintaining directional movement, and do not move into a further phase of movement until replaced by a new set of rotating units) is referred to as Eternalisms, and the process of composing such visual events is referred to as Eternalizing.

The three film or video picture-units are arranged to strike the eyes sequentially. For example, where A and B are the image pictures and C is the bridging picture, the picture units are arranged (A, B, C). This arrangement is then repeated any number of times, as a continuing loop. The view of this continuing loop allows for the perception of a perceptual combining and sustained movement of image pictures (A, B). Naturally, if this loop is placed on a film strip, then it is arranged and repeated in a linear manner (A, B, C, A, B, C, A, B, C, A, B, C, etc.). The repetition of the sequence provides an illusion of continuous movement of the image pictures (A, B); with bridging picture (C), preferably in the form of a neutral or black frame, not consciously noticed by the viewer at all, except perhaps as a subtle flicker.

A more fluid or natural illusion of continuous movement from a finite number of image pictures is provided by using two of each of the three pictures and repeating the cycle of the pairs sequentially, or by blending adjacent pictures together on an additional picture-frame and placing the blended picture between the pictures in sequential order. The two image pictures (A, B) are now blended with each other to produce (A/B); the two image pictures are also blended with the bridging picture to produce (C/A and B/C), and then all pictures repeat in a series starting with the bridging picture (C, C/A, A, A/B, B, B/C) each blended picture being represented by the two letters with a slash therebetween). This series is repeated a plurality of times to sustain the illusion as long as desired. Repeating the sequence with additional blended frames provides more fluid illusion of continuous movement of the (optically combined) two image pictures (A, B).

Additionally, various arrangements of the pictures and the blends can be employed in the present invention and need not be the same each time. By varying the order of pictures in the sequence, the beat or rhythm of the pictures is changed. For example, A, B, C can be followed by A, A/B, B, B/C, C which in turn is followed by A, A, A/B, B, B, B, B/C, C, C, C, C, i.e. A, B, C, A, A/B, B, B/C, C, A, A, A/B, B, B, B, B/C, B/C, C, C, C, C, A, B, C, A, etc.

With A and B frames being similar images (such as a pair of normal two-eye perspective views of a three-dimensional scene from life), and frame C a contrasting frame (preferably a solid-color picture instead of an image-picture) relative to A,B, frame C acts as essentially a bridge-interval placed between recurrences of A,B. Any color can be used for the contrasting frame C: for example, blue, white, green; however, black is usually preferred. The contrasting frame can also be chosen from one of the colors in one of the two image pictures. For example, if one of the image pictures has a large patch of dark blue, then the color of the contrasting frame, bridging picture, may be dark blue.

Blending of the pictures is accomplished in any manner which allows for both pictures to be merged in the same picture frame. Thus, the term blending as used in the specification and claims can also be called superimposing, since one picture is merged with the other picture. Blending is done in a conventional manner using conventional equipment, suitably, photographic means, a computer, an optical printer, or a rear screen projection device. For animated art, the blending can be done by hand as in hand drawing or hand painting. Preferably, a computer is used. Suitable software programs include Adobe Photoshop, Media 100 and Adobe After Affects. Good results have been obtained with Media 100 from Multimedia Group Data Translations, Inc. of Marlborough, Mass., USA.



When using Media 100, suitable techniques include additive dissolving, cross-dissolving, and dissolving-fast fix and dither dissolving.

In blending the pictures, it is preferred to use 50% of one and 50% of the other. However, the blending can be done on a sliding scale, for example with three blended pictures, a sliding scale of quarters, i.e. 75% A/25% B, 50% A/50% B, 25% A/75% B. Good results have been obtained with a 50%/50% mix, i.e. a blend of 50% A/50% B.

The two image pictures, A and B, which are visually similar to each other, are preferably taken from side-by-side frame exposures from a motion picture film of an object or image or that is moving such that when one is overlaid with the other, only a slight difference is noted between the two images.

Alternatively, the two image pictures are identical except that one is off-center from the other. The direction of the off-center, e.g. up, down, right, or left, will determine which direction the series provides the appearance of movement, e.g. if image picture B is off-center from image picture A to the right of A, the series of C, C/A, A, A/B, B, B/C will have the appearance of moving from left to right. Likewise, if you reverse the order of appearance then the appearance of movement will be to the left.

More than two image pictures can be used in the invention. Likewise, more than one bridging picture can be used in the present invention. For example, four image pictures can be used along with one bridging picture. In this case, the series for the four image pictures, designated A, B, D and E, would be: C, A, B, D, E; or a 50/50 blend C, C/A, A, A/B, B, B/D, D, D/E, E, E/C; or side-by-side pairs, C, C, A, A, B, B, D, D, E, E.

The image picture need not fill the picture frame. Furthermore, more than one image picture can be employed per frame. Thus, the picture frame can contain a cluster of images and the image or images need not necessarily filling up the entire frame. Also, only portions of image pictures can be used to form the image used in the present invention.

Also, image pictures and portions of the image picture can be combined such that the combination is used as the second image picture. The portion of the image picture is offset from the first image picture when they are combined such that there is an appearance of movement. For example, a window from image picture A can be moved slightly while the background remains the same, the picture with the moved window is designated image picture B and the two combined to create the appearance of the window moving and/or enlarging or shrinking in size. In this case, both picture A and picture B are identical except for the placement of the window in the image picture. The same can also be done by using an identical background in both image pictures and superimposing on both pictures an image which is positioned slightly different in each picture. The image could be a window, as before, of a man walking, for example.

The number of series which are put together can be finite if it is made on a length of film or infinite if it is set on a continuous cycle or loop wherein it repeats itself.

In accordance with an embodiment, an electrically controlled spectacle for viewing a video is provided. The electrically controlled spectacle includes a spectacle frame and optoelectronic lenses housed in the frame. The lenses comprise a left lens and a right lens, each of the optoelectrical lenses having a plurality of states, wherein the state of

the left lens is independent of the state of the right lens. The electrically controlled spectacle also includes a control unit housed in the frame, the control unit being adapted to control the state of each of the lenses independently.

In one embodiment, each of the lenses has a dark state and a light state.

In another embodiment, when viewing a video the control unit places both the left lens and the right lens to a dark state.

In another embodiment, a method for viewing a video is provided. A user wears the electrically controlled spectacle described above, and the wearer is shown a video having dissimilar bridge frames and similar image frames.

In accordance with another embodiment, a first modified image frame is determined by removing a first portion of a selected image frame. A second modified image frame different from the first modified image frame is determined by removing a second portion of the selected image frame. A third modified image frame different from the first and second modified image frames is determined by removing a third portion of the selected image frame. A first bridge image frame different from the selected image frame and different from the first, second, and third modified image frames is determined. A second bridge image frame different from the selected image frame, different from the first, second, and third modified image frames, and different from the first bridge image frame is determined. The first bridge image frame is blended with the first modified image frame, generating a first blended image frame. The first bridge image frame is blended with the second modified image frame, generating a second blended image frame. The first bridge image frame is blended with the third modified image frame, generating a third blended image frame. The first blended image frame, the second blended image frame, and the third blended image frame are overlaid to generate an overlayed image frame. The overlayed image frame and the second bridge image frame are displayed.

In one embodiment, the first bridge image frame comprises a non-solid color.

In another embodiment, each of the optoelectronic lenses comprises a plurality of layers of optoelectronic material.

In accordance with another embodiment, a first modified image frame is determined by removing a first portion of a selected image frame. A second modified image frame different from the first modified image frame is determined by removing a second portion of the selected image frame. A third modified image frame is determined by removing a third portion of the first modified image frame. A fourth modified image frame different from the third modified image frame is determined by removing a fourth portion of the first modified image frame. A fifth modified image frame different from the third and fourth modified image frames is determined by removing a fifth portion of the first modified image frame. A sixth modified image frame is determined by removing a sixth portion of the second modified image frame. A seventh modified image frame different from the sixth modified image frame is determined by removing a seventh portion of the second modified image frame. An eighth modified image frame different from the sixth and seventh modified image frames is determined by removing an eighth portion of the second modified image frame. A first bridge image frame different from the first and second modified image frames is determined. A second bridge image frame different from the first and second modified image frames, and different from the first bridge image frame is determined. A third bridge image frame different from the first and second modified image frames, and different from the first and second bridge image frames is determined. A fourth bridge image frame different from the first and second modified image frames, and different from the first, second and third bridge image frames is determined. A first blended image frame is generated by blending the third modified image frame with the first bridge image frame. A second blended image frame is generated by blending the fourth modified image frame with the second bridge image frame. A third blended image frame is generated by blending the fifth modified image frame with the third bridge image frame. The first blended image frame, the second blended image frame, the third blended image frame, and the fourth bridge image frame are displayed. A fourth blended image frame is generated by blending the sixth modified image frame with the first bridge image frame. A fifth blended image frame is generated by blending the seventh modified image frame with the second bridge image frame. A sixth blended image frame is generated by blending the eighth modified image frame with the third bridge image frame. The fourth blended image frame, the fifth blended image frame, the sixth blended image frame, and the fourth bridge image frame are displayed.

In one embodiment, the fourth bridge image frame is solid white, and the spectacle frame comprises a sensor adapted to receive synchronization signals embedded in the video and provide the synchronization signals to the control unit.

In accordance with another embodiment, a first modified image frame is determined by removing a first portion of a selected image frame. A second modified image frame different from the first modified image frame is determined by removing a second portion of the selected image frame. A third modified image frame different from the first and second modified image frames is determined by removing a third portion of the selected image frame. A bridge image frame different from the selected image frame and different from the first, second, and third modified image frames is determined. The first modified image frame, the second modified image frame, and the third modified image frame are overlaid, to generate an overlayed image frame. The overlayed image frame and the bridge image frame are displayed.

In accordance with another embodiment, a bridge image frame that is different from a first image frame and different from a second image frame is determined, the first and second image frames being consecutive image frames in a video. A first modified image frame is determined by removing a first portion of the first image frame. A second modified image frame different from the first modified image frame is determined by removing a second portion of the first image frame. A third modified image frame different from the first and second modified image frames is determined by removing a third portion of the first image frame. The first, second, and third modified image frames are overlaid to generate a first overlayed image frame. The first overlayed image frame and the bridge image frame are displayed. A fourth modified image frame is determined by removing a fourth portion of the second image frame. A fifth modified image frame different from the fourth modified image frame is determined by removing a fifth portion of the second image frame. A sixth modified image frame different from the fourth and fifth modified image frames is determined by removing a sixth portion of the second image frame. The fourth, fifth, and sixth modified image frames are overlaid to generate a second overlayed image frame. The second overlayed image frame and the bridge image frame are displayed.

In accordance with another embodiment, a first modified image frame is determined by removing a first portion of a

selected image frame. A second modified image frame different from the first modified image frame is determined by removing a second portion of the selected image frame. A third modified image frame different from the first and second modified image frames is determined by removing a third portion of the selected image frame. A first bridge image frame different from the first, second, and third modified image frames is determined. A second bridge image frame different from the first, second, and third modified image frames, and different from the first bridge image frame is determined. A third bridge image frame different from the first, second, and third modified image frames, and different from the first and second bridge image frames is determined. A fourth bridge image frame different from the first, second, and third modified image frames, and different from the first, second and third bridge image frames is determined. The first modified image frame is blended with the first bridge image frame to generate a first blended image frame. The second modified image frame is blended with the second bridge image frame to generate a second blended image frame. The third modified image frame is blended with the third bridge image frame to generate a third blended image frame. The first blended image frame, the second blended image frame, and the third blended image frame are overlaid to generate an overlayed image frame. The overlayed image frame and the fourth bridge image frame are displayed.

In one embodiment, the fourth bridge image frame is solid white, and the spectacle frame comprises a sensor adapted to receive synchronization signals embedded in the video and provide the synchronization signals to the control unit.

In accordance with another embodiment, a first modified image frame is determined by removing a first portion of a selected image frame. A second modified image frame different from the first modified image frame is determined by removing a second portion of the selected image frame. A third modified image frame is determined by removing a third portion of the first modified image frame. A fourth modified image frame different from the third modified image frame is determined by removing a fourth portion of the first modified image frame. A fifth modified image frame different from the third and fourth modified image frames is determined by removing a fifth portion of the first modified image frame. A sixth modified image frame is determined by removing a sixth portion of the second modified image frame. A seventh modified image frame different from the sixth modified image frame is determined by removing a seventh portion of the second modified image frame. An eighth modified image frame different from the sixth and seventh modified image frames is determined by removing an eighth portion of the second modified image frame. A first bridge image frame different from the first, second, third, fourth, fifth, sixth, seventh, and eight modified image frames is determined. A second bridge image frame different from the first bridge image frame and different from the first, second, third, fourth, fifth, sixth, seventh, and eight modified image frames is determined. The first bridge image frame is blended with the third modified image frame to generate a first blended image frame. The first bridge image frame is blended with the fourth modified image frame to generate a second blended image frame. The first bridge image frame is blended with the fifth modified image frame to generate a third blended image frame. The first blended image frame, the second blended image frame, and the third blended image frame are overlaid to generate a first overlayed image frame. The first overlayed image frame and the second bridge image frame are displayed. The first bridge image frame is blended with the sixth modified image frame to generate a fourth blended image frame. The first bridge image frame is blended with the seventh modified image frame to generate a fifth blended image frame. The first bridge image frame is blended with the eighth modified image frame to generate a sixth blended image frame. The fourth blended image frame, the fifth blended image frame, and the sixth blended image frame are overlaid to generate a second overlayed image frame. The second overlayed image frame and the second bridge image frame are displayed.

In one embodiment, the first bridge image frame comprises a non-solid color.

In accordance with another embodiment, one or more of the following actions may be performed in performing one or more of the methods described above: generating a blended image frame by blending a plurality of image frames, generating a combined image frame by combining a plurality of image frames, generating a combined image sequence by combining a plurality of image sequences, generating one or more doubled image frames by doubling one or more image frames, generating an overlayed image frame by overlaying a plurality of image frames, generating a modified image frame by removing a portion of an image frame, repeating one of an image frame or a series of image frames, generating a sequence of image frames, generating a collage based on one or more portions of one or more image frames, stitching together one or more portions of one or more image frames, superimposing a first image frame on a second image frame, determining a transitional frame, inserting and/or lifting a portion of a first image frame into a second image frame, reshaping a portion of an image frame, and relocating a portion of an image frame.

In accordance with an embodiment, an apparatus includes a storage adapted to store one or more image frames, and a processor. The processor is adapted to determine a first modified image frame by removing a first portion of a selected image frame, determine a second modified image frame different from the first modified image frame by removing a second portion of the selected image frame, determine a third modified image frame different from the first and second modified image frames by removing a third portion of the selected image frame, determine a first bridge image frame different from the selected image frame and different from the first, second, and third modified image frames, determine a second bridge image frame different from the selected image frame, different from the first, second, and third modified image frames, and different from the first bridge image frame, blend the first bridge image frame with the first modified image frame, generating a first blended image frame, blend the first bridge image frame with the second modified image frame, generating a second blended image frame, blend the first bridge image frame with the third modified image frame, generating a third blended image frame, overlay the first blended image frame, the second blended image frame, and the third blended image frame to generate an overlayed image frame, display the overlayed image frame, and display the second bridge image frame.

In one embodiment, the apparatus also includes an electrically controlled spectacle to be worn by a viewer. The electrically controlled spectacle includes a spectacle frame, optoelectronic lenses housed in the frame, the lenses comprising a left lens and a right lens, each of the optoelectrical lenses having a plurality of states, wherein the state of the left lens is independent of the state of the right lens, and a control unit housed in the frame, the control unit being

adapted to control the state of each of the lenses independently. Each of the lenses has a dark state and a light state, and when viewing a video the control unit places both the left lens and the right lens to a dark state.

In another embodiment, the first bridge image frame comprises a non-solid color.

In accordance with another embodiment, an apparatus includes a storage adapted to store one or more image frames, and a processor. The processor is adapted to determine a first modified image frame by removing a first portion of a selected image frame, determine a second modified image frame different from the first modified image frame by removing a second portion of the selected image frame, determine a third modified image frame by removing a third portion of the first modified image frame, determine a fourth modified image frame different from the third modified image frame by removing a fourth portion of the first modified image frame, determine a fifth modified image frame different from the third and fourth modified image frames by removing a fifth portion of the first modified image frame, determine a sixth modified image frame by removing a sixth portion of the second modified image frame, determine an seventh modified image frame different from the sixth modified image frame by removing a seventh portion of the second modified image frame, determine an eighth modified image frame different from the sixth and seventh modified image frames by removing an eighth portion of the second modified image frame, determine a first bridge image frame different from the first, second, third, fourth, fifth, sixth, seventh, and eight modified image frames, determine a second bridge image frame different from the first bridge image frame and different from the first, second, third, fourth, fifth, sixth, seventh, and eight modified image frames, blend the first bridge image frame with the third modified image frame to generate a first blended image frame, blend the first bridge image frame with the fourth modified image frame to generate a second blended image frame, blend the first bridge image frame with the fifth modified image frame to generate a third blended image frame, overlay the first blended image frame, the second blended image frame, and the third blended image frame to generate a first overlayed image frame, display the first overlayed image frame and the second bridge image frame, blend the first bridge image frame with the sixth modified image frame to generate a fourth blended image frame, blend the first bridge image frame with the seventh modified image frame to generate a fifth blended image frame, blend the first bridge image frame with the eighth modified image frame to generate a sixth blended image frame, overlay the fourth blended image frame, the fifth blended image frame, and the sixth blended image frame to generate a second overlayed image frame, and display the second overlayed image frame and the second bridge image frame.

In one embodiment, the apparatus also includes an electrically controlled spectacle to be worn by a viewer.

In another embodiment, the first bridge image frame comprises a non-solid color.

In accordance with another embodiment, a system for presenting a video is provided. The system includes an apparatus comprising a storage adapted to store one or more image frames associated with a video, and a processor. The processor is adapted to reshape a portion of at least one of the one or more image frames. The system also includes an electrically controlled spectacle which includes a spectacle frame, optoelectronic lenses housed in the frame, the lenses comprising a left lens and a right lens, each of the optoelectrical lenses having a plurality of states, wherein the state of the left lens is independent of the state of the right lens, and a control unit housed in the frame, the control unit being adapted to control the state of each of the lenses independently. Each of the lenses has a dark state and a light state. When viewing the video the control unit places both the left lens and the right lens to a dark state.

In accordance with another embodiment, an apparatus includes a storage adapted to store one or more image frames, and a processor. The processor is adapted to obtain a first image from a first video stream, obtain a second image from a second video stream, wherein the first image is different from the second image, stitching together the first image and the second image to generate a stitched image frame, generating a first modified image frame by removing a first portion of the stitched image frame, generating a second modified image frame by removing a second portion of the stitched image frame, generating a third modified image frame by removing a third portion of the stitched image frame, wherein the first modified image frame, the second modified image frame, and the third modified image frame are different from each other, identify a bridge frame, blend the first modified image frame with the bridge frame to generate a first blended frame, blend the first modified image frame with the bridge frame to generate a first blended frame, blend the first modified image frame with the bridge frame to generate a first blended frame, overlay the first blended frame, the second blended frame, and the third blended frame to generate a combined frame, and display the combined frame.

In one embodiment, the apparatus also includes spectacles adapted to be worn by a viewer of a video.

In another embodiment, the bridge frame includes a non-solid color.

In accordance with yet another embodiment, a method of displaying one or more frames of a video is provided. Data comprising a compressed image frame and temporal redundancy information is received. The image frame is decompressed. A plurality of bridge frames that are visually dissimilar to the image frame are generated. The image frame and the plurality of bridge frames are blended, generating a plurality of blended frames, and the plurality of blended frames are displayed.

In one embodiment, the image frame is decompressed based on the temporal redundancy information.

In another embodiment, the data comprises a compressed video file associated with a compression format that uses temporal redundancy to achieve compression of video data. For example, the data may comprise an MPEG compressed video file.

In another embodiment, each bridge frame comprises a solid black picture, a solid colored picture, or a timed unlit-screen pause.

In another embodiment, the plurality of blended frames are displayed in accordance with a predetermined pattern.

In another embodiment, the plurality of blended frames are displayed in accordance with a predetermined pattern that includes a first pattern comprising the plurality of blended frames, and a second pattern that comprises repetition of the first pattern.

In accordance with another embodiment, an apparatus includes a storage configured to store a compressed image frame and temporal redundancy information, and a processor configured to receive the compressed image frame and the temporal redundancy information, decompress the image frame, and generate a plurality of bridge frames that are visually dissimilar to the image frame. The plurality of bridge frames includes a first bridge frame having a first

width, the first bridge frame comprising a first white rectangle in an upper portion of the first bridge frame, the first white rectangle having the first width, and a second bridge frame having a second width, the second bridge frame comprising a second dark rectangle in an upper portion of the second bridge frame, the second dark rectangle having the second width. The processor is further configured to blend the image frame and the plurality of bridge frames, generating a plurality of blended frames, wherein the plurality of blended frames include a first blended frame that includes the first portion of the image frame in an upper portion of the first blended frame, and a second blended frame that includes the second dark rectangle in an upper portion of the second blended frame. The processor is also configured to display the plurality of blended frames consecutively within a video.

In another embodiment, the processor is further configured to decompress the image frame based on the temporal redundancy information.

In another embodiment, the data comprises a compressed video file associated with a compression format that uses temporal redundancy to achieve compression of video data.

In another embodiment, each bridge frame comprises a timed unlit-screen pause.

In another embodiment, the processor is further configured to display the plurality of blended frames in accordance with a predetermined pattern.

In another embodiment, the processor is further configured to display the blended frames in accordance with a predetermined pattern that includes a first pattern comprising the plurality of blended frames, and a second pattern that comprises repetition of the first pattern.

In another embodiment, the plurality of bridge frames comprise a first bridge frame having a first pattern and a second bridge frame having a second pattern that is complementary to the first pattern.

In accordance with still a further embodiment of the invention, a method for generating modified video is provided. A source video comprising a sequence of 2D image frames is acquired, and an image frame that includes two or more motion vectors that describe motion in the image frame is obtained from the source video, wherein each of the motion vectors is associated with a region of the image frame. A respective parameter is calculated for each of the following: (a) a lateral speed of the image frame, using the two or more motion vectors, and (b) a direction of motion of the image frame, using the two or more motion vectors. A deformation value is generated by applying an algorithm that uses both of the parameters, and the deformation value is applied to the image frame to identify a modified image frame. The modified image frame is blended with a bridge frame that is a non-solid color and is different from the modified image frame, to generate a blended frame. The direction of motion and velocity of motion parameters in the calculating step are calculated only from the motion vectors input along with the image frame.

In one embodiment, a viewer views the modified video through spectacles. The spectacles have a left and right lens, and each of the left lens and right lens has a darkened state. Each of the left and right lenses has a darkened state and a light state, the state of the left lens being independent of the state of the right lens.

In another embodiment, the spectacles also include a battery, a control unit and a signal receiving unit. The control unit may be adapted to control the state of the each of the lenses independently. In another embodiment, the left and right lenses comprise one or more electro-optical materials. In another embodiment, the blended frame is displayed to a viewer.

In accordance with another embodiment, a method for generating modified video is provided. A source video including a sequence of 2D image frames is acquired, and a modified image frame is obtained based on a selected one of the image frames of the source video. The modified image frame is blended with a bridge frame that is a non-solid color and is different from the modified image frame, to generate a blended frame.

In one embodiment, the selected image frame comprises two or more motion vectors that describe motion in the selected image frame, wherein each of the motion vectors is associated with a region of the selected image frame. A respective parameter is calculated for each of the following: (a) a lateral speed of the selected image frame, using the two or more motion vectors, and (b) a direction of motion of the selected image frame, using the two or more motion vectors. A deformation value is generated by applying an algorithm that uses both of the parameters, and the deformation value is applied to the image frame to identify a modified image frame. In one embodiment, the direction of motion and velocity of motion parameters in the calculation step are calculated only from the motion vectors.

In accordance with another embodiment, a method for generating modified video is provided. A source video comprising a sequence of 2D image frames is acquired, a first image frame and a second image frame in the source video are identified, the first image frame and the second image frame are combined to generate a modified image frame, and the modified image frame is blended with a bridge frame that is a non-solid color, different from the modified image frame, different from the first image frame, and different from the second image frame, to generate a blended frame. In one embodiment, the first image frame and the second image frame are similar.

Many advantages, features, and applications of the invention will be apparent from the following detailed description of the invention that is provided in connection with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **2***a* shows a left lens of Continuous Adjustable 3Deeps Filter Spectacles fabricated from a single layer of electrochromic material.

FIG. **2***b* shows details of an electrochromic device for fabricating the electronically controlled variable tint material of the right and left lenses of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **3** is a block diagram of the operation of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **4** is a flow chart showing the operation of the Control Unit of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **5** is a perspective view of the second preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles fabricated from multiple layers of electrochromic material.

FIG. **6***a* shows a left lens of Continuous Adjustable 3Deeps Filter Spectacles fabricated from multiple layers of electrochromic material.

FIG. **6***b* shows details of a multiple layered electrochromic device for fabricating the electronically controlled vari-

able tint material of the right and left lenses of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **7** is a block diagram of the operation of the Continuous Adjustable 3Deeps Filter Spectacles using a multiple layered electrochromic device for fabricating the electronically controlled variable tint material of the right and left lenses.

FIG. **8** is a flow chart showing the operation of the Control Unit of the Continuous Adjustable 3Deeps Filter Spectacles using a multiple layered electrochromic device for fabricating the electronically controlled variable tint material of the right and left lenses.

FIG. **9** is a transition time curve for a single layer of electrochromic material with transition time as a function of transmissivity.

FIG. **10** is a transition time curve for a double layer (multi-layer) of electrochromic material with transition time as a function of transmissivity.

FIG. **11** is a perspective view of the third preferred embodiment of the multi-use Continuous Adjustable 3Deeps Filter Spectacles with single-layered lenses.

FIG. **12** is a block diagram of the operation of the multi-use Continuous Adjustable 3Deeps Filter Spectacles with single-layered lenses.

FIG. **13** is a flow chart showing the operation of the Control Unit of the multi-use Continuous Adjustable 3Deeps Filter Spectacles with single-layered lenses.

FIG. **14** is a perspective view of the fourth preferred embodiment of the multi-use Continuous Adjustable 3Deeps Filter Spectacles with multi-layered lenses.

FIG. **15***a* shows a left lens of Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles fabricated from multiple layers of electrochromic materials.

FIG. **15***b* shows details of a Multi-Use electrochromic device for fabricating the electronically controlled variable tint material of the right and left lenses of the Multi-Use Electrically Controlled 3Deeps Continuous Adjustable 3Deeps Filter Spectacles using multi-layered lenses.

FIG. **16** is a block diagram of the operation of the multi-use Continuous Adjustable 3Deeps Filter Spectacles with multi-layered lenses.

FIG. **17** is a flow chart showing the operation of the Control Unit of the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles with multi-layered lenses.

FIGS. **18** *a*-**18** *c* illustrates the present invention with three pictures.

FIGS. **19** *a*-**19** *c* illustrates the present invention using three pictures along with blended pictures.

FIGS. **20** *a*-**20** *c* illustrates the present invention using the same picture wherein one is offset from the other.

FIGS. **21** *a*-**21** *b* illustrates the present invention with side-by-side pairs of pictures.

FIGS. **22** *a*-**22** *c* illustrates the present invention wherein pictures G and H are identical but image F has been imposed in a slightly different location.

FIGS. **23** *a*-**23** *c* illustrates pictures of two women in Eternalism with two pictures.

FIGS. **24** *a*-**24** *c* illustrates the women of FIG. **6** with a 50-50 blend between the women and the women and the bridging frame.

FIGS. **25** *a*-**25** *c* illustrates the same women in two different perspectives (not apparent to normal viewing as pictured here), joined to create an Eternalism.

FIGS. **26** *a*-**26** *b* illustrates the doubling of the frames from FIG. **6**.

FIGS. **27** *a*-**27** *c* illustrates the two women with a smaller frame depicting a portion of one woman repeated and overlayed in the upper left-hand corner of the frame to create a separate depth-configuration within the larger frame.

FIG. **28** illustrates a combination of the two women with a portion of the one woman both in the bridging frame as well as in one of the frames that contain both women.

FIG. **29** illustrates Eternalism with two women and a circle moving through the frames.

FIG. **30** illustrates the Pulfrich filter.

FIG. **31** shows components of a video display manager in accordance with an embodiment.

FIG. **32** is a flowchart of a method of decompressing and displaying one or more image frames in accordance with an embodiment.

FIG. **33** shows an image frame in accordance with an embodiment;

FIGS. **34**A-**34**B show respective bridge frames in accordance with an embodiment.

FIGS. **35**A-**35**B show respective blended frames in accordance with an embodiment.

FIG. **35**C shows a pattern comprising a plurality of blended frames in accordance with an embodiment.

FIG. **35**D shows a predetermined pattern that includes repetition of a second pattern that comprises a plurality of blended frames in accordance with an embodiment.

FIG. **36** is a high-level block diagram of an exemplary computer that may be used to implement certain embodiments.

FIG. **37** shows a typical curve of retinal reaction time as a function of luminosity.

FIG. **38**A shows the operation of the Pulfrich illusion when there is no horizontal foreground motion in the motion picture.

FIG. **38**B shows the operation of the Pulfrich illusion when the motion picture exhibits horizontal foreground motion from the right to the left.

FIG. **38**C shows the operation of the Pulfrich illusion when the motion picture exhibits horizontal foreground motion from the left to the right.

FIG. **39** uses the typical curve of retinal reaction time as a function of luminosity to explain the operation of cardboard Pulfrich Filter spectacles with fixed lenses.

FIG. **40** uses the typical curve of retinal reaction time as a function of luminosity to demonstrate how to compute from a motion vector and luminosity the optimal optical density for the neutral density lens of the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles so that the difference in retinal reaction time between the viewer's eyes results in instant and lagging images that correspond to a separation on the display monitor of exactly 2½ inches.

FIG. **41** shows an algorithm that can be used to calculate the optimal optical density for the neutral density filter of the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **42** is an illustration of an alternate algorithm to characterize lateral motion in a motion picture.

FIG. **43** uses the typical curve of retinal reaction time as a function of luminosity to demonstrate a first alternate embodiment for computing an optimal optical density for the neutral density lens of the Continuous Adjustable 3Deeps Filter Spectacles so that the difference in retinal reaction time between the viewer's eyes is a constant value.

FIG. **44** shows Continuous Adjustable 3Deeps Filter Spectacles that include a photo-detector.

FIG. **45** uses the typical curve of retinal reaction time as a function of luminosity to demonstrate a second alternate embodiment for computing an optimal optical density for the neutral density lens of the Continuous Adjustable 3Deeps Filter Spectacles so that the difference in retinal reaction time between the viewer's eyes corresponds to a fixed number of frames of the motion picture.

FIG. **46** is a flowchart showing the use of a format conversion semiconductor chip to compute the Continuous Adjustable 3Deeps Filter Spectacles synchronization information.

FIG. **47** is a block diagram showing the operation of the Video and 3Deeps processing used to calculate the optimal optical density of the neutral density filter in the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **48** is a table showing control information for the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **49** shows a typical operating characteristic curve for an electrochromic material with optical density as a function of voltage.

FIG. **50** is a first example of a transition time curve for an electrochromic material with transition time as a function of optical density.

FIG. **51** is a second example of a transition time curve for an electrochromic material with transition time as a function of optical density.

FIG. **52** is a block diagram showing the operation of the control unit of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **53** is a block diagram showing the operation of a typical the Continuous Adjustable 3Deeps Filter Spectacles system.

FIG. **54** is a block diagram for a preferred embodiment of an IC Chip generating optimum optical density signals for each individual lens of a Continuous Adjustable 3Deeps Filter Spectacle.

FIG. **55** is a block diagram of an alternate embodiment of an IC chip generating the change in optical density signals for each individual lens of a Continuous Adjustable 3Deeps Filter Spectacle.

FIG. **56** shows Continuous Adjustable 3Deeps Filter Spectacles that include an IC chip generating the change in optical density signals for each individual lens of a Continuous Adjustable 3Deeps Filter Spectacle.

FIG. **57** shows components of a video display manager in accordance with an embodiment.

FIG. **58** is a flowchart of a method of displaying one or more image frames in accordance with an embodiment.

FIGS. **59**A-**59**B comprise a flowchart of a method of generating modified video in accordance with an embodiment.

## DETAILED DESCRIPTION

References will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings. Wherever possible, the same reference numbers will be used throughout the drawings to refer to the same or like parts.

To help understand the invention the following summary of inventive work from the previous related patent disclosures is provided. The purpose of this section then is to explain the ground that has been covered in previous related patents and then identify the problems that this current patent application addresses and solves.

The Pulfrich Illusion

There is a well-studied stereoscopic illusion called the Pulfrich illusion in which the illusion of 3D is invoked by differentially shading the left and right eye. Anyone watching TV through special viewing glasses can see the illusion. One way to construct the special Pulfrich viewing glasses is to take sunglasses and remove the left lens, so that the left eye views the TV screen unobstructed and the right eye views the TV screen through the darkened sunglass lens. With such Pulfrich viewing spectacles all screen motion from left-to-right will be in 3D. The illusion is based on basic eye mechanics—the shaded lens causes the eye to send the image to the brain later than unshaded eye. If the time difference is 1/10 second than on a 100 Hz digital TV the difference is 10 screen images, which is enough to produce a vivid illusion of 3D in the presence of moderate lateral motion. The image processing part of the brain puts the two disparate images together as depth. This is a pure optical illusion that has nothing to do with how a motion picture is filmed.

The Pulfrich illusion has been used for more than 50 years to produce 3D movies, using cardboard viewing spectacles with a clear left lens and dark transparent right lens. Pulfrich 3D motion pictures have been produced including such offerings as the 1971 feature length movie I, Monster Starring Christopher Lee as well as selected scenes from the 1997 second season finale of the network TV sitcom Third Rock From The Sun. However there is a problem in that the special Pulfrich viewing glasses impose severe constraints on both the movie and viewing venue.

More specifically, the problem then is that for any special viewing spectacles with lenses of a fixed optical density, the lighting, and speed and direction of screen motion have to be in exactly proper alignment to get an optimal 3D effect that is comparable to other 3D methods such as anaglyph (blue-red viewing spectacles). That conjunction of light and motion rarely happens so Pulfrich is not considered a viable approach to 3D movies or TV. Movies made for viewing using the Pulfrich illusion are best viewed in darkened venues, and if the same movie is viewed in a brightly lit venue the illusion is diminished or may even totally disappear.

These problems could be addressed if dynamic Pulfrich viewing spectacles could be constructed that self-configured themselves to the light and motion instant in a motion picture. However, such dynamic viewing spectacles still must be totally passive to the viewer.

3Deeps Systems Proposed in the Earliest Related Patent Applications

Early solutions provided dynamic Pulfrich viewing spectacles (called 3Deeps viewing spectacles) that could be synchronized to the movies. These solutions utilized neutral optoelectronic lenses (transmissivity of visible light) that are controllable by an electric potential. The lenses could take any of three states; clear left lens and clear right lens (clear-clear) when there is no screen motion; clear left lens and dark right lens (clear-dark) when screen motion is from left to right; and, dark left lens and clear right lens (dark-clear) when the screen motion is from right to left. Wired or wireless signals (Infrared, radio, or sound) synchronized the 3Deeps viewing spectacles to the movies. These early solutions also addressed how to calculate the lateral motion between frames of a motion picture and the synchronization controllers that calculated and transmitted the motion vector information to the 3Deeps viewing spectacles. The proposed solution had significant benefits and advantages including:

Every movie ever made—without additional alteration or processing—could be viewed in 3D when wearing 3Deeps spectacles

A movie could be viewed simultaneously by viewers with or without 3Deeps spectacles, and

No changes are required to any broadcast standards, cinema formatting, viewing venue, or viewing monitors

It should be understood, that the natural view of the world that viewer's expect of cinema is 3-dimensional, and to any movie viewer with binocular vision, it is the screen flatness of 2D that is strange and unnatural. From the earliest days of motion pictures cinematographers have used light and lateral movement as cues to help the viewer translate 2D screen flatness into their binocular vision expectations. But light and lateral motion are precisely the factors that elicit the Pulfrich illusion, so when movies are produced, cinematographers and lighting specialists stress precisely the features that the 3Deeps systems can translate into the natural sense of depth that the viewer is expecting. That is to say, since the advent of moving pictures, filmmakers have been unknowingly preparing their movies for advantageous 3D viewing using 3Deeps spectacles.

However, the early 3Deeps spectacles did not address how to calculate an optical density for the lenses of the 3Deeps spectacles that would maximize the Pulfrich stereoscopic illusion.

A Second Solution—Continuous Adjustable 3Deeps Filter Spectacles

The most recent related 3Deeps patent applications disclose how to construct better 3Deeps viewing spectacles that maximize the Pulfrich stereoscopic illusion and are referred to as Continuous Adjustable 3Deeps Filter Spectacles. To construct these improved 3Deeps viewing spectacles we utilize the body of existing knowledge about (1) the human eye retinal reaction time, and (2) the operating characteristics of the optoelectronic material of the 3Deeps lens.

Retinal Reaction Time

While each eye is stimulated by light continuously, there is a time delay called the retinal reaction time until the information is triggered and transmitted to the brain. Retinal reaction time is primarily dependent on the amount of light (brightness) that falls on the eye. For instance, in the presence of the bright light of a "Clear Sky at noon" the retinal reaction time is about 100 milliseconds (1/10-th of a second) and the eye will trigger about every 100 milliseconds and send the image from the eye to the brain. In the presence of light from a "Clear Sky" the retinal reaction time is slower—about 200 milliseconds. And in the presence of light that approximates a "Night sky with a full moon" the retinal reaction time is slower still—almost 400 milliseconds. The darker is the illumination, the retinal reaction time become increasingly slower.

While the retinal reaction mechanisms are independent for each eye, in normal viewing both eyes are unobstructed and the luminance value is the same and the eyes trigger at about the same time. However, if one eye is shaded so the eyes have unequal retinal illuminance, then the two eyes will trigger at different speeds and different times. Using lens filters with different optical density shading causes this to happen and results in a difference in retinal reaction time for each eye. The difference in retinal reaction time between the two eyes is one factor in the commonly accepted explanation for the Pulfrich illusion.

The second factor is simultaneity. The brain will take two eye images and put them together in a simultaneous fashion to generate the image that we perceive. Thus in normal viewing, if both eyes see the same 2D image without any filtered obstruction, the brain gets two identical images and there is no information by which the brain may infer depth. However, if one eye is differently shaded, than the eyes send two different images to the brain, and the mind places them together and interprets the two different images as depth. These two factors, retinal reaction time, and simultaneity are the two factors that explain Pulfrich illusion.

If the scene being viewed is static with no moving object, then the "instant" image of the unshaded eye and the "lagging image" of the shaded eye will still see the same image and the retinal reaction delay and simultaneity factors will not provide any depth information. Thus, the Pulfrich illusion does not work in the absence of motion. But if the scene being viewed has horizontal motion (also called lateral motion) then the shaded eye will see an image that is "lagging" the instant image. In this case the "lagging image" caused by retinal reaction delay of the shaded eye, when juxtaposed with the "instant image" perceived by the unshaded eye will, through the mechanism of simultaneity, be reconciled by the brain as a perception of depth. This is the Pulfrich illusion.

Well-researched retinal reaction curves describing this phenomenon are available and are used by the Continuous Adjustable 3Deeps Filter Spectacles to select the optical density of the lens to maximize the Pulfrich illusion. This is done in the following exemplary manner. First we measure the ambient light optical density and use that with the retinal reaction curve to get the retinal delay for the eye viewing through the "clear" lens. We then use the direction of lateral motion to determine which of the right and left lenses is clear (with the other lens the dark lens.) If the lateral motion is from the left-to-right direction on the screen then the "clear" lens of the Continuous Adjustable 3Deeps Filter Spectacles will be the left lens, and if the lateral motion is in the opposite direction then the "clear" lens will be the right lens.

To set the optical density of the dark lens we now utilize the magnitude of the motion. As an example, if lateral motion of the major object in the frame is measured as moving at 0.25 inches per frame then it will take 10 frames to move 2.5 inches—the average inter-ocular distance. In this case the Continuous Adjustable 3Deeps Filter Spectacles use the retinal reaction curve to determine an optical density setting for the darkened lens so the motion-direction eye will see a lagging image that is 10 frames behind that of the unshielded eye. If the TV screen has a refresh rate of 100 Hz then 10 frames is precisely 100 milliseconds, so if the ambient light is that of a "Clear Sky at noon" with a retinal reaction time of 100 milliseconds, then we would set the dark lens to have an optical density of a "Clear Sky" which corresponds to a retinal reaction time of 200 milliseconds. Depending upon the ambient illumination, the optical density of the dark lens can always be calculated and precisely determined from the retinal reaction curve and the objective function that maximizes the Pulfrich illusion.

Once the optimal optical density values are known for the lenses of the Continuous Adjustable 3Deeps Filter Spectacles, the Operating Characteristic curve of the optoelectronic material of the lenses can be utilized to apply the correct potential to the lenses so the lenses of the viewing spectacles have the optical density so the movie is viewed with a maximal Pulfrich stereoscopic illusion.

In previous patent applications, retinal reaction time is used to calculate the optimal optical density value (a first optimization) and the operating characteristic curve is used for control over the lenses of the Continuous Adjustable

3Deeps Filter Spectacles (a second optimization). However, other problems are not address and are the subject of this pending patent application.

There is a problem that many optoelectronic materials often do not change state instantaneously. While frame-to-frame display of a motion picture may be 100 Hz (100 frames a second or 10 milliseconds per frame) a typical optoelectronic material made from electrochromic material may have a "slow" response time and take several seconds to change from a clear state to a much darker state. A second problem may relate to a limited "cycle life" (number of clear-dark cycles) of some optoelectronic materials that may be limited. Both of these problems can be addressed by using multiple layers of optoelectronic material in fabricating the lenses of the Continuous Adjustable 3Deeps Filter Spectacles, and this patent discloses how to implement such a solution. Both problems relate to the viewing spectacle side of the solution that implements the already independently calculated optical density that maximizes the 3D Pulfrich stereoscopic illusion.

Variable Tint and Optoelectronic Devices

Optoelectronic devices (or materials) that control the transmission of light through the device may be referred to as a variable tint device or variable tint material. Neutral variable tint devices reduce the transmission of light approximately equally along the entire spectrum of visible light and thus do not noticeably distort color. Other variable tint devices may allow transmission of light in a restricted spectrum of visible light and block light outside the restricted range, such as blue variable tint devices that allows the passage of light in the blue spectrum ($\lambda$~490-450 nm). Devices that control properties of light other than the transmission of light through the medium will be referred to simply as optoelectronic devices.

Methods of Producing 3-D Illusion in Moving Pictures

Motion pictures are images in 2-dimensions. However, several methods have been developed for providing the illusion of depth in motion pictures. These include the Anaglyph, Intru3D (also called ColorCode 3D), IMAX (Polaroid), shutter glasses and Pulfrich 3-dimensional illusions.

Anaglyph 3-Dimensional Illusion

"Anaglyph" refers to the red/blue (red/cyan or red/green) glasses that are used in comic books and in cereal packets etc. The glasses consist of nothing more than one piece of transparent blue plastic and one piece of transparent red plastic. These glasses are easy to manufacture and have been around since the 1920s.

An anaglyph stereo picture starts as a normal stereo pair of images, two images of the same scene, shot from slightly different positions. One image is then made all green/blue and the other is made all red, the two are then seen together.

When the image is viewed through the glasses the red parts are seen by one eye and the other sees the green/blue parts. The visual cortex of the brain fuses this into perception of a three-dimensional scene or composition. This effect is fairly simple to do with photography, and extremely easy to do on a PC, and it can even be hand-drawn. The main limitation of this technique is that because the color is used in this way, the true color content of the image is usually lost and the resulting images are usually in black and white. As the colors compete for dominance they may appear unstable and monochromatic. A few images can retain a resemblance to their original color content, but the photographer has to be very selective with color and picture content.

Intru3D—Intel

Intel's Intru3D uses the ColorCode 3D method that is an update to the more familiar Anaglyph method of 3D stereoscopy. It is similar to the Anaglyph method of stereoscopy but rather than make one image green/blue and the other image red, Intru3D records the two images as amber and blue. This provides generally truer color than typical Red/Blue anaglyphs, particularly where Red image components are concerned.

IMAX (Polaroid) 3-Dimensional Illusion

IMAX creates the illusion of 3-dimensional depth by recording the motion pictures on two separate rolls of film with two camera lenses to represent the left and right eyes. These lenses are separated by an interocular distance of about 2.5 in., the average distance between a human's eyes. By recording on two separate rolls of film for the left and right eyes, and then projecting them simultaneously, IMAX can create a 3-Dimensional illusion for viewers.

IMAX uses either of two different methods to create the 3D illusion in the theatre. The first method relies on polarization. During projection, the left eye image is polarized in one direction and the right eye image polarized perpendicular to the left eye image as they are projected on the IMAX screen. By wearing special viewing glasses with lenses polarized in their respective directions to match the projection, the left eye image can be viewed only by the left eye since the polarization of the left lens will cancel out that of the right eye projection, and the right eye image can be viewed only by the right eye since the polarization of the right lens will cancel out that of the left eye projection.

IMAX also uses another method—shutter glasses—for 3D viewing. This method of 3D projection involves the use of LCD shutter glasses that use similarly polarized lenses for both eyes. The left and right eye images are projected on the viewing screen in alternate frames. These LCD shutter glasses are synchronized to the projector. The projector displays the left and right images that are momentarily viewed by the appropriate eye by allowing that LCD lens to become transparent while the other remains opaque. That is when the left eye frame is projected on the screen, the left lens of the shutter glasses becomes transparent and the right lens of the shutter glasses becomes opaque. When the next frame is projected on the screen—a frame for the right eye—the left lens becomes opaque and the right lens becomes transparent.

In both the IMAX 3D systems only the correct eye is allowed to view the correct image while the other eye is "blinded". The "transparent" state is actually quite dark, and occludes about 35% of the projected light to the viewing eye while the non-viewing eye is supposed to view no image at all.

Shutter Glasses

Different formulations of shutter glasses have been implemented over the last few decades, but without much large-scale commercial success. A shutter glasses solution generally require two images for each image of video, with shutter covering or uncovering each eye of the viewer. This allows one eye to see, than the other, with the shutters timed and synchronized with the video so that each eye only sees the image intended for it.

Some shutter glass systems are wired to a control device while some shutter glass systems use wireless infrared signaling to control the state of the lenses.

CrystalEyes is the name of a stereoscopic viewing product produced by the StereoGraphics Corporation of San Rafael, Calif. They are lightweight, wireless liquid crystal shuttering eyewear that are used to allow the user to view alternating

field sequential stereo images. The source of the images alternately displays a left-eye view followed by a right-eye view. CrystalEyes' shutters can block either of the user's eyes so that only images appropriate for each eye are allowed to pass. A wireless infrared communications link synchronizes the shuttering of the eyewear to the images displayed on the monitor or other viewing screen. CrystalEyes shutter glasses, weight only 3.3 ounces, use two 3V lithium/manganese dioxide batteries, and have a battery life of 250 hours. This demonstrates the robustness and potential of any viewer glass solution.

Because shutter glasses only expose each eye to every other frame, the refresh rate of the video is effectively cut in half. On a TV with refresh rates of 30 frames per second (for an NTSC TV) or 25 frames per second (for a PAL TV), this is hard on the eyes because of the continual flicker. This problem is eliminated with higher refresh rates, such as on PC monitors.

However, shutter systems have not been overwhelmingly commercially successful. Motion pictures that use such stereo shutter systems require two frames for each frame of regular film. Motion pictures would then have to be produced in at least 2 versions. Also, except on high refresh rate systems, such as expensive PC monitors, the viewer sees too much flicker causing distraction and annoyance. An additional requirement and burden is the wired or wireless signaling to control the state of the lens. LCD screens that are used on laptops generally do not have high enough refresh rates for stereoscopic shutter 3D systems. Shutter systems generally do not work well with LCD or movie projectors.

Electronically Controlled Variable Tint Materials

Numerous materials have been identified that have the property that the transmission of light through the material can be controlled by the application of an electronic voltage or potential across the material. These include the classes of materials typically named electrochromic, suspended particle and polymer dispersed liquid crystal devices. Within each class of electronically controlled variable tint material there are numerous formularies. Other classes of materials may be found in the future. Any material for which the transmission of light or other optical property of light can be controlled by an electronic potential may be utilized in the invention.

Electrochromic Devices (EDs)

Electrochromic devices change light transmission properties in response to voltage and thus allow control of the amount of light passing through the material. A burst of electricity is required for changing the tint of the material, but once the change has been occurred, no electricity is needed for maintaining the particular shade that has been reached. Electrochromic materials provide visibility even in the darkened state, and thus preserves visible contact with the outside environment. It has been used in small-scale applications such as rearview mirrors. Electrochromic technology also finds use in indoor applications, for example, for protection of objects under the glass of museum display cases and picture frame glass from the damaging effects of the UV and visible wavelengths of artificial light. Recent advances in electrochromic materials pertaining to transition-metal hydride electrochromics have led to the development of reflective hydrides, which become reflective rather than absorbing, and thus switch states between transparent and mirror-like.

Suspended Particle Devices (SPDs)

In suspended particle devices (SPDs), a thin film laminate of rod-like particles suspended in a fluid is placed between two glass or plastic layers, or attached to one layer. When no voltage is applied, the suspended particles are arranged in random orientations and tend to absorb light, so that the glass panel looks dark (or opaque), blue or, in more recent developments, gray or black color. When voltage is applied, the suspended particles align and let light pass. SPDs can be dimmed, and allow instant control of the amount of light and heat passing through. A small but constant electrical current is required for keeping the SPD in its transparent stage.

Polymer Dispersed Liquid Crystal Devices (PDLCs)

In polymer dispersed liquid crystal devices (PDLCs), liquid crystals are dissolved or dispersed into a liquid polymer followed by solidification or curing of the polymer. During the change of the polymer from a liquid to solid, the liquid crystals become incompatible with the solid polymer and form droplets throughout the solid polymer. The curing conditions affect the size of the droplets that in turn affect the final operating properties of the variable tint material. Typically, the liquid mix of polymer and liquid crystals is placed between two layers of glass or plastic that include a thin layer of a transparent, conductive material followed by curing of the polymer, thereby forming the basic sandwich structure of the smart window. This structure is in effect a capacitor. Electrodes from a power supply are attached to the transparent electrodes. With no applied voltage, the liquid crystals are randomly arranged in the droplets, resulting in scattering of light as it passes through the smart window assembly. This results in the translucent, "milky white" appearance. When a voltage is applied to the electrodes, the electric field formed between the two transparent electrodes on the glass cause the liquid crystals to align, thereby allowing light to pass through the droplets with very little scattering, resulting in a transparent state. The degree of transparency can be controlled by the applied voltage. This is possible because at lower voltages, only a few of the liquid crystals are able to be aligned completely in the electric field, so only a small portion of the light passes through while most of the light is scattered. As the voltage is increased, fewer liquid crystals remain out of alignment thus resulting in less light being scattered. It is also possible to control the amount of light and heat passing through when tints and special inner layers are used. Most of the devices offered today operate in on or off states only, even though the technology to provide for variable levels of transparency is easily applied. This technology has been used in interior and exterior settings for privacy control (for example conference rooms, intensive-care areas, bathroom/shower doors) and as a temporary projection screen. A new generation of switchable film and glass called 3G Switchable Film is available from Scienstry, using a non-linear technology to increase transparency, lower the required driving voltage and extend the lifetime.

A First Preferred Embodiment of the Invention

FIG. **1** is a perspective view **100** of the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles. It is comprised of a frame **101** that is used as the housing for the lenses and control circuitry. Such frames are a well-known means by which lenses can be fixed before a person's eyes for viewing. On the frame **101** is battery device **104** to power all circuitry of the Continuous Adjustable 3Deeps Filter Spectacles. Also, on the frame **101** is a receiver **102** labeled "Rx" that is powered by the battery **104**. The receiver **102** has apparatus to receive radio-frequency (RF) **110** waves with synchronization and control information used to control the Continuous Adjustable 3Deeps Filter Spectacles. Such receivers are well known in the art of electronics. Also on the frame **101** is a control unit **103**

powered by the battery **104** that transforms the continuing optical density signals into the electronic potentials used to control the optical density of each individual lens. Also on the frame **101** is an on/off switch **112** that controls whether the electronic circuits of the 3Deeps spectacles **101** receive power (on position) from the battery or not (power off). Other embodiments may replace RF communications with other communications means, including but not limited to infrared, or audio sound.

Two lenses are fixed in the frames—a right lens (from the movie viewer's vantage point) **105** and a left lens **106**. In the preferred embodiment, each lens is made of an electrochromic material for which the optical density can be reliably and precisely controlled by the application of an electronic potential across the material. The lens has circuitry so that the control unit **103** can independently control the transmissivity of each lens. Other embodiment may use optoelectronic materials other than electrochromics. A second preferred embodiment of Continuous Adjustable 3Deeps Filter Spectacles using multi-layered lenses is disclosed starting in FIG. **5**. A third preferred embodiment of Continuous Adjustable 3Deeps spectacles using single-layered lenses for a multi-use application is disclosed starting in FIG. **11**. A fourth preferred embodiment of Continuous Adjustable 3Deeps Filter Spectacles using multi-layered lenses for a multi-use application is disclosed starting in FIG. **14**.

For exemplary purposes, FIG. **1** shows the Continuous Adjustable 3Deeps Filter Spectacles in just one of the three states that the lenses can take. FIG. **1** shows the right lens **105** darkened and the left lens **106** as clear with the clear lens allowing more light transmission than the darkened lens. This is the configuration to view a motion picture with a 3-dimensional effect in which the lateral motion in the motion picture is moving from left-to-right on the viewing screen. Other embodiments of the invention may have Continuous Adjustable 3Deeps Filter Spectacles that fit over regular prescription glasses in a manner similar to that in which snap-on or clip-on sunglasses are configured. In still another embodiment the lenses of the Continuous Adjustable 3Deeps Filter Spectacles may also be prescription lenses customized for the viewer vision impairments.

Also, while the preferred embodiment of the invention uses Continuous Adjustable 3Deeps Filter Spectacles that are wireless, other embodiments may use wired connections. What is required is that the Continuous Adjustable 3Deeps Filter Spectacles can receive and respond to synchronization signals from the controller, and whether that is by wired or wireless means is immaterial to the invention.

Earlier versions of 3Deeps Filter Spectacles (also called Pulfrich Filter Spectacles) have been previously described in co-pending patent applications and patents U.S. patent application Ser. Nos. 12/274,752, 11/928,152, 11/372,723, 11/372,702, and U.S. Pat. Nos. 7,030,902 and 7,218,339.

There are 3 lens settings used by the Continuous Adjustable 3Deeps Filter Spectacles. One setting is that both the right **105** and left lens **106** are clear. Neither lens is darkened. This is the lens state that is used in the preferred embodiment when there is no significant lateral motion in the motion picture. The second setting is the left lens **106** clear and the right lens **105** darkened. This is the lens state that is used in the preferred embodiment when foreground lateral motion in the motion picture is moving from the left to the right direction, as seen from the viewer's perspective. The third setting is the left lens **106** darkened and the right lens **105** clear. This is the lens state that is used in the preferred embodiment when the foreground lateral motion in the motion picture is moving from the right to the left direction, as seen from the viewer's perspective.

The lens state consisting of both left and the right lens darkened is not used by any of the 3Deeps spectacles. However, this lens state can be achieved by the Continuous Adjustable 3Deeps Filter Spectacles, and may have uses in other embodiments of the invention. In the third preferred embodiment of the invention, this lens state is used to provide an alternate use for 3Deeps viewing spectacle—sunglasses. In that embodiment, "multi-use" 3Deeps spectacles are switch selectable as either (Use **1**) 3Deeps viewing spectacles using the 3 lens settings described in the preceding paragraph for 3Deeps viewing, or (Use **2**) sunglasses using the left and right lens darkening to a pre-set optical density.

In Continuous Adjustable 3Deeps Filter Spectacles, the right and left lenses of the viewing glasses may independently take a multiplicity of different levels of darkness to achieve different effects, resulting in many different lens states. In particular, the darkening of the non-clear lens can be optimized according to the speed of lateral motion and/or luminance, so as to optimize the degree of 3-dimensional effect (a first optimization). Also, the Control Unit **103** can control the electrochromic lenses so that they reach their target state in an optimal manner (a second optimization).

Various consumer-based control units may be utilized with the Continuous Adjustable 3Deeps Filter Spectacles that can both display the audio/video of the associated motion picture, as well as perform the Continuous Adjustable 3Deeps Filter Spectacles synchronization to identify 3Deeps synchronization events and issue control signals to the Continuous Adjustable 3Deeps Filter Spectacles. This includes, but is not limited to; DVD-based control units; Digital Movie Projector control units; Television-based control units; hand-held and operated control units; spectacle-based control units; software-based processing that parses compressed digital video file and uses its motion estimation information (e.g. MPEG); and, cell-phone based control units.

FIG. **2***a* **200** shows a left lens **106** of Continuous Adjustable 3Deeps Filter Spectacles fabricated from a single layer of electrochromic material. Its fabrication using electrochromic material is shown in adjoining FIG. **2***b*.

FIG. **2***b* **225** shows the cross-sectional detail of the electrochromic device of FIG. **2***a* used for fabricating the electronically controlled variable tint material of the right and left lenses of the Continuous Adjustable 3Deeps Filter Spectacles. The Figure shows a typical dual-polymer electrochromic device consisting of seven layers of material. In the preferred embodiment of the invention, the right lens **105** and left lens **106** of the Continuous Adjustable 3Deeps Filter Spectacles **100** are fabricated from such material. The first layer **201** of the electrochromic material **225** is a glass, plastic (or other clear insulating material.) The second layer **202** is a conducting layer, followed by a third layer **203** of polymer. The fourth layer **204** is an electrolytic layer that depending upon the electrochromic material may be a liquid or gel. This layer provides the ion transport whose direction is determined by the application of potential across the conducting layers. The fifth layer **205** is the complementary polymer layer, followed by a sixth layer **206** of conducting material. The last layer **207** of the electrochromic is another insulting layer of glass, plastic or other clear insulating material.

While FIG. **2***b* **225** show a typical dual-polymer electrochromic device, as previously indicated, there are numerous such electrochromic devices, and any electrochromic may

be favorably utilized in the invention. Some electrochromic devices may not have seven layers as shown in FIG. **2***b*. For instance, some variable tint materials may be in the form of a flexible film or laminate that can be applied to a single layer of clear glass or plastic.

Also, any electronically controlled variable tint material may be used in the invention rather than the displayed electrochromic device. Any material whose optical property of transmissivity of light may be controlled by the application of an electric potential may be favorably use to fabricate the lenses of the Continuous Adjustable 3Deeps Filter Spectacles **100**.

FIG. **3** is a block diagram **300** of the operation of the Continuous Adjustable 3Deeps Filter Spectacles of FIG. **1**. All circuits on the Continuous Adjustable 3Deeps Filter Spectacles **101** are powered **301** by the Power Unit **104** (if the power on/off switch **112** is in the on position), including the Control Unit **103**, Signal Receiving Unit **102**, the Left Lens **106**, and the Right Lens **105**. The control information **110** is received by the Signal Receiving Unit **102** and sent **302** to the Control Unit **103**. The control unit **103** implements an algorithm that is specific for the lens materials used in the fabrication of the Right Lens **105** and the Left lens **106** of the Continuous Adjustable 3Deeps Filter Spectacles, and controls the Left Lens **106** over a control circuit **303**, and the Right Lens over a control circuit **305**.

FIG. **4** is a flow chart **400** showing the operation of the Control Unit **103** of the Continuous Adjustable 3Deeps Filter Spectacles of the first preferred embodiment. The input to the Control Unit **103** is the synchronization signal **302**. The output is the control signal sent to the left lens **106** over the control left lens control circuit **303**, and the control signal sent to the right lens **105** over the right lens control circuit **305**. The synchronization signals **302** are received and stored by the Read and Store 3Deeps Signal block **401** of the Control Unit **103** and stored in a LIFO (Last In First Out) memory stack **403**. Control then passes to Store and Manage Signal processing **405** that "pops" the top of the stack (read the value and eliminates it from storage) and processes the synchronization signal by storing it in a 3Deeps Signal memory storage **407**. Processing control then passes to Parse and Store Left and Right OD in which the 3Deeps signal memory storage **407** is parsed and stored in the Left OD value **411**, and the Right OD value **413**. Processing then continues with the Right Lens Control **417** in which the right lens value **413** is converted to an electronic signal **305** that controls the optical density of the right lens. Processing then continues with the Left Lens Control **415** in which the left lens value **411** is converted to an electronic signal **303** that controls the optical density of the left lens. Processing in the Control Unit **103** then is passed back to the Read and Store 3Deeps Signal.

It should be understood that different control circuits might be utilized by other embodiments. For instance other embodiments may have no need for LIFO signal store and management since control of the 3Deeps spectacles is in real-time and there is no need to switch the lenses to past setting. Also, better emphasize the logical operation of the control unit some functions have not been shown. For instance, the control unit may cycle at a much faster rate then the received synchronization signals resulting in an empty stack. The handling of such an empty stack state is not shown in the flow diagram but would be handled as well-known in the art by detecting that the stack is empty and passing control in the Control Unit **103** back to the Read and Store 3Deeps Signal state **401** rather than passing control as shown in the flow diagram **400**.

Continuous Adjustable 3Deeps Filter Spectacles have great advantages. The control information **110** is spectacle-agnostic; i.e. all spectacles receive the same transmitted control information. The control unit **103** on the spectacles performs a final view-spectacle-specific optimization, translating the control information into control signals specific to the lens material used to fabricate the Continuous Adjustable 3Deeps Filter Spectacles. Two viewers sitting side-by-side and watching the same video on a digital TV but wearing Continuous Adjustable 3Deeps Filter Spectacles that have lens material with totally different characteristics, will each see the movie with an illusion of 3D optimized for their spectacles.

A Second Preferred Embodiment of the Invention

FIG. **5** is a perspective view **500** of the second preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles **550** with multi-layered lenses. The difference between FIG. **5** (multi-layered lens) and FIG. **1** (single layer lens) is in their respective right lens (**505** of FIG. **5**), left lens (**506** of FIG. **5**), and control unit (**503** of FIG. **5**). Like numbered items in FIG. **5** and FIG. **1** have the same function and definition. The lenses for the second preferred embodiment (**505** and **506**) are described in greater detail in FIGS. **6***a* and **6***b*, and the control unit for the second preferred embodiment is described in greater detail in FIG. **8**.

FIG. **6***a* **600** shows a left lens **506** of Continuous Adjustable 3Deeps Filter Spectacles fabricated from multiple layers of electrochromic material. Its fabrication using electrochromic material is shown in adjoining FIG. **6***b*. Since only a single layer of insulating glass material will be required between the different layers of the multi-layered electrochromic lens, the drawing of the top layer is slightly different than that of FIG. **2***a* to emphasize that only one layer of such insulating material is necessary. FIG. **6***a* therefore shows the lens **106** as two layers where the first active layer **611** is separated by the second active layer **601** by an insulating layer **610**. The first active layer **611** land the insulating layer **610** comprise the single layer lens **106** of FIG. **2***a*.

FIG. **6***b* **625** shows the cross-sectional details of the multiple layered electrochromic device of FIG. **6***a* that is used for fabricating the electronically controlled variable tint material of the right and left lenses of the Continuous Adjustable 3Deeps Filter Spectacles. The 7 layers of the electrochromic left lens **106** of FIG. **2***b* are shown in FIG. **6***b* as the 6 active layers **611**, and the (seventh) insulating layer **201**. Each layer is identical to their like numbered description accompanying FIG. **2***b*. A second active layer **601** is included in the multi-layered electrochromic lens. In the second preferred embodiment of the invention, the second layer **601** of the lens is fabricated from identical electrochromic material as used to fabricate the first layer **611** of the left lens **506** so that each layer has the same Operating Characteristic curve **900** as shown in FIG. **9**. The six layers of electrochromic material for the second layer are identical to their like numbered description accompanying FIG. **2***b*. Other embodiments may use electrochromic material with different material so that the two layers have different Operating Characteristic curves. Also, other embodiments may have more than 2 layers.

FIG. **7** is a block diagram **700** of the operation of the Continuous Adjustable 3Deeps Filter Spectacles of FIG. **5** using a multiple layered electrochromic device for fabricating the electronically controlled variable tint material of the right **505** and left lenses **506**. All circuits on the Continuous Adjustable 3Deeps Filter Spectacles **550** are powered **301** by the battery **104**, including the Control Unit **503**, Signal

Receiving Unit **102**, the Left Lens **506**, and the Right Lens **505**. The control information **110** is received by the Signal Receiving Unit **102** and sent **302** to the Control Unit **503**. The control unit **503** implements an algorithm that is specific for the multi-layered lens materials used in the fabrication of the Right Lens **505** and the Left lens **506** of the multi-layered Continuous Adjustable 3Deeps Filter Spectacles, and controls the Left Lens **506** with a control circuit **703**, and the Right Lens **505** with a control circuit **704**.

The difference between FIG. **7** (multi-layered lens) and FIG. **3** (single layer lens) is in their respective right and left lenses, control units, and control circuits. For the right lens **505** and left lens **506**, the lenses are fabricated from multiple layers of electrochromic material. In the second preferred embodiment of the invention these are the same as the lens fabrication shown in FIG. **6**. The control unit for the multi-layered lens **503** must control multiple layers while the control unit for the single-layered lens **103** only need control a single layer electrochromic lens. In this second preferred embodiment of the invention, both layers of the multi-layered electrochromic lens are made of the same material with the same Operating Characteristic curve and both lenses have applied to them identical voltage across each layer. However, since there are multi-layers of material, it will be shown using the Operating Characteristic curve of FIGS. **9** and **10**, that to achieve a target optical density for each lens, the control unit **503** will only need apply voltage to the multi-layers for less time than for the single layer. For the control circuits, the multi-lens control circuits need to apply voltage across multiple layered assemblies, not just a single lens assembly.

FIG. **8** is a flow chart **800** showing the operation of the Control Unit **503** of the Continuous Adjustable 3Deeps Filter Spectacles **550** using a multiple layered electrochromic device for fabricating the electronically controlled variable tint material of the right lens **505** and left lens **506**. This flow chart **800** is very similar to the flow chart of the control unit for the Continuous Adjustable 3Deeps Filter Spectacles using a single layered electrochromic device of FIG. **4**. The memory storage LIFO Signal Stack **403**, 3Deeps Signal **407**, Left OD **411**, and Right OD **413** are the same as previously described for FIG. **4**. The processing modules Read & Store 3Deeps Signal **401**, Store and Manage 3Deeps Signal **405**, and Parse and Store Left and Right OD **409** are the same as previously described for FIG. **4**. The difference between FIG. **4** and FIG. **8** is in the Left Lens Multilayer circuitry **815** and the left lens **506** that the circuit controls, and in the Right Lens Multilayer Control circuitry **817** and the right lens **505** that the circuit controls. In this multi-layer embodiment of the invention, the Left Lens Multilayer circuitry **815** must control two layers of the electrochromic left lens **506**, and the Right Lens Multilayer circuitry **817** must control two layers of the electrochromic right lens **505**. It will be shown later in FIGS. **9** and **10** that the target optical densities for the left lens **411** and the right lens **409** can be achieved more rapidly.

This approach has the same advantages as for single-layer Continuous Adjustable 3Deeps Filter Spectacles. The control information **110** is spectacle-agnostic; i.e. all spectacles receive the same transmitted control information. The control unit **503** on the spectacles performs a final view-spectacle-specific optimization, translating the control information into control signals specific to the multi-layered lens material used to fabricate the Continuous Adjustable 3Deeps Filter Spectacles. Two viewers sitting side-by-side and watching the same video on a digital TV but wearing Continuous Adjustable 3Deeps Filter Spectacles that have lens material with totally different characteristics, will each see the movie with an illusion of 3D optimized for their spectacles. It also has the additional advantage that since a multi-layer lens is used, the transition time between optical density states will be faster than the corresponding transition time for a single-layer lens.

The second preferred embodiment of the Optical Density Continuing Adjustable 3Deeps Filter Spectacles use electrochromic lenses. Additional detail about Electrochromism is now provided.

Electrochromism is the phenomenon displayed by some chemicals of reversibly changing color when an electric potential is applied. Electrochromism has a history dating back to the nineteenth century and there are thousands of chemical systems that have already been identified electrochromic. A narrow definition limits electrochromic devices to chemical processes for which there is a redox reaction that undergo an electron uptake reduction or electron release when potential is applied and the reverse or oxidation with a reverse potential. Most redox processes are electrochromic and are candidate electrochromes and potential 3Deeps lenses. While the preferred embodiments of this invention use such narrowly defined electrochromic devices, any device for which the transmission of light may be controlled by an electronic potential may be utilized in the invention. For instance, Liquid Crystal Device (LCD) lenses may be used in the invention since they may be controlled by an electronic potential, even though they use a totally different mechanism to control the optical properties of the material. LCDs rely on an interference effect (block the transmission of light), while the narrow definition of electrochromic device is limited to materials that rely on a redox reaction to change the color of the material. Either redox or LCD material, or any material for which the transmission of light may be controlled by an electronic potential can be advantageously utilized in the invention.

There are many different families of chemicals that exhibit such properties—both organic and inorganic. These include but are not limited to polyaniline, viologens, polyoxotungstates's and tungsten oxide. Oxides of many transition metals are electrochromic including cerium, chromium, cobalt, copper, iridium, iron, manganese, molybdenum, nickel, niobium, palladium, rhodium, ruthenium, tantalum, titanium, tungsten, and vanadium. Within each family, different mixtures of chemicals produce different properties that affect the color, transmissivity, and transition time. Some electrochromics may only affect ultraviolet light—not visible light—appearing clear to an observer since they do not affect visible light. Electrochromics have been the object of intense study for over 40 years, and have found their chief commercial success for use in "smart windows" where they can reliably control the amount of light and heat allowed to pass through windows, and has also been used in the automobile industry to automatically tint rear-view mirrors in various lighting conditions.

Other embodiments of the inventions may advantageously use multiple-color electrochromic devices or materials that exhibit electropolychromism. Some electrochromic devices may take a whole series of different colors, each colored state generated at a characteristic applied potential. One example is methyl viologen, which has electron potential states that are correspondingly colorless, blue, and red-brown. Electrochromic viologens have been synthesized with as many as six different colors.

The operating characteristics of each formulation of any of the thousands of different electrochromic material will be different. Some of the operating characteristics that should

be considered when selecting materials for 3Deeps lenses include; Response time (the time required to change from its clear to darkened state or vice versa); Power consumption; Memory effect (when power is off between write cycles there is no redox process and the electrochromic material retains its optical properties); Coloration efficiency (the amount of electrochromic darkening formed by the charge); Cycle life (The number of write-erase cycles that can be performed before any noticeable degradation has occurred); and, write-erase efficiency (the fraction of the originally formed darkening that can be subsequently electro-cleared. For 3Deeps viewing spectacles this should be 100%).

The operating characteristics of each formulation of any of the 1000s of different electrochromic material will be different. FIG. **9** shows a typical Operating Characteristic curve relating transmissivity (% transmission of light) to transmission time when a potential of 2 volts is applied across the electrochromic device. Some electrochromic materials may take several seconds to change state from one optical density to another—others may be near instantaneous. For many electrochromic materials the color change is persistent and electric potential need only be applied to effect a change. For such persistent optoelectronic materials, only an electronic on-off pulse is needed, while non-persistent materials require the application of a continuing electronic potential. Other materials may attain state under the presence of electric potential, but then slowly leak and change back. These materials may require a maintenance potential to maintain state but one that is different from that to attain the optical density state.

The second preferred embodiment of the Continuing Adjustable 3Deeps Filter Spectacles is fabricated from a persistent electrochromic material (material that has a so-called memory effect) that takes up to 1.85 seconds to change state from its lightest to darkest optical density, and up to 1.85 seconds to change state from its lightest to darkest optical density. In moving between states the preferred embodiment will always seek to optimize transition time.

While electrochromic material is used in the second preferred embodiment of the optical density Continuous Adjustable 3Deeps Filter Spectacles, any optoelectronic materials that change optical density in response to an applied potential may be used. This includes but is not limited to PDLCs (Polymer Dispersed Liquid Crystal devices) or SPDs (Suspended Particle Devices.) In the future, new optoelectronic materials will be discovered and may be advantageously used in the practice of this invention.

FIG. **9** is a transition time curve **900** for a single layer of electrochromic material with transition time as a function of transmissivity when a potential of 2.0V is applied to the electrochromic material. It is for a slow electrochromic material with transition time **902** as a function of transmissivity **901** (or percent transmission of light). This transition time curve **900** has a lightest state **906** with a transmissivity of 100% density (clear) and its darkest state **905** is 0% in which all light is blocked from passing through the electrochromic material. The electrochromic material cannot however attain either of the extreme values (0% or 100%) of transmissivity. The Operating Characteristic curve **903** shows a material that can attain about 99% transmissivity **904** (almost clear) and 10% transmissivity **915** (almost dark). The material can then take any optical density in between the blocking only 1% of the light (99% transmissivity) and blocking 90% of light (10% transmissivity) by the application of 2V for the proper length of time. If the material is in its clearest state **904**, and, and a 2V potential is applied to the material, it will take about 1.8 seconds to change state and achieve its darkest state **915** or 10% transmissivity. This is shown on the transition time curve **903** of the Operating Characteristic of the material in FIG. **9**.

As another example, if the material is in its clearest state **904**, and the control signal **110** received on the frames receiving unit **102** indicates that the subject lens should change to an optical density associated with transmissivity of 70% **923**, then the transition time curve **903** would be implemented by the control unit **103** to apply 2V potential to the lens for 1.35 seconds. A value of 70% **923** transmissivity intercepts the Operating Characteristic curve **903** at a point on the curve **921** that corresponds to a transition time **922** of 1.35 seconds. Once a potential of 2V has been applied for 1.35 seconds, no potential need further be applied since the electrochromic lens will latch in the new state.

This is an example of how an algorithm implemented in the Control Unit **103** of the Continuous Adjustable 3Deeps Filter Spectacles with a single layer of lens material (FIG. **1-4**) would use the transition time curve **903** to control the right lens **105** and the left lens **106**. To transition a lens from and optical density associated with a clear state **904** to the optical density associated with a transmissivity of 70% the Control Unit **103** would apply 2V potential to the lens for 1.35 seconds.

This is a simplified example for illustrative and teaching purposes. Other electrochromic materials may have other operating characteristics that have characteristic exponential, negative exponential, or logistic (s-shaped) relationships. In this example, 2V potential is used to move between states. It is used under the assumptions that (a) for this electrochromic formulation the higher the electronic potential the more rapid will be the change from a lighter to a darker optical density, and (b) change of state from a lighter to a darker optical density is to be optimized. Other materials may require different potentials to be applied to move from between states. In any of these cases, the principle of operation is identical and the Control Unit **103** on the frames of the lenses uses the operating characteristics of the material used in the right **105** and left **106** lenses to determine the potential and the length of time the potential is to be applied to transition between lens control states.

FIG. **10** is a transition time curve **1000** for a double layer (multi-layer) of electrochromic material with transition time as a function of transmissivity. FIG. **10** is similar to FIG. **9** with the addition of a second Operating Characteristic curve **1003**. The numbered elements of FIG. **10** have the same description as their like numbered elements of FIG. **9**. The Operating Characteristic curve for the double layer **1003** (multi-layer) lenses of the preferred embodiment are shown along with the Operating Characteristic curve of the single layer **903** to better emphasize the transition time Benefit and Loss of using the double layer of electrochromic material. The example shows that doubling the lens material results in a 44% decrease in Transmission Time (Benefit) when moving from a clear to a 70% transmissivity state for only a 1% loss in the Clear State (Loss).

As an example, if the multi-layer material is in its clearest state **1015**, and the control signal **110** received on the frames receiving unit **102** indicates that the subject lens should change to an optical density associated with transmissivity of 70% **923**, then the transition time curve **1003** would be implemented by the control unit **503** to apply 2V potential to the lens for 0.75 seconds. A value of 70% **923** transmissivity intercepts the Operating Characteristic curve **1003** at a point on the curve **1011** that corresponds to a transition time **1012** of 0.75 seconds. Once a potential of 2V has been

applied for 0.75 seconds, no potential need further be applied since the electrochromic lens will latch in the new state.

In summary, for a single layer lens then, to move from a clear state to a 70% transmissivity state 2V potential is applied for 1.35 seconds to a single layer material. For the double layer lens of the preferred embodiment to move from a clear state to a 70% transmissivity state 2V potential is applied for 0.75 seconds. Using two layers of electrochromic material results in a beneficial 44% decrease in transmission time for only a 1% loss in the clear state.

A Third Preferred Embodiment of the Invention

It has previously been observed in this disclosure that the lens state consisting of both left and the right lens darkened is not used by any of the 3Deeps spectacles. The third preferred embodiment of the invention uses this lens state that is not used by any of various 3Deeps spectacles previously described, and extends the first preferred embodiment (single layer Continuous Adjustable 3Deeps Filter Spectacles) so they may also be switch selectable to function as sunglasses.

In particular, a switch **1101** is added to the Continuous Adjustable 3Deeps Filter Spectacles described in FIG. **1**. In a first switch position the spectacles operate precisely as described in the first preferred embodiment. In a second switch position the spectacles operate as sunglasses. Toggling the switch changes the spectacles to operate with the switched characteristics. The lenses of the third preferred embodiment are single-layer, and are precisely the same as described in FIG. **2***a* and FIG. **2***b*. The control unit **103** of the first preferred embodiment is modified and presented as a new Control Unit **1103**. This control unit takes as an additional input the position of the selection Switch **1101**. If the Switch is positioned so the spectacles operate as Continuous Adjustable 3Deeps Filter Spectacles then the Control Unit controls the lenses of the spectacles in precisely the same fashion as previous described in FIG. **4**. If the Switch is positioned so that the spectacles operate as sunglasses, then the Control Unit controls the lenses so that they both take the same pre-specified dark optical density and operate as ordinary sunglasses.

FIG. **11** is a perspective view **1100** of the third preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles **1150** with single-layered lenses. The difference between the single-layered lenses of FIG. **1** and FIG. **11** is that in the third preferred embodiment a selection Switch **1101** has been added to the spectacles, and the control unit **1103** has been expanded to include control of the sunglasses. All like numbered items in FIG. **11** and FIG. **1** have the same function and definition. The selection switch **1101** may take either of two positions. In the first position, the spectacles will operate as Continuous Adjustable 3Deeps Filter Spectacles precisely as described in the first preferred embodiment. In the second position, the spectacles will operate as sunglasses.

The third preferred embodiment uses lenses identical to the lenses used in the first preferred embodiment and described in FIG. **2***a* and FIG. **2***b*.

FIG. **12** is a block diagram **1200** of the operation of the Continuous Adjustable 3Deeps Filter Spectacles **1150** of FIG. **11** using a single layered electrochromic device for fabricating the electronically controlled variable tint material of the right **105** and left lenses **106**. All circuits on the Continuous Adjustable 3Deeps Filter Spectacles **1150** are powered **301** by the battery **104**, including the Control Unit **1103**, Signal Receiving Unit **102**, the Left Lens **106**, and the Right Lens **105**. The control information **110** is received by the Signal Receiving Unit **102** and sent **302** to the Control Unit **1103**. The switch **1101** position is also powered **301** by the battery **104**, and its position is output to the Control Unit **1103**. The Control Unit **1103** implements an algorithm that is specific for the multi-use (Use **1**: 3Deeps spectacles or Use **2**: sunglasses) single-layered Continuous Adjustable 3Deeps Filter Spectacles, and controls the Left Lens **106** with a control circuit **1203**, and the Right Lens **105** with a control circuit **1205**.

FIG. **13** is a flow chart **1300** showing the operation of the Control Unit **1103** of the multi-use Continuous Adjustable 3Deeps Filter Spectacles **1150** with single-layered lenses. The switch position **1202** is input to the Control Unit **1103** and processing commences with Switch **1** or Switch **2 1370** that can parse the switch position and determine which position the Switch **1101** is in. If the Switch position is in the first position then the control processing **103** is used. This is the same as the control processing for the First Preferred Embodiment and is described in FIG. **4**. Only the input and output to the control processing **103** is shown in FIG. **13**—not the details of the processing that is the same as shown in FIG. **4**. If the Switch position is in the second position then the control processing **1240** for sunglasses is used. Pre-selected Optical densities for the left lens **106** and right lens **105** are stored in the controller as the Left OD **1311** and the Right OD **1313**. First the Right OD **1313** is read by the Right Lens Control processing **1317** and an electronic signal is issued on circuit **1205** to change the Right Lens **105** to that associated Optical Density. Processing then passes to the Left Lens Control **1315** that reads the pre-stored value Left OD **1311** and an electronic signal is issued on circuit **1203** to change the Left Len **106** to that associated value.

This exemplary Control Unit **1103** has been purposely simplified for clarity and to show the principles of the control operation. It shows two separate control circuits—the first **103** for control of Continuous Adjustable 3Deeps Filter Spectacles, and the second **1240** for control of sunglasses. The Control Unit **1103** has two separate memory storages for the Left and Right optical densities. It should be understood that good engineering design would reuse as much circuitry as possible for two controlling functions of the Control Unit **1103**. So for instance, another implementation of the Control Unit **1103** may only have a single memory storage for the Left and Right optical densities that are used by both the circuitry controlling the 3Deeps Filter Spectacles and the circuitry controlling the sunglasses.

A Fourth Preferred Embodiment of the Invention

In the second preferred embodiment of the invention the right and left lenses of the 3Deeps spectacles are fabricated from multiple layers of the same electrochromic material. In a fourth preferred embodiment of the invention, the lenses are fabricated from two layers with electrochromic devices that have different optical characteristics. In this fourth preferred embodiment of the invention the first layer of electrochromic uses the same material to fabricate the lenses as has previously been described—a neutral density filters that block the transmission of light approximately equally along the entire visible spectrum. The second layer uses electrochromic material that can be electronically controlled so the left lens is clear or can be set to allow transmission of light in the visible red spectrum and the right lens is clear or can be set to allow the transmission of light in the visible blue spectrum. The two layers of material are switch selectable so that either of the layers may be activated, but not both layers at the same time. These Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles

thus are switch selectable so they can be used to watch 2D (single image viewed by right and left eyes) movies in 3D using the 3Deeps methodology or alternatively to watch specially made 3D movies (separate left and right images) formatted for anaglyph 3D viewing.

FIG. **14** is a perspective view **1400** of the fourth preferred embodiment of the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles **1450**. Like numbered items in FIG. **5** and FIG. **1** have the same function and definition. The primary difference between this embodiment and previous embodiments is in the use of different electrochromic devices for the layers of the lenses (described further in FIG. **15***a* and FIG. **15***b*), and in the Control Unit **1403** that controls the operation of the spectacles based on the position of the Switch **1101**. The toggle switch **1101** allows either the first layer **411** of the multi-use 3Deeps spectacles **1450** to be activated (3Deeps method of viewing 3D) or it allows the second layer **1501** of the multi-use 3Deeps spectacles to be activated (anaglyph 3D viewing.) In this fourth preferred embodiment of the invention, only one layer may be activated at a time. Other embodiments may allow more than one layer of material to be active at one time. The control unit **1403** has all the functionality of control unit **103** when the first layer is active. When the first layer is active both lenses of the second layer are set to their clear state. When the second layer of is activated the control unit **1403** will run a control program specific to the control of anaglyph 3D viewing. In particular when the second layer is activated for anaglyph viewing, both lenses of the first layer of material are set to their clear state, and the left lens **1406** of the second layer is set to a red and the right lens **1405** of the second layer is set to blue. This state is maintained throughout the viewing of the anaglyph 3D movie and no additional switch of state is required of the control program as is the case with 3Deeps viewing. In this way the left lens is red and the right lens is blue as required for anaglyph 3D movies.

FIG. **15***a* **1500** shows a left lens **1006** of Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles fabricated from multiple layers of electrochromic material. Its fabrication using electrochromic material is shown in adjoining FIG. **15***b*. Since only a single layer of insulating glass material will be required between the different layers of the multi-layered electrochromic lens, the drawing of the top layer is slightly different than that of FIG. **2***a* to emphasize that only one layer of such insulating material is necessary. FIG. **15***a* therefore shows the lens **1006** as two layers where the first active layer **411** is separated by the second active layer **1501** by an insulating layer **410**. The first active layer **411** and the insulating layer **410** comprise the single layer lens **106** of FIG. **2***a*.

FIG. **15***b* **1525** shows the cross-sectional details of the Multi-use electrochromic device of FIG. **15***a* for fabricating the electronically controlled variable tint material of the right and left lenses of the Continuous Adjustable 3Deeps Filter Spectacles using multiple layers of electrochromic material. The 7 layers of the electrochromic left lens **106** of FIG. **2***a* are shown in FIG. **15***b* as the 6 active layers **411**, and the (seventh) insulating layer **201**. Each layer is identical to their like numbered description accompanying FIG. **2***b*. A second active layer **1501** is included in the multi-layered electrochromic lens. In this fourth preferred embodiment of the invention, the second layer **1501** of the lens is fabricated from electrochromic material that is totally different from the neutral density electrochromic material of the first layer. This second layer of electrochromic material will have its own Operating Characteristic curve and electronically control properties of light differently from that of the first layer.

In particular, FIG. **15***b* shows the left lens **1406** of the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles with a second layer of electrochromic material. The second layer is fabricated from electrochromic material that can be electronically controlled to allow the transmission of light in the clear or visible red spectrum. (A right lens that is not shown would be fabricated from electrochromic material that can be electronically controlled to allow the transmission of light in the clear or visible blue spectrum.) The second multi-layer of electrochromics of the multi-use lens is made from 6 layers of material. The top layer **1501** is made from an insulating layer of glass, plastic or other clear insulating material. This is followed by layer **1502** of a conducting layer, followed by a third layer **1603** of polymer. A fourth layer **1504** provides the ion transport whose direction is determined by the application of potential across the conducting layers. The fifth layer **1505** is the complementary polymer layer, and is then followed by another conducting layer **1506**. The polymer layers **1503** and complimentary polymer layer **1505** provide the electronically controllable tinting of the lens as either clear or red. The right lens—not shown—would have polymer and complimentary polymer layers to provide electronically controllable tinting for the right lens as either clear or blue.

TABLE 1 shows the different types of Optoelectronic materials that may be used in the fabrication of Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles. The first column of the TABLE 1 is a numbering of the methods—but no preference is to attributed to the ordering. The Method Number is used for reference in the disclosure. The second column of TABLE 1 labeled Viewing Method and is the type of viewing that may be attained through the use of the associated optoelectronic device that is described in the third column of TABLE 1. The third column of TABLE 1 labeled OptoElectronic Device is a brief description of the controllable optical characteristic necessary to achieve the associated viewing method.

TABLE 1

| Method No. | Viewing Method | OptoElectronic Device |
|---|---|---|
| 1 | 3Deeps movies (2D images viewed as 3D) | Single or multi-layers variable tint device |
| 2 | Anaglyph 3D movies | Right Lens Blue; Left Len Red device |
| 3 | Intru3D 3D movies | Right Lens Blue; Left Lens Amber device |
| 4 | Optimum emissive colors of TV phosphors (for Methods 1, 2, 3) | Optimized to emissive colors of TV |
| 5 | Polarized Lenses 3D movies | Right and left lenses at 90% polarization device |
| 6 | Vision correction | Near- or far-sightedness correction device |
| 7 | Shutter glasses | Rapid shuttering between clear and totally dark device |
| 8 | Sunglasses | Single layer variable tint device |
| 9 | Optical property of light | Electro Optical control of a property (or properties) of light |

With respect to the Method No. 1 of the table, the use of an electrochromic optoelectronic device for viewing 3Deeps

movies with a single-layer of variable tint lenses has been previously described in the first preferred embodiment of the invention, and the use of an electrochromic optoelectronic device for viewing 3Deeps movies with multi-layers of variable tint lenses has been previously described in the second preferred embodiment of the invention. With respect to Method No. 2 of the table, the use of an electrochromic optoelectronic device for viewing anaglyph 3D movies (left lens red and right lens blue) with Multi-Use Electrically Controlled 3Deeps Continuous Adjustable 3Deeps Filter Spectacles has been previously described in the third preferred embodiment of the invention.

The Multi-Use Electrically Controlled 3Deeps Continuous Adjustable 3Deeps Filter Spectacles described may also replace the layers of materials described or add additional layers of materials (with corresponding changes to the manual switches of the spectacles and the control program) to achieve other methods of electronically assisted viewing spectacles. Such methods may include; Intru3D 3D movies (Method No. 3) with left lens amber and right lens blue; optoelectronic devices (Method No. 4) that are tuned to the optimum emissive colors of a TV phosphor; optoelectronic devices (Method No. 5) that allow viewing of 3D movies using polarized lenses in which the right and left lenses have polarizations that are perpendicular to each other; optoelectronic devices that provide prescription glasses that correct vision such as near- or far-sightedness (Method No. 6); optoelectronic devices that allow viewing of 3D movies by the shutter glass method (Method No. 7) in which there is rapid shuttering between a clear and totally dark state for one eye, while the other eye has corresponding states of totally dark and clear in synchronization with right and left images of the displayed motion picture. The spectacles have a layer (Method No. 8) that when activated provides sunglasses. Any other optical property of light that can be beneficially controlled by an optoelectronic device (Method No. 9) can be used as a layer of the Multi-Use Electrically Controlled 3Deeps Continuous Adjustable 3Deeps Filter Spectacles. In some embodiments of the invention several methods may be operable at the same time as when Vision correction optoelectronics (Method No. 6) is active at the same time as any of the methods for viewing 3D movies.

FIG. **16** is a block diagram **1600** of the operation of the multi-use Continuous Adjustable 3Deeps Filter Spectacles **1450** with multi-layered lenses. All circuits on the multi-use Continuous Adjustable 3Deeps Filter Spectacles **1450** are powered **301** by the battery **104**, including the Control Unit **1403**, Signal Receiving Unit **102**, the Left Lens **1406**, and the Right Lens **1405**. The control information **110** is received by the Signal Receiving Unit **102** and sent **302** to the Control Unit **1403**. The switch **1101** position is also powered **301** by the battery **104**, and its position is output **1202** to the Control Unit **1403**. The Control Unit **1403** implements an algorithm that is specific for the multi-use (Use **1**: 3Deeps spectacles or Use **2**: Anaglyph 3D viewing) multi-layered Continuous Adjustable 3Deeps Filter Spectacles, and controls the Left Lens **1406** with a control circuit **1603**, and the Right Lens **1405** with a control circuit **1605**.

FIG. **17** is a flow chart **1700** showing the operation of the Control Unit **1403** of the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles **1450** with multi-layered electrochromic lenses. The switch position **1202** is input to the Control Unit **1403**. Processing commences with Change both right and left lens of layer land **2** to clear **1761** by switching both the right lens **1505** and left lens **1506** of the first electrochromic layer **411** and the second electrochromic layer **1501** to clear. Processing is then transferred to a control circuit Switch **1** or Switch **2** **1763** that can parse the switch position and determine which position the Switch **1101** is in. If the Switch position is in the first position (3Deeps viewing) then a first control processing unit **103** is used to control the first layer **411** of the lenses of the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles **1450**. If the Switch position is in the second position (anaglyph viewing) then a second control processing unit **103*a*** that is similar to the control processing unit **103** shown in FIG. **4**) is used to control the second layer **1501** of the lenses of the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles **1450**.



The two control processing units **103** and **103*a*** of the Control Unit **1403** are the same as the control processing unit for the First Preferred Embodiment and is described in FIG. **4**. The first control processing unit controls the spectacles for 3Deeps viewing and the second control processing unit control the spectacles for anaglyph 3D viewing. Only the input and output to the control processing **103** is shown in FIG. **17**—not the details of the processing that is the same as shown in FIG. **4**.

If the Switch position is in the first position then the control processing unit electronically synchronizes to the movie using 3Deeps technology by controlling the left **1406** and right lenses **1405** of the first layer **411** of the multi-use Continuous Adjustable 3Deeps Filter Spectacles **1450** over the control circuits for the left lens **1603** and control circuit for the right lens **1605**. In this case the second layer **1501** has been set so both right and left lenses of the second layer are clear. If the Switch position is in the second position then the control processing unit electronically controls the 3Deeps spectacles for anaglyph 3D viewing by switching the left lens **1406** to red and right lens **1405** to blue of the second layer **1501** of the multi-use Continuous Adjustable 3Deeps Filter Spectacles **1450** over the control circuits for the left lens **1603** and control circuit for the right lens **1605**. In this case the first layer **411** has been set so both right and left lenses of the first layer are clear.

This exemplary Control Unit **1403** has been purposely simplified for clarity and to show the principles of the control operation. It shows two separate control circuits **103** and **103*a***—the first **103** control circuit for control of Continuous Adjustable 3Deeps Filter Spectacles (first layer **411**), and the second **103*a*** control circuit for anaglyph 3D viewing (second layer **1501**). FIG. **17** shows each circuit **103** and **103*a*** with its own circuits for control of the left lens **1406** and control of the right lens **1405**. It should be understood that good engineering design would reuse as much circuitry as possible for two controlling functions of the Control Unit **1403**.

TABLE 2 shows control information for Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles. Such control information is necessary when the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles are under remote control rather than a manually control **1101** as shown in FIG. **14**.

TABLE 2

| Method No. | Viewing Method | Control Code | Control Information |
|---|---|---|---|
| 1 | 3Deeps movies (2D images viewed as 3D) | Ctrl-1 | Optical Density for left and right lens |
| 2 | Anaglyph 3D movies | Ctrl-2 | None |
| 3 | Intru3D 3D movies | Ctrl-3 | None |

TABLE 2-continued

| Method No. | Viewing Method | Control Code | Control Information |
|---|---|---|---|
| 4 | Optimum emissive colors of TV phosphors (for Methods 1, 2, 3) | Ctrl-4 | Real-time setting of optical density of right and left lens |
| 5 | Polarized Lenses 3D movies | Ctrl-5 | None |
| 6 | Vision correction | Ctrl-6 | Real-time optical property of density of right and left lens |
| 7 | Shutter glasses | Ctrl-7 | Shutter synchronization |
| 8 | Sunglasses | Ctrl-8 | Real-time setting of sunglass color of right and left lens |
| 9 | Optical property of light | Ctrl-9 | Optical property of right and left lens |

Control information for Continuous Adjustable 3Deeps Filter Spectacles has been previously shown in the related patent application Ser. No. 12/274,752. In that related disclosure no multi-layer or multi-use information was required of the spectacle control protocol since the Continuous Adjustable 3Deeps Filter Spectacles had only a single-layer and a single-use. With Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles that are under remote control, a control code sequence may be transmitted to signal the Control Unit **1403**—which layer of the multi-layered spectacles the controlling information references.

The first column of the TABLE 2 is a numbering of the methods—but no preference is to attributed to the ordering. The Method Number is used for reference in the disclosure. The second column of TABLE 2 labeled Viewing Method identifies the viewing method. Columns **1** and **2** of TABLE 2 are the same as in the like labeled column of TABLE 1. The third column of TABLE 2 labeled Control Code has the control code in the RF sequence that is utilized by the Control Unit **1403** to switch control to the associated lens. For instance, when the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles of FIG. **10**, receive a Ctrl-2 sequence it switch to control of the associated method—in this can Anaglyph 3D movies. Once the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles have received a Control Code sequence, all the control information that then follows will be interpreted to control the associated method. In the current example where a Ctrl-2 sequence is received switching the spectacles into Anaglyph 3D mode, all follow-on control information received by the spectacles would be interpreted to as controlling the Anaglyph 3D spectacle method and lens layer. Such follow-on control information references the switched method until another control-code is received.

A description of the contents of the Follow-on control information associated with each of the viewing methods is indicated in column **4** of the table, labeled Control Information. When the Control Unit **1403** of the spectacles receive a Ctrl-2 sequence indicating it is to switch to anaglyph mode, the control unit **1403** changes the left lens **1406** to a red and the right lens **1405** to a blue color. The spectacles stay in this mode until another CTRL-code is received switching the spectacles to another method. Since the Anaglyph method, activated by Control Code, CTRL-2 requires no further or follow-on controlling information, the entry for Anaglyph in the Control Information column is None indicating that no further control information is required for the Anaglyph mode. Similarly, no additional control information is required for Intru3D 3D movies; and, Polarized lenses. Control Information is required for methods 3Deeps Movies; Optimum emissive colors of TV; Vision correction; shutter glasses; sunglasses; and, Optical Property of Light.

The control information that is received wirelessly **102** by the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles of FIG. **14** may be transmitted by any of the means disclosed in the related patent applications including but not limited to; DVD-based control units; Digital Movie Projector control units; Television-based control units, hand-held and operated control units; spectacle-based control units, and cell-phone based control units.

Other Embodiments

While the preferred embodiments have been described using electrochromic materials, other electro-optical (optoelectronics) materials may be utilized. Any material for which the optical properties can be controlled by the application of a potential across the material may be advantageously used in the invention.

While the preferred embodiment uses 2 layers of electrochromic materials, even faster switching time can be achieved by using 3 or more layers.

While the preferred embodiment uses the same voltage applied to each of the multi-layers of the lenses, other embodiments may achieve control over the switching time to the optical optimal density by the application of different voltage across each layer of the multi-layered lenses of the Continuous Adjustable 3Deeps Filter spectacles.

In some embodiments of the invention, several different layers of multi-use-electronic materials may be switch selectable and active at the same time to achieve different optical effects. For instance electronically controllable vision correction may be combined with Continuous Adjustable 3Deeps Filtering to provide a single pair of viewing spectacles that both correct vision while at the same time providing optimal 3Deeps viewing of 2D motion pictures as 3D motion pictures.

In yet another embodiment of the invention, rather than use electrochromic materials that have the same optical properties (transmission OC curve), materials with different optical properties may be beneficially utilized.

As lenses get older their OC curve may change. In another embodiment the control program may tune the control OC curve based on age or time of use so that the spectacles do not appear to degrade in performance as they get older.

The switch selection for the Multi-Use Electrically Controlled Continuous Adjustable 3Deeps Filter Spectacles was shown on the spectacles. Alternatively, the switch selection can be activated by the viewing media by broadcasting a Rx signal that is picked up by the receiving unit of the 3Deeps spectacles **102**, passed to the control unit of the spectacles, and which are read and acted upon by the control program that controls the operation of the spectacles. For instance, a control code at the beginning of an anaglyph motion picture may allow the spectacles to respond by taking the proper configuration for viewing of anaglyph 3D encoded motion pictures without any manual intervention by the viewer.

In other embodiment of the invention the multi-layered or multi-use lenses may be in the form of clip-on lenses that readily fit over normal prescription lenses.

In still another embodiment of the invention, multi-use 3Deeps viewing spectacles are fabricated from a single layer of an electropolychromism device.

Previous related patent applications (such as U.S. Pat. No. 7,508,485) have disclosed systems and methods by which a

motion estimation value that characterizes movement in a frame of a 2D motion picture may be extracted from successive frames of the motion picture. The motion estimation value and a luminance value are used to calculate an optical density for the lens of the Pulfrich Filter spectacles and are transmitted to the Pulfrich Filter spectacles. The transmitted values are used to control the optical density of the lenses of the Pulfrich Filter spectacles. In still another embodiments of the invention, the motion estimation value is calculated from the motion estimation values that are part of the MPEG digital video compression standards.

In another embodiment of the invention, the 3Deeps electrochromic sunglasses have additional variable brightness controls. In one case, the sunglasses have means by which the user can set the darkness level of the sunglasses. That is, rather than a have Pre-selected optical densities value for the left lens and right lens stored in the control unit (as in FIG. **13**, the optical density value of the lenses of the sunglasses is under the control of the user. A rotary or slide switch could be utilized to select any optical density between the low and high values of the switch. In another embodiment a multi-pole switch is used so that user can select one of a set of pre-selected optical densities for the lenses of the sunglasses.

In another embodiment of the invention the 3Deeps electrochromic sunglasses, the variable brightness of the lenses of the sunglasses operate similarly as an electrochromic version of photochromatic lenses. That is, the optical density of the 3Deeps sunglasses is set in accordance with a continuum of the ambient surrounding light. In low light (dark) there would be a minimum of little or not darkening of the lenses, while in intense sunlight such as at noon on a cloudless sunny day the lenses would take an extreme dark value. Lighting situations in-between would result in the optical density values for the lenses in-between the minimum and maximum values. This could be achieved for instance by incorporating a photodiode on the 3Deeps spectacles that measures the ambient light at the spectacle frames, and inputs that value to the control unit on the spectacles.

In another embodiment of the invention, the Continuous Adjustable 3Deeps Filter Spectacles may not respond to every synchronization signal. While some electrochromic materials may have been reported that have a cycle life of up to 50 million changes—and even higher values can be obtained—if the Continuous Adjustable 3Deeps Filter Spectacles are made from a material with a shortened cycle life it may be necessary to also additionally consider and optimize for the operation of the spectacles for the cycle life. While the synchronization signals would still be broadcast for every frame, the Continuous Adjustable 3Deeps Filter Spectacles may be set to only process and respond to some of those changes so as efficiently use cycle life. This make sense, as scenes that exhibit movement may be on the order of 10-30 seconds long, or longer, and the same optical density setting will provide a near-optimal setting for the Continuous Adjustable 3Deeps Filter Spectacles. To address cycle time then, the Continuous Adjustable 3Deeps Filter Spectacles may use a combination of ad-hoc rules such as (a) responding only to every nth synchronization event; (b) responding to only synchronization events with changes to the optical density of more than a pre-set percent; (c) responding to synchronization events in which there is a change to direction of motion; (d) responding to synchronization events in which there is a change in presence or absence of motion; (e) scene change, or (f) some other motion picture frame event.

As noted above, in accordance with certain embodiments, a method is provided for originating visual illusions of figures and spaces in continuous movement in any chosen direction using a finite number of pictures (as few as two pictures) that can be permanently stored and copied and displayed on motion picture film or electronic media. The method of the present invention entails repetitive presentation to the viewer of at least two substantially similar image pictures alternating with a third visual interval or bridging picture that is substantially dissimilar to the other substantially similar pictures in order to create the appearance of continuous, seamless and sustained directional movement.

Specifically, two or more image pictures are repetitively presented together with a bridging interval (a bridging picture) which is preferably a solid black or other solid-colored picture, but may also be a strongly contrasting image-picture readily distinguished from the two or more pictures that are substantially similar. In electronic media, the bridge-picture may simply be a timed unlit-screen pause between serial re-appearances of the two or more similar image pictures. The rolling movements of pictorial forms thus created (figures that uncannily stay in place while maintaining directional movement, and do not move into a further phase of movement until replaced by a new set of rotating units) is referred to as Eternalisms, and the process of composing such visual events is referred to as Eternalizing.

The three film or video picture-units are arranged to strike the eyes sequentially. For example, where A and B are the image pictures and C is the bridging picture, the picture units are arranged (A, B, C). This arrangement is then repeated any number of times, as a continuing "loop". The view of this continuing loop allows for the perception of a perceptual combining and sustained movement of image pictures (A, B). Naturally, if this loop is placed on a film strip, then it is arranged and repeated in a linear manner (A, B, C, A, B, C, A, B, C, A, B, C, etc.). The repetition of the sequence provides an illusion of continuous movement of the image pictures (A, B); with bridging picture (C), preferably in the form of a neutral or black frame, not consciously noticed by the viewer at all, except perhaps as a subtle flicker.

A more fluid or natural illusion of continuous movement from a finite number of image pictures is provided by using two of each of the three pictures and repeating the cycle of the pairs sequentially, or by blending adjacent pictures together on an additional picture-frame and placing the blended picture between the pictures in sequential order. The two image pictures (A, B) are now blended with each other to produce (A/B); the two image pictures are also blended with the bridging picture to produce (C/A and B/C), and then all pictures repeat in a series starting with the bridging picture (C, C/A, A, A/B, B, B/C) each blended picture being represented by the two letters with a slash therebetween). This series is repeated a plurality of times to sustain the illusion as long as desired. Repeating the sequence with additional blended frames provides more fluid illusion of continuous movement of the (optically combined) two image pictures (A, B).

Additionally, various arrangements of the pictures and the blends can be employed in the present invention and need not be the same each time. By varying the order of pictures in the sequence, the beat or rhythm of the pictures is changed. For example, A, B, C can be followed by A, A/B, B, B/C, C which in turn is followed by A, A, A/B, B, B, B, B/C, C, C, C, C, i.e. A, B, C, A, A/B, B, B/C, C, A, A, A/B, B, B, B, B/C, B/C, C, C, C, C, A, B, C, A, etc.

With A and B frames being similar images (such as a pair of normal two-eye perspective views of a three-dimensional scene from life), and frame C a contrasting frame (preferably a solid-color picture instead of an image-picture) relative to A,B, frame C acts as essentially a “bridge-interval” placed between recurrences of A,B. Any color can be used for the contrasting frame C: for example, blue, white, green; however, black is usually preferred. The contrasting frame can also be chosen from one of the colors in one of the two image pictures. For example, if one of the image pictures has a large patch of dark blue, then the color of the contrasting frame, bridging picture, may be dark blue.

Blending of the pictures is accomplished in any manner which allows for both pictures to be merged in the same picture frame. Thus, the term “blending” as used in the specification and claims can also be called superimposing, since one picture is merged with the other picture. Blending is done in a conventional manner using conventional equipment, suitably, photographic means, a computer, an optical printer, or a rear screen projection device. For animated art, the blending can be done by hand as in hand drawing or hand painting. Preferably, a computer is used. Suitable software programs include Adobe Photoshop, Media 100 and Adobe After Affects. Good results have been obtained with Media 100 from Multimedia Group Data Translations, Inc. of Marlborough, Mass., USA.

When using Media 100, suitable techniques include additive dissolving, cross-dissolving, and dissolving-fast fix and dither dissolving.

In blending the pictures, it is preferred to use 50% of one and 50% of the other. However, the blending can be done on a sliding scale, for example with three blended pictures, a sliding scale of quarters, i.e. 75% A/25% B, 50% A/50% B, 25% A/75% B. Good results have been obtained with a 50%/50% mix, i.e. a blend of 50% A/50% B.

The two image pictures, A and B, which are visually similar to each other, are preferably taken from side-by-side frame exposures from a motion picture film of an object or image or that is moving such that when one is overlaid with the other, only a slight difference is noted between the two images.

Alternatively, the two image pictures are identical except that one is off-center from the other. The direction of the off-center, e.g. up, down, right, or left, will determine which direction the series provides the appearance of movement, e.g. if image picture B is off-center from image picture A to the right of A, the series of C, C/A, A, A/B, B, B/C will have the appearance of moving from left to right. Likewise, if you reverse the order of appearance then the appearance of movement will be to the left.

More than two image pictures can be used in the invention. Likewise, more than one bridging picture can be used in the present invention. For example, four image pictures can be used along with one bridging picture. In this case, the series for the four image pictures, designated A, B, D and E, would be: C, A, B, D, E; or a 50/50 blend C, C/A, A, A/B, B, B/D, D, D/E, E, E/C; or side-by-side pairs, C, C, A, A, B, B, D, D, E, E.

The image picture need not fill the picture frame. Furthermore, more than one image picture can be employed per frame. Thus, the picture frame can contain a cluster of images and the image or images need not necessarily filling up the entire frame. Also, only portions of image pictures can be used to form the image used in the present invention.

Also, image pictures and portions of the image picture can be combined such that the combination is used as the second image picture. The portion of the image picture is offset from the first image picture when they are combined such that there is an appearance of movement. For example, a window from image picture A can be moved slightly while the background remains the same, the picture with the moved window is designated image picture B and the two combined to create the appearance of the window moving and/or enlarging or shrinking in size. In this case, both picture A and picture B are identical except for the placement of the window in the image picture. The same can also be done by using an identical background in both image pictures and superimposing on both pictures an image which is positioned slightly different in each picture. The image could be a window, as before, of a man walking, for example.

The number of series which are put together can be finite if it is made on a length of film or infinite if it is set on a continuous cycle or loop wherein it repeats itself.

Broadly, an embodiment of the invention is a method for creating an appearance of continuous movement with a plurality of picture frames using three or more pictures, said method comprising:

a) selecting at least two image pictures, a first image picture and a second image picture, which are visually similar;
b) selecting a bridging picture which is dissimilar to said image pictures;
c) arranging said pictures in a sequential order to create a first series of pictures, said sequential order being one or more first image pictures, one or more second image pictures, one or more bridging pictures;
d) placing said first series of pictures on a plurality of picture frames wherein each picture of said first series is placed on a single frame; and
e) repeating the first series of pictures a plurality of times to create a continuous plurality of picture frames having said first series thereon, such that when said plurality of picture frames are viewed, an appearance of continuous movement is perceived by a viewer.

Preferably, step (c) is replaced with the steps comprising:

(c1) blending said first image picture with said bridging picture to obtain one or more blended first-bridging picture;
(c2) blending said first image picture with said second image picture to obtain one or more blended first-second picture;
(c3) blending said second image picture with said bridging picture to obtain one or more blended second-bridging picture;
(c4) arranging said pictures in a sequential order of one or more bridging pictures, one or more of said blended first-bridging picture, one or more of said first image picture, one or more of said blended first-second pictures, one or more of said second image picture, one or more of said blended second-bridging picture to create a first series of pictures.

An artificial 3-D image can be achieved by the present invention, as will be described in more detail below. Another way to obtain an artificial 3-D image is by a method of electronic switching of Pulfrich light-filtering before right or left eye, synchronized with screen action.

The start or end of the sequences doesn’t matter since the sequence is placed in a continuous loop, however, the order of the pictures in the loop is critical in the practice of the present invention.

FIG. **18*a*** illustrates three pictures that are employed in a method in accordance with an embodiment of the invention. Picture A, illustrated with lines slanting upward left to right, and Picture B, illustrated with lines slanting downward from

left to right. Both pictures A and B are single frame photographs such as two side-by-side frames taken from a movie film showing movement of an object, for example, a woman walking down a street or a man walking his dog. Such side-by-side frames would be similar to each other but not identical. Picture C is a solid black picture.

In FIG. **18***b* pictures A, B and C are arranged in sequential order, and placed on picture frames to form a series. In FIG. **18** *c* this series is then repeated to produce the appearance of movement by pictures A and B.

Turning to FIG. **19***a* and the use of blended pictures, the three pictures are combined to produce a blend of CIA, blend of A/B and a blend of B/C by using Adobe Photoshop or another program to make a 50/50 blend of the three pictures.

In FIG. **19***b*, all six pictures are placed side-by-side to create a series and the series is copied to create a continuous or semi-continuous film video or computer sequence where the series is repeated a plurality of times as shown in FIG. **19***c*.

FIGS. **20***a*-**20***c* illustrates an alternative three pictures that are employed in the method of this invention. Picture D and Picture E both illustrate a capital A, however, in Picture D, the capital A is aligned with the center of the frame while in Picture E the A is off-set to the right of the center of the frame (exaggerated here to be visible; in actual practice the displacement of figures might be so subtle as to not be discernable as illustrated here). Picture C is identical to Picture C in FIG. **18***a*.

The capital A is chosen for FIGS. **20***a*-**20***c* for illustration purposes and could be a single photograph of anything.

The three pictures are placed side-by-side to form a series. Finally, the series is copied a plurality of times to form a repeating series. The repeating series in FIG. **20** *c* creates the optical illusion that the letter A is moving from left to right and, if one letter A were to be slightly different in size from the other, the letter would appear to be moving in depth, i.e. given a third dimension.

In FIGS. **20***a*-**20***c* the background of Picture E is identical to the background of Picture D except that the image A is off-set slightly to the right.

FIGS. **21***a*-**21***b* illustrates the present invention where the series is two of each picture placed in side-by-side frames. It has been found that two pictures side-by-side are visually equivalent to a blend. In other words, a series of A, A, B, B, C, C is visually equivalent to a series of C/A, A, A/B, B, B/C, C.

Additionally, a series made in accordance with the present invention need not be uniform in that the pictures can be arranged to provide a different rhythm or beat to the film. For example, the series could be: C/A, C/A, A, A/B, A/B, B, B, B, B/C, C, C, C. Different arrangements provide different visual perceptions.

Furthermore, a plurality of different series can be combined together, i.e. C/A, A, B, B, C with C/A, C/A, A, B, B, C, C to form C/A, A, B, B, C, C/A, C/A, A, B, B, C, C.

FIGS. **22***a*-**22***c* illustrates the invention where both pictures are identical except for the position of a superimposed image F on the pictures. Image F could be taken from the original picture G or could be taken from another picture, which is separate and distinct from pictures G and H. For example, pictures G and H could have the common background of a country side road while image F is a man walking his dog. In picture G, the man and his dog is placed at one location while on picture H the man and his dog is placed at a different location on the country road. By viewing the repeating of a series of G, H, C, a viewer is given with the impression that the man is walking his dog down the road, from top of the frame towards the bottom of the frame, appearing to be continually moving in the same direction without changing his actual position.

Furthermore, image pictures can be identical except that when they are arranged in the frame, one is oriented slightly tilted relative to the other. The repeating series provides the visual perception that the picture is spinning.

Also, the size of or the orientation of image F in FIGS. **22***a*-**22***c* can be varied while maintaining the location of image F. Varying the size gives the viewer the impression that the man is walking forward or backward, depending on the order in which pictures are arranged. Changing the orientation or tilting of image F leaves the viewer with the impression that the man is spinning.

The repeating series can be viewed in any media, it could be digitalized or placed on conventional film for viewing.

The movement created by the invention is seamless movement, sustained fluid entirely on-going movement.

Continuous movement means the illusion of a progressive action that can sustain as such into infinite time. For instance, a door beginning to open, it keeps beginning to open without ever progressing to the stage of actually opening. A door, in reality, in order to repeat this very limited movement, would have to move back and forth, recovering territory in order to go forward again, but in this visual illusion the door only moves forward. A normal film or video might approach this effect by multiple printing of the picture frames depicting only the forward motion, so that a return motion would be hidden from audience eyes, but the effect would be of a visual stutter; the action would be repeating, and not continuous. The stutter could be made less obvious and percussive by dissolving head frames of the shot into tail frames, but only with some subject matter (i.e., a waterfall) might the repeat character of the motion not be apparent.

The appearance of transfixed continuous motion (a going without going anywhere) is created in this invention from a specific employment of flicker, the contrast created by viewing the slight shifting of a pictured form or forms between the image pictures in opposition to the bridging picture. Movies have always been dependent for their illusion of continuity on flicker-rates; silent movies filmed at 16 frames per second required 3-bladed shutters not only to block projection light during the successive replacing of frames but also to twice interrupt the display of each frame so as to achieve a flicker rate that the viewer would mistakenly see as uninterrupted light. Slow cranking of the film through the projector gave rise to "the flickers" as a pejorative. Video and computer image-continuity depends likewise on rapid on-off display. The present invention purposely makes flicker apparent, utilizing the effects of emphatic flicker on the human optical/nervous system to create uncanny time and space illusions.

Simple alternation of a single image picture with intervals of blackness (or any other interrupting color/s) is enough to create subtle illusions of continual sliding movement across the screen. Alternations of two image pictures with an interrupting interval of a solid colored picture provides any number of continuous motions, including motion into illusionistic depth. While such screening-illusions of movement and depth resemble movements and depths as seen in actuality; this is a creative artistic method and not intended as a reliable way of reporting the actuality that may have existed in front of a camera.

As noted above, no special viewing devices are required to view the present invention, although certain effects can be

enhanced or put through interesting changes when viewed with a filter intercepting and reducing light to one eye; the Pulfrich Effect.

Remarkably, with the present invention, depth illusions can be experienced even by the single-eyed person. Normally our perception of depth, stereopsis, depends on properly functioning binocular vision, two eyes working in tandem with each other; one of the benefits of this invention is to offer visual depth experience to those deprived of such experiences by physical defect. Because contrasting perspectival information is available to both or either eye, a single eye becomes sufficient to deliver the information to the brain when employing the present invention.

The present invention is best created on the computer, to be viewed on the computer or transferred to film or any video format. It can also be created directly onto film or video but the precision control possible with the computer is lacking.

The present invention can employ very small shifts in the placement of objects as seen in one picture in relationship to another similar picture. Such small object-placement shifts are also to be found in the simultaneously exposed pairs of frames made with a stereo still-camera, its two lenses placed horizontally apart approximately the distance between human eyes. The stereo still-camera offers object-placement differences derived, as with our two eyes, from a fixed interval of space: the twin perspectives recorded by lenses 2½ inches apart. The degree of inter-ocular distance, as it is called, enormously affects the character of depth to be seen when the stereo-pair is properly viewed one picture to each eye; depth would seem very distorted, either too shallow or too extended (with other depth aberrations) if the distance between our eyes was not being matched by the two-lens stereo-camera.

In contrast to stereo-camera photography, with the single-lens motion picture camera (film or video), exploitable difference between like images arises from the interval of time between picture-exposures, during which the objects filmed shift in spatial relationship to each other; or/and the camera itself moves, capturing the 3-dimensional scene from another perspective, and thus shifting two-dimensional placement of pictured objects (which may not have moved in actuality) as recorded exposure to exposure. Because distance or direction traversed by the camera between exposures is not constant, nor movement by subjects recorded under photographer control, the visual equation of two-dimensional similarities and differences from which 3-dimensional movements will be constructed cannot produce scenes as reliably life-like as can simultaneous stereo-exposures with a fixed horizontal distance of 2½ inches between a pair of lenses. Eternalism 3-D movements made from sequential exposures are not intended to offer scientific data pertaining to reality but instead to provide odd and expressive impossible-in-reality impressions.

The stereo still-camera provides a pair of mentally combinable left and right eye flat image pictures; viewed one picture to each eye, similarities and differences are automatically assessed and a semblance of familiar depth is seen. We gaze from plane to plane into a seeming depth, the angling of our two eyes crossing for close objects and spreading to parallel alignment for very distant ones (Yet we remain focused on the same plane in depth, the actual plane of the picture surface; in life, we constantly refocus as well as angle for different distances.) We are not conscious, either in actual life or when looking into such artificial depths, of the doubling of forms (as they fall back into 2-dimensionality) at distances that we are not at the moment angling for. This automatic angling operation of the eyes cannot happen when looking with both eyes at the same territory of flat picture surface. The coinciding of opposing 2-dimensional perspectival viewings of an object (by which volume can be conceived by the mind) must be done for the viewer, a task greatly enabled by the computer.

The present invention revolves each set of picture-units in place, but if a figure from one perspective is not placed in a correspondingly similar position in its frame (and in matching horizontal alignment) with its representation as recorded from another perspective, there is only a 2-dimensional jiggering with no volume illusion or continuous direction of movement created. With the computer, one can slide and place one picture, or an area of that picture, into exact relationship with a matching picture or area so as to achieve the precise effect desired. (A recorded object becomes an area within a flat picture-image.) The slightest advance in a particular direction of the contour of one area in relation to its match-up area determines movement in that direction. Slight shrinking or enlargement of one area compared to the other creates a zooming in or out effect. A problem in overlaying one entire picture over another in order to match up one area usually means other areas will not coincide, not synchronize; but the computer allows for each area to be matched separately and inlaid into the scene according to one's depth-movement intentions for each area. The crazy-quilt artificiality of a scene can be hidden or obvious, its parts drawn from a single-pair source of related images or from as many sources as desired. Photo-images can be mixed with or replaced by drawn and painted imagery. The scene can imitate real life one moment and veer off into impossibility the next.

Again, although only two image pictures are usually cycled, more than two can be worked into a cycle to create a particular effect. Following and inventing variants on the directions above, and the formula as described below for sequencing frames, will create the impression of solid entities moving in a charmed dimension where normally transient physical gestures can endure forever. In fact, computer interactivity can mean the viewer deciding how long the effects of each series continues. Further interactivity will give the viewer the option to place picture of his/her own choice into this unique cycling system.

FIGS. **23***a*-**23***c* shows two phases of an action, A & B, plus black bridge-frame C. We see the pictures separately in FIG. **23***a*; made sequentially adjacent to each other in FIG. **23***b* and presented as a repeating series of pictures, as a loop or cycle, in FIG. **23***c*.

FIG. **24***a* demonstrates the creation of intermediary or blended frames between A, B and C, which are 50-50% blends producing A/C, A/B & B/C. FIG. **24***b* shows them in sequence and FIG. **24***c* shows them repeating as an ongoing loop.

FIG. **25***a* shows one figure in isolation, removed from the previous scene. Pictures D & E may appear identical but are actually two different perspectives which together make possible a 3-dimensional figure. While the recording camera remained in a fixed position the figure moved before it, frame after frame, making two perspectives possible. Because the figure moved to different positions in the two film frames, it was necessary to move one figure in one frame so that both figures would occupy the same location in both frames. It is now possible to see them as a single 3-dimensional figure when the frames cycle in quick succession together with the bridge frame as shown in FIGS. **25***b* and **25***c*.

FIGS. **26***a* and **26***b* represents the doubling of each frame in an A, B, C series.

FIGS. **27***a*-**27***c* shows a section of picture G & H is repeated in the upper left corner. When observed in quick succession this series will show the two center figures in one configuration of depth and the inset series as an opposing configuration of depth. Left eye/right eye views as placed in G & H are reversed in the inset figure, so that parts of the figure that (3-dimensionally) approach the viewer in the larger picture are seen to retreat away from the viewer in the smaller picture, and vice versa.

FIG. **28** illustrates two sets of four; with both similarities (J, K, M) and differences (L, N) between the sets, including in the upper left corner an action that straddles bridging frame (M) and picture frame (J). Note the bridging frame is not completely blank or colored. Frame J has a smaller frame in the upper left corner of a larger frame and is an example of a combined frame that may be generated by stitching a first frame and a second frame together.

FIG. **29** illustrates an example of an Eternalism effect coexisting with more normal screen action, and of an Eternalism repetition taking place but with no two frames exactly alike: a visual element (the circle) proceeds frame to frame throughout as it would in a normal movie, unaffected by Eternalism looping. Again, note that the bridging frame is not completely blank.

FIG. **30** is an illustration of Pulfrich filter spectacles: (1) clear; (2) activated to partly block light reaching figure's right eye; (3) activated to partly bock light reaching figure's left eye. Liquid crystal reaction is one method of achieving the blocking effect.

Certain embodiments may be described as follows:

In the Pulfrich filter effect, interference by the light-reducing filter has the effect of retarding the light that does pass through it to the eye. As long as forms and objects are changing position relative to each other as pictured frame to frame, a delayed picture seen in combination with a present-moment picture offers two slightly different pictures simultaneously to the mind. Thus an artificial three-dimensional image can be produced by the mind utilizing the same mechanisms that allow it, in viewing actuality, to produce a three-dimensional mental image from the pair of two-dimensional perspective-images received from horizontally adjacent eyes. The artificial 3-D image can be said to depend on a variable report of actuality. A Pulfrich filter used to view actual three-dimensional space will distort that space (assuming the scene is in motion). Similarly, depth in a screen image can be distorted, and in manifold ways, including reversal of near and far and direction of motion flow. Such distortions can have expressive artistic value.

The Pulfrich Effect, triggered (as described above) to accord with pictured directional motion on-screen, would have applications beyond use with Eternalized movies. Video games and other video movies featuring extended screen movements to left or right could, in many instances, be enhanced for viewers by Pulfrich projection into three-dimensional depth. For many such screen events for instance, a scene filmed or videotaped from a moving vehicle, especially perpendicularly, with the camera aimed at or close to a 90 degree angle from the side of the vehicle, convincingly realistic deep space would result. A stipulation of realistic deep space, as made available by the Pulfrich Effect, is that the partial light-absorbing filter be before the eye on the side to which the pictured foreground objects are seen to move. If filming or videotaping was to be done with the camera aimed perpendicular to a vehicle's path of movement, and the camera was on the driver's side, motion onscreen would flow screen-left, and the Pulfrich filtering would therefore have to take place before the left eye; thus the need to switch dark-filter placement from eye to eye in accordance with direction of screen movement. The filter works best when there is essentially horizontal movement; when viewing an unmoving or inappropriate image, both left and right eye filters should clear. Presented as electronic media, such images would benefit from timed application of appropriate Pulfrich filtering. This aspect of the invention would allow 3-dimensional movies to be created and presented (less spectacles) with the same cinema technology used for making and presenting ordinary 2-dimensional movies.

Description of the Eternalism Optical Phenomena

The idea of an interval of action running in place without apparent beginning, middle and end, forever swelling or turning or rising or opening, forever seeming to evolve without ever actually doing so (until given a determined release into a further phase of development), can be literally unimaginable, so alien is it to our experience. Neither in life or on film or in electronic imagery has it been possible to create the optical illusion of a door forever cracking open or a muscle rippling or head turning or any other limited gesture continuing as such into potentially unlimited time—until advent of this invention. We have termed this phenomenon Eternalism, and we speak of pictured forms or objects, scenes or gesture being Eternalized into Eternalisms. A further benefit of this invention is enhanced 3-Dimensionality of Eternalized images, a 3-D that can be reasonably life-like or radically at odds with depth as we know it.

Consider, for example, the action of a door opening. And select from that entire action only the fraction of time that it would take for the door to just begin to open, as it cracks open a narrow space alongside the doorframe, with the outer edge of the door swinging over little more than an inch of flooring. Designating this very limited time-space interval as a movie shot. The most minimal movie shot possible, it consists of only two running frames of film or video.

In reality, there would be no way to sustain into unlimited time the very limited action of the door cracking open; to keep opening and only opening yet never moving past that very limited phase of just cracking open. This motion is not repeated but sustained. The reality, of course, is that to remain in motion, and in forward motion only, one would have to move the door to a further phase of motion: the door would have to open wider. And the designated space-time interval would be left behind.

This is similar to someone walking against the direction of a conveyer belt walkway (as at an airport) and at exactly the same speed of the conveyer belt, continually walking forward yet getting nowhere. The Eternalism technique is a sort of cinematic conveyer belt moving in an opposing direction to any moving image placed on it.

It is a conveyer belt with a beat, a flicker, a visual beat capable of supple changes. In the history of cinema, flicker—referring to visible intervals of darkness between flashes of successive film-frames, intrusive reminders of the mechanical basis of the cinematic illusion—has been a pejorative term. To commercially entertain, the technology needed to quickly outgrow flicker. Yet in doing so some other illusionistic potentials of the art, very curious departures from life-like representation, were never discovered, their expressive potential left untapped, until now.

Method

Visible flicker is essential to Eternalism technique, which investigates and utilizes different intensities of emphasis, frame choices and frame-counts of flicker in order to create

entirely new illusions to augment cinema's repertoire of visual effects. Today's audiences are entirely receptive to non-realistic representation, the textures of visual technologies are no longer unwelcome onscreen. Visible flicker does sometimes appear in movies in purposeful ways, usually representing lightning or machine-gun bursts, and even as rhythmic hits of light-energy, but not with the methodology and results of Eternalisms.

No less than three basic units, two pictures and a bridge-interval (A, B, C), are necessary to create an Eternalism, even when picture B might be only a slight modification, a shifting or size reduction or expansion or tilting, etc. of picture A. On the simplest level, the series of units would proceed: A, B, C, A, B, C, A and so on. Each unit interval may be of any effective time duration, an effective smooth-working duration for computer assembling is two frames per unit, shown here as A,A, B,B, C,C, A,A, B,B, C,C, A,A and so on. It is sometimes desired to insert transitional frames, usually 50/50% (percentage mixture may vary) superimposed frames of adjacent units, shown here as: A, A/B, B, B/C, C, C/A, A and so on.

Additionally, all re-appearances of the basic cycling units comprising an Eternalism needn't be exactly the same. Strict mechanical repetition can give way to flexible variation within the limits imposed by what is necessary to sustain the motion/depth illusion (unless one chooses to abandon the illusion entirely for a period of time; it is expected that for commercial movie use of the method, that the effect would be used intermittently, for selected scenes). Any number of factors comprising a unit-sequence may be altered from appearance to appearance as it cycles, including colors, shapes, placement of shapes, objects pictures, unit duration, etc., so that the same Eternalism would seem to remain in play while going through subtle or even vibrant internal changes, before being replaced by a successive phase of motion or a distinctly other selection of picture/interval units. Change in the order of units, such as A, B, C, A, B, C, A being replaced by B, A, C, B, A, C, B would initiate an immediate reversal in direction of pictured movement. Varying durations of units within an Eternalism or traveling from Eternalism to Eternalism may not only make for desired beat and rhythm changes but also affect the apparent character of motion and/or depth in interesting ways. A composer of a series may even choose to play against its smooth continuity by momentary unit-replacement or interjection by other picture units, as for instance: A,A, B,B, C,C, A,D, B,B, C,E,C, A,A. The entire screen may Eternalize with the same sequential rhythm (usually the case) or different parts may sequence with different rhythms to different pictorial effect.

Many techniques commonly in use in computer and hand-crafted movie animation can be adapted to Eternalism use. For instance, similar to screen combinations of photographed reality with animation cartooning, only a section or sections of the screen image may be Eternalized while normal movie motion proceeds in other sections. Or a figure in normal motion may move through an Eternalized scene. Or, among other combination possibilities, a smaller Eternalism (which can be an object or shape or a separately framed scene) may be imbedded within a larger Eternalism, or may float before it, or move—substantial yet ghostlike—through it.

Stereo Vision and Special Requirements of Eternalism Composition

Eternalism images may be so composed as to create an impression of 3-dimensional volume, designed to appear more or less realistic, but never with the degree of realism as to fool anyone that they are other than images. No one will ever attempt to sink a hand into one to grab at passing fish as children do at Sony I-MAX. Eternalism depth is readily apparent and yet more problematic, as is its character of movement. Depth isn't simple there to be taken for granted, but seems constantly caught in the act of being generated out of flat elements. Eternalism is an illusion of depth. Our minds are given the task of entertaining together two conflicting impressions: of things simultaneously appearing both flat and deep. However, the degree of 3-dimensionality that is there can be seen without need of special viewing devices of any sort, and in fact can be seen by many persons normally deprived of any 3-dimensional vision (those missing sight in one eye, for instance).

Depth as well as ongoing movement must be artificially composed in the making of Eternalisms. Calculated placement of areas to be brought into working correspondence within a picture A and picture B is of paramount importance.

It does happen that images are recorded on film or in electronic media that work effectively enough when sequentially overlayed with each other as-is, so as to need little or no cut-and-paste rearrangement. But more often there are areas not adequately corresponding in sequential location and therefore, when alternated quickly, will merely bounce back and forth from place (in A-frame) to place (in B-frame). In normal stereo-vision ones two eyes angle in and out from parallel alignment as they match corresponding areas on their two retinal images. Each retinal image is in fact 2-dimensional; 3-dimension vision is a result of this muscular matching, this pulling-into-alignment activity performed by muscles surrounding the eyes (as dictated to by viewers focus of interest) activity by the eyes and the mental comparing and processing of like and unlike information sent by each eye to the brain. Only within a very limited interval of actual depth, up to about twenty five feet distance for most humans, can we effectively shift and overlay forms so as to discriminate depth accurately (eyes work in parallel beyond that distance, with greatly reduced depth distinction). The closer to the eyes the target of focus, the more the eyes have to cross, and the different degrees or angles of crossing demanded as things approach or recede means that while one layer of depth will be properly shifted to overlay figures, others will not be. Selective focusing and shift in real-life visual experience, selectively attending to the 3-D figures creates in the mind, while ignoring—helped by a "dominant eye"—the remaining non-overlayed and doubled flat figures remaining in the twin fields of vision, peripheral to the focus of attention.

Ignoring such peripheral mismatchings in Eternalisms does not come so naturally. Because the image pictures alternate in appearance, they don't quietly superimpose (with one image largely discarded from mind due to our having a "dominant eye"): non-overlayed areas will tend to jiggle and bounce, usually a distraction. Unless that is the effect wanted in a particular instance, the procedures of artificially overlaying A and B picture-areas for the viewer will be carried out throughout an Eternalism composition, into all peripheral areas of the picture. Again, this can be done employing computer graphics cut-and-paste techniques, with the filling of areas left emptied (by removal or shifting of a form) usually accomplished by the extending of adjacent colors.

Picture-frames A and B may be near-identical or have only some elements with close visual correspondence. Similarity of shape and location within the frame are important factors determining the effect. This is true to the point that entirely different pictured objects but of similar shape and on-screen location will give better results than two images of

the same object recorded from perspectives too far apart or placed too far apart within consecutive frames, in which case the images will be seen to vibrate or bounce back and forth without visually combining into a single moving form. While matching image elements in pictures A and B must occupy almost the exact screen-space in order to combine properly, it will be the differences between them (within close tolerances) that will produce and determine the character of movement and dimensionality. Computer graphics cut-and-paste techniques can be used to select and place, shrink and expand and otherwise manipulate matching elements (from any source) into effective screen-locations relative to each other. One or both pictures may be collaged or stitched together from multiple sources, parts may be removed or inserted, lifted and reshaped or/and relocated. Even when the image is photographed from life and appears life-like, the process of composition can be as exacting and labor-intensive and involved with techniques of artifice as cartoon animation.

Embodiments

In practice, the implementation of this technique opens up a new world of visual effects. Its uncanniness may be emphasized to create unsettling time-space aberrations for comic or dramatic effect in movies. Or, aiming for more realistic appearance, the method could be used to provide more lively snapshots of familiar things and events. For instance, people could carry, programmed into a Palm Pilot-type electronic wallet, a great many (low memory demanding) moving replicas of loved ones in characteristic living gestures, with heightened 3-dimensional presence. Even very limited movement, limited 3-dimensionality, can enormously augment and reinforce visual information: i.e., a child's face breaks into a smile. Again, the very low demand of electronic memory by an Eternalism (cycling as few as two picture-frames with an interval of darkness), makes possible extensively illustrated electronic catalogues or even encyclopedias, supporting hundreds and eventually thousands of Eternalized illustrations. A reader-viewer might observe a home appliance in operation. Or study a visual sampling of an ocean wave breaking in its sweep to shore, study it as has never been possible before, forever breaking from peak ascendancy. One may study a springing cat, sheath of muscles sliding over ribs continually, available for sustained observation; or follow a clear demonstration of the direction a screwdriver must turn to further imbed a screw. Any number of instances where stereo-dimensional action (often audio-accompanied, as audio also demands little computer-memory) would communicate so much more than a still and flat image, or even a moving but flat image.

In accordance with another embodiment, a method of displaying one or more frames of a video is provided. Data comprising a compressed image frame and temporal redundancy information is received. The image frame is decompressed. A plurality of bridge frames that are visually dissimilar to the image frame are generated. The image frame and the plurality of bridge frames are blended, generating a plurality of blended frames, and the plurality of blended frames are displayed.

The basic idea of video compression is to remove spatial area redundancy within a video frame (e.g. as done with Fax transmissions) and temporal redundancy between video frames. Since the successive frames in a video stream usually do not change much within small time intervals, the temporal redundancies can be used to encode and compress a video frame based on other video frames temporally (successively or previously) close to it.

As an example, MPEG compressed video files record a 16×16 pixel area (referred to as a macro block) of a frame of a motion picture, and then for successive frames only record a motion vector describing the motion of the macro block. In MPEG compression the motion vector has a horizontal and vertical part, each part ranging from −64 to +63 with a positive value indicating that the macro block moves to the right or downward respectively. Any macro block can move up to 64 pixels laterally and vertically between frames. (MPEG compression tracks not just rigid rotation but also macro block rotation.) High compression rates are achievable for moving pictures in part because the next successive frame of a motion video consists in the main of identical information. For instance, if the camera is fixed, the background information for a scene will be mostly identical between the frames of the scene. Most macro blocks will have an associated numerical motion vector indicating the macro block has not moved. In those cases where the macro block exhibits motion between frames, the macro block will have an associated numerical motion vector quantifying where the macro block has moved. In either case, only the motion vector needs to be recorded in the compressed file, not the redundant macro block. Software-based (e.g. Microsoft Media Player) and hardware-based (e.g., DVD) video players can read a compressed file and decompress it back to a video stream for display on a monitor device for viewing.

This has great advantages over previously described methods since it relies on motion vector descriptors that are pre-calculated and stored in the compressed video file, and does not require real-time image processing.

The discussion herein refers to MPEG compressed video files as two examples of video file formats that could be used by this invention. While the preferred embodiment of the invention will demonstrate the principle using just the MPEG format, it should be clearly understood that the principles disclosed in the invention could be used by any video compression technique that relies on temporal redundancies. Other formats, such as QuickTime, may be used.

Video File Data Compression

Video compression refers to reducing the quantity of data used to represent digital video images, and is a combination of spatial image compression and temporal motion compensation. Compressed video can effectively reduce the bandwidth required to transmit video via terrestrial broadcast, via cable TV, or via satellite TV services.

Most video compression is lossy—it operates on the premise that much of the data present before compression is not necessary for achieving good perceptual quality. For example, DVDs use a video coding standard that can compress around two hours of video data by 15 to 30 times, while still producing a picture quality that is generally considered high-quality for standard-definition video. Video compression is a tradeoff between disk space, video quality, and the cost of hardware required to decompress the video in a reasonable time. However, if the video is over-compressed in a lossy manner, visible (and sometimes distracting) artifacts can appear.

Video compression typically operates on square-shaped groups of neighboring pixels, usually called macro-blocks. These pixel groups or blocks of pixels are compared from one frame to the next and the video compression records only the differences within those blocks. This works extremely well if the video has no motion. A still frame of text, for example, can be repeated with very little transmitted data. In areas of video with more motion, more pixels change from one frame to the next. When more pixels

change, the video compression scheme must send more data to keep up with the larger number of pixels that are changing. If the video content includes an explosion, flames, a flock of thousands of birds, or any other image with a great deal of high-frequency detail, the quality will decrease, or the variable bitrate must be increased to render this added information with the same level of detail.

Video data contains spatial and temporal redundancy. Similarities can thus be encoded by merely registering differences within a frame (spatial), and/or between frames (temporal). Spatial encoding is performed by taking advantage of the fact that the human eye is unable to distinguish small differences in color as easily as it can perceive changes in brightness, so that very similar areas of color can be "averaged out" in a similar way to jpeg images. With temporal compression only the changes from one frame to the next are encoded as often a large number of the pixels will be the same on a series of frames.

One of the most powerful techniques for compressing video is interframe compression. Interframe compression uses one or more earlier or later frames in a sequence to compress the current frame, while intraframe compression uses only the current frame, which is effectively image compression.

The most commonly used method works by comparing each frame in the video with the previous one. If the frame contains areas where nothing has moved, the system simply issues a short command that copies that part of the previous frame, bit-for-bit, into the next one. If sections of the frame move in a simple manner, the compressor emits a (slightly longer) command that tells the decompresser to shift, rotate, lighten, or darken the copy—a longer command, but still much shorter than intraframe compression.

MPEG-1 Video Compression Standard

The Moving Picture Experts Group (MPEG) was formed by the International Organization for Standards (ISO) to set standards for audio and video compression and transmission. Its first meeting was in May 1988, and by 2005, MPEG included approximately 350 members per meeting from various industries, universities, and research institutions. MPEG's has developed several sets of standards referred to as MPEG-1, MPEG-2, MPEG-3 and MPEG-4, and is continuing to work on other video compression standards.

MPEG-1 is an ISO/IEC (International Organization for Standardization/International Electrotechnical Commission) standard for medium quality and medium bit rate video and audio compression. It allows video to be compressed by the ratios in the range of 50:1 to 100:1, depending on image sequence type and desired quality. The MPEG-1 standard is one of many video file compression technique that use spatial redundancy and temporal redundancy to reduce the size of the digital video file with little noticeable loss from the originally uncompressed digital version. The MPEG-1 standard is still widely used even though it is more than 15 years old is still widely used. The preferred embodiment of the invention will use the MPEG-1 video compression standard to demonstrate the principles of the invention. However, it should be clearly understood that the principles disclosed in the invention could be used by any video compression technique that relies on temporal redundancies to achieve compression of video data. Thus, the invention is not restricted to just MPEG-1 or other MPEG compression standards. The invention may be applied using any compressed video file associated with a compression format that uses temporal redundancy to achieve compression of video data.

In MPEG-1, a video stream is a sequence of video frames. Each frame is a still image, and a video player decompresses an MPEG-1 bit stream and displays one frame after another to produce the motion video. When a motion video is compressed, MPEG-1 video compression removes both spatial redundancy within a video frame and temporal redundancy between video frames. The compression algorithms exploit several techniques to remove spatial redundancy but most importantly for this invention is its use of motion-compensation to remove temporal redundancy. Since the images in a video stream usually do not change much within small time intervals, and the idea of MPEG-1 motion-compensation is to encode a video frame based on other video frames temporally close to it.

A MPEG-1 compressed digital file is a sequence of three kinds of frames: an I-frame, a P-frame, and a B-frame. The I-frames are intra-coded, i.e. they can be reconstructed without any reference to other frames. The P-frames are forward predicted from the last I-frame or P-frame, i.e. it is impossible to reconstruct them without the data of another frame (I or P). The B-frames are both forward predicted and backward predicted from the last/next I-frame or P-frame, i.e. there are two other frames necessary to reconstruct them. P-frames and B-frames are referred to as inter-coded frames.

Whether a frame of video is coded as an I-frame, P-frame, or B-frame, the frame is processed as micro-blocks. A micro-block is a square array of 16×16 pixels, and is the unit for motion-compensated compression. If a video frame has a resolution of 320×240 pixels the MPEG-1 bit stream will reference this frame with respect to 20×15=300 macro-blocks.

An I-frame is encoded as a single image, with no reference to any past or future frames. The encoding scheme used is similar to JPEG compression. Each 8×8 block is encoded independently with one exception explained below. The block is first transformed from the spatial domain into a frequency domain using the DCT (Discrete Cosine Transform), which separates the signal into independent frequency bands. Most frequency information is in the upper left corner of the resulting 8×8 block. After this, the data is quantized. Quantization can be thought of as ignoring lower-order bits (though this process is slightly more complicated). Quantization is the only lossy part of the whole compression process other than subsampling. The resulting data is then run-length encoded in a zig-zag ordering to optimize compression. This zig-zag ordering produces longer runs of 0's by taking advantage of the fact that there should be little high-frequency information (more 0's as one zig-zags from the upper left corner towards the lower right corner of the 8×8 block). The afore-mentioned exception to independence is that the coefficient in the upper left corner of the block, called the DC coefficient, is encoded relative to the DC coefficient of the previous block (DCPM coding).

A P-frame is encoded relative to the past reference frame. A reference frame is a P- or I-frame. The past reference frame is the closest preceding reference frame. Each macro-block in a P-frame can be encoded either as an I-macro-block or as a P-macro-block. An I-macro-block is encoded just like a macro-block in an I-frame. A P-macro-block is encoded as a 16×16 area of the past reference frame, plus an error term. To specify the 16×16 area of the reference frame, a motion vector is included. A motion vector (0, 0) means that the 16×16 area is in the same position as the macro-block we are encoding. Other motion vectors are relative to that position. Motion vectors may include half-pixel values, in which case pixels are averaged. The error term is encoded using the DCT, quantization, and run-length encoding. A

macro-block may also be skipped which is equivalent to a (0, 0) vector and an all-zero error term. The search for good motion vector (the one that gives small error term and good compression) is the heart of any MPEG-1 video encoder and it is the primary reason why encoders are slow.

A B-frame is encoded relative to the past reference frame, the future reference frame, or both frames. The future reference frame is the closest following reference frame (I or P). The encoding for B-frames is similar to P-frames, except that motion vectors may refer to areas in the future reference frames. For macro-blocks that use both past and future reference frames, the two 16×16 areas are averaged.

The MPEG-1 bit stream for both P-frames (forward predicted), and B-frames (forward and backward predicted) have motion vectors explicitly or implicitly associated with each macro-block. A P-frame of the motion video file with a resolution of 320×240 may have as many as 300 motion vectors describing the movement of the macro-blocks from the most recent I-frame or P-frame. A B-frame of the motion video file will similarly have up to 300 motion vectors describing the movement of the macro-blacks from last/next I-frame or P-frame.

As an example, consider a single macro-block. A following P-frame shows the same triangle but at another position. Prediction means to supply a motion vector that determines how to move the macro-block from an I-frame to the P-frame. This motion vector is part of the MPEG stream and it is divided in a horizontal and a vertical part. These parts can be positive or negative. A positive value means motion to the right or motion downwards, respectively. A negative value means motion to the left or motion upwards, respectively. The parts of the motion vector are in the range of −64 . . . +63. So the referred area can be up to 64×64 pixels away.

An I-frame is intra-coded and cannot refer to another frame so it cannot have any motion vectors. However, the inter-coded P-frames and B-frames have motion vectors for each macro-block and are used by this invention to calculate for their respective frames the Characteristic 3Deeps Motion Vector necessary to calculate the optical densities of the lenses of the 3Deeps Filter Spectacles.

In accordance with an embodiment, data comprising a compressed image frame and temporal redundancy information is received. The image frame is decompressed. A plurality of bridge frames that are visually dissimilar to the image frame are generated. The image frame and the plurality of bridge frames are blended, generating a plurality of blended frames, and the blended frames are displayed.

FIG. **31** shows a video display manager that may be used to implement certain embodiments in accordance with an embodiment. Video display manager **3100** comprises a processor **3110**, a decompression module **3120**, a bridge frame generator **3130**, a frame display module **3150**, and a storage **3140**.

FIG. **32** is a flowchart of a method of decompressing and displaying one or more image frames in accordance with an embodiment. In an illustrative embodiment, a compressed video file **2500** is stored in storage **3140**. Compressed video file **2500** may be generated by video display manager **3100** or, alternatively, received from another device or via a network such as the Internet.

At step **3210**, data comprising a compressed image frame and temporal redundancy information is received. In the illustrative embodiment, processor **3110** retrieves compressed video file **2500** from storage **3140**.

At step **3220**, the image frame is decompressed. Decompression module **3120** decompresses compressed video file **2500**, generating a video image frame. FIG. **33** shows an image frame **3350** showing a man against a background of clouds and sky.

At step **3230**, a plurality of bridge frames that are visually dissimilar to the image frame are generated. Bridge frame generator **3130** generates two or more bridge frames that are dissimilar from image frame **3350**. FIGS. **34**A and **34**B show two bridge frames **3410** and **3420** that may be generated. In the illustrative embodiment, bridge frame **3410** has a first pattern and a bridge frame **3420** has a second pattern that is complementary to the first pattern of bridge frame **3410**.

In other embodiments, bridge frames may be retrieved from a storage.

At step **3240**, the image frame and the plurality of bridge frames are blended, generating a plurality of blended frames. In the illustrative embodiment, frame display module **3150** blends image frame **3350** and bridge frame **3410** to generate blended frame **3510**, shown in FIG. **35**A. Frame display module **3150** also blends image frame **3350** and bridge frame **3420** to generate blended frame **3520**, shown in FIG. **35**B.

At step **3250**, the plurality of blended frames are displayed. Frame display module **3150** now displays blended frames **3510** and **3520** in a manner similar to that described above. For example, blended frames **3510** and **3520** may be displayed in accordance with a predetermined pattern, for example. In an embodiment illustrated in FIG. **35**C, blended frames **3510**, **3520** consecutively in a predetermined pattern.

In other embodiments, blended frames **3510** may be displayed in a pattern that includes a plurality of blended frames and image frame **3350**, or in a pattern that includes other bridge frames.

In accordance with another embodiment, a plurality of blended frames may be displayed in accordance with a predetermined pattern that includes a first pattern comprising the plurality of blended frames, and a second pattern that includes repetition of the first pattern. In an embodiment illustrated in FIG. **35**D, blended frames **3510** and **3520** are displayed in a repeating pattern that includes blended frame **3510**, blended frame **3520**, and a bridge frame **3590**.

In various embodiments, the method steps described herein, including the method steps described in FIG. **32**, may be performed in an order different from the particular order described or shown. In other embodiments, other steps may be provided, or steps may be eliminated, from the described methods.

Systems, apparatus, and methods described herein may be implemented using digital circuitry, or using one or more computers using well-known computer processors, memory units, storage devices, computer software, and other components. Typically, a computer includes a processor for executing instructions and one or more memories for storing instructions and data. A computer may also include, or be coupled to, one or more mass storage devices, such as one or more magnetic disks, internal hard disks and removable disks, magneto-optical disks, optical disks, etc.

Systems, apparatus, and methods described herein may be implemented using computers operating in a client-server relationship. Typically, in such a system, the client computers are located remotely from the server computer and interact via a network. The client-server relationship may be defined and controlled by computer programs running on the respective client and server computers.

Systems, apparatus, and methods described herein may be used within a network-based cloud computing system. In such a network-based cloud computing system, a server or

another processor that is connected to a network communicates with one or more client computers via a network. A client computer may communicate with the server via a network browser application residing and operating on the client computer, for example. A client computer may store data on the server and access the data via the network. A client computer may transmit requests for data, or requests for online services, to the server via the network. The server may perform requested services and provide data to the client computer(s). The server may also transmit data adapted to cause a client computer to perform a specified function, e.g., to perform a calculation, to display specified data on a screen, etc.

Systems, apparatus, and methods described herein may be implemented using a computer program product tangibly embodied in an information carrier, e.g., in a non-transitory machine-readable storage device, for execution by a programmable processor; and the method steps described herein, including one or more of the steps of FIG. **32**, may be implemented using one or more computer programs that are executable by such a processor. A computer program is a set of computer program instructions that can be used, directly or indirectly, in a computer to perform a certain activity or bring about a certain result. A computer program can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment.

A high-level block diagram of an exemplary computer that may be used to implement systems, apparatus and methods described herein is illustrated in FIG. **36**. Computer **3600** includes a processor **3601** operatively coupled to a data storage device **3602** and a memory **3603**. Processor **3601** controls the overall operation of computer **3600** by executing computer program instructions that define such operations. The computer program instructions may be stored in data storage device **3602**, or other computer readable medium, and loaded into memory **3603** when execution of the computer program instructions is desired. Thus, the method steps of FIG. **32** can be defined by the computer program instructions stored in memory **3603** and/or data storage device **3602** and controlled by the processor **3601** executing the computer program instructions. For example, the computer program instructions can be implemented as computer executable code programmed by one skilled in the art to perform an algorithm defined by the method steps of FIG. **32**. Accordingly, by executing the computer program instructions, the processor **3601** executes an algorithm defined by the method steps of FIG. **32**. Computer **3600** also includes one or more network interfaces **3604** for communicating with other devices via a network. Computer **3600** also includes one or more input/output devices **3605** that enable user interaction with computer **3600** (e.g., display, keyboard, mouse, speakers, buttons, etc.).

Processor **3601** may include both general and special purpose microprocessors, and may be the sole processor or one of multiple processors of computer **3600**. Processor **3601** may include one or more central processing units (CPUs), for example. Processor **3601**, data storage device **3602**, and/or memory **3603** may include, be supplemented by, or incorporated in, one or more application-specific integrated circuits (ASICs) and/or one or more field programmable gate arrays (FPGAs).

Data storage device **3602** and memory **3603** each include a tangible non-transitory computer readable storage medium. Data storage device **3602**, and memory **3603**, may each include high-speed random access memory, such as dynamic random access memory (DRAM), static random access memory (SRAM), double data rate synchronous dynamic random access memory (DDR RAM), or other random access solid state memory devices, and may include non-volatile memory, such as one or more magnetic disk storage devices such as internal hard disks and removable disks, magneto-optical disk storage devices, optical disk storage devices, flash memory devices, semiconductor memory devices, such as erasable programmable read-only memory (EPROM), electrically erasable programmable read-only memory (EEPROM), compact disc read-only memory (CD-ROM), digital versatile disc read-only memory (DVD-ROM) disks, or other non-volatile solid state storage devices.

Input/output devices **3605** may include peripherals, such as a printer, scanner, display screen, etc. For example, input/output devices **1905** may include a display device such as a cathode ray tube (CRT) or liquid crystal display (LCD) monitor for displaying information to the user, a keyboard, and a pointing device such as a mouse or a trackball by which the user can provide input to computer **3600**.

Any or all of the systems and apparatus discussed herein, including video display manager **3100**, and components thereof, may be implemented using a computer such as computer **3600**.

One skilled in the art will recognize that an implementation of an actual computer or computer system may have other structures and may contain other components as well, and that FIG. **36** is a high-level representation of some of the components of such a computer for illustrative purposes.

Further embodiments are now described. As is apparent from the foregoing, most systems for 3D stereoscopy are dual-image systems; that is the motion picture has a separate right-eye and left-eye image that are directed to the correct eye. Embodiments of the invention are single-image systems; that is the identical image is directed to both eyes of the viewer. All 3Deeps Filter Spectacles have the important advantage over traditional 3D viewing systems that two viewers sitting next to each other can both view the same movie, one in 3D wearing the 3Deeps Filter Spectacles, and the other in 2D not wearing the 3Deeps Filter Spectacles. Hence, we use the terminology introduced above: "instant image" and "lagging image". These images are different from "right-eye image" and "left-eye image", and should not be confused.

In the instant invention both eyes see the same identical image, but the difference in retinal reaction time causes the images to be transmitted to the brain at slightly different times. The image that is transmitted to the brain from the eye covered by the clear lens of the Continuous Adjustable 3Deeps Filter Spectacles is termed the instant image. The image that is transmitted to the brain from the eye that is covered by a neutral density filter lens of the Continuous Adjustable 3Deeps Filter Spectacles is termed the lagging image. The viewer's brain sees the instant image and lagging image as a single eye image that displays 3-D depth characteristics when lateral motion is present. More particularly, Continuous Adjustable 3Deeps Filter Spectacles use a dual optimization of the spectacle apparatus to achieve 3D that optimizes the Pulfrich illusion for the viewer.

A First Optimization

One embodiment of the invention teaches how to use a retinal reaction time curve to calculate an optimal optical density for use in setting the neutral density filter of the Continuous Adjustable 3Deeps Filter Spectacles. More specifically, three teaching methods are presented, including:

a. Computing an optical density for the neutral density filter so the difference in retinal reaction time between the instant image and the lagging image is 2½ inches (the average inter-ocular distance between the right and left eyes) and thereby imparting 3-D depth characteristics to the scene. This embodiment requires as input both direction and speed of motion between frames of a motion picture, and luminance.

b. Computing an optical density for the neutral density filter so the difference in retinal reaction time between the instant image and the lagging image is a constant value and thereby imparting 3-D depth characteristics to the scene. This embodiment only requires luminance as input.

c. Computing an optical density for the neutral density filters so the difference in retinal reaction time between the instant image and the lagging image corresponds to a fixed number of picture frames and thereby imparting 3-D depth characteristics to the scene. This embodiment only requires luminance as input.

Such methods are only exemplary and not exhaustive. Other methods of using the retinal reaction time curve to calculate the optical density of the neutral density filter of the Continuous Adjustable 3Deeps Filter Spectacles may be employed. Similar methods using factors other than direction and speed of motion between frames of a motion picture, and luminance of the frame of the motion picture may also be advantageously used. Each method optimizes to a specific feature and characteristic of Continuous Adjustable 3Deeps Filter Spectacles. The invention further encompasses the use of a photo-detector, such as a photodiode, on the spectacles as an alternate means of estimating luminance for Continuous Adjustable 3Deeps Filter Spectacles.

A Second Optimization

The invention further directs to showing how a controller uses the optimal optical density, and the operating characteristics of the electrochromic material used in the fabrication of the spectacles, to optimize the operation of the Continuous Adjustable 3Deeps Filter Spectacles. More specifically, the invention further directs to showing how the Operating Characteristic curve and the Transition Time curve of the electrochromic material are used to control the neutral density filter lens of the Continuous Adjustable 3Deeps Filter Spectacles.

Other Features

The invention further directs to showing how video format conversion chips, used for real-time image processing in High Definition LCD, Plasma, and Projection TV's, as well as Digital Cinema Projectors can be utilized in calculation of the optical density of the neutral optical filter lens of the Continuous Adjustable 3Deeps Filter Spectacles. While the calculation of the optical density of the neutral density filter may be done in software, it can advantageously be performed using electronic circuitry. The circuitry can (a) be included within the video format conversion chip, (b) be embedded in a separate chip that couples to a video format conversion chip on an IC board and connects directly to the Continuous Adjustable 3Deeps Filter Spectacles, or (c) be embedded in a separate chip that couple to another IC chip that connects to the spectacles.

Also, a general luminance reduction has been used in a dual image systems. No precise continuous luminance control has been disclosed. Furthermore, in such a dual image system embodiment, rather than use the optimal OD value for the Continuous Adjustable 3Deeps Filter Spectacles, the value is used to generate a second frame of a dual image 3D motion picture.

We use the terminology neutral filter (or neutral density filter) to mean a darkened, gray or colored transparent filter. In this invention a neutral filter reduces light by the approximately the same amount for all wavelengths over the visual spectrum. For a neutral density filter with optical density d the amount of optical power transmitted through the filter is given by $10^{-d}$. For reference, a neutral filter with an optical density of 0.3 allows transmission of about 50% of the light; an optical density of 0.6 allows transmission of about 25% of the light, and an optical density of 0.9 allows transmission of about 12.5% of the light.

We also use the term clear to refer to a filter that is much clearer than the neutral filter and seemingly does not block light. However, all filters block the transmission or reduce the passage of light to some extent. For instance, clear glass reduces light by about 1%. By clear then it should be understood we refer to a filter that reduces light less than the neutral density filter. That is all that is required to actuate the Pulfrich illusion.

Throughout the disclosure we use interchangeably the terms 3Deeps Filter Spectacles and Pulfrich Filter Spectacles'—both referring to the earlier spectacles of this invention that allow 2D movies to be viewed with the visual effect of 3 dimensions. The term Continuous Adjustable 3Deeps Filter Spectacles refers to the improved 3Deeps Filter Spectacles that use double optimization to solve problems inherent in earlier 3Deeps Filter Spectacles.

In the embodiments of the invention the direction of motion is used to determine which of the two viewing lenses is clear and which is darkened to a neutral density. If the motion on the screen is determined to be left-to-right then the left lens of the spectacles is clear and the right lens darkened. If the motion on the screen is determined to be right-to-left then the right lens of the spectacles is clear and the left lens darkened. If there is no motion in the scene then both lenses are set to clear.

We may also use the term action directed eye. When the motion on the screen is from left-to-right then the right eye that views the scene through the neutral density filter is the action directed eye. When the motion on the screen is from right-to-left then the left eye that views the scene through the neutral density filter is the action directed eye.

Pulfrich 3-Dimensional Illusion

Pulfrich was a physicist that recognized that an image that travels through a dark lens or filter takes longer to register with the brain than it does for an image that passes without interruption. The delay is not great—just milliseconds—but enough for a frame of video to arrive and register on the mind one frame later from an eye looking through a dark filter than from an unobstructed eye. Pulfrich spectacles then have one clear lens (or is absent a lens) that does not cause a delay, and one darkened lens that slightly delays the image that arrives to the other eye. In a motion picture viewed through Pulfrich lenses, for an object moving laterally across the screen, one eye sees the current frame and the other eye sees a previous frame.

The clear lens may block some light. Even clear glass blocks some light. What is important and necessary for the invention to show passages of a 2D motion picture in 3D is that the clear lens be clearer than the other darkened lens and not diminish as much light as the darkened lens. The invention will produce a 3D effect as long as the clear light diminishing lens diminishes less light than the darkened light diminishing lens.

As with normal two-eye parallel viewing, the disparity between the two images is perceived as depth information. The faster a screen-object moves in contrast to its back-

ground, the more separation there is between the instant image and the lagging image, and the closer or further the object appears according to the eye being intercepted by the dark filter (closer if on the side to which the object is moving). The fact that faster objects can appear closer than slower objects also coincides with the principles of motion parallax. Generally, however, the greater displacements frame to frame (and now eye to eye) result from degrees of closeness to the recording camera (proximity magnifies), so that Pulfrich viewing can deliver an approximately correct and familiar depth likeness. While the depth likeness is unquestionably 3-D, it may differ from the fixed constant of an individual's inter-ocular distance when observing the world directly. Few observers will notice this anymore than they are bothered by the spatial changes resulting from use of telephoto or wide-angle lens in filming scenes.

Motion pictures made for the Pulfrich method can be viewed without any special glasses—appearing as regular motion pictures minus the 3-D effect. Also, motion pictures made without regard for the Pulfrich effect, will still show the 3-D visual effect if lenses are worn and appropriately configured.

The limitation of the Pulfrich technique is that the 3-dimensional illusion works only for objects moving horizontally or laterally across the screen. Motion pictures made to take advantage of these glasses contain lots of horizontal tracking shots or lateral picture-subject motion to create the effect. The illusion does not work if the camera doesn't shift location while subject matter remains static, but vertical camera movement will create horizontal movement as the field of view expands or contracts. Pulfrich, who first described this illusion, was blind in one eye, and was never able to view the illusion, though he accurately predicted and described it.

The 3-dimensional visual effect is produced by the 3Deeps System regardless of whether the motion picture was shot on regular or digital film; regardless of whether the presentation media is film, digital film, VCR tape, or DVD, and; regardless of whether the motion picture is viewed in the movie theater, home TV, Cable TV, iPod or PDA, or on a computer monitor.

A basic example of the Pulfrich illusion can be seen by viewing either of two TV stations. The news headlines on the CNN Television network or the stock market quotations on CNBC scroll in from the right of the TV screen and across and off the screen to the left. The news or quotations appear in a small band across the bottom of the screen while the network show appears above the scrolling information. When either of these network stations is viewed through Pulfrich glasses, with the darkened lens covering the left eye and the clear lens covering the right eye, the scrolling information appears in vivid 3-dimensions appearing to be in front of the TV screen. If the lenses are reversed with the clear lens covering the left eye and the darkened lens covering the right eye, the scrolling information appears to the viewer as receded, and behind the TV screen.

Another example of the Pulfrich illusion can be seen in the movie The Terminator, starring Arnold Schwarzenegger. Any off-the-shelf copy of the movie—VCR tape, or DVD—can be viewed on a TV or PC playback display monitor as originally intended by the filmmaker. But, viewing scenes that include lateral motion from The Terminator, such as the scene when Sarah Connors enters a bar to call police (about 29 minutes into the movie) when viewed through Pulfrich glasses (left eye clear lens and right eye dark lens) shows the scene vividly in 3-dimensions, even though this visual effect was totally unanticipated by the director and cinematographer.

Another stunning example is the famous railroad yard scene from "Gone with the Wind", in which Scarlett O'Hara played by Vivien Leigh walks across the screen from the right as the camera slowly pulls back to show the uncountable wounded and dying confederate soldiers. When viewed through Pulfrich glasses (with left eye clear lens and right eye dark lens), the scene appears to the user in 3-dimensions, even thought it was totally unintended by the director and cinematographer. Interesting here is that the main movement of this scene was created by the camera lifting and receding and so expanding the view. Effective lateral motion resulting from such camera movement would in fact be to only one side of the screen, which the viewers will utilize to interpret the entire scene as in depth.

The Continuous Adjustable 3Deeps system will allow any movie, such as "Gone with the Wind" which was shot in 1939, to be viewed in part in 3-dimensions. And with the Continuous Adjustable 3Deeps system this new viewing experience does not require any additional effort on the part of the owners, producers, distributors, or projectionists of the motion picture—just that the viewer don the 3Deeps viewing glasses (also called 3Deeps viewing spectacles).

Note that the Pulfrich 3-D effect will operate when the left or right filtering does not correspond with the direction of foreground screen movement. The depth-impression created is unnatural, a confusion of sold and open space, of forward and rear elements. When confronted by such anomalous depth scenes, most minds will turn off, and not acknowledge the confusion. For normal appearing 3-D, mismatched image darkening and foreground direction must be avoided.

We have described the need to match horizontal direction of foreground screen-movement to Left or Right light-absorbing lens. This, however, is a rule that often has to be judiciously extended and even bent, because all screen-action appropriate to Pulfrich 3-D is not strictly horizontal; horizontal movements that angle up or down, that have a large or even dominant element of the vertical, may still be seen in depth. Even a single moving element in an otherwise static scene can be lifted into relief by way of an adroit application of a corresponding Pulfrich filter. There would even be times when a practiced operator would choose to schedule instances of lens-darkening contrary to the matching-with-foreground-direction rule; the explanation for this lies in the fact that the choice of left or right filter-darkening will pull forward any object or plane of action moving in a matching direction, and there are times when the most interesting action in a picture for seeing in 3D could be at some distance from the foreground, even requiring a Left/Right filter-match at odds with the filter-side that foreground-movement calls for. For instance, if one wished to see marchers in a parade marching Left, to lift them forward of their background would require darkening of the Left lens, but foreground movement could be calling for a Right lens darkening; this would be a situation when a choice might be made to over-ride the foreground-matching rule. In most instances the rule is to be followed, but not mechanically; screen movement is often compound and complex, and an observant individual could arrange a Pulfrich timing for a movie with an alertness to such subtleties that did not limit decisions to recognition of foreground direction alone. As mentioned earlier, there would even be times, when the recording camera had moved either forward or backwards through space, when both Left and Right lenses would half-darken to either side of their centers, outer halves

darkening moving forward (with picture elements moving out to both sides from picture-center) or both inner halves darkening when retreating backwards (with picture elements moving in towards center from each side).

One of the advantages of optical density Continuous Adjustable 3Deeps Filter Spectacles over the 3Deeps Filter Spectacles previously described is that they obviate the necessity of many of the heuristic rules that would govern the operation of the Continuous Adjustable 3Deeps Filter Spectacles. Heuristic rules were used to address the problems of 3Deeps Spectacles in rapidly transitioning the state of the lenses for the viewer. In previous co-pending 3Deeps applications, we had described the use of such heuristics.

For instance, in U.S. Pat. No. 7,405,801 "System and method for Pulfrich Filter Spectacles", heuristic embodiments for 3Deeps Filter Spectacle were described as follows: [Col 23, Line 45] "Other embodiment may have synchronization algorithms that utilize various heuristic rules in determining a synchronization event. For instance, if the viewer lenses responding to rapidly detected changing lateral motion, switch states too rapidly, this may cause undue discomfort to the viewer. Other embodiments may allow the user to override the synchronization signals placed in the motion picture, and require that any single state remain active for a minimum period of time. This may be important for people that are photosensitive—people who are sensitive to flickering or intermittent light stimulation. Photosensitivity is estimated to affect one in four thousand people, and can be triggered by the flicker from a television set. While photosensitive people may simply remove the Pulfrich Filter Spectacles, heuristic rules could be employed to reduce flicker and eliminate any additional photosensitivity from the Pulfrich Filter Spectacles. For instance, such a heuristic rules may implement logic in the synchronization decision rule that require that no change to a synchronization event can take place for a set number of seconds after the last synchronization event—i.e. a lens state must be active for a minimum length of time before a new state may be implemented."

The use of Continuous Adjusting 3Deeps Filter Spectacles as described herein eliminate the need for such heuristic rules since the lenses are now continually changing to conform to an optimal optical density.

The following technologies can be used in the present invention:

Substances that Change Color and Transparency

Objects that change color have been well known for a long time. Animate creatures such as cephalopods (squid) have long been known for their ability to change color seemingly at will, by expanding or retracting chromatophore cells in their body.

There are many different technologies that are used to cause physical materials to change their color and transparency. These may react to heat, light, ultraviolet light, or electronic means to change their state, which in turn affect how they reflect and refract light, or their properties of transparency, or translucency.

For instance, photochromatic lenses automatically darken in sunlight and lighten when indoors, and have been utilized in sunglasses for many years. Some may darken instantaneously, and others have lenses that take several different shades depending upon the intensity of the light presented.

Thermochromatic materials are heat activated, causing the color to change when the activation temperature is reached, and reverse the color change when the area begins to cool. These are used in such products as inks, and strip thermometers.

LEDs (Light Emitting Diodes) are electronic diodes that allow current to flow in one direction and not the other. LEDs have the unique "side effect" of producing light while electricity is flowing through them. Thus they have two states—when electricity flows through them they are on and emit light, or off when no electricity flows through them and they do not emit light.

Phosphors are emissive materials that are used especially in display technologies and that, when exposed to radiation, emits light. Any fluorescent color is really a phosphor. Fluorescent colors absorb invisible ultraviolet light and emit visible light at a characteristic color. In a CRT, phosphor coats the inside of the screen. When the electron beam strikes the phosphor, it makes the screen glow. In a black-and-white screen, there is one phosphor that glows white when struck. In a color screen, there are three phosphors arranged as dots or stripes that emit red, green and blue light. In color screens, there are also three electron beams to illuminate the three different colors together. There are thousands of different phosphors that have been formulated, and that are characterized by their emission color and the length of time emission lasts after they are excited.

Liquid crystals are composed of molecules that tend to be elongated and shaped like a cigar, although scientists have identified a variety of other, highly exotic shapes as well. Because of their elongated shape, under appropriate conditions the molecules can exhibit orientational order, such that all the axes line up in a particular direction. One feature of liquid crystals is that electric current affects them. A particular sort of nematic liquid crystal, called twisted nematics (TN), is naturally twisted. Applying an electric current to these liquid crystals will untwist them to varying degrees, depending on the current's voltage. These crystals react predictably to electric current in such a way as to control light passage.

Still another way to alter the amount of light that passes through a lens is with Polaroid lenses. Polaroids are materials that preferentially transmit light with polarization along one direction that is called the polarization axis of the polaroid. Passing unpolarized light through a polaroid produces transmitted light that is linearly polarized, and reduces the intensity of the light passing through it by about one-half. This reduction in light from a first polaroid does not depend on the filter orientation. Readily available optically active materials are cellophane, clear plastic tableware, and most dextrose sugars (e.g. Karo syrup). Materials that alter the polarization of light transmitted through them are said to be optically active.

If two polaroids are placed immediately adjacent to each other at right angles (crossed) no light is transmitted through the pair. If two similar polaroids immediately adjacent to each other are in complete alignment, then the second polaroid does not further reduce the intensity of light passing through the first lens. Additional reduction of light intensity passing through the first polaroid lens will occur if the two similar polaroids immediately adjacent to each other are in other then complete or right angle alignment. This can be beneficially used in other embodiments of the invention to more precisely control the intensity of light passing through the 3Deeps spectacles lenses.

Polaroids can be actively controlled by electronic currents, and are used in such products as LCD displays. For example digital watches often use LCD display for the display of time. In such products, there is a light source behind two layers of LCD materials. Electronic current is used to control the polarity of specific areas of the two layers. Any area of the screen for which the two polaroid

layers are at right angles to each other will not pass any light—other areas will allow light to pass. In this manner, the alphanumeric information of LCD can be electronically controlled and displayed on an LCD display.

Another technology to control the intensity of light passing through the lenses includes directional filters such as the micro-louver.

In embodiment of this invention, we utilize electrochromics that change transparency when an electronic current is passed through them. In particular, we use a substance that is darkened (allowing some light to pass through) when current is applied across it, but is clearer and transparent and allows more light to pass unhindered when no current is applied to it. In other embodiments of the invention, other substances and technologies could be used that allow the lenses to change their color, or their properties of transparency or translucency.

Algorithms to Detect Movement in Motion Pictures

Early motion detectors were entirely analog in nature but completely suitable to monitor situations where no motion is to be expected, such as restricted areas in museums, and stores when they are closed for the evening. Recent advances in digital photography and computers have allowed new means to monitor such situations, and incorporate digital video systems that can passively record images at set time intervals (e.g. 15 frames per second), computer processors to process the image and detect motion, and cause appropriate action to be taken if motion is detected.

Many different algorithms have been developed for computer processing of images that can be used to determine the presence of lateral movement in a motion picture, as well as identifying the direction of lateral motion. In the future new algorithms will continue to be developed. Any algorithm that can process sequences of digital images, and detect motion and the direction of motion can be used in the invention.

Out of necessity, algorithms to detect movement in a motion picture have had to be developed. The problem is that movies for TV, cine, digital cameras, etc. use many different formats. To show these different formats with the highest quality possible in a home or movie theater venue requires that the problem of format conversion between the input format and the output screen format be deftly handled to optimize the quality of the viewing. Detailed descriptions of the problem and various digital image processing solutions can be found in the magazine articles Electronic Design Strategy News articles by Brian Dipert, "Video improvements obviate big bit streams", Mar. 15, 2001, pp 83-102 and Electronic Design Strategy News, article by Brian Dipert, "Video quality: a hands-on view, Jun. 7, 2001, pp 83-96". A simplified example will however help to explain the problem and the approaches take to a solution.

Consider an input signal to a TV which is 30 frames per second (analog TV) but that is being output and shown on a high-end digital LCD TV running at 120 frames per second. Showing a TV input signal of 30 fps at an output of 120 fps is an example of a format conversion problem. One simple way to address this problem of format conversion is to simply add 3 exact copies of each frame to the output stream. That works if there is no motion, but if a screen object exhibits any motion between frames then the 3 new frames have the moving object in the wrong place. If this solution is used, then the better and more expensive the digital TV, the worse this problem appears to the viewer. So digital TVs incorporate format conversion image processing, generally implemented as format-conversion chips that perform complex frame-to-frame image processing and track speed and direction of motion and then use that information to better construct the 3 new frames.

At least two different approaches are taken to detect and quantify motion between frames of a moving picture. They include edge-based algorithms and region-based algorithms. Any algorithm that quantifies motion between frames of a motion picture can be used with the algorithms of the preferred and alternate embodiments to set the optimal optical density of the neutral density filter of 3Deeps Filter Spectacles.

Edge-based algorithms have been used in digital cameras as part of the means to implement functions such as autofocus. Edge-based algorithms utilize information that can be calculated from the discontinuities between adjoining pixels of the digitized image. For instance, consider a person standing against a light background. The edge pixels of the person can be clearly identified because of the sudden change in pixel value. Edge-based algorithms generally identify such intensity edges in the image, eliminate all other pixels (for instance by changing them from their recorded value to white), and then process the image based solely on the identified intensity edges.

The MELZONIC chip from Philips is one example of a region-based algorithm. The Philips MELZONIC chip uses a technique for motion estimation, which they call 3-D Recursive Search Block-Matching. By analyzing two successive TV fields to locate blocks of pixels in the second field that match blocks in the first, 3-D Recursive Search Block-Matching is able to assign a velocity vector to each block of pixels in the first field. These velocity vectors can then be used to interpolate the correct spatial position of each pixel block in a new field that is positioned temporally between the two original fields—i.e. to create new movement phases.

The Philips MELZONIC chip, or the methods, systems and apparatus in the previously described US patents of Iue (U.S. Pat. No. 5,717,415), Nagaya (U.S. Pat. No. 5,721,692), or De Haan (U.S. Pat. No. 6,385,245), or in other inventions or algorithms for motion object detection, may be incorporated in embodiments of the 3Deeps System as a means control the optical density of the neutral density filter of the 3Deeps Filter Spectacles.

One might think that alternating between the screen-flatness of a dialogue scene and the deep space of an action scene would disrupt the flow of a story. In fact, just as accompanying movie-music can be intermittent while entirely supporting a story development, dialogue is best attended to with the screen flat and action-spectacle is most effective given the dimension and enhanced clarity of depth. Usually a function of lighting specialists, it is always necessary to make objects and spaces on a flat screen appear distinct from each other; besides making a scene more convincing, 3-D separation of forms and of spatial volumes one from the other speeds up the "reading" of what are essentially spatial events. This is to say: flat can best enable concentration on dialogue; depth-dimension can most effectively deliver action scenes. Alternating between 2-D and 3-D awareness is something we even do, to a degree, in our experience of actuality, as a function of our changing concentration of attention; just as we hear things differently when we concentrate on listening. Then, too, making sense of movies is a thing we learn to do, as different from life-experience as a movie is with its sudden close-ups and change of angle and of scene, its flashbacks, et cetera. Movie viewing is a learned language, a form of thinking; the alternating of flat-screen information with depth-informa-

tion will be as readily adapted to as any other real-world-impossibility accepted without question as natural to the screen.

Synchronization and Control

The preferred embodiment of the Continuous Adjustable 3Deeps system makes use of signals to synchronize the lens filters of the viewing spectacles to the lateral motion in the motion picture, and thus control the 3-dimensional visual effect for the viewer. The signals are developed in real-time, and does not require any alteration to the motion picture, or that any control information is placed in the motion picture. The information that is calculated is used to determine synchronization events that are used to control the state of darkening individually of the left and right lenses of the Continuous Adjustable 3Deeps system.

Motion pictures have benefited from other types of synchronization and control information that is placed within the frames of motion pictures. However, these are characteristically different than the synchronization and control used in this invention.

In many motion pictures, to alert the movie theater projectionist that it is time to change reels, movie producers would place visible control information, in the form of a white circle appearing in the upper right upper hand corner of successive frames of the movie. When the projectionist sees this information, they know that it is time to start a second projector that has the next reel of the movie, and thus maintain an uninterrupted motion picture presentation.

Another means of communicating control information in motion picture frames is with the clapper slate board that indicates the start of a new scene when filming a motion picture. When filming motion picture or other type of video production, video and audio have been recorded separately. The two separate recordings must be precisely synchronized to insure that the audio recording matches the video image. Synchronization of the video and audio recordings has been accomplished using a clapper slate board. The audible clap created when a technician snaps the slate board in front of the camera is used during editing to manually synchronize the audio recording with the video recording. The editor simply views the video image of the snapping clapper slate, and then manually adjusts the timing of the audio recording such that the image of the clapper snapping shut and the sound of the clapper snapping shut are synchronized. Such synchronization can now be accomplished using electronic clapper slates. Electronic clapper slates display a Society of Motion Picture and Television Engineers (SMPTE) code, usually in large red light emitting diode numerals. The SMPTE code displayed is then used to electronically synchronize the video recording with a separate audio recording.

These types of synchronization and control information solve problems related to the synchronization of sound with filmed action during the production and editing of motion pictures, and related to changing reels of film during the presentation of motion pictures.

Overview

As described above, FIG. **1** is a perspective view of an embodiment of the Continuous Adjustable 3Deeps Filter Spectacles that are the ocular mechanism through which 2D movies may be viewed as 3D. FIG. **37** shows a typical curve of retinal reaction time as a function of luminosity. In FIG. **37** and FIG. **38**A-**38**C, we will explain the working of the Pulfrich illusion that occurs when viewing with one eye through a filtered lens and the other eye unobstructed or through a clear or unfiltered lens. The image seen through the clear lens is termed the instant image and the image seen through the darker lens is termed the lagging image. While previous related co-pending applications have taught this well-known illusion, we re-explain it in terms of a general retinal reaction time curve. Fully understanding the retinal reaction time curve is key to understanding how the instant invention uses this relationship to select optimal values for the optical density of the neutral density filter.

As previously described, the terminology instant image and lagging image of the disclosed invention should not be confused with left-eye image and right-eye image of other 3D systems. Dual image systems have separate right-eye and left-eye images that are directed to the appropriate eye. The present invention is a single-image system so that the right-eye and the left-eye always view the identical image. The eye however transmits delayed images to the brain that are termed the instant image and the lagging image and are organized by the brain as the eye image. Thus, the present single-image invention works with any motion picture ever made, while most 3D systems must have specially prepared, produced, processed and displayed dual image motion pictures. Additionally, a viewer cannot watch a dual-image 3D system such as Analglyph, IMAX or Polaroid, or shutter-glass system with Continuous Adjustable 3Deeps Filter Spectacles. Similarly a viewer cannot watch a regular movie with the special viewing spectacles used with dual-image 3D systems such as Analglyph, IMAX or Polaroid, or shutter-glass and view the movie 3D.

In FIG. **39** we use the retinal reaction time curve to explain the working of cardboard Pulfrich spectacles. Cardboard Pulfrich Spectacles have been used for many years prior to the invention of 3Deeps Filter Spectacles (and are sometimes also called TV spectacles). We explain the shortcomings and problems of the cardboard spectacle approach. The current invention overcomes most of the problems and shortcomings of the cardboard spectacles.

In FIG. **40** and FIG. **41** the retinal reaction time curve is used to explain how to calculate an optical density for the controllable neutral density filter that optimizes the Pulfrich illusion. This preferred embodiment requires as input measures the horizontal speed and direction of lateral motion, and a luminance or brightness measure. Since the average inter-ocular distance between a person's eyes is 2.5 inches, this method computes an optical density for the neutral density filter so the lagging image seen through the filtered eye lags the instant image seen through the unfiltered eye by the average inter-ocular distance of 2.5 inches. This method optimizes the depth perception of Continuous Adjusting 3Deeps Filter Spectacles, and overcomes the shortcomings and problems of the cardboard Pulfrich spectacles. FIG. **42** is an illustration of an alternate algorithm to characterize lateral motion in a motion picture.

In FIG. **43** we use the retinal reaction time curve to show a first alternate method to calculate an optical density for the controllable neutral density filter. This method only requires that we know the direction of lateral motion and luminance value—but not the speed of motion. This approach sets the optical density of the neutral density lenses at a value so the difference in retinal reaction time is constant even as luminance changes. This method also overcomes shortcomings and problems of the cardboard Pulfrich spectacles. In FIG. **44** we show how this method operates when incorporated with a photo-detector that is included directly into the Continuous Adjusting 3Deeps Filter Spectacles.

In FIG. **45** we use the retinal reaction time curve to show a second alternate method to calculate an optical density for the controllable neutral density filter. This method only requires that we know the direction of lateral motion and

luminance value—not the speed of motion—and using the retinal reaction time curve, selects values so the instant and lagging images are separated by a pre-specified number of frames of the motion picture. This method also overcomes the shortcomings and problems of the cardboard Pulfrich spectacles.

The video industry has for many decades used Video Format Converters (semiconductor chips, and apparatus such as up-converters) to reformat movies for showing in different venues. FIG. **46** teaches how to incorporate methods of this invention with such video formatters. FIG. **46** is a flowchart of how to incorporate the methods of the invention with such a semi-conductor video format converter chips that is able to report out the detected motion vectors. In method of the invention may also be incorporated directly into the video format conversion chip to calculate control information for the Continuous Adjustable 3Deeps Filter Spectacles. FIG. **47** is a block diagram showing operation of a Video and 3Deeps processing used to calculate the optimal optical density of the neutral density filter in the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles.

In FIG. **48-53** we focus on the operation of the Continuous Adjustable 3Deeps Filter Spectacles, and specifically the means by which we optimize the operation of the lenses of the spectacles to the characteristics of the material from which the lenses are fabricated. FIG. **48** is a table showing the control information provided to the Continuous Adjustable 3Deeps Filter Spectacles by the Video and 3Deeps Processing, and referring back to FIG. **3**, a block diagram of the operation of the Continuous Adjustable 3Deeps Filter Spectacles is provided.

For a typical electrochromic material FIG. **49** provides a typical Operating Characteristic curve (input Voltage and output optical density) for electrochromic material and shows how it is used by the 3Deeps Filter Spectacle to set the optical density of the neutral filter lens. FIG. **50** is a typical transition time curve for an electrochromic material with transition time as a function of optical density and for an electric potential that provides the most rapid change from a lower to higher optical density. FIG. **51** is a typical transition time curve for an electrochromic material with transition time as a function of optical density and for an electric potential that provides the most rapid change from a higher to a lower optical density.

FIG. **52** is a block diagram showing the operation of the control unit of the Continuous Adjustable 3Deeps Filter Spectacles, and describes how the operating characteristic curve of FIG. **49** and the transition time curves of FIG. **50** and FIG. **51** are used to optimize the operation of the lenses of the Continuous Adjustable 3Deeps Filter Spectacles. FIG. **53** shows the operation of an entire system—a typical Continuous Adjustable 3Deeps Filter Spectacles system—from input of the video frame, through Video and 3Deeps Processing to calculate the optimal optical density, the transmission and reception of the control information, and the operation of the Control Unit of the Continuous Adjustable 3Deeps Filter Spectacles.

FIGS. **54-56** shows hardware implementations of algorithms that calculate an optical density for the controllable neutral density filters. FIG. **54** shows an IC implementation selectable for either the algorithm described in FIG. **40** and FIG. **41**, or the algorithm described in FIG. **43**. The chip may be coupled to a video format conversion chip for input, and for output to the Continuous Adjustable 3Deeps Filter Spectacles, or another chip that outputs to the spectacles. FIG. **55** shows an alternate IC chip embodiment using the algorithm of FIG. **43**. In this embodiment only the change in optical density is transmitted to the Control Unit of the Continuous Adjustable 3Deeps Filter Spectacles. While this IC chip may be coupled to a video format conversion chip, FIG. **56** shows how it may be implemented and coupled to the Control Unit of the Continuous Adjustable 3Deeps Filter Spectacles.

Calculating the Optical Optimal Density of Continuous Adjustable 3Deeps Filter Spectacles

FIG. **37** shows a typical retinal reaction time curve **3700**. While each eye is stimulated by light continuously, there is a time delay till the information is triggered and transmitted to the brain. This time delay occurs when we view fix-eyed (as during movie viewing), and is called the "Retinal Reaction Time". The retinal reaction time is dependent on the amount of light (brightness) that falls on the eye. Luminance is measured in log [candela per square meter(dc/m.sup.2)] as has been presented in FIG. **37** on the abscissa scale **3701**. (In studies of perception and psychophysics luminance is often measured in Trolands which is a unit of conventional retinal illuminance, but corrects the measurements of luminance values impinging on the human eye by scaling them by the effective pupil size.)

To aid the reader, we have included a second abscissa scale **3702** in FIG. **37** that translates Luminance into commonly understood terms. For instance a luminance reading of 0 approximates the amount of ambient light from a "clear sky" **3713**. Other commonly understood values are also presented including a luminance reading of −2 that approximates the amount of ambient light from a "night sky with a full moon" **204**.

The ordinate scale **3703** of the retinal reaction time curve shows in milliseconds the amount of time till the corresponding amount of light triggers and sends the information to the brain. For instance in a clear sky **3713** having a luminance measure of 0, the eye will trigger about every 200 msec and send the image to the brain. A night sky with a full moon **3704** has a luminance measure of −2 and the eye will trigger about every 325 msec and send the image to the brain.

While the retinal reaction mechanisms are independent for each eye, when both eyes are unobstructed the luminance value is the same and they trigger at about the same time. However, if one eye is shaded so the eyes have unequal retinal illuminance, then the two eyes will trigger at different speeds and different times. As explained above, the terminology we use is instant image for the image sent to the brain by an unshaded eye, and lagging image for that image sent to the brain by the shaded eye. Using filters with different optical density shading results in a difference in retinal reaction time. The difference in retinal reaction time between the two eyes is one factor in the commonly accepted explanation for the Pulfrich illusion.

The second factor is simultaneity. The brain will take the two eye images and put them together in a 'simultaneous' fashion to generate the image that we perceive. Thus in normal viewing, if both eyes see the same image without any filtered obstruction, the brain gets two approximately identical 'instant images'. These images only differ by the inter-ocular distance between the eyes (about 2½ inches), and the mind puts these two simultaneous images together to perceive depth. However, if one eye is shaded than the mind will perceive one instant image and one lagging image and put those together simultaneously to perceive depth. These two factors, retinal reaction time, and simultaneity are the two factors that explain Pulfrich illusion.

If the scene being viewed is static with no moving object, then the instant image of the unshaded eye and the lagging

image of the shaded eye will still see the same image and the retinal reaction delay and simultaneity factors will not provide any depth information. Thus, the Pulfrich illusion cannot work in the absence of motion. But if the scene being viewed has horizontal motion (also called lateral motion) then the shaded eye will see an image that is lagging the instant image. In this case the lagging image caused by retinal reaction delay of the shaded eye, when juxtaposed with the instant image perceived by the unshaded eye will, through the mechanism of simultaneity, be reconciled by the brain as a perception of depth. This is the Pulfrich illusion. This will be diagrammatically explained in FIGS. **38**A-**38**C.

Note from the typical retinal reaction time curve **3710** the potential of the Pulfrich illusion. Retinal reaction time from the illumination of light from a clear sky at noon (1/10th of a second) is approximately half as long as retinal reaction time from a clear sky (1/5th of a second). On a TV with a 100 Hz refresh rate that is 10 frames. The instant invention uses the retinal reaction time curve to select the optical density of the neutral shaded lens to optimize the Pulfrich illusion.

The retinal reaction time curve **3710** in FIG. **37** is a typical curve provided for teaching purposes and may be further refined in the future. The effect of luminance on retinal reaction time has been extensively studied as in "Simple Reaction Time As A Function Of Luminance", Alfred Lit, et al, in Perception & Psychophysics, 1971, Vol 10(6), p 397. The relationship will differ from person-to-person, and also exhibits variability within the same person as they age, or even exhibit intra-day variation due to factors such as eyestrain, etc. The retinal reaction time curve **3710** exhibits a reciprocal relationship with retinal illuminance, and also has a discontinuity at a retinal illumination of about −1 the threshold at which the cone sensors of the eye turn off and only rod sensors (that do not see color) are operational. For the teaching purposes of this disclosure however, the smooth retinal reaction time curve **3710** of FIG. **37** will be used.

FIG. **37** shows the general relationship **3710** between reaction time (in milliseconds) as a function of luminance. For either eye, the magnitude of the visual latent period is a reciprocal function of the prevailing level of retinal illumination. The figure shows a slow retinal reaction time at low luminance, with retinal reaction time progressively increasing as luminance levels increase. The relationship shown by this figure is used in various embodiments to calculate the optical density of the neutral filter. In the preferred embodiment, this relationship will be used to approximate normal stereoscopic vision by calculating the optical density of the neutral filter to using an average inter-ocular separation between the eyes (about 2½ inches).

FIGS. **38**A-**38**C show in more detail the geometry **3800** of how the Pulfrich illusion works. The geometry of the Pulfrich illusion has been well described as for instance in "The Magnitude Of The Pulfrich Stereo-Phenomenon As A Function Of Target Velocity", Alfred Lit, Journal of Experimental Psychology, Vol. 59, No 3, 1960. Placing a neutral density filter **3812** over one eye and allowing the other eye to view the motion picture unobstructed actuates the Pulfrich illusion. We again note that with the Pulfrich illusion both eyes view the same single image on a screen **3810**. The difference in retinal reaction time allows the eyes to view a single image, but the mind is fooled into thinking it is seeing two different images (the lagged and instant images) when lateral motion is present. Simultaneity allows the mind to put the two images together to get a depth-perceived eye-target image with depth perception.

We stress that the Pulfrich illusion will not work if separate right-eye and left-eye images are presented to the viewer, as is the case with other dual image 3D viewing systems. 3Deeps is incompatible with any dual image 3D system.

FIG. **38**A shows the geometry of a viewer wearing 3Deeps Filter Spectacle **101** in which the left eye **3802** has a shaded filter **3812** and the right eye **3804** is unobstructed. At the top of the figure is a schematic showing the spectacles **101** with the left lens shaded **106** and the right lens clear **105**. In this figure there is no lateral motion in the motion picture. The right eye **3804** focuses on an object in the motion picture that we call the instant image **3830** in a 2D plane on the screen **3810**. Even though the left eye **3802** views through a shaded filter lens **3812** causing a retinal delay, because there is no motion, the left eye **3802** sees a lagging image **3820** that is coincident with the instant image **3830**, and the brain simultaneously interprets them as the eye target **3855** in a 2D plane on the screen. In this case no illusion of depth is provided by the Pulfrich illusion.

FIG. **38**B shows the geometry of a viewer wearing Continuous Adjustable 3Deeps Filter Spectacle **101** in which the left eye **3802** has a shaded filter **3812**, and the right eye **3804** is unobstructed. At the top of the figure is a schematic showing the spectacles **101** with the left lens shaded **106** and the right lens **105** clear. In this figure the direction of lateral motion on the screen is from right-to-left. The right eye **304** focuses on an object in the motion picture that we call the instant image **3830** in a 2D plane on the screen **310**. Because the left eye **3802** views through a shaded lens **3812**, the retinal delay causes the left eye **3802** to see the image lagging behind the instant image **3830** also called the lagging image **3820**. The brain receives the instant image **3830** and the lagging image **3820** and places them together as an eye target **3855** with an illusion of depth in front of the 2D plane of the screen **3810**.

In FIG. **38**B the distance dScreen **3880** measures the distance between the viewer and the screen, and the distance d **3885** measures the perceived distance of the eye target **3855** away from the screen **3810**. The distances d **3885** and dScreen **3880** can be used to provide a measure of the degree of the depth illusion. One measure of the 3D depth effect is d/dScreen as a percentage. For example if d **3885** is ½ foot, and dScreen **3880** is 10 feet, then d/dSceeen is 1/20 and the degree of depth perception is 5%.

With this configuration, if another object in the movie has a frame-to-frame lateral motion from right-to-left that is faster than the instant image than it will lag the instant image even more and appear to the viewer even closer than the eye image. If another object in the movie has a frame-to-frame lateral motion from right-to-left that is slower than the instant image than it will lag the instant image less and appear to the viewer further away than the eye image. This is in complete agreement with how the mind interprets motion parallax as a cue for depth perception.

FIG. **38**C shows the geometry of a viewer wearing Continuous Adjustable 3Deeps Filter Spectacle **101** in which the left eye **3802** has a shaded filter **3812**, and the right eye **3804** is unobstructed. At the top of the figure is a schematic showing the spectacle with the left lens **106** shaded and the right lens **105** clear. The only difference between FIG. **38**C and FIG. **38**B is that in this figure the direction of lateral motion on the screen is from left-to-right. The right eye still focuses on an object in the motion picture that we call the instant image **3830** in a 2D plane on the screen **3810** in the same place as in FIG. **38**B. Because the left eye **3802** is shaded, the retinal delay causes the left eye **3802** to see the image lagging **3820** behind the instant image **3830**. The brain receives the instant image **3830** and the

lagging image **3820** and places them together as an eye target **3855** appearing in 3D behind the 2D plane of the screen **3810**. The distance dScreen **3880** measures the distance between the viewer and the screen and is shown as the same distance as in FIG. **38**B. The distance d **3890** is a negative number since it is behind the screen, and d/dScreen measures the degree of the depth illusion.

The geometry for a viewer wearing Continuous Adjustable 3Deeps Filter Spectacles in which the right eye has a shaded filter and the left eye has a clear filter is similar. If in FIG. **38**B the filter had been shown filtering the right eye rather than the left eye, then the right eye would see a lagging image so that the eye image would appear behind the 2D plane of the screen. If in FIG. **3**C the filter had been shown filtering the right eye rather than the left eye, then the right eye would see a lagging image so that the eye image would appear in front of the 2D plane of the screen.

In FIG. **39**, curve **3900** uses the typical curve **3710** of retinal reaction time **3703** as a function of luminosity **3701** to explain the working of Cardboard Pulfrich Spectacles **3990** with fixed lenses. The standard cardboard Pulfrich spectacle **3990** comes with a clear lens (usually the left eye) and a neutral density lens of fixed optical density (usually covering the right eye). There is no provision to change the lens. The optical densities of the clear and neutral lens filters **3990** are fixed and the only variable is the retinal luminance. Different luminance will occur for instance depending upon the lighting of the viewing venue. One immediate problem is that because the gray filter lens is fixed in the frames and cannot be changed, all motion must be in a single direction—usually from left-to-right. To address this problem, movies viewed through cardboard Pulfrich filters **3990** have been limited to scenes that have either no motion or motion in only a single direction. This problem can be termed the direction of motion constraint.

A second problem is that for a given speed of lateral motion, as the luminosity changes, the amount of depth perception will change. This problem is demonstrated by looking at the retinal reaction curve **3710** in FIG. **39**. It shows the difference in retinal reaction time c **3915** and $\Delta_2$ **3925** between the two eyes for two different values of ambient light (unaided eye). With bright ambient light the cardboard Pulfrich spectacles **3990** indicated on the figure by bracket **3910** produce a difference in retinal delay of Ai **3915**. Luminance of the clear lens intersects **3930** the retinal reaction curve **3710** and the luminance through the neutral density filter intersects **3933** the retinal reaction curve **3710** to yield a difference **3915** in retinal reaction time of $\Delta_1$. Similarly if the luminance is darker then the difference **3925** in retinal reaction time is a value $\Delta_2$. Darker ambient light indicated on the figure by bracket **3920** produces a difference in retinal delay of $\Delta_2$ **3925** that is significantly greater than $\Delta_1$. This is a function of the relationship between luminance **3701** and retinal reaction time **3703**. Increasing luminance results in an increase in the visual latency period. Note that with bright ambient light, the difference ($\Delta_1$) **3915** in retinal reaction time is smaller than the difference ($\Delta_2$) **3925** in retinal reaction time, so the depth illusion is greater in a darker room rather than a lighter room.

A related problem is that as speed of lateral motion changes but for a fixed luminosity, the amount of depth perception will also change. This is unnatural and another problem with cardboard Pulfrich spectacles **3990**. A scene should maintain the same amount of depth perception independent of the speed of objects in the scene. To address these problems, movies produced for viewing through cardboard Pulfrich filter **3990** may try to maintain a constant luminosity and speed of motion. That is these problems severely constrain the content of the movie. This can be referred to as oscillating visualization of depth.

Also, since cardboard Pulfrich Spectacles **3990** only has one neutral density filter it is usually very dark resulting in more loss of light than is necessary to actuate the proper 3D depth illusion. This problem can be referred to as over-darkening.

Another problem is that the depth perception will change depending on the lighting of the venue in which the motion picture is shown. In darkened theaters, the perception of depth will be larger than when viewing the movie in a brightly lit home environment, since the difference in retinal delay is greater in a darkened environment than a well-lit environment. This may mean the 3D depth illusion will be attenuated in a dark movie theater and muted in a well-lit home theater. The implication is that the same movie, viewed through cardboard Pulfrich spectacles **3990**, will view 3D depth differently depending on the lighting of the venue. This problem can be referred to as a venue-dependency.

One way to illustrate the problem with cardboard Pulfrich spectacles **3990** with a fixed neutral density filter is that as luminance changes the degree of depth perception is also constantly changing and will only rarely and per chance be at the level of normal stereoscopic vision. Note that in FIG. **39** the horizontal lines that give the readings on the retinal reaction time scale all have their arrows pointing towards the scale which is due to the fact that with cardboard Pulfrich spectacles **3990** there is no control over the retinal reaction rime for either eye, and no control for the difference in retinal reaction time between the eyes.

FIG. **40** and FIG. **41** use the retinal reaction time curve **3710** to show how to calculate an optical density for the controllable neutral density filter that optimizes the Pulfrich illusion. The approach that is described solves the problems with the cardboard Pulfrich spectacles **3990**, including the direction of motion constraint, oscillating visualization of depth, over-darkening, and venue-dependency problems.

In this embodiment of the invention, the Continuous Adjusting 3Deeps Filter Spectacles are controlled to provide a neutral density filter that has an optical density so that the distance between the lagged image that is seen by the eye obstructed by the neutral filter, and the image seen by the unobstructed image, is 2½ inches. This distance, 2½ inches, is the average distance between a viewer's eyes—also called the inter-ocular distance. That is, the optical density of the neutral filter is chosen dependent on (1) speed of motion on the screen, (2) the luminance reaching the unobstructed eye, and (3) so that the delayed image from the filtered eye appears 2½ inches behind image from the unfiltered eye.

Consider the following—normal stereoscopic vision is obtained by viewing a 3-dimensional world from the vantage point of a left and right eye that are about 2½ inches apart (the average inter-ocular distance). Each eye sees the same image but from the slightly different vantage of eyes that are separated by approximately 2½ inches. To get an optimal 3Deeps stereoscopic depth illusion we turn this around. When viewing a motion picture on a TV or in a movie theater each eye is viewing the exact same image in a 2-dimensional plane of the screen. An optimal Pulfrich illusion will occur via the Pulfrich illusion when the difference in retinal reaction time results in instant and lagging images that appear 2½ inches apart.

This number, 2½ inches, is also used in other 3D viewing systems. Cameras for recording dual-image 3D systems that are viewed using anaglyph spectacles, shutter-glasses,

IMAX, or Polaroid spectacles use cameras with lenses that are lashed together to have a separation of 2½ inches between the lenses that record same scene right-eye and 'left-eye images.

Geometrically, in normal stereoscopic vision the eyes, separated by the inter-ocular distance, triangulate on an object. In the preferred embodiment of the invention each eye sees instant and lagging images separated by the inter-ocular distance and the mind triangulates to get a stereoscopic eye image. In the two cases we have the same triangulation and geometry so the 3Deeps visualization is what the mind expects to see. The calculations for this preferred embodiment are shown in FIG. **40**. This provides depth perception that is entirely natural.

In FIG. **40**, curve **4000** uses the typical curve **3710** of retinal reaction time **3703** as a function of luminosity **3701** to demonstrate how to compute from a motion vector and luminosity the optimal optical density for the neutral density lens of the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles so that the difference in retinal reaction time between the viewer's eyes results in instant and lagging images correspond to a separation on the display monitor of exactly 2½ inches. The figure describes an algorithm $f_{PrefEmb}$(Luminance, LatScrMotion) that has luminance and a motion vector as input (negative value for right-to-left lateral motion and a positive value for left-to-right lateral motion. The algorithm $f_{PrefEmb}$(Luminance, LatScrMotion) is described in more detail in FIG. **41**.

First we measure the ambient luminance or brightness **4010**. This is the first input parameter. Luminance represents the amount of light that the unaided eye will see through the clear lens. Using the retinal reaction time curve **3710** we can establish the retinal reaction time delay. In our example we have an input luminance measure **4010** of 0.52 cd/m2, that from the retinal reaction time curve **3710** corresponds **4011** to a retinal reaction time delay **4012** of 120 msec. The second input parameter is the speed of lateral motion. For this example we assume a left-to-right lateral screen motion of 100 dots (pixels) per frame. That is the major object on the screen (for example a speeding car) is traveling across the screen from frame to frame at the speed of 100 dots per frame. We assume the motion picture is being viewed on a quality monitor with a pixel resolution of 100 dots per inch. This computes to taking 2½ frames to move 2½ inches across the screen. If the TV has a refresh rate of 60 Hz (60 frames per second) then it will take 2.5/60=1/24 or approximately 42 msec for the screen object to traverse 2½ inches on the screen. That is, we want the retinal reaction time difference **4018** between the two eyes to be 42 milliseconds. Adding the 42 msec to 120 msec computes to 162 msec retinal reaction time **4013** to affect a 42 millisecond retinal reaction time difference **518** between the two eyes. Now going back to the intercept **4014** on the retinal reaction curve **3710** we see that we need to choose an optical density for the neutral density lens that will give us a luminance reading **4015** of about −0.6 on the luminance scale. If the direction of the lateral motion is from left-to-right, the right lens will take this optical density and the right lens will be clear.

The algorithm $f_{PrefEmb}$(Luminance, LatScrMotion) provides the computation of the optical density of the neutral density lens $f_{PrefEmb}$(Luminance, LatScrMotion) and more detail is provided in FIG. **41**.

This is then the method by which we can compute the optical density of the neutral density lens that is optimal in that the 3D depth perception as viewed through the 3Deeps Filter Spectacles will be exactly the same as for normal human stereoscopic vision.

FIG. **41** provides some more detail of the steps of the algorithm **4100** but in tabular form. In Step **1 4110** the direction and speed of motion is calculated. The search for a moving object is limited to an upper bounded region **4111** and a lower bounded region **4112** of the movie. The upper bounded region **4111** is a surrogate for the image background and the lower bounded region **4112** a surrogate for the image foreground. The single most prominent moving object **4115** in the background **4111**, and the single most prominent object **4116** in the foreground **4112** surrogate regions are tracked between frames of the motion picture and the horizontal component of the motion is calculated as direction (right- to left or left-to-right) and speed (in units of pixels per inch or dots per inch). A negative horizontal speed motion represents motion from right-to-left, and a positive horizontal speed motion represents motion from left-to-right. A reading of 0 for speed of motion means that there is no discernable foreground of background object in motion.

The method presented in Step **1 4110** to find the measure the motion in the frame of the moving picture is only exemplary and is over-simplified to teach the principle. Any algorithm that allows us to quantify the direction and speed of lateral motion in a motion picture frame can be used. The video industry has expended considerable resources on R&D to develop image processing algorithms used for video format conversion to track motion of objects between frames of a motion picture, and Step **1** would derive benefit from use of that body of research. Many of the video format conversion chips used in digital TVs, up-converters, and digital projectors track numerous moving objects from frame-to-frame to perform the best possible format conversion of object in motion. In alternate embodiments it would be beneficial to use a subset pr the entire set of motion vectors to calculate a single speed and direction of motion that characterizes motion in the moving picture.

In Step **2 4120**, the background horizontal vector $LatScrMotion_{Top}$ **4115** is subtracted from the foreground horizontal vector $LatScrMotion_{Bot}$ **4116** to get an overall measure (LatScrMotion) of the instantaneous motion associated with the frame of the motion picture, and the value is stored.

In step **3 4130** the Luminance value is calculated and stored. In this teaching example the Luminance is estimated as the average brightness of all Pixels in the frame. Other embodiments may use other means to quantify luminance. In step **4 4140** the two input value, speed of lateral motion (LatScrMotion) and Luminance are used as input value in the algorithm described in FIG. **40** to get the value of the optical density for the neutral density lens—i.e. the value of $f_{PrefEmb}$(Luminance, LatScrMotion) from FIG. **40**. A decision procedure **4150** is then used to get the optical density for each of the 3Deeps spectacle lenses. If the lateral screen motion (LatScrMotion) is zero (dpi) or near-zero (−10 dpi<LatScrMotion<10 dpi) then both lenses will be set to the ClearState optical density value (OD). If the lateral screen motion in a direction from right-to-left then set the left lens to the calculated value $f_{PrefEmb}$(Luminance, LatScrMotion) **4140** and the right lens to clear. If the lateral screen motion is in a direction from left-to-right then set the right lens to the calculated value $f_{PrefEmb}$(Luminance, LatScrMotion) **4140** and the left lens to clear.

This overcomes the problems with cardboard Pulfrich lenses **3990**. Firstly, the 3Deeps Filter Spectacle lenses always take the correct state consonant with the direction of motion on the screen. Secondly, rather than the depth perception fluctuating as with cardboard Pulfrich filter **3990**, the optical density of the neutral density lens fluctuates to provide the constant degree of depth perception that the

mind expects from its everyday vision of reality. Third, the 3Deeps Filter Spectacle lenses do not over-darken but always take an optical value since they can conform to speed of motion and luminance. And finally, since luminance is accounted for, the motion picture will view the same regardless of whether viewed in a darkened movie theater, or a well-lit home theater environ.

Before describing alternate means to select the optical density for a filter to produce the Pulfrich illusion, it is useful to consider further how to determine the parameters that are used to calculate an optimal optical density for the neutral lens of the Pulfrich Filter Spectacles. The two parameters are (a) a motion vector that describes the speed and direction of lateral motion in the motion picture, and (b) luminance or brightness of the motion picture.

Motion Measures in a Motion Picture

In order to address de-interlacing and up-conversion format problems with motion picture recording, broadcast and display, various algorithms have been developed to determine the direction and speed of motion in a motion picture, and many of these algorithms have been implemented in software and hardware devices.

Consider an input signal to a TV which is 30 frames per second (for example as from analog TV) but that is being output and shown on a high-end digital LCD TV running at 120 frames per second. Showing a TV input signal of 30 fps at an output of 120 fps is an example of format conversion that is done by many different format conversion apparatus. One simple way to do this format conversion is for the chip to simply add 3 exact copies of each frame to the output stream. That works if there is no motion, but if a screen object exhibits any motion between frames then the 3 new frames have the moving object in the wrong place. The better and more expensive the digital TV, the worse this problem appears to the viewer. So the better format-conversion chips perform complex frame-to-frame image processing and track speed and direction of motion and then use that information to better construct the 3 new frames. But estimating speed and direction of motion between frames (which these devices already do) is also sufficient information to calculate the timing and optimal optical density for the neutral (shaded) density lens of the 3Deeps (which the devices do not do).

This is an oversimplified example of video format conversion, but that is useful for teaching purposes. State-of-the art format-conversion chips may also have functions to do some or all of the following—adaptive motion de-interlacing, edge smoothing, intelligent image scaling, black level extension, digital noise reduction, auto flesh-tone correction, as well as other complex image processing functions.

Many companies have already developed the image processing algorithms and implemented them in Integrated Chip circuitry. Philips described their semiconductor MELZONIC chip in the following way: "After exhaustive investigation and computer simulation, researchers at Philips developed a totally new technique for motion estimation which they have called '3-D Recursive Search Block-Matching'. By analyzing two successive TV fields to locate blocks of pixels in the second field that match blocks in the first, 3-D Recursive Search Block-Matching is able to assign a velocity vector to each block of pixels in the first field. These velocity vectors can then be used to interpolate the correct spatial position of each pixel block in a new field that is positioned temporally between the two original fields—i.e. to create new movement phases."

In U.S. Pat. No. 5,717,415, Iue describes "Motion Vector Detecting" by analysis of successive frames of a motion picture. The motion vectors are used to develop separate left-eye and right-eye images so that 2D movies may be viewed as 3D movies. There is no disclosure nor suggestion that the motion vectors be used in a single-image system with controllable Pulfrich spectacles.



In essence, digital TV and digital cinema rely upon various implementation of video format conversion, and make extensive use of motion adaptive algorithms implemented as hardware and software to detect and quantify motion between frames. They use such information to enhance the quality of the video output signal. All such hardware and software implementation that detect and quantify a motion vector can be used advantageously for Continuous Adjustable 3Deeps Filter Spectacles.

Luminance Measures in a Motion Picture

By luminance we mean brightness. However since the motion picture is viewed through 3Deeps spectacles, luminance of the screen picture may be calculated in many different ways. We could use the screen luminance of the motion picture, the ambient light of the room, or a measure of light arriving at the eye of the viewer.

For standard analog TV signals, every raster point on the TV screen has an attached luminance value as part of the TV signal. Screen luminance may be calculated as an average of all screen luminance values. Other means may be used to calculate a luminance measure of each screen frame for analog TVs. Similarly, different means may be used to calculate an overall luminance measure for digital TVs.

While luminance of the picture is one factor in setting the optical density of the neutral lens of the Pulfrich Filter Spectacles, ambient light of the room or theater in which the motion picture is viewed need also be considered. Many TVs already have built in luminance control. The Philips Electronics Ambilight technology used in their flat-panels is an RGB backlight that changes color based on the on-screen image. A filter is used to calculate the average color on the top, left and right border of the screen that is then sent to a micro controller that controls three separate banks of red, green and blue cold-cathodes.

Also, some TVs will sense ambient light and can use that information to adjust the brightness of the picture. In a bright room they will show a brighter picture while when they sense a darkened room they can present a more subdued picture. This is done in part to extend the life of the LCD and plasma screens that are used in digital TVs and projectors.

Recalling that the primary mechanism by which the Pulfrich illusion works is the difference in retinal reaction time triggered by a neutral lens covering one eye, the retinal illuminance is a more important factor than screen luminance in developing depth perspective via 3Deeps Filter Spectacles.

In FIG. **44**, described later, we use a photodiode located on the Continuous Adjusting 3Deeps Filter Spectacles as a surrogate measure for retinal luminance. Each of the algorithmic embodiments shown in FIG. **40**, FIG. **43**, and FIG. **45** could preferably use luminance measures of the display venue or retinal illuminance rather than the luminance of the motion picture in their calculations. If we were using the algorithm of the preferred embodiment, speed and direction of motion would need to be transmitted to the 3Deeps Filter Spectacles that would then use luminance and the motion vector with the algorithm of the preferred embodiment to calculate and set the optical value of the neutral density lens of the 3Deeps Filter Spectacles.

FIG. **42** is an illustration of an alternate algorithm **4200** that can be used to characterize lateral motion in a motion picture. It estimates 4 motion vectors—an upper-right (UR)

**4232** and upper-left (UL) **4231** motion vectors to estimate background lateral motion, and a lower-right (LR) **4233** and lower-left (LL) **4234** motion vectors to estimate foreground lateral motion. Each vector is estimated from its non-overlapping regions in the frame of the movie. In this sample algorithm the most prominent motion vector in the Upper Right **4222**, Upper Left **4221**, Lower Right **4224**, and Lower Left **4223** regions are identified. Each of these 4 vectors can take any of 3 value; it may be moving either right-to-left (negative lateral speed motion **4242**) or moving left-to-right (positive lateral speed motion **4243**), or if there is no motion the lateral component of the vector has a value of 0 **4245**. That is there are 81 ($3^4$) possible combinations. Each of the 81 combinations might have separate and distinct computation in this alternate algorithm.

One of the 81 possible combinations has the UR **4232**, UL **4231**, LR **4233** and LL **4234** each having a value of 0. This is what would be expected when there is no motion on the screen as for instance during a close-up on a single character speaking. This case would be result in both lenses of the 3Deeps Filter Spectacles taking the same or clear state (ClearStateOD).

Another of the 81 possible combinations would have both the UR **4232** and LR **4233** vector showing right-to-left motion (negative values), and both the UL **4231** and LL**4234** showing left-to-right motion (positive values). This is what would be expected when the camera is receding and expanding a scene and the primary component of motion comes from the action of the camera panning. (This is exactly the scenario in the famous railroad yard scene from "Gone with the Wind", in which Scarlett O'Hara played by Vivien Leigh walks across the screen from the right as the camera slowly pulls back to show the uncountable wounded and dying confederate soldiers.) In this case the alternate algorithm would calculate the value UL+LL+UR+LR as the LatScrMotion **4120**. If this value were negative then the algorithm **4150** would set the right lens to the ClearStateOD and the left lens to a darkened state in accordance with the value $f_{PrefEmb}$(Luminance, LatScrMotion) **4140**. If this value were positive then the algorithm **4150** would set the left lens to the ClearStateOD and the right lens to a darkened state in accordance with this value $f_{PrefEmb}$(Luminance, LatScrMotion) **4140**.

Each of the other 79 cases would similarly have appropriate calculations.

Each of the 2 algorithms presented for teaching use the notion of selecting the most prominent motion vector in a region. In these algorithms we define that as the longest edge in the search region that is exhibiting motion. Other definitions may be used. For instance, within a scene the algorithm may use this definition to first identify a prominent edge. The identified edge may then persist throughout other frames as long as it continues to appear in subsequent frames, even if that edge is no longer the longest edge in the region. Other algorithm may continue to track this edge through subsequent frames, even were it to move out of the search region.

While two algorithms have been used to characterize lateral motion in a motion picture from a set of motion vectors, other algorithms may be advantageously employed. Motion pictures are filmed so that the major action takes place in the center of the screen. Other algorithms to characterize lateral motion in a motion picture from a set of motion vectors may then search for the major vector of motion in the center of the screen and use motion vectors from the top of the screen (a surrogate for background) and motion vectors from the bottom of the screen (a surrogate for foreground) to estimate parallax in the frame of the motion picture. The major vector of motion and estimate of parallax can then be used to determine the optimal optical density of the neutral density filter. In another approach, an algorithm to characterize lateral motion in a motion picture would focus on the regions of the movie that are well lit. Cinematographers compose film, using light to focus attention and highlight the most important action in the scene. This may be useful in delimiting the portion of the frame of the motion picture to which an algorithm to characterize lateral motion in a motion picture frame is restricted. It should be appreciated that from the large number of motion vectors between frames of a motion picture, there are many different algorithms that can be advantageously used to quantify a motion vector that characterizes motion in a frame of a motion picture that is used to determine the optimal optical density of the neutral density filter.

A First Alternate Embodiment

Motion pictures are often viewed on small, personal devices such as an Apple iPod. Such devices have small screens and are held within arms reach for viewing. For such devices the preferred embodiment that optimizes the Optical Density of the neutral density lens to an average inter-ocular distance may be inappropriate. We provide other alternate embodiments, either of which is appropriate for small viewing devices, as well as for TV or movie theater viewing.

FIG. **43** shows the use of the retinal reaction time curve **3710** for a first alternate embodiment algorithm **4300** to calculate the optical density of the neutral density lens. The x-axis **3701** shows luminance, and the y-axis **3703** shows retinal reaction time. Observe that the amount of light produced by a motion picture is constantly changing. Some night scenes in a movie produce low light, and other scenes such on the open seas at noon are much brighter. In this first alternate embodiment, rather choose an optical density for the neutral filter so that there is a separation of 2½ inches between the instant and delayed image to the eye (as in the preferred embodiment), we may choose to fix the difference (Δ) **4320** between retinal reaction time of the eyes. Then as retinal illumination to the unfiltered eye changes, the optical density of the neutral filter is chosen to produce a constant difference in reaction time between the right and left eyes. It will be seen that this has some advantages.

In this example, assume as in FIG. **40** that the luminance **4310** is 0.54. As demonstrated in FIG. **40** that relates **4311** to a retinal reaction time **4312** for the unaided eye of 120 msec. For this example choose a fixed difference A **4320** between the retinal reaction time of the two eyes of 100 msec, which computes to a retinal reaction time **4313** for the filtered eye of 220 msec (120+100). Then going back to the intercept **4314** on the retinal reaction time curve **3710**, we need to pick an optical density for the neutral density filter so the luminance **4315** to the eye is −1.3.

Similarly as the measured value of luminance changes, this algorithm can be used with new values of luminance to calculate a changing optical density for the neutral density filter. This algorithm only uses an estimate of retinal luminance as input. One benefit of this algorithm is that it only requires the luminance and direction of motion, but not the speed of lateral motion. Thus it is much less computationally intensive, but will provide Continuous Adjustable 3Deeps spectacles that take states conforming to the direction of motion and conforms to the value of luminance. It also affords a means by which the calculation of optical density for the neutral density filter can be implemented on the Continuous Adjustable 3Deeps Filter Spectacles, since luminance can be sensed by the spectacles. This may lessen the

computational requirement for the Phenomenoscope described in U.S. patent application Ser. No. 11/372,723.

In FIG. **44**, **4400** shows 3Deeps Filter Spectacles **4410** that include a photodiode **4420** on the frame of the Continuous Adjustable 3Deeps Filter Spectacles. A photodiode **4420** is a type of photodetector capable of converting light into either current or voltage, depending upon the mode of operation. The output of the photodiode **4420** provides a measure of the amount of light arriving at the frame of the Continuous Adjustable 3Deeps Filter Spectacles **4410**, and is a good surrogate measure of retinal illuminance. This surrogate luminosity measure is input to a Lens Control Unit **103**, also on the spectacles, and used with the algorithm described in the first alternate embodiment to calculate the optical density of the neutral density filter. In this example the direction of motion must still be determined and depending upon the direction of motion the Right Len **105** and the Left Lens **106** will take an optical density of either the ClearStateOD or the calculated neutral density optical density. If this value is determined by a control device external to the Continuous Adjustable 3Deeps Filter Spectacles then such information must be communicated to the Continuous Adjustable 3Deeps Filter Spectacles according to one of the various methods as described in co-pending patents and patent applications. If the Continuous Adjustable 3Deeps Filter Spectacles are the Phenomenoscope described in U.S. patent application Ser. No. 11/372,723, then the Continuous Adjustable 3Deeps Filter Spectacles themselves can determine if inter-frame motion is present, and if so in which direction.

A Second Alternate Embodiment

FIG. **45** uses the typical curve **3710** of retinal reaction time **3703** as a function of Luminance **3701** to demonstrate a second alternate embodiment **4500** for computing an optimal optical densities for the neutral density lens of the Continuous Alternating 3Deeps Filter Spectacles so that the difference (Δ) **4518** in retinal reaction time between the viewer's eyes corresponds to a fixed number of frames of the motion picture.

In this second alternate embodiment, rather choose an optical density for the neutral filter so that there is a separation of the average inter-ocular distance (2½ inches) between the instant and delayed image to the eye (as in the preferred embodiment), we may choose to have a difference (Δ) **4518** between retinal reaction time chosen so that the instant and lagging image are a fixed number of movie frames. It will be seen that this has some advantages.

In this example, assume as in FIG. **40** that the luminance **4510** is 0.54. This is at a point **4511** on the retinal reaction time curve **3710** of (0.54, 0.120). As demonstrated in FIG. **40** that relates to a retinal reaction time **4512** for the unaided eye of 120 msec. Assuming for this example a screen refresh rate of 60 Hz, a delay of 10 frames can be achieved by having a difference in retinal reaction time **4518** of 166 msec. (That is 10/60=1/6 second=166 msec). From a base of 120 msec that is 120+166=286 msec (**4513**). Taking that as the ordinate value, the retinal reaction time **3710** curve intercept is at a point **4514** on the retinal reaction curve **3710**, and we need to select an optical density of the neutral density lens of −1.7 **4515**.

As the measured value of luminance changes, this algorithm can be used as the only input to calculate optical density for the neutral density filter. The benefit of this algorithm is that it also only requires the luminance and direction of motion, but not the speed of lateral motion. Thus it is much less computationally intensive, will provide Continuous Alternating 3Deeps Filter Spectacles that take states conforming to the direction of motion and conforms to the value of luminance. It also affords a means by which the calculation of optical density for the neutral density filter can be performed by the Continuous Alternating 3Deeps Filter Spectacles. This may greatly lessen the computational requirement for the Phenomenoscope described in U.S. patent application Ser. No. 11/372,723.

Video and 3Deeps Processing

Various algorithms have been described to determine the optimal density for the neutral density filter of the Continuous Alternating 3Deeps Filter Spectacles. Whether the calculations are performed by embedded dedicated hardware, or by software running on a CPU, the Video and 3Deeps processing of the preferred embodiment will have the following functions; (1) take as video input the frames of a motion picture, (2) perform video format conversions to address de-interlacing and up-converter conversion problems, (3) output the converted video, (4) calculate a motion vector, luminance, and optimal optical density, (5) and output the 3Deeps control information to the Continuous Alternating 3Deeps Filter Spectacles. FIG. **46** teaches how to incorporate methods of this invention with such video formatters. FIG. **47** is a block diagram showing operation of a Video and 3Deeps processing used to calculate the optimal optical density of the neutral density filter in the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles.

FIG. **46** is a flowchart **4600** showing the use of a format conversion semiconductor chip **4620** to compute the Continuous Adjustable 3Deeps Filter Spectacles synchronization information. Video Format conversion chips are used to convert a movie from one format such as interlaced 60 Hz to another format such as non-interlaced 120 Hz.

Across the top, the flowchart shows the video format conversion chip **4620** in its normal operation. To emphasize that the step is performed by a semiconductor chip, it is shown with a depiction of the pins **4690** of a semiconductor chip. As is typical with format conversion chip, it inputs frames (analog or digital) **4610** of the motion picture, and outputs suitably reformatted digital versions **4630** of the movie. Within the format conversion semiconductor chip **4620** image processing algorithms perform motion vector detection and quantify and extract the motion vector(s) and Luminosity values (**4621**) and use them to reformat the video (**4622**) for output.

The motion vector(s) (MV) and Luminosity value (L) are output by the format conversion IC and are read and stored **4651** by another processing unit that implements any of the previously described algorithms to calculate the optical density value of the neutral density frame. The output motion vector (MV) and luminosity (L) measures are stored **4652**. They are then read by a computing device **4653**, which incorporates any of the teaching algorithms herein described, or uses another algorithm to compute the LatScrMotion for each frame and output the value of the optical density of the neutral density filter. A decision rule **4654** will then determine the setting for the right and left lenses of the 3Deeps Filter Spectacles. If the LatScrMotion=0 (**4661**) then both lenses are set to a clear optical density (**4671**). If the LatScrMotion<0 (**4660**) then screen motion is from right-to-left and the left lens will be set to the corresponding darkened optical density and the right lens will have the clear optical density (**4670**). If the LatScrMotion>0 (**4662**) then screen motion is from left-to-right and the right lens will be set to the corresponding darkened optical density and the left lens will have the clear optical density (**4672**). The results are formulated **4680** into Continuous Alternating

3Deeps Filter Spectacle control information, and transmitted **4695** synchronously with the motion picture. The control information is described in FIG. **3**. In one embodiment, the control information is transmitted wirelessly, but other embodiments may use wired means.

In another embodiment (not shown) the algorithm to compute the 3Deeps Filter Spectacle synchronization information is included entirely within the format conversion semiconductor rather than on a second computer processor. In this case the format conversion chip not only inputs frames (analog or digital) of the motion picture, and outputs suitably reformatted versions of the movie, but also calculates and reports out the 3Deeps Filter Spectacle synchronization information.

FIG. **47** is a block diagram **4700** showing more detail of the operation of the Video and 3Deeps processing module **4790** used to calculate the optimal optical density of the neutral density filter in the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles.

If the motion picture is analogue then it is input using the Analogue Audio/Video input **4701**. The analogue is fed to an Analogue to Digital Converter **4705** module that converts it to digital format frame by frame. A Memory-Control-In module **4710** stores the digital frames in Memory **4715**. Each successive frame is stored in a different memory section denoted **f1**-**f4**. Other embodiments may have significantly more frame memory. The first frame of the motion picture would be stored in memory section **f1**, the second frame in **f2**, the third frame in **f3**, and the fourth frame stored in memory section **f4**. The frame memory will then roll over—with frame **5** stored in frame memory **f1**, frame **6** stored in **f2**, and so on. While this is happening in real-time other module of the Video and 3Deeps Processing module **4790** will also be accessing the frame memory, and performing the required calculations for each frame. Once the motion vector detection **4725**, Luminance **4730**, and 3Deeps OD and Synchronization **4735** calculations are performed, the associated motion picture frame stored in frame memory $f_i$ **4715** is no longer needed and can be overwritten by rolling over the storage location number in frame memory **4715**.

The analogue **4701** is also directed unchanged to an analogue audio/video out module **4740**. The analogue A/V out **4740** data is precisely the same as the Analogue A/V In **4701**, without any format conversion. Other embodiments of the Video and 3Deeps Processing module **4790** may perform format conversion or reformatting of the analogue input signal before output of the analogue signal. Also, the output from the Analogue to Digital Converter is routed to the Digital Audio/Video Out module **4759**. Before it is output at the Digital A/V Out **4759**, it is processed by the Reformat Video module **4780** using as input the output from the Luminance **4730** and Motion Vector Detection **4725** modules. In this way the motion picture Analogue A/V **4701** is available for output both as the original Analogue A/V out **4740**, and also in a reformatted digital A/V out **4759**.

The Video and 3Deeps Processing module **4790** may also accept the motion picture in a digital format using module Digital A/V In **4702**. In this case the Analogue to Digital converter **4705** is not used. The Digital A/V will be routed to the Digital A/V Out **4759** in the same way as previously described. That is before it is output at the Digital A/V Out **4759**, it passes through Reformat Video module **4780** using as input the output from the Luminance **4730** and Motion Vector Detection **4725** modules.

The Digital A/V **4702** will also be processed by the Memory-Control-In module **4710**, and stored in the digital frame memory **4715**. The frames will be stored as previously described with successive frames stored in high labeled frame buffers, and rolling over when the highest frame numbered frame buffer has been reached.

Consider now the processing of a current frame. The Memory-Control-Out module **4720** will fetch the corresponding current frame from the frame memory **4715** and input it for processing to the Luminance calculation module **4730**, and the Motion Vector Detection module **4725**. The motion detection module **4725** will also reference the previous frame from frame memory **4715**. In this simplified preferred embodiment, for teaching purposes, only two frames of the motion picture are used to estimate a lateral motion vector in the motion picture. In other embodiment many more frames may be used to estimate the lateral motion vector. Algorithms for the calculation of the lateral motion vector have been described in this and co-pending patent applications. Any of those algorithms may be used or other algorithms well known in the art, or that are already in use by format conversion chips. Whichever algorithm is used, it is implemented in the Motion Vector Detection module **4735**. The calculation of Luminance is as described previously, and this algorithm is implemented in the Luminance module **4730**. Alternate algorithms for the calculation of Luminance may be implemented in other embodiments.

The Luminance module **4730**, and the motion vector detection module **4725** are also input to the 3Deeps Optical Density and Synchronization module **4735**. For the preferred embodiment, and the current frame, the algorithm described in FIG. **40** and FIG. **41** is implemented in the 3Deeps Optical Density and Synchronization module **4725** that take as input the Motion Vector Detection **4725** and Luminance **4730** and calculate the optimal optical density for the motion-directed lens of the Continuous Alternating 3Deeps Viewing spectacles. If no lateral motion is detected then the output for the right lens is set to a digital value representing the clear state, and the output for the left lens is set to a digital value representing the clear state.

The control information calculated by the 3Deeps OD and synchronization module **4735** is further described in FIG. **48**. If the motion vector is in the left to right direction then the output for the left lens is set to a digital value representing the clear state and the output for the right lens is set to a value representing the optimal optical density calculated by the algorithm in the module of the 3Deeps OD and synchronization module. If the motion vector is in the right to left direction then the output for the left lens is set to a digital value representing the optimal optical density calculated by the algorithm of the 3Deeps OD and synchronization module, and the right lens is set to a digital value representing the clear state. The control information is output and transmitted **4695** to the Continuous Alternating 3Deeps Filter Spectacles.

All output values are synchronized for the same frame. That is, when the Video and 3Deeps processing module **4790** outputs a frame of the motion picture on the Digital Audio/Video Out **4759**, and the same frame on the Analogue Audio/Video out **4740**, it will also output and transmit **4695** the Continuous Alternating 3Deeps Filter Spectacle control information for that same frame. In other embodiments, the Video and 3Deeps processing module **4790** may be embedded wholly or partially embedded in the circuitry of a video format conversion chip.

Optimal Control of the Continuous Adjustable 3Deeps Filter Spectacles

Optical Density Continuous Adjustable 3Deeps Filter Spectacles are advanced 3Deeps Filter Spectacles. They are characterized by the reception and utilization of control

information that continually adjust the 3Deeps Filter Spectacles to the optimal optical density to maximize the Pulfrich illusion for viewing 2D motion video as 3D. But Digital TVs have refresh rates of up to 120 Hz, and many electrochromic materials are unable to change optical density that fast. Even were the materials able to change that fast, it may be desirable to continuously moderate the optical density of the Continuous Adjustable 3Deeps Filter Spectacles so there is a continuity and they do not change state too abruptly. The algorithms implemented in the Control Unit **103** of the Continuous Adjustable 3Deeps Filter Spectacles optimally handle the synchronization of the refresh rate of a movie to the viewing spectacles. Analogous to the way in which format conversion chips takes an input format and converts to an output format appropriate for the viewing monitor, Continuous Adjustable 3Deeps Filter Spectacles take the optimal optical density for the viewing spectacles and 'render' them to the viewing spectacles in a manner appropriate to the lens material from which they are fabricated.

In one embodiment of the Continuous Adjustable 3Deeps Filter Spectacles, control information for the spectacles lenses is updated in synchronization with each and every frame of the motion picture. The Control Unit (described in FIG. **52**) of the Continuous Adjustable 3Deeps Filter Spectacles implements algorithms that utilize this information to optimize 3D viewing, and provides significant advantage over earlier, but less active 3Deeps Filter Spectacles. One important advantage is that different Continuous Adjustable 3Deeps Filter Spectacles made from different electro-optical lenses can each receive the same control information and but still each operate in an optimal manner appropriate to the lens material from which they are fabricated. In typical operation, the Continuous Alternating 3Deeps Filter Spectacles may receive the new control and synchronization states for the lenses even before they have finished transitioning to a previous state.

While Continuous Adjustable 3Deeps Filter Spectacles may synchronize with every frame of the movie, as do shutter glasses, they are totally different from the operation of shutter glasses. Shutter-glass is a dual image system that synchronizes to the left and right eye frame images. While the preferred embodiment of Continuous Adjustable 3Deeps Filter Spectacles synchronize to every single frame of the motion picture, they provide a continuously changing optical density with transmission of light controlled for each eye. Shutter-glass systems always have a light-intercepted state—dependent on whether the image is a right eye or left eye image, and in which no transmission of light is allowed through the lens. In contrast, Continuous Adjustable 3Deeps Filter Spectacles require that there always be transmission of light through both lenses, but are continually adjusting the transmissivity of the lenses synchronized to motion in the movie. A movie made for shutter-glasses cannot be viewed with Optical Density Continuing Adjustable 3Deeps Filter Spectacles, and shutter-glasses cannot be used for any movie that can be viewed in 3D using Optical Density Continuing Adjustable 3Deeps Filter Spectacles.

FIG. **48** is a table **4800** showing control information for the Continuous Adjustable 3Deeps Filter Spectacles. The control information is organized by frame **4820** of the motion picture—that is control information is transmitted synchronous with the output frames of the motion picture. If the movie is input at 60 Hz but output to the screen monitor after format conversion at 100 Hz, then the Continuous Adjustable 3Deeps Filter Spectacle control information will be synchronized to the output frame rate of 100 Hz. For each frame **4820** the frame number **4801**, optical density of the Left Lens **4803**, optical density of the right lens **4805**, scalar value of the motion vector **4807**, direction of the motion vector **4809** ('–' for right-to-left lateral motion, '+' for left-to-right lateral motion, or '0' for not motion), and Luminance **4811** are provided.

The control information requires very low bandwidth. If the information is transmitted in character format with 9 characters for the frame number **4801**, 5 characters each for the left lens OD **4803**, right lens OD **4805**, Motion Vector **4807**, Luminance **4811**, and 1 character for the direction **4809**, that is a total of 30 characters for each frame. For a fast output format at 120 Hz that is still a low-bandwidth of 3600 characters per second easily handled by inexpensive off-the-shelf digital Transmit/Receive (Tx/Rx) chip pairs.

This control information is sufficient for all the different embodiments of Continuous Adjustable 3Deeps Filter Spectacles. In the preferred embodiment the control unit **103** on the Continuous Adjustable 3Deeps Filter Spectacles **100** will receive the control information **4800** but only use the subset of the information that is required. In the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles, the only control information that is required is the Left Len OD **4803** and Right Lens OD **4805**.

In another embodiment, a photodiode **4420** on the frames of the Continuous Adjustable 3Deeps Filter Spectacles may be used to provide the Luminance calculation to the algorithm of the first alternate embodiment described in FIG. **43** implemented in the Control Unit **103**. In this case, the Optical Densities calculated and transmitted by the Video and 3Deeps Processing Module are not used, but must be re-calculated by the Control Unit **103** of the Continuous Adjustable 3Deeps Filter Spectacles. Using the algorithm of the first alternate embodiment running on the Control Unit **103**, the direction of motion **4809** for each frame will be input along with the luminance measure from the photodiode **4420** to provide control of the right **105** and left **106** lenses of the Continuous Adjustable 3Deeps Filter Spectacles **101**. Similarly, other embodiments may use different subsets of the control information **4800** to control the Continuous Adjustable 3Deeps Filter Spectacles **101**. An advantage of Continuous Adjustable 3Deeps Filter Spectacles is that if two viewers are sitting side-by-side, one with spectacles that incorporate in the control unit **103** the algorithm of the preferred embodiment (FIG. **40** and FIG. **41**), and the second viewer with spectacles that incorporate in the control unit **103** the algorithm of the first alternate embodiment (FIG. **43**), both will view the movie optimally for their respective spectacles.

Recall from FIG. **3** that all circuits on the Continuous Adjustable 3Deeps Filter Spectacles **101** are powered by the battery **104**, including the Control Unit **103**, Signal Receiving Unit **102**, the Left Lens **106**, and the Right Lens **105**. The control information **110** previously described in FIG. **48** is received by the Signal Receiving Unit **102** and to the Control Unit **103**. The control unit **103** implements an algorithm that is specific for the lens materials used in the fabrication of the right lens **105** and the left lens **106** of the Continuous Adjustable 3Deeps Filter Spectacles, and controls the left lens **106** with a control circuit **303**, and the right lens with a control circuit **305**.

This approach has great advantages. The control information **110** is spectacle-agnostic; i.e. all spectacles receive the same transmitted control information. The control unit **103** on the spectacles performs a final view-spectacle-specific optimization, translating the control information into control signals specific to the lens material used to fabricate the Continuous Adjustable 3Deeps Filter Spec-

tacles. Two viewers sitting side-by-side and watching the same video on a digital TV but wearing Continuous Adjustable 3Deeps Filter Spectacles that have lens material with totally different characteristics, will each see the movie with an illusion of 3D optimized for their spectacles.

Electro-Optical Lenses

Some embodiments of the Optical Density Continuing Adjustable 3Deeps Filter Spectacles use electrochromic lenses. Electrochromism is the phenomenon displayed by some chemicals of reversibly changing color when an electric potential is applied. There are many different families of chemicals that exhibit such properties including but not limited to polyaniline, viologens, polyoxotungstates's and tungsten oxide. Within each family, different mixtures of chemicals produce different properties that affect the color, transmissivity, and transition time. For instance Some electrochromics may only affect ultraviolet light—not visible light—appearing as a clear plastic to an observer since they do not affect visible light. Electrochromics have been the object of study for several decades, and have found their chief use in smart windows where they can reliably control the amount of light and heat allowed to pass through windows, and has also been used in the automobile industry to automatically tint rear-view mirrors in various lighting conditions.

The operating characteristics of each formulation of an electrochromic material will be different. Some electrochromic materials may take several seconds to change state from one optical density to another—others may be near instantaneous. For many electrochromic materials the color change is persistent and electric potential need only be applied to effect a change. For such persistent electro-optical materials, only an electronic on-off pulse is needed, while non-persistent materials require the application of a continuing electronic potential. Other materials may attain state under the presence of electric potential, but then slowly leak potential and change back. These materials may require a maintenance potential to maintain state but one that is different from that to attain the optical density state.

One embodiment of the Continuing Adjustable 3Deeps Filter Spectacles can be fabricated from a persistent electrochromic material. For some electrochromic materials, the transition time moving from a lighter to a darker optical density (FIG. **50**) is different from that of the transition time moving from a darker to a lighter optical density (FIG. **51**). While electrochromic material can be used in the preferred embodiment of the optical density Continuous Adjustable 3Deeps Filter Spectacles, any electro-optical materials that change optical density in response to an applied potential may be used. This includes but is not limited to LCDs or SPDs (Suspended Particle Devices). SPDs are a different material with almost instantaneous response but need a much higher potential to change state faster opto-electrical material. In selecting the lens material, one should seek materials with shorter transition time. The optical transmission time of the lens material should be taken into account in optimizing the operation of the Continuing Adjustable 3Deeps Filter Spectacles with lenses in electrochromic or electro-optical formulations. In the future, new electro-optical materials will be discovered and may be advantageously used in the practice of this invention.

FIG. **49** **4900** shows a typical operating characteristic curve **4910** of an electrochromic material with output optical density **4903** (y-axis) as a function of voltage **4901** (x-axis). An optical density of 0.3 corresponds to about 50% transmission of light (**4923**). An optical density of 0.6 corresponds to about 25% transmission of light (**4922**). And an optical density of 0.9 corresponds to about 12.5% transmission of light (**4921**). To get a specific desired optical density, one only need apply the correct voltage across the material. In this example, were the lenses of the 3Deeps Filter Spectacles made from such electrochromic material then if the desired optical density were 50% transmission of light **4923**, the 3Deeps Filter Spectacle controller would cause 1 Volt **4934** to be applied across the electrochromic lenses. One volt **4934** intersect **4932** the operating characteristic curve **4910** resulting in an optical density of 0.3 (**4903**) that corresponds with 50% transmission of light **4923**. FIG. **49** is a typical operating characteristic curve. Depending on the chemical formulation of the material the operating characteristic curves may differ.

Other embodiments may use more than one layer of material where each material can respond to controlling signals. For instance, one layer may impinge light over a restricted range of visible light and another layer may impinge light over a different range of visible light.

The operating characteristic curve of FIG. **49** will provide sufficient control if the electrochromic lenses change state near instantaneously. But, many electrochromic materials do not respond instantaneously to an applied potential and take a finite time to transition to the desired optical density state. Continuous Adjustable 3Deeps Filter Spectacles need also account for the transition time of the material from which the lenses are fabricated.

FIG. **50** shows **5000** a typical transition time curve **5003** for an electrochromic material with transition time as a function of optical density when a potential of 2.0V is applied to the electrochromic material. It is for a 'slow' electrochromic material with transition time **5002** as a function of optical density **5001**. This hypothetical electrochromic material has a 'lightest' state with an optical density of 0.0, or clear, **5004** and its darkest state **5005** is an optical density of 1.5 or dark. The material can take any optical density between 0.0 and 1.5 by the application of 2V for the proper length of time. If the material has an optical density of 0.0 or clear **5004**, and 2V potential is applied to the material, it will take 2 seconds for the material to change state and darken to a optical density of 1.5 (dark) **5005**. This is shown on the transition time curve **5003**.

As an example, if the material has an optical density of 0.3, and the control signal **110** received on the frames receiving unit **102** indicates that the subject lens should change to an optical density of 0.6, then the transition time curve **5003** would be implemented by the control unit **103** to apply 2V potential to the lens for 0.4 seconds. An optical density 0.3 **1610** intercepts the transition time curve **5003**, at a point **5011** on the curve corresponding to 0.4 seconds **5012**. An optical density 0.6 **5020** intercepts the transition time curve **5003**, at a point **5021** on the curve corresponding to 0.8 seconds **5022**. The absolute value of the difference abs(0.8−0.4)=0.4 seconds then is the length of time that 2V potential needs to be applied to the lens to change its optical density from 0.3 **5010** to 0.6 **5020**. After that length of time has elapsed no potential is applied since the electrochromic will 'latch' in the new state.

This is an example of how an algorithm implemented in the Control Unit **103** of the Continuous Adjustable 3Deeps Filter Spectacles would use the transition time curve **5003** to control the right lens **105** and the left lens **106**. To transition a lens from and optical density of 0.3 to an optical density of 0.6 the Control Unit would apply 2V potential to the lens for 400 msec.

This is a simplified example for illustrative and teaching purposes. Other electrochromic materials may have other

operating characteristics that have characteristic exponential, negative exponential, or logistic (s-shaped) relationships. In this example, 2V potential is used to move between states. It is used under the assumptions that (a) for this electrochromic formulation the higher the electronic potential the more rapid will be the change from a lighter to a darker optical density, and (b) change of state from a lighter to a darker optical density is to be optimized. Other materials may require different potentials to be applied to move from between states. In any of these cases, the principle of operation is identical and the Control Unit **103** on the frames of the lenses uses the operating characteristics of the material used in the right **105** and left **106** lenses to determine the potential and the length of time the potential is to be applied to transition between lens control states.

In the example above, it took 400 msec (0.4 sec) for the Continuous Adjustable 3Deeps Filter Spectacles to change from an optical density of 0.3 and optical density of 0.6. That is in the length of time it will take to change optical density, 48 frames of video will have been shown. The lenses are operating much slower than a digital TV with a refresh rate of 120 Hz (8.3 msec). This apparent problem is actually an advantage. In this example, at each frame of video (every 8.3 msec), the Continuous Adjustable 3Deeps Filter Spectacles are receiving new control values. These advanced 3Deeps spectacles are then continuously moving to their optimum value, and this has real advantages for 2D/3D viewing.

First, note that within a scene, motion will exhibit consistency, and the target optical density will likely will not change very much. Consider a car speeding across through the scene; the luminosity and the speed and direction of motion will stay at about the same value, so the control and synchronization information for the lenses will be about the same. In this example, while it will take 4 tenths of a second for the lenses to reach their target OD, and there will be 48 3Deeps lens control values, corresponding and synchronized to the intervening 48 frame of video, they will likely target about the same lens OD. Once the target is reached, successive lens setting will be similar and thus the lenses will quickly respond and conform to such values—often within the 8.3 msec between successive frames of video. The lenses are then continuously moving towards the optimal value, and that has distinct viewing advantages over lenses that appear to instantaneously and abruptly change OD value at each frame. Also, since the Control Unit of the Continuous Adjustable 3Deeps Filter Spectacles transforms the control signals for the specific lenses, the control signals will not contain any 3Deeps spectacle specific information. Thus, 2 people watching the same Sunday afternoon football game, but each wearing Continuous Adjustable 3Deeps Filter Spectacles (for instance made by different vendors, or different models from the same vendor) that differ only by the operating characteristics of the electrochromic material, will each have optimal viewing from their specific 3Deeps spectacles.

In other embodiments the transmitted control and synchronization information may be other than for every frame. This might be the case with a different vendor TV. In this case no changes are necessary to the Continuous Adjustable 3Deeps Filter Spectacles, and they will continue to operate optimally for the combination of received control signals and electrochromic materials. Consider again our 2 hypothetical viewers above. Were they at half-time to move to another viewing venue, with a digital TV that has a refresh rate of 60 Hz and that only transmits 3Deeps Filter Spectacle control information every other frame (30 times a second), they would each still have optimal viewing for their specific 3Deeps spectacles.



FIG. **49** shows an alternate means to transition from an optical density of 0.3 to an optical density of 0.6 is to apply a potential of 1.18V. The target optical density 0.6 **4942** intersects the operating characteristic curve **4944** of the electrochromic material at a voltage of 1.18V **4946**. So applying a voltage of 1.18 Volts will transition the lens from an optical density of 0.3 to an optical density of 0.6. The transition time curve for a voltage of 1.18V is not shown, but would be used similarly to the transition time curve of FIG. **50** (that is for an applied potential of 2.0V) to determine the length of time that 1.18V is to be applied to the lens. In general, any potential greater than 1.18V and less than 2.0V will be applied for the proper transition time will serve to change the state of the lenses.

In one embodiment, to transition the lenses from an optical density of 0.3 to 0.6 we use the transition time curve for an applied potential of 2.0V, since we have assumed a lens material with the characteristic that the higher the applied potential the more rapid is the transition time. In the preferred embodiment, we seek to maximize transition time. Other embodiments may maximize other characteristics of the electro-optical material.

FIG. **51** shows **5100** a typical transition time curve **5103** for an electrochromic material with transition time as a function of optical density when a negative potential of −2.0V is applied to the electrochromic material (draining the lens material of potential). It is for a 'slow' electrochromic material with transition time **5002** as a function of optical density **5001**. This hypothetical electrochromic material has a 'lightest' state with an optical density of 0.0, or clear, **5004** and its darkest state **5005** is an optical density of 1.5 or dark. The material can take any optical density between 0.0 and 1.5 by the application of −2V for the proper length of time. If the material has an optical density of 2.0 or dark **5006**, and −2V potential is applied to the material, it will take 2 seconds for the material to change state and lighten to an optical density of 0 (dark) **5004**. This is shown on the transition time curve **5103**.

As an example, if the material has an optical density of 0.6, and the control signal **110** received on the frames receiving unit **102** indicates that the subject lens should change to an optical density of 0.3, then the transition time curve **5103** would be implemented by the control unit **103** to apply −2V potential to the lens for 1.1 seconds. An optical density 0.6 **5120** intercepts the transition time curve **5103**, at a point **5121** on the curve corresponding to 1.35 seconds **5122**. An optical density 0.3 **5110** intercepts the transition time curve **5103**, at a point **5111** on the curve corresponding to 0.25 seconds **5112**. The absolute value of the difference abs(1.35−0.25)=1.1 seconds then is the length of time that −2V potential needs to be applied to the lens to change its optical density from 0.6 **5120** to 0.3 **5110**. After that length of time has elapsed no potential is applied since the electrochromic will latch in the new state.

This is an example of how an algorithm implemented in the Control Unit **103** of the Continuous Adjustable 3Deeps Filter Spectacles would use the transition time curve **5103** to control the right lens **105** and the left lens **106**. To transition a lens from and optical density of 0.36 to an optical density of 0.3 the Control unit would apply −2V potential to the lens for 1.1 seconds.

In the general case, the relationship between optical density (x-axis) and transition time (y-axis) for any specific formulation of electro-optical material may be represented

functionally by a response surface as y=f(x,v). The first derivative df(x,v)/dy provides the transition time rate for any value of voltage V. To get the transition time for the material to change state and move from optical density $OD_1$ to $OD_2$ by the application of a potential v to the material, the control unit **103** would evaluate to the integral: Min(response time) =min∫∫df(x,v)dxdv over the range $OD_1$ to $OD_2$, and for all {v: −2v<v<+2}.

The representation of such response surfaces, and the evaluation of integrals by numerical or analytical methods are well known in the art, and any method may be used. In the preferred embodiment the optimization is done to minimize the response time. However other embodiments may optimize on other characteristics of the material. For instance, the use of the maximum and minimum voltage to change state may have a detrimental effect on the life of the lenses. In such cases, boundary conditions may limit the range of voltage to values that have a lesser impact on lens life. For other materials in which battery life may depend upon the applied transition voltage it may make sense to optimize to get longer battery life. While the preferred embodiment optimizes to minimize response time for the lenses to change state, other embodiments may use the same principles to optimize on other characteristics of the electro-optical material from which the lenses are fabricated. In any embodiments however, a dual approach is used in which first the optimal optical densities are calculated, and then the Control Unit **103** of the Continuous Adjustable 3Deeps Filter Spectacles **101** optimize those values to a characteristic(s) of material from which the lenses are fabricated in order to control the spectacle lenses.

FIG. **52** is a block diagram **5200** showing the operation of the Control Unit **103** for the preferred embodiment of the Continuous Adjustable 3Deeps Filter Spectacles **101**. The preferred embodiment uses electrochromic lenses that; (a) latch to state once the desired optical density is reached, (b) have an operating characteristic curve as shown in FIG. **49**, (c) have a transition time curve as shown in FIG. **50** for an applied potential of 2.0V that provides the lenses with the most rapid change from a lower to a higher optical density, and (d) have a the transition time curve as shown in FIG. **51** for an applied potential of −2.0V that provides the lenses with the most rapid change from a higher to a lower optical density.

When the control unit is started **5201** it transitions to a Signal Receiving Unit Module **5203** and inputs the Next Frame Signal **5221**. This will have the Control Information **1300** for a single frame n **4820** and will include the frame number **4801**, optical density of the Left Lens **4803**, optical density of the right lens **4805**, scalar value of the motion vector **4807**, direction of the motion vector **4809**, and Luminance **4811**. After the information is received it is passed to the processing for the Left Lens. First the Left Lens Potential is assigned in the Set Left Lens Potential Module **5205**. In one embodiment we will use either a +2V potential if the change for the left lens is from a lower to higher optical density, or −2V if the change is from a higher to a lower optical density. The value is stored as the Left Potential **5222**. Then in the Calculate Left Lens Duration module **5207**, we use the value of the optical density of the Left Lens **4803** from the prior frame (n−1) and the value of the optical density of the Left Lens for the current frame, and the appropriate transmission time curve to calculate and store the value of the Left Duration **5223**. If the change for the left lens is from a lower to higher optical density then we use the Transmission Time curve **5000** described in FIG. **50**, and if the change for the left lens is from higher to a lower optical density then we use the Transmission Time curve **5100** described in FIG. **51**.

The Control Unit **103** then transitions to processing for the Right Lens. First the Right Len potential is calculated. The Right Lens Potential is assigned in the Set Right Lens Potential Module **5209**. In one embodiment we will use either a +2V potential if the change for the left lens is from a lower to higher optical density, or −2V if the change is from a higher to a lower optical density. The value is stored as the Right Potential **5232**. Then in the Calculate Right Lens Duration module **5211**, we use the value of the optical density of the Right Lens **4805** from the prior frame (n−1) and the value of the optical density of the Right Lens for the current frame, and the appropriate transmission time curve to calculate and store the value of the Right Duration **5233**. If the change for the left lens is from a lower to higher optical density then we use the Transmission Time curve **5000** described in FIG. **50**, and if the change for the left lens is from higher to a lower optical density then we use the Transmission Time curve **5100** described in FIG. **51**.

The Control Unit **103** then transitions to the Right Lens Control **5213** and causes the circuitry to provide the Right Potential **5232** to the right lens **105** for a duration equal to the value of Right Duration **5233**. The Control Unit **103** then transitions to the Left Lens Control **5215** and causes the circuitry to provide the Left Potential **5222** to the left lens **106** for a duration equal to the value of Left Duration **5223**. The Control Unit then transitions reads the Next Frame Signal **5221** and performs the same processing for frame n+1 that it performed for frame n.

FIG. **53** is a block diagram **5300** showing the operation of a typical the Continuous Adjustable 3Deeps Filter Spectacles system. This is the complete system. It follows the operation of the 2D/3D 3Deeps viewing systems through three consecutive frames of video and shows the processing Video and 3Deeps Processing, display of the motion picture in synchronization with transmission of the Control Information for the Continuous Adjustable 3Deeps Filter Spectacles, and reception and control of lenses.

The first column is labeled 'Time' and shows three consecutive frames of video at time $t_n$ **5301**, $t_{n+1}$ **5311**, and $t_{n+2}$ **5321**. As an example, if the video is being shown at 60 Frame per second then the time between each frame (e.g. $t_{n+1}-t_n$) is 16.667 msec. First consider the processing of the frame n **5303** at time $t_n$ **5301**. The Video Frame **5302** is read **5303** by the Video and 3Deeps Processing module **5320**. The Video processing format conversion is output **5304** and displayed as Display Frame **5305**. In this teaching example, the Video/3Deeps Processing consists only of de-interlacing so no new frames are created in the Display Video output stream. If the Video/3Deeps Processing module also performed up-conversion (or down-conversion) then the number of output frames would increase (decrease). The Video and 3Deeps Processing module has been previously described in FIG. **46** and FIG. **47**. The Video/3Deeps Processing also calculates the Control Information **4800** described in FIG. **48**. The control information is transmitted **4695** synchronous with the output display frames **5305**. The Continuous Adjustable 3Deeps Filter Spectacles **101** receive the signal **110** and the Control Unit **103** implements the electrochromic specific algorithm to optimally control the Continuous Adjusting 3Deeps Filter Spectacles and generate the signal synchronous with motion picture to set the dark optical density of the right lens **5309** and the left lens to clear. The operation of the Control Unit **103** has been described in FIGS. **3**, **49**, **50**, **51**, and **52**.

Similarly is the processing of the next frame n+1 **5312** at time $t_{n+1}$ **5311**. The Video Frame **5312** is read **5313** by the Video and 3Deeps Processing module **5320**. The Video processing format conversion is output **5314** and displayed as Display Frame **5315**. The Video/3Deeps Processing calculates the Control Information **4800** described in FIG. **48**. The control information is transmitted **4695** synchronous with the output display frames **5315**. The Continuous Adjustable 3Deeps Filter Spectacles **101** receive the signal **110** and generate the signal to set the dark optical density of the right lens **5319** and the left lens to clear. In this example the right lens **5319** associated with frame n+1 is a darker optical density than the right lens **5309** that is associated with frame n.

Similarly is the processing of the next frame n+2 **5322** at time $t_{n+2}$ **5321**. The Video Frame **5322** is read **5323** by the Video and 3Deeps Processing module **5320**. The Video processing format conversion is output **5324** and displayed as Display Frame **5325**. The Video/3Deeps Processing calculates the Control Information **4800** described in FIG. **48**. The control information is transmitted **4695** synchronous with the output display frames **5325**. The Continuous Adjustable 3Deeps Filter Spectacles **101** receive the signal **110** and generate the signal to set the dark optical density of the right lens **5329** and the left lens to clear. In this example the right lens **5329** associated with frame n+2 is an even darker optical density than the right lens **5319** that is associated with frame n+1.

FIG. **54** **5400** is a block diagram **5401** for a preferred embodiment of an IC Chip generating optimum optical density signals for each individual lens of a Continuous Adjustable 3Deeps Filter Spectacle **101**. One embodiment of the chip is a self-contained optical density calculator that calculates and outputs the OD density values for the Right **5463** and Left lenses **5464** of Continuous Adjustable 3Deeps Filter Spectacles synchronized **5462** to the A/V **5461** of the motion picture. The chip **5401** performs the calculations selectively based on the optimal OD algorithms described in FIG. **40** and FIG. **41**, or selectively based on the optimal OD algorithm described in FIG. **43**. The chip has configurable Frame Search parameters (parms) **5404** used to identify and determine the single motion vector (direction **5432** and velocity **5431**) that characterizes lateral motion in the frame of the motion picture as described in FIG. **41**. Additionally, the preferred embodiment of the chip **5401** is configurable with parameters necessary for the algorithmic calculations **5403** such as the pixel resolution of the viewing screen.

Power **5485** is provided to the IC chip **5401**. The chip has an input port for the A/V Frame-In **5402** for the current frame of the motion picture coupled to the output port of a frame register. The input frame signal **5402** is passed unchanged through the chip **5401**, and output on the A/V Frame-Out **5461** synchronized **5462** with the calculated output values of the Right Lens OD **5463** and the Left Lens OD **5464** of Continuous Adjustable 3Deeps Filter Spectacles **101**.

The chip has an input port **5407** to receive the Motion Vector Values of the current frame coupled to the output of a motion vector estimation module. As previously related, Video format conversion chips calculate motion vector values to compensate for motion when de-interlacing and up-converting video, and the subject IC chip **5401** will often be coupled to such a format conversion chip. The chip **5401** also has an input port to receive the luminance values **5405** coupled to the output of a luminance determination module possibly as calculated by a video format conversion chip. The Motion Vector values **5407** and Luminance values **5405** are stored in Volatile memory **5412** contained on the chip. Other embodiments of the chip **5401** may use off-chip memory for storage of these values.

The preferred embodiment of the chip **5401** has non-volatile memory **5410** to store the Frame Search parameters **5404** of the algorithm implemented in the Lateral Motion Determining Unit **5420**. The Frame Search parameters **5404** have been previously described in FIG. **40** and FIG. **41**, and are the regions of the current frame of the motion picture that delimits the search for lateral motion vector that characterizes motion in the frame of the motion picture. The parameters include the boundaries of the upper bounded region that is a surrogate for the background in the frame of the movie and the lower bounded region that is a surrogate for the foreground of the frame of movie. The input port for the Frame Search parameters **5404** provides a means to input the Frame Search parameters, and the input includes a binary switch to control whether the chip will input, store and use new values for the Frame Search parameters or use the already stored values. In normal usage it would be unusual for the Frame Search parameters **5404** to be changed within any single presentation.

Also stored in the non-volatile memory **5410** are the parameters necessary to compute the Optical Density Calculations. This includes (a) the threshold values for determining whether lateral motion is present or not (e.g. the −10 dpi and 10 dpi values **4150** of FIG. **41**), (b) refresh rate of the viewing monitor (e.g. 60 Hz of FIG. **40**), and (c) the pixel resolution of the viewing monitor (e.g. 100 dpi of FIG. **40**). The input port for the algorithm parameters **5403** provides a means to input the algorithm parameters and includes a binary switch to control whether the chip will input, store and use new values for the algorithm or use the already stored values. In normal usage the algorithm parameters primarily characterize the viewing display (e.g. TV screen) and once set will rarely change.

The Algorithm Select **5406** input allows the chip **5401** to configure itself to use either the circuitry that performs the calculation described in FIG. **40** and FIG. **41** **5441**, or in FIG. **43** **5442**. The algorithm described in FIG. **40** and FIG. **41** requires as input the direction and velocity of lateral motion in the motion picture and the luminance in the frame of the motion picture, while the algorithm described in FIG. **43** requires as input only the direction and luminance of the frame of the motion picture, but not the velocity. In other embodiment the Algorithm Select **5406** input may be stored in the non-volatile memory **5410** and then only changed as necessary.

The operation of the units of circuitry on the chip **5401** using these input values follows. The A/V Frame **5402** is input to the chip so that the Right **5463** and Left OD **5464** values calculated and output with the frame may be synchronized **2062** with the A/V output **5461**. No calculations or reformatting is performed on the A/V signal.

The Lateral Motion Determining Unit **5420** has circuitry to implement the previously described algorithm to determine the single most prominent moving object in the background region of the frame and the single most prominent object in the foreground region of the frame and then process these identified values to calculate the direction and velocity that characterizes lateral motion in the frame. Input to the Lateral Motion Determining Unit **2020** is the Frame Search Parameters **5404** stored in the non-volatile memory **5410**, and the Motion Vector Values **5407** stored in volatile memory **5412**. The output is the calculated Velocity (Vel in dpi units) **5431** and the direction of motion **5432** (die

negative for right-to-left motion and positive for left-to-right motion). These values may be stored in volatile memory in some embodiments.

The Optical Density Calc Unit **5440** implements the Optical Density Calculation to determine the setting of the lenses of the Continuous Adjustable 3Deeps Filter Spectacles **101**. In one embodiment both of the algorithms described in FIG. **40** and FIG. **41 5441**, and in FIG. **43 5442** are implemented within the unit's circuitry. The Algorithm Select input port **5406** determines which of the calculation circuits is used. If the Algorithm described in FIG. **40** and FIG. **41 5441** is used, then the values of Velocity **5431** (Vel) and Direction **5432** (Dir) of lateral motion are read from the output of the Lateral Motion Determining circuitry **5420**. Also, the Luminance (Lum) **5433** value stored in volatile memory **5412** is read, along with the Algorithm parameters **5403** stored in Non Volatile memory **5410**. With these input values the Optical Density Calc Unit **5440** circuitry calculates the optimal optical values for the Right lens (OD R) **5451** and Left Len (OD L) **5452** and passes them to the Sync Unit **5450**. If the Algorithm described in FIG. **43 5442** is used then the values of Direction **5432** (Dir) of the lateral motion is read from the output of the Lateral Motion Determining circuitry **5420**, the Luminance **5433** (Lum) value stored in volatile memory **5412** and the Algorithm parameters **5403** stored in non-volatile memory **5410**. With these input values the Optical Density Calc Unit **5440** circuitry calculates the optimal optical values for the Right Lens (OD R) **5451** and the Left Len (OD L) **5452** and passes them to the Sync Unit **5450**.

The Sync Unit **5450** synchronizes the output of the Video Frame **5461** with the output of the calculated values of the Right Lens OD **5463**, and the Left Lens OD **5464**. Along with a sync signal **5462**, the unit also outputs the frame on the A/V Frame-Out **5461**, and the calculated values of the Optical Density for the right lens (Right Lens OD) **5463** and the left lens (Left Lens OD **5464**).

While the Optical Density Calc Unit **5440** has circuitry to implement the Optical Density algorithms described in accompanying FIG. **40** and FIG. **41 5441**, and FIG. **43 5442**, other embodiments may include other algorithms to calculate the optical density of the Right **5463** and Left lenses **5464** of the Continuous Adjustable 3Deeps Filter Spectacle **101**.

Also, while the Lateral Motion Determining Unit **5420** only uses the Algorithm described in FIG. **40** and FIG. **41** to characterize the lateral motion (direction and speed) in a frame of a motion picture, other embodiments may alternatively use algorithms such as that described in FIG. **42** to characterize the lateral motion in a frame of a motion picture.

The IC chip **5401** has separate outputs for the optimal Left Len OD **5463** and Right Len OD **5464**. Rather than use these values to control Continuous Alternating 3Deeps Filter Spectacles, the values can alternatively be used to determine the frames of a dual image 3D viewing systems as is also described below.

One embodiment of the chip has Input **5402** and Output **5461** ports for the A/V frame of the movie and the chip is able to synchronize **5462** the output frame with the output of the calculated value of the Right **5463** and Left Len **5464** optical densities. Other embodiments may use other means to synchronize the Continuous Adjustable 3Deeps Filter Spectacles **101** to the frame of the motion picture without input of the picture frame A/V Frame In **5402**.

While FIG. **54** shows the Calculation of the Optimum Optical Density Signals for Each Individual Lens Of A Continuous Adjustable 3Deeps Filter Spectacles **101** embodied as a chip coupled with other chips such as video format conversion chips, the circuitry could have been included within the circuitry of such a chip. Also the circuitry of FIG. **54** may connect to other IC chips on an IC board.

FIG. **55 5500** is a block diagram **5501** of an alternate embodiment of an IC chip **5501** generating the change in optical density signals **5540** for each individual lens of a Continuous Adjustable 3Deeps Filter Spectacle **101**. This alternate embodiment of an IC chip **5501** implements the optical density calculation algorithm of FIG. **43 5531**, and has the benefits that (1) it only requires direction and not speed of lateral motion, and (2) it can be implemented directly on the a Continuous Adjustable 3Deeps Filter Spectacle **101** using a photodiode **4420** to provide a measure of luminance. Power **5485** is provided to the IC chip **5501**. Since the algorithm of FIG. **43** requires the refresh rate and pixel resolution of the viewing monitor, these values are provided through the circuitry of the Algorithm Parms **5403** and stored in non-volatile memory **5510**. Once updated, there is no necessity to refresh the values until there is a change of viewing monitor. A chip on the projection or viewing device such as a video format chip calculates and provides the Direction Values **5505**, and the Luminance Values **5405**. Note that the speed of lateral motion is not required for the algorithm described in FIG. **43**, and is not input.

The Direction Value **5505**, and the Luminance Values **5405** are read and stored in volatile memory **5520**. In this embodiment, rather than calculate and output values for the Left Lens OD and the Right Lens OD, only a single Delta Difference value **5540** is calculated and output. This will allow the alternate embodiment chip to have fewer output legs and thus a smaller package with lessened power requirements. To indicate whether the Delta change is to be applied to the Left lens, or the Right Lens, a Lens Change Indicator **5542** is also output. If the Value of the Lens Change Indicator is 0 then both lenses are set back to a default clear state. If the Value of the Lens change Indicator is 1 then only the Left Lens is affected and it is set from its last state ($OD_{Last}$) to a new state ($OD_{current}$) by adding the Delta Lens Change value **5540** (a value of $OD_{current}-OD_{Last}$) to the last value of the Left Lens ($OD_{Last}$). If the Value of the Lens change Indicator is 2 then only the Right Lens is affected and it is set from its last state ($OD_{Last}$) to a new state ($OD_{current}$) by adding the Delta Lens Change value **5540** (a value of $OD_{current}-OD_{Last}$) to the last value of the Right Lens ($OD_{Last}$).

The Value of Delta Change Lens OD **5540** and the Lens Change Indicator **5542** are calculated by the Optical Density Calc Unit **5530** that implements the Algorithm of FIG. **43 5531**. It reads the algorithm parameters **5403** stored in non-volatile Memory **5510**, the Direction Value **5505** stored in volatile memory **5522**, and the Luminance Value **5405** stored volatile memory **5521**. The Unit **5530** performs the calculations and stores the Calculated OD values in volatile memory as OD Current **5523**, keeping track of the last calculated OD values. The Unit **5530** output the Delta Len OD **5540** and the Lens Change Indicator **5542** as previously described.

FIG. **56 5600** shows Continuous Adjustable 3Deeps Filter Spectacles **101** that include an IC chip **5501** generating the change in optical density signals for each individual lens of a Continuous Adjustable 3Deeps Filter Spectacle. It shows the same perspective view of Continuous Alternating 3Deeps Filter Spectacles **101** shown in FIG. **44**, but with the

addition of the IC Chip **5501** of FIG. **55** and a connector **5502** between the IC Chip **5501** and the Control Unit **103**. The receiver **102** labeled Rx is coupled to the IC chip **5501**. The receiver **102** outputs the Algorithm parameters **5403**, and the direction value **5505** to the IC chip **5501** that performs the calculations and outputs the Delta change (A Lens OD) **5540** to the IC chip **5501** (labeled ODIC), along with a Lens Change Indicator **5542** as to whether it is the Right Lens **105** or the Left Lens **106** of the Continuous Alternating 3Deeps Filter Spectacles **101** that is to be change to a new state. The Control Unit **103** and the IC Chip **5501** are connected **5602**, that is used to output the calculations from the IC chip **5501** to the Control Unit **103**. The IC chip **5501** performs the calculations as described in FIG. **55**. The advantage of this embodiment, as previously indicated, is that the Luminous Reading from the Photodiode, can be used for the calculations, and since the photodiode **4420** is on the frame of the spectacles, it will have the best surrogate value for luminance reaching the frames of the spectacles.

Other Embodiments

Other embodiments may develop other means to optimally set the transmissivity of the neutral density filter lens. For instance for special venues it may be desirable to have lenses that optimize the darker and lighter filters for different light wavelengths.

Also, other factors, not part of the retinal reaction curve may be considered to compute an optimal value of the neutral density filter. In the teaching example of the preferred embodiment, luminance is the only factor determining the retinal reaction time. However, research has found other less important factors that affect retinal reaction time including, but not limited to, prolonged readiness, certain common drugs, temperature, and sleep conditions. Knowledge of factors may be advantageously used. Alternately, the Continuous Adjustable 3Deeps Filter Spectacles may have controls allowing customization of values used by the algorithms such as thresholds, parameters of the retinal reaction curve, etc., so that the Continuous Adjustable 3Deeps Filter Spectacles may be customized to individual use.

While one above-described embodiment uses a fixed distance of 2½ inches to lag the delayed image, other embodiments may preferably use other fixed distances. Specifically and advantageously some alternate embodiments may also use the distance between the viewer and the viewing device—that is a preferred distance from the screen. Rather than the exact distance, surrogate distances may be employed. For instance for viewing with an IPOD like personal movie device a distance of about 1 foot may be used. When Continuous Adjustable 3Deeps Filter spectacles are used with a personal computer or a personal DVD player, a distance of 1½ feet between the viewer and display screen may be assumed. When viewing on a large-screen digital or projection TV, a distance based on the size of the display monitor may be used. In a movie theater venue the distance may be set to 50 feet.

The above-described embodiments are for teaching purposes. Other more sophisticated algorithms may be used to calculate the setting of the filter lens. These algorithms may not only have speed of motion, direction or motion, and luminance as input parameters, but may also allow for input of other values, or for the setting of constants such as inter-ocular distance, in their calculations.

Continuous Adjustable 3Deeps Filter Spectacles can benefit from the inclusion of controls that would allow the viewer to customize the specs to individual differences. For instance, while the average inter-ocular distance is 2.5 inches, there is a lot of variation between individuals in this value. Alternate embodiments of Continuous Adjustable 3Deeps Filter Spectacles can beneficially account for individual differences by allowing customized control for this value, either through a physical thumbwheel type setting, or input parameters to the 3Deeps Filter Spectacles controller. For instance, there may be a 3-position manually controlled switch that allows the viewer to change the inter-ocular distance used in the lens calculations to 2¼ inches (small), 2½ inches (average), or 2¾ inches (large). In other embodiments, a computer connects to a master computing appliance to set the Continuous Adjustable 3Deeps Filter Spectacle customization parameters.

In another alternate embodiment, it has been shown that the degree of the depth effect of the Pulfrich illusion is due to the difference in retinal reaction time between the two eyes. That means that there are innumerable settings of the Continuous Adjustable 3Deeps Filter Spectacle lenses that will provide the same depth illusion. For instance FIG. **40** shows an optimal setting of the lenses has one lens clear with a retinal reaction time of 120 msec (input luminance of 0.52) and the neutral lens is chosen with an optical density producing a luminance of −0.6 so the difference in retinal reaction time is 42 msec or 162 msec. Another setting with the same depth perception is if the 0.42 msec retinal reaction time difference is from one lens that is darkened so that the eye receive a luminance of 0.0 corresponding to a retinal reaction time of 150 msec and the other eye has a retinal reaction time of 192 msec (150+42=192 msec), that corresponds to a lens with optical density so the eye receives −0.95 on the luminance scale. The first case is optimal in that we have a clear and dark lens and the eyes receive the maximum amount of light for the desired depth effect. In the second case both lenses obstruct light, though the clear lens obstructs less light than the darker lens. In some instances however, this approach may be beneficial, as for example, to better control the response time of the lenses.

While some electro-optical materials change state seemingly instantaneously (e.g. LCD materials), other materials may have a slow response time. In these cases the Continuous Adjustable 3Deeps Filter Spectacles may be more responsive by taking lens states that have the desired difference in retinal illumination for the two eyes, but may use a gray clear state that is lighter than the darker lens in order to achieve a threshold responsiveness when the lenses change state. That is, if achieving the clearest state takes too long, it may be preferable to have more responsive Continuous Adjustable 3Deeps Filter Spectacles with a clear lens that obstructs some light, and a dark lens chosen to provide the desired difference in retinal reaction time.

In another embodiment, rather than fix the distance d between an object in different frames on the screen, it may be desirable to choose an optical density so the degree of depth illusion remains a constant throughout all frames of the movie that exhibit motion.

In another embodiment, the motion vectors of multiple objects are used to provide an estimate of parallax that is then used to select criteria for the optimization of the optical density of the neutral density lens.

In other embodiments, the viewer may control the degree of darkening allowed. For instance, rather slow movement from left-to-right may require that the neutral density filter be considerably darkened. For some viewers this may be problematical or undesirable and for such viewers allowing them a degree of control over the darkening of the lenses is reasonable. One such control would allow the user to specify an upper limit on the degree of darkening allowed, with

exemplary options allowing 5 settings corresponding to a maximum darkening of 50%, 60%, 70%, 80% and 90%.

Any of the algorithmic embodiments may also include the judicious use of heuristics to achieve a best 3D presentation for the viewer. For instance, in a darkened theater and with a dark scene exhibiting motion, the optimal setting for the neutral density lens may take a value that is deemed either too dark for the best 3D presentation for the viewer. Or, the optimal setting for the neutral density lens may take a value that is deemed to take too long to transition to such a dark state for the best 3D presentation. In either of these cases threshold values may be incorporated to override the optimal settings so that the neutral density filter cannot take values outside a specific range. These are exemplary and other heuristics may be incorporated for beneficial purposes.

Heuristics may also be required to address other issues. For instance, it has been observed that the Pulfrich illusion will turn off when lateral motion is too fast. This phenomenon is not entirely understood, but to address it a heuristic rule may be used in any of the algorithms that determine the optical density of the neutral density filter so that when the lateral motion is too fast the Continuous Adjustable 3Deeps Filter Spectacles take their clear-clear state. This is exemplary and other heuristics may be incorporated for beneficial purposes. We note that cinematographers have long recognized that action that is too fast does not record well, and so movies generally will not exhibit this problem.

Some embodiments provide an example for when such heuristics may be used. The goal of such embodiments is to provide constant depth perception that is normal in the sense that it is in accordance with an individual's normal interocular distance. As previously described this is achieved by optimally controlling the optical density of the neutral density filter.

However, if the viewer is in a darkened venue, viewing a darkened movie and/or lateral screen motion is too slow, it may not be possible to maintain this constant depth perception and heuristic rules may be used to slowly degrade the degree of depth perceived. As noted before, few observers will notice this anymore than they are bothered by the spatial changes resulting from use of telephoto or wide-angle lens in filming scenes.

In still another embodiment, the algorithm to calculate the optical density to optimize the single image 3Deeps Filter Spectacles may be advantageously used in a dual image system. Dual image systems require two images (or frames) for each frame of a traditional movie. One of the two images is a left eye image and the other is a right eye image. Dual image systems have twice as many frames of video as in a single image system, require special format, projectors, and except in the case of lenticular viewing screens, special viewing devices.

Using the preferred embodiment of this invention, based on luminosity and direction and speed of motion, we have described how to determine the optimal optical density of a neutral density filter. Rather than use this calculation to control and synchronize Continuous Adjustable 3Deeps Filter Spectacles, we can use the value to generate a second frame of video for a dual image systems. For clarity the result of the calculation is referred to as OD-optimal and has a value that provides the optimal optical density of the neutral density filter of the Continuous Adjustable 3Deeps Filter Spectacles.

In this dual image system embodiment, rather than use the OD-optimal value for the Continuous Adjustable 3Deeps Filter Spectacles, the result is used to generate a second frame of a dual image 3D motion picture. If the result of the algorithm is that there is no lateral movement in the single frame of the motion picture, then the frame image is duplicated resulting in two frame images, and the frame images is then used as both the right eye image and the left eye image. If the result of the algorithm is that the direction of lateral motion is left to right, then the second frame will be duplicated but with the added shading of OD-optimal. The duplicated shaded image will be used as the right eye image, and the unchanged frame used as the left eye image. If the result of the algorithm is that the direction of lateral motion is right to left, then the second frame will be duplicated but with the added shading of OD-optimal. The duplicated shaded image will be used as the left eye image, and the unchanged frame used as the right eye image.

Since this alternate embodiment is for a dual image system, the right eye image and the left eye image must be directed to the appropriate eye, and this can be done using any of the dual image viewing systems including shutter glasses, head mounted displays, Polaroid or lenticular screens. Since this embodiment is for a dual image system it cannot be used if the viewer is wearing Continuous Adjustable 3Deeps Filter spectacles.

Some 3D viewing systems have darkened lenses and so the calculation of OD-optimal will be slightly different for such systems. While lenticular and head mounted displays will work as previously described, shutter glass and polaroid 3D viewing systems have darkened lenses, and this additional reduction in luminosity must be accounted for in the input to the algorithm.

In still another embodiment, 3D Viewing spectacles are manufactured that may be switched between electronic (1) single image Continuous Alternating 3Deeps Viewing Spectacles, and (2) dual image viewing spectacles. As an example consider an anaglyph dual image system, and two electrochromic materials, one that is either clear or darkens to red, and another that is either clear or darkens to blue. Such materials can be used to build electronically operated anaglyph spectacles. If the Continuous Alternating 3Deeps Viewing Spectacles are manufactured with a second layer of such color changing electrochromic materials then the spectacles may be switched to operate as either Continuous Alternating 3Deeps Viewing Spectacles or anaglyph 3D viewing spectacles. In yet another embodiment, a connector for earphones is included on the Continuous Alternating 3Deeps Viewing Spectacles allowing an audio signal to be played through earphones.

Embodiments of the invention may implement the Video and 3Deeps Processing directly on a video format conversion semiconductor chip. Alternatively the output from such a video format conversion semiconductor may be used as input to a semiconductor chip dedicated to the Video and 3Deeps Processing. Also the dual image alternate embodiment can similarly use the video image processing of a video conversion chip described in such embodiments to generate the value OD-optimal to generate the second image for this dual image embodiment, and assign the image to the correct eye.

In accordance with another embodiment, a method of displaying one or more frames of a video is provided. Data representing an image frame is obtained. A plurality of bridge frames that are visually dissimilar to the image frame are generated. The image frame and the plurality of bridge frames are blended, generating a plurality of blended frames, and the plurality of blended frames are displayed. In one embodiment, the plurality of bridge frames are also different from each other.

FIG. **57** shows a video display manager that may be used to implement certain embodiments in accordance with an embodiment. Video display manager **5700** comprises a processor **5710**, a bridge frame generator **5730**, a frame display module **5750**, and a storage **5740**.

FIG. **58** is a flowchart of a method of displaying one or more image frames in accordance with an embodiment. In an illustrative embodiment, a video file **47000** is stored in storage **5740**. Video file **47000** may be generated by video display manager **5700** or, alternatively, received from another device or via a network such as the Internet.

At step **5810**, data comprising an image frame is received. In the illustrative embodiment, processor **5710** retrieves video file **47000** from storage **5740**. FIG. **33** shows an image frame **3350** showing a man against a background of clouds and sky.

At step **5820**, a plurality of bridge frames that are visually dissimilar to the image frame are generated. Bridge frame generator **5730** generates two or more bridge frames that are dissimilar from image frame **3350**. In one embodiment, the two bridge frames are also different from each other. FIGS. **34**A and **34**B show two bridge frames **3410** and **3420** that may be generated. In the illustrative embodiment, bridge frame **3410** has a first pattern and a bridge frame **3420** has a second pattern that is different from and complementary to the first pattern of bridge frame **3410**. In other embodiments, bridge frames may be retrieved from a storage.

At step **5830**, the image frame and the plurality of bridge frames are blended, generating a plurality of blended frames. In the illustrative embodiment, frame display module **5750** blends image frame **3350** and bridge frame **3410** to generate blended frame **3510**, shown in FIG. **35**A. Frame display module **5750** also blends image frame **3350** and bridge frame **3420** to generate blended frame **3520**, shown in FIG. **35**B.

At step **5840**, the plurality of blended frames are displayed. Frame display module **5750** now displays blended frames **3510** and **3520** in a manner similar to that described above. For example, blended frames **3510** and **3520** may be displayed in accordance with a predetermined pattern, for example. In an embodiment illustrated in FIG. **35**C, blended frames **3510**, **3520** are displayed consecutively in a predetermined pattern.

In other embodiments, blended frames **3510** may be displayed in a pattern that includes a plurality of blended frames and image frame **3350**, or in a pattern that includes other bridge frames.

In accordance with another embodiment, a plurality of blended frames may be displayed in accordance with a predetermined pattern that includes a first pattern comprising the plurality of blended frames, and a second pattern that includes repetition of the first pattern. In an embodiment illustrated in FIG. **35**D, blended frames **3510** and **3520** are displayed in a repeating pattern that includes blended frame **3510**, blended frame **3520**, and a bridge frame **3590**.

Systems and methods described herein may be used advantageously to provide particular benefits. For example, in accordance with one embodiment, a method for generating modified video is provided. FIGS. **59**A-**59**B comprise a flowchart of a method in accordance with an embodiment. At step **5910**, a source video comprising a sequence of 2D image frames is acquired. At step **5920**, a value for an inter-ocular distance of a viewer is determined. At step **5930**, an image frame is obtained from the source video that includes two or more motion vectors that describe motion in the image frame where each of the motion vectors is associated with a region of the image frame. At step **5940**, a single parameter is calculated for each of the following: a lateral speed of the image frame, using the two or more motion vectors, and a direction of motion of the image frame, using the two or more motion vectors. At step **5950**, a deformation value is generated by applying an algorithm that uses the inter-ocular distance and both of the parameters. At step **5960**, the deformation value is applied to the image frame to identify a modified image frame. At step **5970**, the modified image frame is blended with a first bridge frame that is different from the modified image frame to generate a first blended frame. At step **5980**, the modified image frame is blended with a second bridge frame that is different from the modified image frame and different from the first bridge frame to generate a second blended frame. At step **5990**, the first blended frame and the second blended frame are displayed to the viewer. The direction of motion and velocity of motion parameters in the calculation step are calculated only from the motion vectors input along with the image frame.

In one embodiment, the viewer views the modified video through spectacles.

In another embodiment, the spectacles have a left and right lens, and each of the left and right lens has a darkened state. In another embodiment, each of the left and right lenses has a darkened state and a light state, the state of the left lens being independent of the state of the right lens.

In another embodiment, the spectacles further comprise a battery, a control unit and a signal receiving unit. The control unit is adapted to control the state of the each of the lenses independently.

In another embodiment, the left and right lenses comprise one or more electro-optical materials.

In accordance with another embodiment, a method for generating modified video is provided. A source video comprising a sequence of 2D image frames is acquired. A value for an inter-ocular distance of a viewer and factors for a display resolution and a video frame speed are determined. An image frame is obtained from the source video that includes two or more motion vectors that describe motion in the image frame where each of the motion vectors is associated with a region of the image frame. A single parameter is calculated for each of the following: a lateral speed of the image frame, using the two or more motion vectors, and a direction of motion of the image frame, using the two or more motion vectors. A deformation value is generated by applying an algorithm that uses the inter-ocular distance, both of the factors, and both of the parameters, and the deformation value is applied to the image frame to identify a first modified image frame, the first modified image frame being different from any of the sequence of 2D image frames. A second modified image frame is identified based on the first modified image frame, and the second modified image frame is displayed to the viewer. The direction of motion and velocity of motion parameters in the calculation step are calculated only from the motion vectors input along with the image frame.

In accordance with another embodiment, a system comprises at least one processor for generating modified video, the processor adapted to acquire a source video comprising a sequence of 2D image frames, determine a value for an inter-ocular distance of a viewer, obtain an image frame from the source video that includes two or more motion vectors that describe motion in the image frame where each of the motion vectors is associated with a region of the image frame, and calculate a single parameter for each of the following: a lateral speed of the image frame, using the two or more motion vectors, and a direction of motion of the

image frame, using the two or more motion vectors. The at least one processor is further adapted to generate a deformation value by applying an algorithm that uses the inter-ocular distance and both of the parameters, apply the deformation value to the image frame to identify a modified image frame, blend the modified image frame with a first bridge frame that is different from the modified image frame to generate a first blended frame, blend the modified image frame with a second bridge frame that is different from the modified image frame and different from the first bridge frame to generate a second blended frame, and display the first blended frame and the second blended frame to a viewer. The direction of motion and velocity of motion parameters in the calculation step are calculated only from the motion vectors input along with the image frame. The system also includes spectacles for viewing the modified video, the spectacles comprising a left and right lens, each of the lenses having a dark state and a light state, and a control unit adapted to control the state of the each of the lenses independently.

In accordance with another embodiment, a method of displaying video content to a viewer, comprises: obtaining source video content comprised of 2D frames of video; transmitting the source video to a receiver; analyzing the 2D frames of the source video content to measure parameters for direction of motion, velocity of motion and luminance; calculating a deformation value using an algorithm that uses at least two of the measured parameters in combination with values for display resolution and video frame speed; processing the source video content using the deformation value; and displaying the processed video content to a viewer. The method may include, wherein the direction of motion and velocity of motion parameters in the analysis step are calculated only from motion vectors in the source video content. The method may include, wherein the luminance parameter in the analysis step is calculated only from luminance values in the source video content. The method may include, wherein the processed video content in the displaying step is presented to a viewer through spectacles.

In accordance with another embodiment, a system for displaying modified video content to a viewer, comprises: a receiver which receives a 2D video signal comprised of 2D frames; a video signal processor which processes the 2D video signal; and a display unit which displays the processed video signal to a user; wherein the processing step comprises using an algorithm to calculate parameters for direction of motion, velocity of motion and luminance for the 2D frames in said 2D video signal; calculating a deformation value using at least two of said calculated parameters in combination with values for display resolution and video frame speed; and modifying the 2D video signal using the deformation value.

In accordance with another embodiment, a method of displaying video content to a viewer, comprises: obtaining a source video signal comprised of 2D frames; analyzing 2D frames from said source video signal to measure direction of motion, velocity of motion and luminance parameters; calculating a deformation value using an algorithm that includes at least two of said measured parameters in combination with values for display resolution and video frame speed; processing the video source signal using the deformation value; and displaying the processed video signal to a viewer. A method according to item **6**, wherein the direction of motion and velocity of motion parameters in the analysis step are calculated only from motion vectors in the source video content. The method may include, wherein the luminance parameter in the analysis step is calculated only from luminance values in the source video content. The method may include, wherein in the processed video content in the displaying step is presented to a viewer through spectacles.

In accordance with another embodiment, a display apparatus comprises: a receiver which receives a source video signal comprised of 2D frames; a video signal processor which processes the source video signal; and a display unit which displays the processed video signal to a user; wherein said processing step comprises analyzing 2D frames from the video signal to measure direction of motion, velocity of motion and luminance parameters; and calculating a deformation value using an algorithm that includes at least two of the measured parameters in combination with values for display resolution and video frame speed.

In accordance with another embodiment, a method for generating modified video, comprises: acquiring a source video comprised of a sequence of 2D frames; calculating parameters for direction of motion, velocity of motion and luminance of the source video; determining factors for display resolution and video frame speed; generating a deformation value by applying an algorithm that uses at least two of the parameters and both of the factors; applying the deformation value to the source video to produce a modified video; and displaying the modified video to a viewer. The method may include, wherein the direction of motion and velocity of motion parameters in the calculation step are calculated only from motion vectors in said source video. The method may include, wherein the luminance parameter in the calculation step is calculated only from luminance values in the source video. The method may include, wherein in the modified video in the displaying step is presented to a viewer through spectacles.

In accordance with another embodiment, an apparatus which transforms a 2D source video signal, comprises: a video processing means for performing the transformation on the 2D source video signal; and a display means for displaying the transformed video to a viewer; wherein the transformation comprises analyzing the source video signal to generate parameters for direction of motion, velocity of motion and luminance; calculating a deformation value using an algorithm that includes at least two of the parameters in combination with factors for both display resolution and video frame speed; modifying the source video signal using the deformation value; and outputting the transformed video to the display means.

In accordance with another embodiment, a method for generating modified video is provided. A source video comprising a sequence of 2D image frames is acquired, a value for an inter-ocular distance of a viewer is determined, and an image frame is obtained from the source video that includes two or more motion vectors that describe motion in the image frame where each of the motion vectors is associated with a region of the image frame. A single parameter is calculated for each of the following: a lateral speed of the image frame, using the two or more motion vectors, and a direction of motion of the image frame, using the two or more motion vectors. A deformation value is generated by applying an algorithm that uses the inter-ocular distance and both of the parameters, and the deformation value is applied to the image frame to identify a modified image frame. The modified image frame is blended with a first bridge frame that is different from the modified image frame to generate a first blended frame, and the modified image frame is blended with a second bridge frame that is different from the modified image frame and different from the first bridge frame to generate a second blended frame.

The first blended frame and the second blended frame are displayed to a viewer. The direction of motion and velocity of motion parameters in the calculation step are calculated only from the motion vectors input along with the image frame.

In various embodiments, the method steps described herein, including the method steps described in FIG. **58**, may be performed in an order different from the particular order described or shown. In other embodiments, other steps may be provided, or steps may be eliminated, from the described methods.

Systems, apparatus, and methods described herein may be implemented using digital circuitry, or using one or more computers using well-known computer processors, memory units, storage devices, computer software, and other components. Typically, a computer includes a processor for executing instructions and one or more memories for storing instructions and data. A computer may also include, or be coupled to, one or more mass storage devices, such as one or more magnetic disks, internal hard disks and removable disks, magneto-optical disks, optical disks, etc.

Systems, apparatus, and methods described herein may be implemented using computers operating in a client-server relationship. Typically, in such a system, the client computers are located remotely from the server computer and interact via a network. The client-server relationship may be defined and controlled by computer programs running on the respective client and server computers.

Systems, apparatus, and methods described herein may be used within a network-based cloud computing system. In such a network-based cloud computing system, a server or another processor that is connected to a network communicates with one or more client computers via a network. A client computer may communicate with the server via a network browser application residing and operating on the client computer, for example. A client computer may store data on the server and access the data via the network. A client computer may transmit requests for data, or requests for online services, to the server via the network. The server may perform requested services and provide data to the client computer(s). The server may also transmit data adapted to cause a client computer to perform a specified function, e.g., to perform a calculation, to display specified data on a screen, etc.

Systems, apparatus, and methods described herein may be implemented using a computer program product tangibly embodied in an information carrier, e.g., in a non-transitory machine-readable storage device, for execution by a programmable processor; and the method steps described herein, including one or more of the steps of FIG. **58**, may be implemented using one or more computer programs that are executable by such a processor. A computer program is a set of computer program instructions that can be used, directly or indirectly, in a computer to perform a certain activity or bring about a certain result. A computer program can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment.

A high-level block diagram of an exemplary computer that may be used to implement systems, apparatus and methods described herein is illustrated in FIG. **36**. Computer **3600** includes a processor **3601** operatively coupled to a data storage device **3602** and a memory **3603**. Processor **3601** controls the overall operation of computer **3600** by executing computer program instructions that define such operations. The computer program instructions may be stored in data storage device **3602**, or other computer readable medium, and loaded into memory **3603** when execution of the computer program instructions is desired. Thus, the method steps of FIG. **58** can be defined by the computer program instructions stored in memory **3603** and/or data storage device **3602** and controlled by the processor **3601** executing the computer program instructions. For example, the computer program instructions can be implemented as computer executable code programmed by one skilled in the art to perform an algorithm defined by the method steps of FIG. **58**. Accordingly, by executing the computer program instructions, the processor **3601** executes an algorithm defined by the method steps of FIG. **58**. Computer **3600** also includes one or more network interfaces **3604** for communicating with other devices via a network. Computer **3600** also includes one or more input/output devices **3605** that enable user interaction with computer **3600** (e.g., display, keyboard, mouse, speakers, buttons, etc.).

Any or all of the systems and apparatus discussed herein, including video display manager **5700**, and components thereof, may be implemented using a computer such as computer **3600**.

One skilled in the art will recognize that an implementation of an actual computer or computer system may have other structures and may contain other components as well, and that FIG. **36** is a high-level representation of some of the components of such a computer for illustrative purposes.

While preferred and alternate embodiments of the invention have been described and illustrated, it should be apparent that many modifications to the embodiments and implementations of the invention could be made without departing from the spirit or scope of the invention. In various embodiments, methods, apparatus and systems are provided as described below.

The foregoing Detailed Description is to be understood as being in every respect illustrative and exemplary, but not restrictive, and the scope of the invention disclosed herein is not to be determined from the Detailed Description, but rather from the claims as interpreted according to the full breadth permitted by the patent laws. It is to be understood that the embodiments shown and described herein are only illustrative of the principles of the present invention and that various modifications may be implemented by those skilled in the art without departing from the scope and spirit of the invention. Those skilled in the art could implement various other feature combinations without departing from the scope and spirit of the invention.

What is claimed is:

**1**. A method for generating modified video, the method comprising:

acquiring a source video comprising a sequence of image frames, each of the image frames being associated with a respective chronological position in the sequence;

identifying a first image frame associated with a first chronological position in the sequence of the source video and a second image frame associated with a second chronological position in the sequence of the source video;

expanding the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame;

expanding the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame;

combining the modified first image frame and the modified second image frame to generate a modified com-

bined image frame, the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and

displaying the modified combined image frame.

**2**. The method according to claim **1**, further including generating a bridge frame, wherein the bridge frame is different from the first image frame, the modified first image frame, the second image frame, the modified second image frame, and the modified combined image frame.

**3**. The method according to claim **2**, wherein the bridge frame is a solid color and further including displaying the bridge frame.

**4**. The method according to claim **2**, wherein the bridge frame is a non-solid color and further including:

blending the modified combined image frame with the bridge frame to form a blended modified combined image frame; and

displaying the blended modified combined image frame.

**5**. The method according to claim **4**, wherein the blended modified combined image frame includes first and second non-overlapping portions, the first portion having the first dimension and including a first selected portion of the modified combined image frame, the second portion having the first dimension and including a second selected portion of the bridge frame.

**6**. An apparatus comprising:

a storage adapted to:

store a sequence of image frames; and

a processor communicably coupled to the storage and adapted to:

obtain from said storage a first image frame associated with a first chronological position in the sequence image frames and a second image frame associated with a second chronological position in the sequence of image frames;

expand the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame;

expand the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame;

combine the modified first image frame and the modified second image frame to generate a modified combined image frame, the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and

display the modified combined image frame.

**7**. The apparatus according to claim **6**, wherein the processor is further adapted to generate a bridge frame, wherein the bridge frame is different from the first image frame, the modified first image frame, the second image frame, the modified second image frame, and the modified combined image frame.

**8**. The apparatus according to claim **7**, wherein the bridge frame is a solid color and wherein the processor is further adapted to display the bridge frame.

**9**. The apparatus according to claim **7**, wherein the bridge frame is a non-solid color and wherein the processor is further adapted to:

blend the modified combined image frame with the bridge frame to form a blended modified combined image frame; and

display the blended modified combined image frame.

**10**. The apparatus according to claim **9**, wherein the blended modified combined image frame includes first and second non-overlapping portions, the first portion having the first dimension and including a first selected portion of the modified combined image frame, the second portion having the first dimension and including a second selected portion of the bridge frame.

**11**. A method for generating modified video, the method comprising:

acquiring a source video comprising a sequence of image frames, each of the image frames being associated with a respective chronological position in the sequence;

identifying a first image frame associated with a first chronological position in the sequence of the source video and a second image frame associated with a second chronological position in the sequence of the source video;

removing a portion of the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame;

removing a portion of the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame;

combining the modified first image frame and the modified second image frame to generate a modified combined image frame, the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and

displaying the modified combined image frame.

**12**. The method according to claim **11**, further including generating a bridge frame, wherein the bridge frame is different from the first image frame, the modified first image frame, the second image frame, the modified second image frame, and the modified combined image frame.

**13**. The method according to claim **12**, wherein the bridge frame is a solid color and further including displaying the bridge frame.

**14**. The method according to claim **12**, wherein the bridge frame is a non-solid color and further including:

blending the modified combined image frame with the bridge frame to form a blended modified combined image frame; and

displaying the blended modified combined image frame.

**15**. The method according to claim **14**, wherein the blended modified combined image frame includes first and second non-overlapping portions, the first portion having the first dimension and including a first selected portion of the modified combined image frame, the second portion having the first dimension and including a second selected portion of the bridge frame.

**16**. An apparatus comprising:

a storage adapted to:

store a sequence of image frames; and

a processor communicably coupled to the storage and adapted to:

obtain from said storage a first image frame associated with a first chronological position in the sequence image frames and a second image frame associated with a second chronological position in the sequence of image frames;

remove a portion of the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame;

remove a portion of the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame;

combine the modified first image frame and the modified second image frame to generate a modified combined image frame, the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and

display the modified combined image frame.

**17**. The apparatus according to claim **16**, wherein the processor is further adapted to generate a bridge frame, wherein the bridge frame is different from the first image frame, the modified first image frame, the second image frame, the modified second image frame, and the modified combined image frame.

**18**. The apparatus according to claim **17**, wherein the bridge frame is a solid color and wherein the processor is further adapted to display the bridge frame.

**19**. The apparatus according to claim **17**, wherein the bridge frame is a non-solid color and wherein the processor is further adapted to:

blend the modified combined image frame with the bridge frame to form a blended modified combined image frame; and

display the blended modified combined image frame.

**20**. The apparatus according to claim **19**, wherein the blended modified combined image frame includes first and second non-overlapping portions, the first portion having the first dimension and including a first selected portion of the modified combined image frame, the second portion having the first dimension and including a second selected portion of the bridge frame.

**21**. A method for generating modified video, the method comprising:

acquiring a source video comprising a sequence of image frames, each of the image frames being associated with a respective chronological position in the sequence;

identifying a first image frame associated with a first chronological position in the sequence of the source video and a second image frame associated with a second chronological position in the sequence of the source video;

inserting a first selected image into the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame;

inserting a second selected image into the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame;

combining the modified first image frame and the modified second image frame to generate a modified combined image frame, the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and

displaying the modified combined image frame.

**22**. The method according to claim **21**, further including generating a bridge frame, wherein the bridge frame is different from the first image frame, the modified first image frame, the second image frame, the modified second image frame, and the modified combined image frame.

**23**. The method according to claim **22**, wherein the bridge frame is a solid color and further including displaying the bridge frame.

**24**. The method according to claim **22**, wherein the bridge frame is a non-solid color and further including:

blending the modified combined image frame with the bridge frame to form a blended modified combined image frame; and

displaying the blended modified combined image frame.

**25**. The method according to claim **24**, wherein the blended modified combined image frame includes first and second non-overlapping portions, the first portion having the first dimension and including a first selected portion of the modified combined image frame, the second portion having the first dimension and including a second selected portion of the bridge frame.

**26**. An apparatus comprising:

a storage adapted to:

store a sequence of image frames; and

a processor communicably coupled to the storage and adapted to:

obtain from said storage a first image frame associated with a first chronological position in the sequence image frames and a second image frame associated with a second chronological position in the sequence of image frames;

insert a first selected image into the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame;

insert a second selected image into the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame;

combine the modified first image frame and the modified second image frame to generate a modified combined image frame, the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and

display the modified combined image frame.

**27**. The apparatus according to claim **26**, wherein the processor is further adapted to generate a bridge frame, wherein the bridge frame is different from the first image frame, the modified first image frame, the second image frame, the modified second image frame, and the modified combined image frame.

**28**. The apparatus according to claim **27**, wherein the bridge frame is a solid color and wherein the processor is further adapted to display the bridge frame.

**29**. The apparatus according to claim **27**, wherein the bridge frame is a non-solid color and wherein the processor is further adapted to:

blend the modified combined image frame with the bridge frame to form a blended modified combined image frame; and

display the blended modified combined image frame.

**30**. The apparatus according to claim **29**, wherein the blended modified combined image frame includes first and second non-overlapping portions, the first portion having the first dimension and including a first selected portion of the modified combined image frame, the second portion having the first dimension and including a second selected portion of the bridge frame.

* * * * *

# EXHIBIT B

**Patent Claims Analysis**
**of**
**US10021380: "Faster state transitioning for continuous adjustable 3Deeps filter spectacles using multi-layered variable tint materials"**

**against**
**Volkswagen 2020 Backup Camera System**

# US10021380B1

United States

Inventor Kenneth Martin Jacobs, Ronald Steven Karpf

Current Assignee Vdpp LLC Visual Effect Innovations LLC

Worldwide applications

2017 ~~US~~ ~~US~~ 2018 ~~US~~

| | | | |
|---|---|---|---|
| Claims priority from a provisional application | | 01/23/2001 | Expired |

Total patentTerm Adjustments
0

CLAIMS

1. A method for generating modified video, the method comprising:

acquiring a source video comprising a sequence of image frames, each of the image frames being associated with a respective chronological position in the sequence;

identifying a first image frame associated with a first chronological position in the sequence of the source video and a second image frame associated with a second chronological position in the sequence of the source video;

expanding the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame;

expanding the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame;

combining the modified first image frame and the modified second image frame to generate a modified combined image frame, the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and

displaying the modified combined image frame.

| Row | Claim Element | Contention |
|---|---|---|
| 1.0 | 1. A method for generating modified video, the method comprising: | *Volkswagen 2020 Backup Camera System has a method for generating modified video.*<br><br><br><https://www.volkswagen-newsroom.com/en/area-view-3665> @ 2023 |
| 1.1 | acquiring a source video comprising a sequence of image frames, each of the image frames being associated with a respective chronological position in the sequence; | *Volkswagen 2020 Backup Camera System has a storage to store a sequence of Image frames. Two consectutive image frames are read in from storage.*<br><br>*[Note: This is necessary in order to do Image Noise Reduction (Wide Discrete Range (WDR)).* |
| 1.2 | identifying a first image frame associated with a first chronological position in the sequence of the source video and a second image frame associated with a second chronological position in the sequence of the source video; | *Volkswagen 2020 Backup Camera System has a processor communicably coupled to the storage.*<br><br>*To view real-time video filmed by the backup camera, the resolution of the VW 2020 Backup Camera System will have to expand (scale) the video.*<br><br>*Two consecutive image frames are read in from storage.*<br><br>*[Note: This is necessary in order to do Digital Image Stabilization.]* |
| 1.3 | expanding the first image frame to generate a modified first image frame, wherein the modified first image frame is different from the first image frame; | *The first image frame is expanded (scaled) to generate a modified first image frame.* |

| | | |
|---|---|---|
| | | **VW Area View cameras**<br>If your Volkswagen is equipped with Area View, it has four onboard cameras. The front camera is located in the radiator grille and gives a 180-degree view to the front. The side cameras are located under the vehicle's side mirrors and give a 90-degree perspective toward your blind spots. The rear camera is located in the handle of the tailgate and gives a 180-degree view of what's behind. The views from the four cameras are digitally stitched together in real time by the electronic control unit and displayed on your vehicle's touchscreen.<br><https://web.archive.org/web/20220810021443/https://www.hallvw.com/blog/how-does-vw-overhead-view-camera-work/><br><br>*Since the modified image frames are expanded from the first image frames - they are a different size - and therefore different from their respective image frames.* |
| 1.4 | expanding the second image frame to generate a modified second image frame, wherein the modified second image frame is different from the second image frame; | *The second image frame is expanded (scaled) to generate a modified second image frame.*<br><br>**VW Area View cameras**<br>If your Volkswagen is equipped with Area View, it has four onboard cameras. The front camera is located in the radiator grille and gives a 180-degree view to the front. The side cameras are located under the vehicle's side mirrors and give a 90-degree perspective toward your blind spots. The rear camera is located in the handle of the tailgate and gives a 180-degree view of what's behind. The views from the four cameras are digitally stitched together in real time by the electronic control unit and displayed on your vehicle's touchscreen.<br><https://web.archive.org/web/20220810021443/https://www.hallvw.com/blog/how-does-vw-overhead-view-camera-work/><br><br>*Since the modified image frames are expanded from the second image frames - they are a different size - and therefore different from their respective image frames.* |
| 1.5 | combining the modified first image frame and the modified second image frame to generate a modified combined image frame, | *Volkswagen 2020 Backup Camera System combines the modified (scaled) first and second image frame, and combines them - generating a modified combined image frame (which are the Digital Image Stabilized frames).*<br><br>**How to use VW Area View**<br>You can use Area View to see into the blind spots on either side of the vehicle including curbs and obstacles right alongside the car that you might ding your doors on. In front view mode you can use the parking help lines to steer yourself precisely into a parking space. With the wide angle lense, you can also "see around corners" to check whether a pedestrian is coming from the left or right, or to see when it's safe to exit a parking space. In rear view mode, there's even a help line to guide you when backing up to a trailer hitch.<br><https://web.archive.org/web/20220810021443/https://www.hallvw.com/blog/how-does-vw-overhead-view-camera-work/> |

| | | |
|---|---|---|
| 1.6 | the modified combined image frame having first and second opposing sides defining a first dimension and third and fourth opposing sides defining a second dimension; and | *The implication of this clause is that the image displayed is a rectangle.*<br><br>*This means that the screen opposing sides are of equal dimension (the display screen is rectangular in shape).*<br><br>**How to use VW Area View**<br><br>You can use Area View to see into the blind spots on either side of the vehicle including curbs and obstacles right alongside the car that you might ding your doors on. In front view mode you can use the parking help lines to steer yourself precisely into a parking space. With the wide angle lense, you can also "see around corners" to check whether a pedestrian is coming from the left or right, or to see when it's safe to exit a parking space. In rear view mode, there's even a help line to guide you when backing up to a trailer hitch.<br><br><*https://web.archive.org/web/20220810021443/https://www.hallvw.com/blog/how-does-vw-overhead-view-camera-work/*> |
| 1.7 | displaying the modified combined image frame. | *The modified combined image frame is displayed (i.e., the Image Noise Reduced frames or Wide Discrete Range (WDR) frame) is displayed.*<br><br><br><br><https://www.volkswagen-newsroom.com/en/area-view-3665> @ 2023 |
| | | *Note 1: Real-time Digital Image Stabilization (DIS), also called Electronic Image Stabilization (EIS), is used to counteract movement - which is especially a problem on a smartphone . This technique shifts the electronic image from frame to frame of video, enough to counteract the motion of the smartphone.*<br><br>*This is Digital Image Stabilization in pictures - -*<br><br><br><br>*Digital Image Stabilization:* |

| | | |
|---|---|---|
| | | *(1) Reads in consecutive video images to decide how to crop the frames based on information in consecutive frame, and; (2) Up-scales the cropped frames to the desired resolution for display.*<br><br>*Note 2: Not all displays are rectangular in shape. For instance, projector displays are not rectangular in shape.* |

# EXHIBIT C

RAMEY LLP

April 12, 2024

Meta Platforms, Inc.

c/o CSC – Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, Texas 78701,

Dear Sir or Madam,

I write this letter to confirm our understanding of the settlement with VDPP, LLC in May of 2020 with Facebook, Inc. I am counsel for VDPP, LLC and authorized to act on its behalf. No action is needed by your company unless VDPP, LLC's understanding of the settlement agreement is incorrect.

It was my client's understanding that Facebook, Inc. (now Meta Platforms, Inc.) denied that it infringed any of the asserted claims in ***VDPP, LLC v. Facebook Technologies LL***C, Case No. 3:19-cv-04597. Therefore, Facebook would not have had any products to mark with the patent numbers from the asserted patents, including 9,426,452; 9,699,444; and, 9,948,92 and all reissues, reexaminations, continuations, continuations-in-part, and divisionals thereof, and any foreign or domestic patent issuing from any application claiming priority or deriving from or sharing a common priority claim, in whole or in part, to any of the foregoing; and all prior, current and future patents owned, held or controlled by Licensor throughout the world. ("VDPP Patents").

It is VDPP, LLC's further understanding that the end of litigation between Facebook and VDPP was not a license where Facebook was looking to sell a product under any of the VDPP Patents.

It is VDPP, LLC's further understanding that the end of litigation between Facebook and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and Facebook for patent infringement.

It is VDPP, LLC's further understanding that Facebook does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287.

VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.

713-426-3923
www.rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, TX 77006

If Meta Platforms disagrees with any of this letter and instead contends that it produced a patented article during the pendency of the VDPP Patents, please identify the patented article.

Sincerely,

William P. Ramey, III

# EXHIBIT D

RAMEY LLP

April 12, 2024

TTE Corporation

Xinpei Zhang
TTEE Corporation
9F, TCL Electronics Building, TCL International E City. No.l00l Zhongshanyuan Rd.
Nanshan District. Shenzhen

Dear Sir or Madam,

I write this letter to confirm our understanding of the settlement with VDPP, LLC in March of 2020 with TTE Corporation. I am counsel for VDPP, LLC and authorized to act on its behalf. No action is needed by your company unless VDPP, LLC's understanding of the settlement agreement is incorrect.

It was my client's understanding that TTE Corporation denied that it infringed any of the asserted claims in ***VDPP, LLC v. TTE Tech Inc.***, Case No. 3:19-cv-02019. Therefore, TTE would not have had any products to mark with the patent numbers from the asserted patents, including 9,426,452; 9,699,444; and, 9,948,92 and all reissues, reexaminations, continuations, continuations-in-part, and divisionals thereof, and any foreign or domestic patent issuing from any application claiming priority or deriving from or sharing a common priority claim, in whole or in part, to any of the foregoing; and all prior, current and future patents owned, held or controlled by Licensor throughout the world. ("VDPP Patents").

It is VDPP, LLC's further understanding that the end of litigation between TTE and VDPP was not a license where TTE was looking to sell a product under any of the VDPP Patents.

It is VDPP, LLC's further understanding that the end of litigation between TTE and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and TTE for patent infringement.

It is VDPP, LLC's further understanding that TTE does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287.

VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.

713-426-3923
www.rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, TX 77006

If TTE disagrees with any of this letter and instead contends that it produced a patented article during the pendency of the VDPP Patents, please identify the patented article.

Sincerely,



William P. Ramey, III

# EXHIBIT E

RAMEY LLP

April 12, 2024

Acer America Corporation

General Counsel
Legal Department
333 W. San Carlos Street, #1500
San Jose, VCA 95110

Dear Sir or Madam,

I write this leAcerr to confirm our understanding of the settlement with VDPP, LLC in March of 2020 with ACER Corporation. I am counsel for VDPP, LLC and authorized to act on its behalf. No action is needed by your company unless VDPP, LLC's understanding of the settlement agreement is incorrect.

It was my client's understanding that ACER Corporation denied that it infringed any of the asserted claims in ***VDPP LLC v. Acer Am. Corp.***, 3:19-cv-4571. Therefore, ACER would not have had any products to mark with the patent numbers from the asserted patents, including 9,426,452; 9,699,444; and, 9,948,92 and all reissues, reexaminations, continuations, continuations-in-part, and divisionals thereof, and any foreign or domestic patent issuing from any application claiming priority or deriving from or sharing a common priority claim, in whole or in part, to any of the foregoing; and all prior, current and future patents owned, held or controlled by Licensor throughout the world. ("VDPP Patents").

It is VDPP, LLC's further understanding that the end of litigation between ACER and VDPP was not a license where ACER was looking to sell a product under any of the VDPP Patents.

It is VDPP, LLC's further understanding that the end of litigation between ACER and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and ACER for patent infringement.

It is VDPP, LLC's further understanding that ACER does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287.

VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.

If ACER disagrees with this letter and instead contends that it produced a patented article during the pendency of the VDPP Patents, please identify the patented article.

Sincerely,

William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| VDPP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.,<br><br>Defendant. | Case No. 4:23-cv-2961<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT VOLKSWAGEN GROUP OF AMERICA, INC.'S RESPONSE TO PLAINTIFF'S MOTION TO AMEND THE JUDGMENT AND FOR RECONSIDERATION UNDER RULE 59(E)**

# TABLE OF CONTENTS

I. NATURE AND STAGE OF PROCEEDING .......... 1

II. STATEMENT OF THE ISSUES TO BE RULED ON .......... 1

III. BACKGROUND .......... 2

IV. LEGAL STANDARDS .......... 3

V. SUMMARY OF ARGUMENT .......... 4

VI. ARGUMENT .......... 4

A. VDPP's Proposed Amended Complaint Fails to Satisfy § 287 and Just Relitigates Matters the Court Has Already Rejected .......... 4

B. VDPP's Purported Factual Disputes Do Not Prevent Resolution Under Rule 12(b)(6) and Are Forfeited .......... 7

C. VDPP's Newfound Focus on the Subjective Beliefs of Its Licensees Defies Controlling Law, Rule 59 Procedure, and the Facts .......... 9

D. VDPP's "Policy" Argument Cannot Override a Federal Statute and Federal Circuit Precedent .......... 13

E. VDPP Cannot Assert a Separate, Never-Mentioned Patent Under Rule 59 .......... 14

VII. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Cases**

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
24 F.3d 178 (Fed. Cir. 1994) .......... 6

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) .......... passim

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
950 F.3d 860 (Fed. Cir. 2020) .......... passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 4, 7

*BelAir Elecs., Inc. v. Twelve South, LLC*,
No. 2:22-cv-04443, 2023 WL 6388810 (D.S.C. Sept. 29, 2023) .......... 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 4, 7

*Blackbird Tech LLC v. Argento SC By Sicura, Inc.*,
No. 21-cv-11018, 2022 WL 3701084 (S.D.N.Y. Aug. 26, 2022) .......... 4

*DivX, LLC v. Hulu, LLC*,
No. lacv-21-1615, 2021 WL 4459368 (C.D. Cal. June 11, 2021) .......... 5, 7, 12

*Dunlap v. Schofield*,
152 U.S. 244 (1894) .......... 11, 12

*Eidos Display, LLC v. Chi Mei Innolex Corp.*,
No. 6:11-CV-00201-JRG, 2017 WL 1322550 (E.D. Tex. Apr. 6, 2017) .......... 13

*e-Watch Inc. v. Avigilon Corp.*,
H-13-0347, 2013 WL 5231521 (S.D. Tex. Sept. 16, 2013) .......... 7

*Express Mobile, Inc. v. DreamHost LLC*,
No. 1:18-cv-1173, 2019 WL 2514418 (D. Del. June 18, 2019) .......... 5, 7

*Faciane v. Sun Life Assurance Co.*,
931 F.3d 412 (5th Cir. 2019) .......... 8

*Fawaz v. Byers*,
No. H-13-0897, 2014 WL 1671746 (S.D. Tex. Apr. 28, 2014) .......... 4

*Fed. Deposit Ins. Corp. v. Meyer*,
781 F.2d 1260 (7th Cir. 1986) .......... 8

*Fenner Invs., Ltd. v. Hewlett-Packard Co.*,
No. 6:08-CV-273, 2010 WL 1727916 (E.D. Tex. Apr. 28, 2010)............................................ 13

*Foy v. Quarterman*,
No. H-06-2642, 2007 WL 1644031 (S.D. Tex. June 4, 2007) ................................................. 14

*Halliburton Energy Servs., Inc. v. NL Indus.*,
No. H-05-4160, 2008 WL 3165687 (S.D. Tex. Aug. 4, 2008)....................................... 8, 13, 14

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000)........................................................................................................... 13

*Jackson v. Wells Fargo N.A.*,
No. H-20-1172, 2020 WL 7344682 (S.D. Tex. Dec. 14, 2020) ................................................. 6

*James v. Wells Fargo Bank, N.A.*,
No. H-14-0449, 2014 WL 3002415 (S.D. Tex. July 2, 2014) ................................................. 14

*Jimenez v. Mayorkas*,
No. H-21-3242, 2023 WL 5672839 (S.D. Tex. Sept. 1, 2023)............................................... 6, 8

*Kearns v. General Motors Corp.*,
94 F.3d 1553 (Fed. Cir. 1996) ........................................................................................ 15

*Laitram Corp. v. NEC Corp.*,
No. 89-1571, 1996 WL 365663 (E.D. La. July 1, 1996) ......................................................... 14

*Lans v. Digit. Equip. Corp.*,
252 F.3d 1320 (Fed. Cir. 2001) ..................................................................................... 7, 9

*Matthews v. Hous. Fire Dept.*,
No. H-07-1783, 2009 WL 1490834 (S.D. Tex. May 27, 2009) ................................................. 6

*Maxwell v. J. Baker Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) .......................................................................................... 8

*Montes v. Tibbs*,
No. H-23-1352, 2024 WL 1676254 (S.D. Tex. Apr. 18, 2024).................................................. 8

*Norris v. Hearst Tr.*,
500 F.3d 454 (5th Cir. 2007) ........................................................................................ 12

*Papasan v. Allain*,
478 U.S. 265 (1986)......................................................................................................... 5

*Pettyjohn v. Mission-St. Joseph's Health Sys., Inc.*,
202 F.R.D. 208 (W.D.N.C. 2001)..................................................................................... 14

*Pipp Mobile Storage Sys. v. Innovating Growers Equip., Inc.*,
No. 21-c-2104, 2022 WL 157491 (N.D. Ill. Jan. 18, 2022)........ 7, 12

*PLC Trenching Co. v. IM Servs. Grp., LLC*,
No. 20-cv-602, 2021 WL 3234590 (D. Idaho July 29, 2021)........ 7

*Realtime Data, LLC v. Actian Corp.*,
No. 6:15-cv-463, 2017 WL 11662033 (E.D. Tex. Apr. 4, 2017) ........ 10

*Rollins v. Home Depot USA*,
8 F.4th 393 (5th Cir. 2021) ........ 8, 13, 14

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ........ passim

*Ross Dress for Less, Inc. v. ML Dev. LP*,
No. H-20-978, 2021 WL 4205064 (S.D. Tex. Jan. 26, 2021) ........ 6

*S. Constructors Grp., Inc. v. Dynalectric Co.*,
2 F.3d 606 (5th Cir. 1993) ........ 3, 7

*Sanders v. Univ. of Tex. Pan. Am.*,
No. 7:17-cv-446, 2018 WL 11469733 (S.D. Tex. Jan 3, 2018) ........ 12

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018)........ 13

*Schiller v. Physicians Res. Grp. Inc.*,
342 F.3d 563 (5th Cir. 2003) ........ passim

*Scrushy v. Tucker*,
No. H-21-2309, 2021 WL 3667329 (S.D. Tex. Aug. 18, 2021)........ 12

*Senju Pharm. Co. v. Apotex Inc.*,
746 F.3d 1344 (Fed. Cir. 2014) ........ 15

*Sentry Protection Prods., Inc. v. Eagle Mfg. Co.*,
400 F.3d 910 (Fed. Cir. 2005) ........ 5

*Simon v. United States*,
891 F.2d 1154 (5th Cir. 1990) ........ 8

*Solas Oled Ltd. v. Samsung Elecs. Co.*,
No. 2:21-cv-105, 2022 WL 1912873 (E.D. Tex. May 30, 2022) ........ 12

*Stewart v. Metro. Llyods Ins. Co.*,
No. H-19-5008, 2020 WL 9935809 (S.D. Tex. Aug. 25, 2020)........ 3

*Sunless, Inc. v. Selby Hldgs., LLC*,
No. 20-cv-930, 2021 WL 3513871 (M.D. Tenn. Aug. 10, 2021) ........................................ 7, 12

*Templet v. HydroChem Inc.*,
367 F.3d 473 (5th Cir. 2004) ........................................................................................... 3

*U.S. Ethernet Innovations LLC v. Acer, Inc.*,
No. 10-cv-724, 2013 WL 4456161 (C.D. Cal. Aug. 16, 2013) ............................................... 14

*Vlasek v. Wal-Mart Stores, Inc.*,
No. H-07-0386, 2008 WL 4057914 (S.D. Tex. Aug. 26, 2008) .............................................. 14

*Willbern v. Bayview Loan Serv. LLC*,
842 F. App'x 865 (5th Cir. 2021) ........................................................................................ 6

**Statutes**

35 U.S.C. § 287 ........................................................................................................ passim

**Rules**

Fed. R. Civ. P. 11 ....................................................................................................... 10

Fed. R. Civ. P. 12 ................................................................................................. 7, 8, 10

Fed. R. Civ. P. 59 ................................................................................................... passim

## I. NATURE AND STAGE OF PROCEEDING

The Court dismissed this case with prejudice and entered final judgment on March 27, 2024. Dkt. 33; Dkt. 34. On April 18, 2024, VDPP filed a motion to amend the final judgment under Fed. R. Civ. P. 59(e). Dkt. 37.

## II. STATEMENT OF THE ISSUES TO BE RULED ON

VDPP's motion is ungrounded in Rule 59 or any applicable law. It should be denied.

VDPP seeks to relitigate its failure to comply with the marking statute, 35 U.S.C. § 287. Rule 59 prohibits such rehashing. Worse still, VDPP's basis for relitigating flouts Federal Circuit precedent that was decided well before this suit, cited to VDPP early in the case, and addressed by both parties and the Court on Volkswagen's motion to dismiss. VDPP's motion is not only an impermissible redo; it does not even attempt to comport with the law of § 287.

VDPP's motion also raises two new considerations. One is a new legal theory, which Rule 59 disallows. According to VDPP, compliance with § 287 is required only where a licensee admits to infringement. This new theory fails twice over—it is not the law and VDPP never raised it before. Instead, VDPP's theory throughout the case was that nonpracticing entities like it need not comply with § 287. The other new consideration is supposed new evidence. Six days before filing its Rule 59 motion, VDPP allegedly sent letters to three licensees asking if they believed they infringe the '452 patent. These post-settlement letters are irrelevant. What matters for § 287 is whether VDPP can plausibly allege marking compliance when it previously accused these (and other) products of infringement. It cannot, and VDPP's motion does not even try to do so.

VDPP's settlement agreements also highlight a deeper issue. Throughout this case, and even in its Rule 59 motion, VDPP urges that it complied with § 287 yet had eleven settlement

agreements[1] proving that it did not comply. VDPP cannot in good faith urge the Court to believe that "evidence will show" it complied with § 287. VDPP identifies no evidence of compliance in its motion and its eleven settlement agreements demonstrate that VDPP should have known before this case was filed that it could never allege compliance.

Lastly, VDPP's policy arguments about encouraging settlement disregard the policy Congress enacted in § 287. That statutory policy is controlling. And VDPP's attempt to assert a separate patent it never mentioned at any point in this litigation disregards the purpose of Rule 59.

## III. BACKGROUND

VDPP's complaint against Volkswagen asserted an expired patent. *See* Dkt. 1 (asserting U.S. Patent No. 9,426,452 (the "'452 patent"). Because VDPP could not seek future damages, the focus of this case was always retrospective. Volkswagen thus promptly notified VDPP about VDPP's failure to allege compliance with the marking statute, 35 U.S.C. § 287, in the complaint. *See* Ex. A. As set forth in more detail in Volkswagen's pending exceptionality motion, VDPP disregarded this notice from Volkswagen, *see* Dkt. 35 §§ III.A-C, requiring Volkswagen to file a motion to dismiss, Dkt. 13.

VDPP's failure to allege compliance with § 287(a) was the centerpiece of Volkswagen's motion to dismiss. Dkt. 13 at 5-9. In opposition, VDPP raised a single argument—that, as a nonpracticing entity, VDPP was not obliged to comply with § 287. *See* Dkt. 22 at 5. This argument, of course, disregarded Federal Circuit precedent that Volkswagen notified VDPP of early in the case (Ex. A) and raised in its motion to dismiss, which requires marking by a patentee's *licensees* and efforts by the patentee to enforce such marking. *See* Ex. A at 1-3 (citing *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) ("*Arctic Cat I*");

---

[1] *See* Document 36, filed under seal with this Court, containing Sealed Exhibits G through Q to Dkt 35.

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020) ("*Arctic Cat II*")); *see also* Dkt. 13 at 5-6 (same).

On March 27, 2024, the Court granted Volkswagen's motion to dismiss with prejudice and entered final judgment. Dkt. 33; Dkt. 34. As the Court explained, VDPP failed to meet its burden of pleading facts showing it complied with § 287. *Id*. at 8-9. The Court rejected VDPP's legal argument that, as "a non-practicing entity, with no products to mark," it is exempt from § 287. *Id*. at 8. VDPP had publicly settled prior litigations after accusing products of infringing the '452 patent, and "VDPP's assertion that it never made or sold a patented product is therefore irrelevant, and VDPP offers no showing that the settlement agreements contain any such express statement" requiring marking. *Id*. Because VDPP's proposed amended complaint (Dkt. 22-1) likewise failed to plead plausible facts suggesting that it complied with § 287, dismissal with prejudice was appropriate. *Id*. at 8, 11-12.

## IV. LEGAL STANDARDS

A Rule 59(e) motion "calls into question the correctness of a judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004). The motion must show a manifest error of law or fact, present newly discovered evidence, or raise an intervening change in controlling law. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863-64 (5th Cir. 2003)). Altering a judgment is an "extraordinary remedy" courts use "sparingly," and the standard "favors denial" of Rule 59 motions. *Stewart v. Metro. Llyods Ins. Co.*, No. H-19-5008, 2020 WL 9935809, at *2 (S.D. Tex. Aug. 25, 2020) (quoting *Templet*, 367 F.3d at 479; *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993)). Rule 59 "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Id.* (quoting *Rosenzweig*, 332 F.3d at 863-64). Rule 59 thus bars amending complaints when the plaintiff could have presented those amendments before. *See Schiller*, 342 F.3d at 568-69; *Rosenzweig*, 332 F.3d at 864-65; *Constructors*, 2 F.3d at 612.

## V. SUMMARY OF ARGUMENT

VDPP presents five reasons to amend the Court's judgment (Dkt. 37 at 3-9), but none satisfies Rule 59's onerous standard. Instead, each complaint relitigates issues already considered, raises new (and erroneous) theories VDPP could have presented before, or rests on bad law and irrelevant facts. VDPP's motion should be denied.

## VI. ARGUMENT

### A. VDPP's Proposed Amended Complaint Fails to Satisfy § 287 and Just Relitigates Matters the Court Has Already Rejected

VDPP's motion begins by restating—in conclusory fashion—that its proposed amended complaint "complied with the marking requirement." Mot. at 3-4. The Court disagreed. Dkt. 33 at 11-12. VDDP fails to satisfy the Rule 59 standard, and its motion just revives old disputes.

As Volkswagen explained, courts do not accept bare legal conclusions as well-pled facts. *See* Dkt. 13 at 2-3; Dkt. 23 at 4-5; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, the amended complaint's vague allusion to meeting "all statutory requirements to obtain pre-suit damages" (Mot. at 3-4 (quoting Dkt. 22-1)) is precisely the type of hollow legal conclusion courts reject. *See, e.g.*, *BelAir Elecs., Inc. v. Twelve South, LLC*, No. 2:22-cv-04443, 2023 WL 6388810, at *7 (D.S.C. Sept. 29, 2023) ("[T]he Court finds that [patentee's] assertion of compliance 'to the extent required by law' is a conclusory (and unclear) statement and, thus, is insufficient in and of itself to state a claim for past damages."); *Blackbird Tech LLC v. Argento SC By Sicura, Inc.*, No. 21-cv-11018, 2022 WL 3701084, at *2 (S.D.N.Y. Aug. 26, 2022) (dismissing allegation that "[a]ll marking requirements under 35 U.S.C. § 287 have been complied with"); *see also Fawaz v. Byers*, No. H-13-0897, 2014 WL 1671746, at *2, *4 (S.D. Tex. Apr. 28, 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Such "legal conclusion[s] couched as a factual allegation" do not suffice. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S.

265, 286 (1986). Indeed, even this proposed pleading avoids mentioning § 287. *See* Dkt. 23 at 4-5. As discussed below, there is a reason for this avoidance—VDPP *cannot* allege compliance with § 287 regarding its licensees. *See* § VI.C, *infra*.

The Court thus correctly held that VDPP had not and could not plausibly allege compliance with § 287(a). Dkt. 33 at 6-12; Dkt. 13 at 5-9. The Court properly examined *Arctic Cat I* and *II*, applied their burdens, and found VDPP's allegations deficient. Dkt. 33 at 7-8, 11-12 (discussing *Arctic Cat I*, 876 F.3d at 1366; *Arctic Cat II*, 950 F.3d at 864). The Court did not err in applying the correct law. Dkt. 33 at 4-5 (discussing pleading standards), 6-10 (finding VDPP's complaint noncompliant), 11-12 (finding the proposed amended complaint futile).

VDPP's motion never confronts any of the foregoing authority. Nor does VDPP explain how the Court's judgment is manifestly incorrect. Instead, VDPP just asserts that bare legal conclusions are sufficient, listing three cases in a footnote. Mot. at 3 & n.21. Two cases support Volkswagen, and the third is irrelevant.

*DivX* and *Express Mobile* involved complaints that did *not* comply with § 287. *See DivX, LLC v. Hulu, LLC*, No. LACV-21-1615, 2021 WL 4459368, at *5 (C.D. Cal. June 11, 2021) (dismissing pre-suit damages on apparatus claims when the patentee did not "plead compliance with § 287(a)"); *Express Mobile, Inc. v. DreamHost LLC*, No. 1:18-cv-1173, 2019 WL 2514418, at *2 (D. Del. June 18, 2019) ("A claim for past damages requires pleading compliance with the marking statute."). Because VDPP's complaint did not plausibly allege marking, these cases *confirm* the Court's judgment. *See* Dkt. 13 at 2-3; Dkt. 23 at 4-5; Dkt. 33 at 6-10. Finally, *Sentry* is a pre-*Twombly* case where the Federal Circuit declined to apply waiver on appeal when a patentee alleged actual notice and produced an affidavit showing marking at summary judgment. *Sentry Protection Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005). VDPP has

no such affidavit and does not allege actual notice before the '452 patent expired. *See* Dkt. 33 at 9-10. *Sentry* has nothing to do with this case. *See also Arctic Cat II*, 950 F.3d at 866-67 (quoting *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994)) (rejecting the idea that allegations of willfulness or knowledge satisfy § 287).

VDPP's motion thus tries to rehash issues the Court decided without addressing the Court's reasoning. VDPP adduces no new relevant facts or law, ignores cases cited by the Court and Volkswagen, and just asks the Court to change its mind. Courts deny such arguments under Rule 59. *See Jimenez v. Mayorkas*, No. H-21-3242, 2023 WL 5672839, at *2 (S.D. Tex. Sept. 1, 2023) (denying a Rule 59(e) motion for "attempt[ing] to relitigate issues the court decided"); *Ross Dress for Less, Inc. v. ML Dev. LP*, No. H-20-978, 2021 WL 4205064, at *1 (S.D. Tex. Jan. 26, 2021) ("A Rule 59(e) motion is 'inappropriate to relitigate old matters'" that "repeat arguments previously made" (quoting *Willbern v. Bayview Loan Serv. LLC*, 842 F. App'x 865, 869 (5th Cir. 2021))); *Jackson v. Wells Fargo N.A.*, No. H-20-1172, 2020 WL 7344682, at *1 (S.D. Tex. Dec. 14, 2020); *Matthews v. Hous. Fire Dept.*, No. H-07-1783, 2009 WL 1490834, at *1 (S.D. Tex. May 27, 2009) ("A Rule 59(e) motion should not be used to relitigate prior matters . . . that simply have been resolved to the movant's dissatisfaction."). The same result is appropriate here.

VDPP concludes by alluding to undisclosed "evidence" supposedly curing its pleading defects but never explains what this evidence entails. Mot. at 4. To the extent VDPP is referencing facts not of record, VDPP should have alleged those facts in its proposed amended complaint. It did not do so. Dkt. 22-1. This forfeits the argument at this stage. *See, e.g.*, *Schiller*, 342 F.3d at 568-69 (affirming denial of a Rule 59 motion when it was "not based on any newly discovered evidence that was unavailable prior to the district court's final judgment"); *Rosenzweig*, 332 F.3d at 864-65 (affirming denial of a Rule 59 motion when plaintiffs did not "raise[] any facts which

were not available previous to the district court's opinion"); *Constructors*, 2 F.3d at 612 (rejecting plaintiff's "attempt to amend its complaint []as nothing more than an attempt to try its theories of recovery seriatim"). The proposed complaint remains futile. Dkt. 33 at 11-12. To the extent VDPP is referencing the "evidence" discussed later in its motion, those allegations do not support Rule 59 relief for the reasons discussed below. *See* Sections VI.B-C, *infra*.

**B. VDPP's Purported Factual Disputes Do Not Prevent Resolution Under Rule 12(b)(6) and Are Forfeited**

VDPP next argues that the Court could not dismiss the case because marking compliance "is a fact question." Dkt. 37 at 4-5. There are two principal problems with this argument.

First, VDPP is wrong. As the Court explained, the Federal Circuit and this District have resolved § 287(a) disputes at the pleading stage. *See* Dkt. 33 at 9-10 (discussing *Lans v. Digit. Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001); *e-Watch Inc. v. Avigilon Corp.*, H-13-0347, 2013 WL 5231521, at *3 (S.D. Tex. Sept. 16, 2013)). Other districts have held the same. *See, e.g.*, *Pipp Mobile Storage Sys. v. Innovating Growers Equip., Inc.*, No. 21-c-2104, 2022 WL 157491, at *2 (N.D. Ill. Jan. 18, 2022) (rejecting the theory that "sufficiency of notice is a question of fact that the Court cannot decide on a Rule 12(b)(6) motion" because "the Federal Circuit" and "many federal courts" have required "a patentee plead compliance with § 287"); *DivX*, 2021 WL 4459368, at *4-6; *PLC Trenching Co. v. IM Servs. Grp., LLC*, No. 20-cv-602, 2021 WL 3234590, at *9-10 (D. Idaho July 29, 2021) (granting a motion to dismiss under § 287); *Sunless, Inc. v. Selby Hldgs., LLC*, No. 20-cv-930, 2021 WL 3513871, at *4-5 (M.D. Tenn. Aug. 10, 2021) (dismissing pre-suit damages for lack of marking); *Express Mobile*, 2019 WL 2514418, at *2.

Even when complaints implicate factual matters—as every complaint must—district courts dismiss them when they do not plead a plausible claim. *E.g.*, *Iqbal*, 556 U.S. at 678-79 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."); *Twombly*, 550

U.S. at 570. Here, § 287(a) imposes a pleading burden on VDPP. *Arctic Cat I*, 876 F.3d at 1366 ("The patentee bears the burden of pleading … he complied with § 287(a)'s marking requirement."). This burden includes alleging marking by VDPP's licensees. *Id.* VDPP did not carry this burden. Dkt. 33 at 6-10.

VDPP addresses none of this authority and again points to inapposite law. Mot. at 4 nn.23-24. VDPP cites *Maxwell v. J. Baker Inc.*, 86 F.3d 1098 (Fed. Cir. 1996), but there substantial evidence supported a jury verdict when a licensee marked over 95% of articles sold under a patent. *Id.* at 1111-12. *Maxwell* has nothing to do with pleading standards, does not preclude marking decisions on a motion to dismiss, and does not help VDPP when none of its licensees mark their products. *See* Dkt. 37 at 5-7 (discussing false marking); Section VI.C, *infra* (discussing licenses).

Second, VDPP forfeited this argument by failing to raise it before. Rule 59(e) motions cannot present arguments that "could, and should, have been made before the judgment issued." *See, e.g.*, *Rollins v. Home Depot USA*, 8 F.4th 393, 396 (5th Cir. 2021) (quoting *Faciane v. Sun Life Assurance Co.*, 931 F.3d 412, 423 (5th Cir. 2019); *Schiller*, 342 F.3d at 567-59; *Rosenzweig*, 332 F.3d at 863-64; *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986)). This Court often holds litigants to this standard. *See, e.g.*, *Montes v. Tibbs*, No. H-23-1352, 2024 WL 1676254, at *1, *5 (S.D. Tex. Apr. 18, 2024) (quoting *Rosenzweig*, 332 F.3d at 863; *Templet*, 367 F.3d at 478-79); *Jimenez*, 2023 WL 5672839, at *1-2 (same); *Halliburton Energy Servs., Inc. v. NL Indus.*, No. H-05-4160, 2008 WL 3165687, at *2, *5 (S.D. Tex. Aug. 4, 2008) (also explaining how a party cannot "raise [an] issue for the first time in [a] Rule 59 motion" when it "did not raise the issue in its responsive briefing or during [an] oral argument").

VDPP never contended § 287(a) presented a factual question not addressable in a

Rule 12(b)(6) motion. It did so neither in its briefing (Dkt. 22 at 4-6) nor at the hearing on Volkswagen's motion to dismiss (*see* Hearing Tr. (Dec. 8, 2023), at 5:10-6:5, 10:18-11:12). Indeed, the Court asked the parties if they needed "any discovery . . . to resolve the motion that would make it a summary judgment motion." *Id*. at 12:11-14. Volkswagen confirmed that no discovery was needed since this was a pleadings issue, and VDPP likewise did not request discovery. *Id*. at 12:15-13:15. VDPP's motion points to no intervening change in controlling law, and multiple courts—including the Federal Circuit—have rejected VDPP's argument. *See Lans*, 252 F.3d at 1328; *see also supra* (citing cases). VDPP's sole argument was that, as a nonpracticing entity, it "[h]as no product to mark." Dkt. 22 at 5. This contention was wrong, and VDPP's failure to raise this new issue prior to its Rule 59 motion forfeits the argument now.

### C. VDPP's Newfound Focus on the Subjective Beliefs of Its Licensees Defies Controlling Law, Rule 59 Procedure, and the Facts

VDPP's third position is its most troubling. It makes claims that are demonstrably false, conflict with controlling Federal Circuit law, and have no authority supporting them.

According to VDPP, this case should proceed because three of its licenses "are not in evidence" and thus "[t]here is no way for the Court to determine compliance with §287." Mot. at 5. This is false. VDPP produced *eleven* of its license agreements and *none* of them imposes a marking obligation on licensees. *See* Dkt. 35 at 5-6; Dkt. 36 Exs. G-Q. When a patentee "d[oes] not require [a licensee] to mark" and in fact "expressly authorize[s the licensee] to sell licensed products without marking," it does not comply with § 287. *Arctic Cat I*, 876 F.3d at 1366-67; *Arctic Cat II*, 950 F.3d at 864-65. Here, ten of VDPP's agreements do not address marking (Dkt. 36 Exs. G-H, J-Q), and one expressly repudiates a duty to mark (Dkt. 36 Ex. I § 6.15). All eleven licenses thus fail under § 287. This new evidence—disclosed after Volkswagen moved to dismiss—*reconfirms* the Court's judgment. It is difficult to imagine a less meritorious Rule 59

motion than when the "new" evidence reaffirms the Court was right.[2]

VDPP tries to avoid this result by ignoring the licenses and pretending "it is the defendant's responsibility to affirmatively . . . prove that a product is a patented article." Mot. at 5 nn.26-27 (citing *Realtime Data, LLC v. Actian Corp.*, No. 6:15-cv-463, 2017 WL 11662033, at *3 (E.D. Tex. Apr. 4, 2017)). But as VDPP knows, the Federal Circuit unambiguously *rejected* that proposition in *Arctic Cat I*. Under controlling law, VDPP bears the burden to allege its licensees' products do not practice the patent:

> We hold an alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are "patented articles" subject to § 287. To be clear, this is a low bar. The alleged infringer need only put the patentee on notice that he or his authorized licenses sold specific unmarked products which the alleged infringer believes practice the patent…. Once the alleged infringer meets its burden of production, [] the patentee bears the burden to prove the products identified do not practice the patented invention.

*Arctic Cat I*, 876 F.3d at 1368. *Realtime* is worse than irrelevant—it is bad law.[3]

None of this is news to VDPP. VDPP cites *Arctic Cat I* in the immediately preceding footnote and has done so throughout the case. *See* Mot. at 5 n.25; Dkt. 22 at 5 n.5. Volkswagen discussed *Arctic Cat*'s burden-shifting regime before judgment, *e.g.*, Dkt. 23 at 2-3 (quoting *Arctic Cat I*, 876 F.3d at 1368); Dkt. 13 at 6-7, and indeed before Rule 12 briefing began, Ex. A at 1-2. The Court did the same in its opinion. Dkt. 33 at 7-9. As the Court explained, Volkswagen satisfied its burden by identifying products it believed failed to comply with § 287. *Id.* It was thus incumbent upon VDPP to allege plausible facts showing that the identified products do not practice

---

[2] It is remarkable for VDPP to seek to mislead the Court in a Rule 59 motion as to what the "evidence" will show when VDPP's licenses confirm the opposite.

[3] In *Realtime*, the patentee also disputed whether the sold products practiced the asserted patent. *Realtime*, 2017 WL 11662033, at *3. As explained below, VDPP carefully avoids making that representation here because doing so would show VDPP made false infringement allegations in its prior complaints. This is a serious and concerning prospect under Fed. R. Civ. P. 11.

the '452 patent. *Id.* (discussing *Arctic Cat I* and *II*). Neither VDPP's original complaint nor its proposed amended complaint did so—VDPP just urged that "it has no such obligation." *Id*. Under these circumstances, the Court correctly dismissed the case as futile. *Id.* at 11-12. Thus, even if VDPP's licenses were not produced (and they were), both complaints would still fail as a matter of black letter law. *See* Sections VI.A-B, *supra*.

VDPP tries to skirt the issue by claiming that its licensees never *admitted* to infringing the '452 patent. Mot. at 6-7 (emphasizing how no "alleged infringer believes [it] practice[s] the patent" and "each of the three defendants [will] den[y] that they infringed VDPP's patent"). This is no answer at all. Controlling law places the burden *on VDPP* to plausibly allege that its licensees' products do not practice the '452 patent. *E.g.*, *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894) ("The duty of alleging [notice] is upon the plaintiff."); *Arctic Cat I*, 876 F.3d at 1366-68 ("The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement," including "that [licensed] products identified do not practice the patented invention."). What VDPP's licensees may or may not subjectively believe is immaterial.

Thus, VDPP's after-the-fact letters inquiring as to what its licensees believe and making unfounded legal conclusions about § 287 (Mot. at 7) do not cure the problems of VDPP's complaint. These statements do not disavow VDPP's prior allegations accusing specific products of infringement. *See, e.g.*, *VDPP LLC v. Facebook Techs., LLC*, No. 3:19-cv-4597, Dkt. 1 ¶ 15 (N.D. Cal.); *VDPP LLC v. Acer Am. Corp.*, 3:19-cv-4571, Dkt. 1 ¶ 16 (N.D. Cal.); *VDPP LLC v. TTE Tech., Inc.*, No. 5:19-cv-02019, Dkt. 1 ¶ 17 (C.D. Cal.); *see also* Dkt. 13 at 7 (discussing prior settlements); Dkt. 12 at 1-2 (same); Dkt. 33 at 8 (same). Nor do they make VDPP's complaint plausible. VDPP cannot claim that "Volkswagen fails to identify any patented article" (Dkt. 37 at 5) when both Volkswagen and the Court did just that by citing *VDPP's own allegations* in federal

courts. Dkt. 13 at 7; Dkt. 23 at 1-2; Dkt. 33 at 8.

In any event, VDPP cites no authority for the unprecedented idea that compliance with § 287(a) depends on the subjective beliefs of licensees. *Solas Oled Ltd. v. Samsung Elecs. Co.*, No. 2:21-cv-105, 2022 WL 1912873 (E.D. Tex. May 30, 2022), found only that a defendant forfeited a marking defense when it failed to timely identify unmarked products. *Id.* at *2. VDPP cannot make this allegation here. Volkswagen identified the unmarked products—described in VDPP's prior court filings—at the outset of the case. Dkt. 13 at 7; Dkt. 23 at 1-2; Ex. A at 1-2. The Court found this sufficient. Dkt. 33 at 8. VDPP does not challenge that ruling.[4]

VDPP's newfangled focus on the beliefs of its licensees also shrugs off Federal Circuit precedent. Shifting *Arctic Cat*'s burden onto licensees conveniently absolves VDPP from taking a position on its prior allegations of infringement. But the law places § 287's pleading burden *on VDPP*—not its licensees. *See Dunlap*, 152 U.S. at 248 ("The duty of alleging [notice] is upon the plaintiff."); *Arctic Cat I*, 876 F.3d at 1366 ("The patentee bears the burden of pleading . . . compli[ance] with § 287(a)'s marking requirement."); *see also Pipp*, 2022 WL 157491, at *2; *DivX*, 2021 WL 4459368, at *2; *Sunless*, 2021 WL 3513871, at *4. Here, VDPP alleged in federal pleadings that multiple products infringe the '452 patent. *Supra*. VDPP cannot now allege in good faith that they no longer do so. VDPP thus cannot carry its burden to plausibly allege compliance with the marking statute, and its case is futile. Dkt. 33 at 11-12. If VDPP wishes to disavow its prior infringement claims and confirm it files patent cases without basis, it should do so directly. Otherwise, VDPP should not be heard to shirk from its prior representations to federal courts.

---

[4] VDPP also does not challenge the Court's authority to take judicial notice of VDPP's prior filings. *See* Dkt. 33 at 8; Dkt. 23 at 2-3 (citing *Sanders v. Univ. of Tex. Pan. Am.*, No. 7:17-cv-446, 2018 WL 11469733, at *2 & n.22 (S.D. Tex. Jan 3, 2018); *Scrushy v. Tucker*, No. H-21-2309, 2021 WL 3667329, at *1-2 & n.1 (S.D. Tex. Aug. 18, 2021)); Dkt. 13 at 7; *see also, e.g.*, *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

Finally, VDPP's novel legal theory is also forfeited. Other than its irrelevant letters, VDPP points to no change in law or fact that would support its Rule 59 motion. Accordingly, for this additional reason, the Court may reject VDPP's argument. *Rollins*, 8 F.4th at 396; *Schiller*, 342 F.3d at 567-59; *Rosenzweig*, 332 F.3d at 863-64; *Halliburton*, 2008 WL 3165687, at *2, *5.

**D. VDPP's "Policy" Argument Cannot Override a Federal Statute and Federal Circuit Precedent**

VDPP's new policy argument about encouraging settlement, Dkt. 37 at 7-8, is answered by § 287 itself and Federal Circuit law. According to VDPP, "policy considerations are advanced when parties are allowed to freely settle cases without admitting infringement and thus not require marking." *Id*. at 8. But as explained above, a licensee's intent or admission on infringement is irrelevant under § 287. *See supra* § VI.C. "Achieving a better policy outcome—if what [VDPP] urges is that—is a task for Congress, not the courts." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13-14 (2000). VDPP's policy arguments "are properly addressed to Congress, not this Court." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018).

VDPP's ensuing discussion of damages caselaw, Dkt. 37 at 8, also has no bearing on § 287. *Rude* does not contain the quote VDPP attributes to it, and does not address marking in any event. *Rude v. Westcott*, 130 U.S. 152 (1889). *Eidos Display* and *Fenner Investments* both stand for the proposition that a settlement payment may not necessarily indicate a reasonable royalty. *Eidos Display, LLC v. Chi Mei Innolux Corp*., No. 6:11-CV-00201-JRG, 2017 WL 1322550, at *4 (E.D. Tex. Apr. 6, 2017); *Fenner Invs., Ltd. v. Hewlett-Packard Co*., No. 6:08-CV-273, 2010 WL 1727916, at *1 (E.D. Tex. Apr. 28, 2010). None of VDPP's caselaw addresses marking or supports its policy argument.

Rather, as the Court explained, § 287 applies regardless of the form VDPP's licenses take—whether a "license," "covenant" not to sue, or "settlement agreement." Dkt. 33 at 8-9; *see*

*also* Dkt. 23 at 3 (quoting *U.S. Ethernet Innovations LLC v. Acer, Inc.*, No. 10-cv-724, 2013 WL 4456161, at *8 (C.D. Cal. Aug. 16, 2013); *Laitram Corp. v. NEC Corp.*, No. 89-1571, 1996 WL 365663, at *2 (E.D. La. July 1, 1996)). The law directly refutes VDPP's imagined distinction between "settlement licenses" (Dkt. 37 at 9) and these other forms of agreements.

Lastly, VDPP's new policy arguments are also forfeited because they were never presented until now. *Rollins*, 8 F.4th at 396; *Schiller*, 342 F.3d at 567-59; *Rosenzweig*, 332 F.3d at 863-64; *Halliburton*, 2008 WL 3165687, at *2, *5.

### E. VDPP Cannot Assert a Separate, Never-Mentioned Patent Under Rule 59

VDPP seeks leave to assert U.S. Patent No. 10,021,380 (the "'380 patent"). Dkt. 37 at 9. This is not a Rule 59(e) request. It is a request to begin a new litigation.

The '380 patent issued on July 10, 2018 (more than five years before this suit was filed) and expired on January 22, 2022 (together with the '452 patent, 1.5 years before this suit was filed). Dkt. 37 at 9; *see also* Dkt. 37-3 ('380 patent). Never in this litigation has VDPP ever mentioned the '380 patent. Granting VDPP's request would mean introducing an entirely new cause of action, which is not the purpose of Rule 59(e). *See, e.g., James v. Wells Fargo Bank, N.A.*, No. H-14-0449, 2014 WL 3002415, at *4 (S.D. Tex. July 2, 2014) (denying Rule 59(e) motion seeking to file amended complaint with "two new causes of action"); *Foy v. Quarterman*, No. H-06-2642, 2007 WL 1644031, at *1 (S.D. Tex. June 4, 2007) (finding that proposed "new claim" raised under Rule 59(e) "does not constitute grounds for relief from the final judgment."); *Vlasek v. Wal-Mart Stores, Inc.*, No. H-07-0386, 2008 WL 4057914, at *3 (S.D. Tex. Aug. 26, 2008) (denying Rule 59(e) motion and finding that if plaintiff had new claim to file it "may only do so in a new suit"); *Pettyjohn v. Mission-St. Joseph's Health Sys., Inc.*, 202 F.R.D. 208, 211 (W.D.N.C. 2001) ("[P]laintiffs' post-game attempt to assert a new cause of action is inappropriate under Rule 59(e)"). The Federal Circuit has made clear that "each patent establishes an

independent and distinct property right," and thus "[e]ach patent asserted raises an independent and distinct cause of action." *Kearns v. General Motors Corp.*, 94 F.3d 1553, 1555-56 (Fed. Cir. 1996); *Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 1349 (Fed. Cir. 2014) (same). VDPP cites no legal authority allowing a new cause of action based on the '380 patent via Rule 59(e). Dkt. 37 at 9. Indeed, as the above law makes clear, Rule 59(e) does not allow this.

Lastly, VDPP's suggestion that it would have added the '380 patent via an amended complaint, *id.*, is disproven by the proposed amended complaint VDPP actually submitted. *See* Dkt. 22-1. This proposed pleading did not mention the '380 patent. VDPP's Rule 59 motion is the first time VDPP ever referenced this patent. Rule 59 is not an available vehicle for VDPP.

## VII. CONCLUSION

For the foregoing reasons, the Court should deny VDPP's motion to amend the judgment.

Dated: April 30, 2024

Respectfully submitted,

*/s/ T. Christopher Trent*

T. Christopher Trent
TRENT & TAYLOR, LLP
State Bar No. 20209400
919 Milam, Suite 1500
Houston, TX 77002
(713) 222-2323 – Telephone
(713) 222-2226 - Facsimile
ctrent@trent-law.com

Elliot C. Cook (pro hac vice)
Joseph M. Schaffner (pro hac vice)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street, 8th Floor
Reston, VA 20190-6023
(571) 203-2700 – Telephone
elliot.cook@finnegan.com
joseph.schaffner@finnegan.com

*Counsel for Defendant*
*Volkswagen Group of America, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system pursuant to the Federal Rules of Civil Procedure. Parties may access this filing through the Court's system.

*/s/ T. Christopher Trent*

T. Christopher Trent

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **VDPP, LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 4:23-cv-02961** |
| **v.** | ) | |
| | ) | |
| **VOLKSWAGEN GROUP OF** | ) | |
| **AMERICA, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE TO VOLKSWAGEN GROUP OF AMERICA INC.'S MOTION FOR ATTORNEYS' FEES**

**TABLE OF CONTENTS**


I. INTRODUCTION AND BACKGROUND ........ 1

II. RELEVANT LAW ........ 2

III. ARGUMENT ........ 4

A. The Court Should Defer Deciding Volkswagen's Motion for Fees Until after Ruling on the Motion to Modify the Judgment ........ 4
B. Volkswagen's Motion for Fees ........ 4
C. VDPP Believed it had a Good Faith Basis for Asserting that it Need Not Comply with the Marking Statute ........ 5
D. Low Settlement Amounts are Not a Basis for Fees ........ 15
E. Volkswagen's Reference to Other Cases Should Not Affect this Case ........ 17
F. Volkswagen Conflates and Confuses Forfeiture ........ 17
G. Fees are Not Warranted ........ 18
H. Sanctions Under §1927, the Court's Inherent Power are not Warranted ........ 18

IV. Volkswagen's Apparent Fee Request is Unreasonable ........ 19

V. CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Cases**

*AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353 (Fed. Cir. 2017)......................16

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523 (Fed. Cir. 1993) ................15

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350 (Fed. Cir. 2017)..........................................................................8, 10, 11

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.,* 950 F.3d 860 (Fed. Cir. 2020) ..................................................................7, 8, 9, 13

*Bayer CropScience AG v. Dow AgroSciences LLC.*, No. 12-256, 2015 WL 1197436 (D. Del. Mar. 15, 2015), aff'd, 851 F.3d 1302 (Fed. Cir. 2017).........20

*Browning v. Kramer*, 931 F.2d 340 (5th Cir.1991)................................................ 4

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ................................................................................................ 4

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371 (Fed. Cir. 2017) ...........19

*DP Wagner Mfg. Inc. v. Pro Patch Sys., Inc.*, 434 F. Supp. 2d 445 (S.D. Tex. 2006) ...............................................................................................12

*Edwards v. Gen. Motors Corp.*, 153 F.3d 242 (5th Cir.1998)............................4, 19

*Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322550 (E.D. Tex. Apr. 6, 2017)..........................................................14

*EscapeX IP LLC v. Google LLC*, 2023 WL 5257691 (N.D. Cal. Aug. 16, 2023) ..17

*Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986)................17

*Fed. Deposit Ins. Corp. v. Maxxam, Inc.,* 523 F.3d 566 (5th Cir. 2008) ................ 4

*Fenner Invs ., Ltd. v. Hewlett–Packard Co.,* No. 6:08–CV–273, 2010 WL 1727916 (E.D.Tex. Apr. 28, 2010)................................................................14

*Gust, Inc. v. Alphacap Ventures*, LLC, 905 F.3d 1321 (Fed. Cir. 2018) ...........3, 10

*Jenkins v. Methodist Hosp. of Dallas,* 478 F.3d 255 (5th Cir. 2007)........................ 4

*Mankes v. Vivid Seats Ltd.*, 822 F.3d 1302 (Fed. Cir. 2016)........................3, 10, 16

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996) .............................8, 9, 10

*Motorola, Inc. v. United States*, 729 F.2d 765 (Fed. Cir. 1984) .............................. 8

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545 (2014) ......3, 18

*Park-In-Theatres, Inc. v. Perkins*, 190 F.2d 137 (9th Cir. 1951) .......................3, 18

*Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360 (Fed. Cir. 2017)..........17

*REALTIME DATA, LLC, Plaintiff, v. ACTIAN CORPORATION ET AL., Defendants. Additional Party Names: Blue Coat Sys., Inc., F5 Networks, Inc., Riverbed Tech., Inc.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662033 (E.D. Tex. Apr. 4, 2017)...........................................................11, 12

*ResQNet,* 594 F.3d at 872 (Fed. Cir. 2010) ...........................................................14

*Rude v. Westcott*, 130 U.S. 152, 9 S.Ct. 463 [468] ................................................14

*Sentry Prot. Prod., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910 (Fed. Cir. 2005) ............10

*Solas Oled Ltd. v. Samsung Elecs. Co.*, No. 2:21-CV-105-JRG-RSP, 2022 WL 1912873 (E.D. Tex. May 30, 2022)...................................................................12

*Stitt v. Williams,* 919 F.2d 516 (9th Cir.1990) ........................................................ 4

*Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 56 S.Ct. 528, 80 L.Ed. 736 (1936) ......................................................................... 7

**Constitutional Provisions & Statutes**

28 U.S.C. § 1927.......................................................................................... 3

35 U.S.C. § 285 ......................................................................................... 3

35 U.S.C. § 286 ........................................................................................14

35 U.S.C. § 287 ........................................................................................13

**Rules & Regulations**

Fed. R. Civ. P. 11(b)(1)................................................................................ 4

Fed. R. Evid. 408 .......................................................................................15

VDPP, LLC ("VDPP" or "Plaintiff") files this Response to Defendant Volkswagen Group of America, Inc's ("Volkswagen" or "Defendant) Motion For Attorneys' Fees[1] ("Defendant's Motion for Fees") showing the Court that it should be denied because nothing rare happened in this case, it was normal litigation and the case was in its infancy:

## I. INTRODUCTION AND BACKGROUND

VDPP's counsel twice requested an extension from Volkswagen's counsel to respond to Defendant's Motion for Fees until after the Court ruled on the Motion to Modify the Judgment,[2] specifying that a response would not be necessary if the Court granted the motion.[3] However, in an apparent effort to drive up costs, Volkswagen's counsel refused to be unopposed to the requested extension.[4] While Defendant's Motion for Fees hammers VDPP for unreasonably increasing the costs of litigation, it should not be forgotten that Volkswagen has taken every opportunity they could to increase costs for VDPP. As fee shifting is equitable in nature, Volkswagen's conduct in increasing the costs of the litigation should mediate against any award of fees.

Returning to why the present case is not exceptional, on August 11, 2023, Plaintiff VDPP sued Defendant Volkswagen alleging that it infringes U.S. Pat. No. 9,426,452 ("the '452 Patent") (the "Patent-in-Suit").[5] On October 13, 2023, Volkswagen filed a Motion to Dismiss VDPP's Complaint for Failure to State a Claim ("Volkswagen's Motion to Dismiss").[6] Volkswagen's Motion to Dismiss requested:

---

[1] See Doc. No. 35.
[2] Doc. No. 37.
[3] Ex. A, E-mail chain between counsel for VDPP and counsel for Volkswagen at April 18 and May 6 e-mails requesting extension, to the Declaration of William P. Ramey, III ("Ramey Decl.").
[4] Ex. A at May 7 and April 23rd e-mail declining to be unopposed to extension.
[5] Doc. No. 1
[6] Doc. No. 13.

1. Dismissal with prejudice because VDPP had not complied with the marking statute;[7]
2. Dismissal of VDPP's willful and indirect infringement claims;[8] and,
3. Dismissal based on an error in venue pleading.[9]

VDPP responded specifying that it did not believe it had an obligation to mark, that it would dismiss its indirect and willful infringement claims and that it would correct the error in venue pleading.[10] VDPP specifically requested leave to amend in its response and provide a proposed amended complaint that attempted to cure the issues raised by Volkswagen.[11] The Court granted Volkswagen's Motion to Dismiss without leave to amend.[12] Volkswagen's Motion for Fees followed.[13] Ramey LLP filed a motion to amend the judgment on April 18, 2024.[14]

In summary, Plaintiff filed a complaint, Defendant moved to dismiss, Plaintiff responded requesting leave to amend, and the Court dismissed with prejudice. No discovery occurred. No motions were filed by Plaintiff. The merits of VDPP's infringement position were never considered by the Court. The case was very short lived, about 7 months. In sum, nothing makes this case rare as it does not stand out from the rest. This was normal litigation. The sanction of dismissal was adequate and no further sanction under Section 285, Section 1927, the inherent powers of the Court, or otherwise is warranted. In fact, the largest filing in the case by far is Volkswagen's Motion for Fees at 20+ pages.

## II. RELEVANT LAW

The Patent Act provides that a "court in exceptional cases may award reasonable attorney

---

[7] Doc. No. 13 at 5-9.
[8] Doc. No. 13 at 9.
[9] Doc. No. 13 at 10.
[10] Doc. No. 22, *generally*.
[11] Doc. No. 22-1.
[12] Doc. No. 33.
[13] Doc. No. 35.
[14] Doc. No. 37.

fees to the prevailing party."[15] "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."[16] "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."[17] A nonexclusive list of factors to consider includes frivolousness, motivation, objective unreasonableness as to facts or legal components of the case, and the need in particular circumstances to advance considerations of compensation and deterrence.[18] The prevailing party must prove an "exceptional case" by a preponderance of the evidence.[19]

Fees are not to be awarded "as a penalty for failure to win a patent infringement suit."[20] In areas of evolving law, "it is particularly important to allow attorneys the latitude necessary to challenge and thus solidify the legal rules without the chill of direct economic sanctions."[21] A case is not necessarily exceptional necessitating a fee award even where a court determines the party applied an incorrect legal standard. This is especially true in areas where the law is changing or where the party's pleadings can be taken as a good faith effort to change the law[22] or a reasonable basis under then existing law.

Section 1927 provides that a court may require an attorney to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred" when the attorney "multiplies the proceedings in any case unreasonably and vexatiously."[23] However, a lawyer should not be

---

[15] 35 U.S.C. § 285.
[16] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 554 (2014).
[17] *Id*.
[18] *See Octane Fitness*, 572 U.S. at 554 n.6.
[19] *See Id*. at 557-58.
[20] *Octane Fitness*, 572 U.S. at 548-49 (quoting *Park-In-Theatres, Inc. v. Perkins*, 190 F.2d 137, 142 (9th Cir. 1951)).
[21] *See, e.g., Gust, Inc. v. Alphacap Ventures*, LLC, 905 F.3d 1321, 1329 (Fed. Cir. 2018).
[22] *Mankes v. Vivid Seats Ltd.*, 822 F.3d 1302, 1312 (Fed. Cir. 2016).
[23] 28 U.S.C. § 1927.

sanctioned for failing to abandon his client's case at the drop of a motion, unless there is no colorable defense to the motion that can be advocated and no possible merit to any argument that can be advanced.[24] The Supreme Court has cautioned that court's must find fraud or abuse of the judicial process sufficiently beyond 'exceptional' before it can invoke its inherent sanctioning power.[25] The Fifth Circuit requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court."[26] Section 1927 only authorizes shifting fees that are associated with "the persistent prosecution of a meritless claim."[27]

Rule 11 expressly requires that an attorney presenting a pleading, motion, or other paper before a court certify that the attorney has performed "an inquiry reasonable under the circumstances" such that he can verify that (1) "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," (2) "the claims ... are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law;" (3) "the factual contentions have evidentiary support or, ... will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."[28] The Fifth Circuit "has been emphatic" that the Rule 11 analysis is a strictly objective inquiry and "expressly rejected any inquiries into the motivation behind a filing."[29]

## III. ARGUMENT

### A. The Court Should Defer Deciding Volkswagen's Motion for Fees Until after Ruling on the Motion to Modify the Judgment

To conserve judicial resources, this Court should defer deciding Defendant's Motion for

---

[24] *Stitt v. Williams,* 919 F.2d 516, 528 (9th Cir.1990).
[25] *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).
[26] *Edwards v. Gen. Motors Corp.,* 153 F.3d 242, 246 (5th Cir.1998).
[27] *Browning v. Kramer,* 931 F.2d 340, 345 (5th Cir.1991).
[28] Fed.R.Civ.P. 11(b)(1)–(3).
[29] *Fed. Deposit Ins. Corp. v. Maxxam, Inc.,* 523 F.3d 566, 580 (5th Cir. 2008); *Jenkins v. Methodist Hosp. of Dallas,* 478 F.3d 255, 264 (5th Cir. 2007).

Fees until after the resolution of Plaintiff's Motion to Amend the Judgement.[30] VDPP requested an extension from Volkswagen to file its response to Defendant's Motion for Fees until after the Court rules on VDPP's Motion to Modify the Judgment, but Volkswagen declined to extend the courtesy.[31] VDPP's Motion to Modify only requests leave to amend. If the Court grants leave to amend, it will obviate the need to respond to Defendant's Motion for Fees.

**B. Volkswagen's Motion for Fees**

Volkswagen makes numerous complaints about VDPP in Defendant's Motion for Fees but Defendant did not file a motion to dismiss under paragraph 6 that alleged it did not know what was accused. In other words, it knew what was being accused of infringing. Defendant's Motion for Fees falsely twists VDPP's conduct to allege that VDPP's counsel did not engage. However, VDPP's counsel engaged at every step, at very communication.

Defendant bases its requests for fees in large part on its September 29, 2023 letter to VDPP's counsel.[32] A letter responded to by e-mail on October 11, 2023[33] that further included responses to the infringement allegations.[34] VDPP responded line by line in two-weeks-time, which shows engagement. Defendant slams the response and tries to insinuate the response was an "AI" generated response,[35] but the Declaration of Simon Sunatori[36] and Ron Karpf[37] specify that they drafted the rebuttal arguments to Defendant's letter. The declarations further specify the pre-suit investigation that was performed for the infringement analysis.[38] Each of Dr. Karpf and Mr. Sunatori is a valuable technical resource with Sunatori having a Master of Engineering

---

[30] Doc. No. 37.
[31] Ex. A at May 7 and April 23rd e-mail declining to be unopposed to extension.
[32] Doc. No. 35-1.
[33] Doc. No. 35-5.
[34] Doc. No. 35-4.
[35] Doc. No. 35 at 4.
[36] Declaration of Simon Sunatori ("Sunatori Decl.") at ¶9.
[37] Declaration of Ron Karpf ("Karpf Decl.") at ¶6.
[38] Sunatori Decl. at ¶8; Karpf Decl. at ¶5.

(Engineering Physics) degree from McMaster University in Hamilton, Ontario, Canada[39] and Dr. Karpf a Ph.D from the American University in Mathematical Statistics.[40]

Even after receiving VDPP's response to its September 29 letter, Volkswagen did not reengage but rather filed it motion to dismiss on October 13, 2023. Volkswagen never once asked VDPP to file an amended complaint or gave VDPP that opportunity prior to filing its motion to dismiss. VDPP would have gladly amended the complaint to correct issues that the parties could agree upon but rather than work together counsel for Volkswagen appears to have been creating a narrative.[41] Typically, counsel work together to reduce issues for the Court, but not Volkswagen's counsel, the narrative was more important. Volkswagen's representations to the Court that VDPP did not engage are false and very troubling. It is clear Volkswagen disagrees that it infringes but it is not uncommon for a defendant to contend it does not infringe.

Defendant's Motion for Fees next tries to impugn the character of VDPP and its counsel by creating the narrative that VDPP was willfully not producing settlement agreements. However, in preparing its Initial Disclosures, counsel for VDPP reached out its contact for VDPP, Dr. Karpf in an effort to get copies of the licenses. Counsel was told he had none. Counsel asked that the search continue. VDPP therefore served its initial disclosures specifying that it was continuing the search and would produce them later.[42] Jeff Kubiak was unaware that any licenses existed until queried by counsel for Volkswagen and he answered truthfully: "[a]s of this time we have no settlement agreements to disclose. We have agreements in principle and will update once we have final, signed agreements."[43] That counsel for Volkswagen tries to spin a true answer is astounding.

---

[39] Sunatori Decl. at ¶3.
[40] Karpf Decl. at ¶3.
[41] Declaration of William P. Ramey ("Ramey Decl.") at ¶6.
[42] Ramey Decl. at ¶9; Doc. No. 35-7 at 5.
[43] Doc. No. 35-8 at 4/14.

It is not uncommon for clients to not provide everything to their lawyers when first asked. Here, counsel for VDPP did not accept its clients first response and made certain that the agreements were collected and produced.[44] Rather than exceptional, or otherwise sanctionable, VDPP and its counsel did as would be expected, it collected the settlement agreements. This conduct does not support a finding of exceptionality or other sanction. More importantly, the delay in serving the agreements was from November 22nd to December 5th.[45] Two weeks is all it took to gather them.

Volkswagen engages in further hand waving by providing that VDPP served discovery when discovery was stayed. However, Volkswagen does not show the Court VDPP's acknowledgement that it was early.[46] Further, that a paralegal with Ramey LLP sent the requests again does not show bad faith or any misconduct. In fact, Volkswagen never alleges VDPP sought to enforce its early-served discovery or alleges any other harm.

### C. VDPP Believed it had a Good Faith Basis for Asserting that it Need Not Comply with the Marking Statute

Volkswagen next faults VDPP for taking a position that NPE's (non-practicing entities) do not have an obligation to mark as they have no products to mark.[47] Volkswagen cites to *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.* as support that a patentee's licensee's must mark their products.[48] That case also provides the rule that:

> The notice provisions of § 287 do not apply to patents directed to processes or methods. *See Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.*, 297 U.S. 387, 395, 56 S.Ct. 528, 80 L.Ed. 736 (1936). Nor do they apply when a patentee never makes or sells a patented article. *Id.* at 398, 56 S.Ct. 528. Thus, a patentee who never makes or sells a patented article may recover damages even absent notice to an alleged infringer.[49]

---

[44] Ramey Decl. at ¶10.
[45] Ex. F at December 5th e-mail transmitting settlement agreements.
[46] Ex. F, e-mail chain between counsel for Volkswagen and counsel for VDPP, to the Ramey Decl.
[47] Defendant's Motion for Fees at 7-8.
[48] 950 F.3d 860, 864 (Fed. Cir. 2020).
[49] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860, 864 (Fed. Cir. 2020).

Therefore, it is not surprising that VDPP would take the position that it had no obligation to mark products. Using Defendant's nomenclature, *Artic Cat I and II* concerned a license by Artic Cat of certain patents[50] to Honda for Honda to produce personal watercraft that were alleged to be within the scope of the claims of the licensed patents, i.e. "patentably cover Arctic Cat's Controlled Thrust Steering methods, systems, and developments."[51] In fact, Artic Cat itself apparently produced personal watercraft at one time but had stopped its own production by the time the licensed patents issued.[52] The Federal Circuit specifically stated that "Arctic Cat's obligation to mark arose when its licensee began selling patented articles."[53]

In *Artic Cat I*, the Federal Circuit explained that:

> Section 287 is thus a limitation on damages, and not an affirmative defense. *Motorola, Inc. v. United States*, 729 F.2d 765, 770 (Fed. Cir. 1984). Compliance with § 287 is a question of fact. *Maxwell*, 86 F.3d at 1111.
> A patentee's licensees must also comply with § 287, because the statute extends to 'persons making or selling any patented article for or under [the patentee].' *Id.* (quoting § 287(a)). Recognizing that it may be difficult for a patentee to ensure his licensees' compliance with the marking provisions, we have held that where third parties are involved, courts may consider 'whether the patentee made reasonable efforts to ensure compliance with the marking requirements.'[54]

Based upon this law, as each of the settlement agreements VDPP has with defendants were settlements of patent litigation, what other courts have referred to as settlement licenses, where the defendants did not admit infringement, did not admit that they were producing a patented article, VDPP took the position that the defendants in the settlement licenses did not agree that they were producing patent articles and would not agree to mark products they produced, if any.

---

[50] U.S. Patents 6,793,545 ("the '545 patent") and 6,568,969 ("the '969 patent").
[51] *Arctic Cat Inc.*, 950 F.3d 860 at 862.
[52] *Arctic Cat Inc.*, 950 F.3d 860 at 862.
[53] *Arctic Cat Inc.*, 950 F.3d at 865.
[54] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017).

Neither *Artic Cat I or II* is believed to address this factual scenario as Honda's license was to produce personal watercraft covered by the licensed patents and the license agreement specifically provided that there was no obligation to mark.[55] Here, as compliance with the marking statute is a question of fact, VDPP offered an amended complaint that pleaded compliance with Section 287(a):[56]

> **I. CONDITIONS PRECEDENT**
>
> Plaintiff is a non-practicing entity, with no products to mark. Plaintiff has pled all statutory requirements to obtain pre-suit damages. Further, all conditions precedent to recovery are met." [57]

In discovery, VDPP would have presented evidence of substantial compliance with §287(a) by showing at least that it was not required to mark due to the facts of each of the litigations identified by Volkswagen, the 11 licenses.[58] Plaintiff does admit that its original complaint did not plead compliance and therefore cannot stand without amendment. However, compliance with §287 is a fact question.[59] That the Court found otherwise and dismissed Plaintiff's complaint does not make the case exceptional, sanctionable or otherwise necessitating a fee award.

When the failure to mark is caused by someone other than the patentee, a court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements. The rule of reason is consistent with the purpose of the constructive notice provision—to encourage patentees to mark their products in order to provide notice to the public

---

[55] *Arctic Cat Inc.*, 950 F.3d 860 at 862.
[56] And fixed other issues noted by Volkswagen.
[57] Doc. No. 22-1 at 2/69.
[58] Doc. No. 35 at 5-6, *referencing* Doc Nos. 35-09, 35-10, 35-11, 35-12, 35-13, 35-14, 35-15, 25-16, 35-17, 35-18, and 35-19, Exs. G-Q, respectively.
[59] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

of the existence of the patent and to prevent innocent infringement.[60] Here, VDPP would have presented evidence that it believes establish, under the facts of this case, that it did comply with the express language of §287. The Federal Circuit has been clear that the use of a sanction of attorneys' fees should not be applied where there is a good faith basis to challenge or solidify the law.[61] This is especially true in areas where the law is changing or where the party's pleadings can be taken as a good faith effort to change the law[62]

VDPP believes its evidence would have shown that under the rule of reason analysis, the facts surrounding the litigations identified by Volkswagen established that VDPP used reasonable efforts to ensure substantial compliance with §287.[63] That Volkswagen asserts that this position warrants a finding of exceptionality, sanctions and an award of fees is overreaching. Here, VDPP advances well supported positions in an area of the law that specifies that the issue is a fact question. At the pleading stage, there are few to no facts known in a case which is why the federal circuit only requires pleading compliance.[64] Perhaps if Volkswagen had researched the law a little more it would have not made these baseless claims for fees and sanctions. It is undisputed that compliance with Section 287(a) is a fact question.[65] That the Court dismissed VDPP's complaint does not absolve Volkswagen of correctly applying the law where it is clear. Here, Volkswagen's motion fails entirely and has unreasonably increased the costs of this litigation.

Volkswagen points to eleven cases that did in fact result in settlement licenses to support that this case should be found exceptional, sanctionable and necessitating a fee award. However, no analysis of the licenses was performed. VDPP appreciates that Volkswagen's Response to the

---

[60] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111–12 (Fed. Cir. 1996).
[61] *See, e.g., Gust, Inc. v. Alphacap Ventures*, LLC, 905 F.3d 1321, 1329 (Fed. Cir. 2018).
[62] *Mankes v. Vivid Seats Ltd.*, 822 F.3d 1302, 1312 (Fed. Cir. 2016).
[63] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.,* 876 F.3d 1350, 1366 (Fed. Cir. 2017).
[64] *Sentry Prot. Prod., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005).
[65] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

Motion to Amend the Judgment alleges that it does identify products,[66] but Volkswagen's counsel misapplies its quote. The Federal Circuit requires a Defendant to at least identify that a licensee has "sold specific unmarked products which the alleged infringer believes practice the patent."[67] Volkswagen identified only settlement agreements and no products. As such, Volkswagen has not identified any "specific unmarked product." Thus, there is no way for the Court to determine compliance with §287, if required. Moreover, there is no evidence that *a patented article* was produced under any of the settlement licenses.[68] There simply is no evidence that any of the litigations identified by Volkswagen were a license by VDPP to manufacture a patented article for or under VDPP's patents to support that this case should be found exceptional, sanctionable and necessitating a fee award.[69]

At least one other district court has recognized that consistent with the usual burden of proof for affirmative defenses, [] it is the defendant's responsibility to affirmatively identify and prove that a product is a patented article, particularly when the product is manufactured by a third party under a settlement license agreement rather than a product manufactured by the plaintiff. While the Federal Circuit has noted that compliance with Section 287(a) is not an affirmative defense but rather a limitation on damages,[70] it would still be a defendant's obligation to affirmatively identify which product is a patented article. Otherwise, a defendant's general allegations could easily instigate a fishing expedition for the patentee in order to stave off pursuit of damages for infringement."[71] Here, Volkswagen made no effort to identify a patented article

---

[66] Doc. No. 40 at 16.
[67] *Arctic Cat*, 876 F.3d at 1368.
[68] Doc. No. 35 at 5-6, *referencing* Doc Nos. 35-09, 35-10, 35-11, 35-12, 35-13, 35-14, 35-15, 25-16, 35-17, 35-18, and 35-19, Exs. G-Q, respectively.
[69] *REALTIME DATA, LLC, Plaintiff, v. ACTIAN CORPORATION ET AL., Defendants. Additional Party Names: Blue Coat Sys., Inc., F5 Networks, Inc., Riverbed Tech., Inc.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662033, at *3 (E.D. Tex. Apr. 4, 2017).
[70] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017).
[71] *REALTIME DATA, LLC, Plaintiff, v. ACTIAN CORPORATION ET AL., Defendants. Additional Party Names:*

allegedly manufactured for or under any of the prior litigations. In short, Volkswagen failed to put VDPP on notice that the settlement licenses sold specific unmarked products which the alleged infringer believes practice the patent, as no product was identified.[72] Therefore, as the case was dismissed at the pleading stage, nothing supports that this case should be found exceptional, sanctionable and necessitating a fee award. .

Volkswagen's Motion for Fees asks the Court to make the evidentiary leap that the defendants in each of the three litigations agreed that they were producing a patented article for or under VDPP's patents. Such a leap at the pleading stage would require VDPP to marshal its evidence and is improper. VDPP anticipates the evidence will show that each of the defendants in the settlement licenses denied that they infringed VDPP's patent and would not have agreed to mark any product. As courts in this district have noted, false patent marking is met when "(1) an article was marked with the word patent or any word or number that imports that the article is patented; (2) the article so marked was an unpatented article; and (3) the marking was for the purposes of deceiving the public."[73] Therefore, unless the defendants in the settlement licenses believed they needed to mark a product it is highly unlikely the three defendants would have marked when faced with a potential false marking claim. Requiring marking for a company that does not admit infringement does not further the purposes of §287(a) but rather subjects parties to settled litigation to potential false marking claims.

VDPP has notified on or about the filing date of this response each of defendants in three litigations identified by Volkswagen; Meta Platforms, Inc. (formerly Facebook, Inc.),[74] Acer

---

*Blue Coat Sys., Inc., F5 Networks, Inc., Riverbed Tech., Inc.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662033, at *2 (E.D. Tex. Apr. 4, 2017).

[72] *Solas Oled Ltd. v. Samsung Elecs. Co.*, No. 2:21-CV-105-JRG-RSP, 2022 WL 1912873, at *2 (E.D. Tex. May 30, 2022).

[73] *DP Wagner Mfg. Inc. v. Pro Patch Sys., Inc.*, 434 F. Supp. 2d 445, 451 (S.D. Tex. 2006).

[74] Ex. C to the Declaration of William P. Ramey, III ("Ramey Decl.")

America Corporation[75] and TTE Corporation[76] of its understanding that it has complied with §287(a), the marking statute. Each of the letters was sent to illustrate substantial compliance with the marking statute as each provides that it is VDPP's understanding that

1. the end of litigation between the defendant and VDPP was not a license where the defendant was looking to sell a product under any of the VDPP Patents;
2. the end of litigation between defendant and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and defendant for patent infringement;
3. Defendant does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287; and,
4. VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.[77]

This is further evidence that that this case should not be found exceptional, sanctionable or necessitating a fee award. VDPP was attempting to comply with the Court's Order dismissing the case.

The policy of § 287 "serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented."[78] These policy considerations are advanced when parties are allowed to freely settle cases without admitting infringement and thus not require marking. Volkswagen has offered no evidence that the settlement licenses it identifies were entered into because any of the Defendants believed they infringed VDPP's patents. Rather, it is believed that none of the Defendants admitted to

---

[75] Ex. E to the Ramey Decl.
[76] Ex. D to the Ramey Decl.
[77] Exs. C, D and E at 1.
[78] *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 950 F.3d 860, 865 (Fed. Cir. 2020).

infringement and thus none of the Defendants would have marked a product as such marking would be false marking.

Further, license fees negotiated in the face of a threat of high litigation costs "may be strongly influenced by a desire to avoid full litigation."[79] Such licenses may therefore have little to do with whether the parties to the settlement agreed there was infringement. In fact, the courts have long recognized the differences between settlement licenses and other licenses.[80] In the past, settlement agreements were generally not relevant in a royalty analysis "because in the usual course they do not provide an accurate reflection of what a willing licensor would do in an arm's length transaction."[81] District courts routinely exclude settlement licenses because the potential prejudice and jury confusion substantially outweigh whatever probative value they may have.[82] Thus, settlement licenses are not a typical license between parties to product a patent article for or under a patent.

Therefore, as there is no evidence that the settlement licenses were anything more than a desire to end litigation, the policies of §287 are not violated. Such a result is further warranted by 35 U.S.C. §286 which allows for the recovery of damages for six years prior to the filing of the complaint.[83] In short, the conduct of VDPP and its lawyers do not warrant that this case should be found exceptional, sanctionable and necessitating a fee award.

Further support for not finding this case exceptional can be found with reference that the

---

[79] *Rude v. Westcott,* 130 U.S. 152, 164, 9 S.Ct. 463 [468], 32 L.Ed. 888 (1889).
[80] *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322550, at *4 (E.D. Tex. Apr. 6, 2017) (While settlement licenses have been used to assess damages in patent litigation, their admittance is never obtained without scrutiny because of the inherent risk they pose in skewing a reasonable royalty calculation. *See ResQNet,* 594 F.3d at 872 (Fed. Cir. 2010) (noting that "the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation").
[81] *Fenner Invs ., Ltd. v. Hewlett–Packard Co.,* No. 6:08–CV–273, 2010 WL 1727916, at *1 (E.D.Tex. Apr. 28, 2010).
[82] *See, e,g,, id.*
[83] 35 U.S.C.A. § 286 (West) ("Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action").

Federal Circuit has long recognized that there is no requirement to patent mark for a method claim.[84] Thus, as the Court found that VDPP must have its licensees mark, VDPP could have dismissed its claims directed to apparatus claims and only assert the method claims in U.S. Pat. No. 10,021,380 ("the '380 patent"). Claims 1-5, 11-15, and 21-25 of the '380 patent are directed to methods. Exhibit B to this motion for a new trial is a draft claim chart asserting Claim 1 of the '380 patent against Volkswagen that VDPP that can be asserted. As the claim is not directed towards a product, its pleading removes the marking requirement. As such, there are viable claims against Volkswagen that mediate against that this case should be found exceptional, sanctionable and necessitating a fee award.

### D. Low Settlement Amounts are Not a Basis for Fees

First, it is worth noting that Volkswagen reproduces Rule 408 communications without any regard. Such conduct cannot be said to be in good faith as it does not help resolve disputes. Rule 408 provides:

> **a) Prohibited Uses.** Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> **(1)** furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
> **(2)** conduct or a statement made during compromise negotiations about the claim….[85]

Here, Volkswagen attached Rule 408 communications as exhibits in an effort prove or disprove VDPP's claim. Such practice should be admonished as it hinders settlement communications. Further, the Federal Circuit has been clear that "[a]sserting seemingly low damages against

[84] *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993) (patent marking does not apply to method claims).

[85] Fed. R. Evid. 408.

multiple defendants—or settling with defendants for less than the cost of litigation—does not necessarily make a case 'exceptional' under § 285." [86] For that conduct to support exceptionality it must be coupled with some other litigation misconduct, like for example when in *AdjustaCam*, the party "asserted nuisance-value damages against many defendants, settled with them for widely varied royalty rates, and continued to press baseless infringement contentions well past an adverse *Markman* order and expert discovery."[87] Thus, it was Adjustcam's action of asserting its infringement position pasty *Markman*, past a court construction of the claims, was what made the case exceptional. Here, no such conduct has occurred. The Court dismissed the case and VDPP has not continued to assert it claims other than filign a Motion to Amend the Judgment as allowed under the Rules.

It is not uncommon for defendants to cite *Adjustacam* in this manner. However, the case did not say making low settlement offer warrants a finding of exceptionality. As the Federal Circuit has stated, "there is no minimum damages requirement to file a patent infringement case," and "[a]sserting seemingly low damages against multiple defendants—or settling with defendants for less than the cost of litigation—does not necessarily make a case 'exceptional' under § 285."[88] The Federal Court recognized that a patent plaintiff is able to make patent litigation more affordable by distributing common costs over many suits, thus making each suit worthwhile on lower terms.[89] Moreover, as for settlement amounts, a low figure might simply reflect the small size of an individual defendant's potential liability. Indeed, the figure may result from what the Supreme Court has recognized as the normal, legitimate settlement calculus, which includes

---

[86] *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1361 (Fed. Cir. 2017).
[87] *Id.*
[88] *Thermolife Int'l LLC*, 922 F.3d at 1363-4 *citing AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1361 (Fed. Cir. 2017).
[89] *See Id.*

consideration of litigation costs: specified as a prediction of the amount of liability, discounted by its probability, plus the transaction costs of further litigation.[90] However, in today's patent infringement world, another factor that should be considered by the courts are the high costs of patent infringement litigation, which are high enough to take away most patent plaintiff's access to legal representation. Liability and damages experts alone can be several hundred thousand dollars with the costs of even small cases getting into the 7 figures. As such, patent litigation has become so expensive as to make it almost impossible for most patent owners to enforce their patents, in large part due to the litigation tactics of parties like Volkswagen who commonly make the costs higher than necessary. A court should consider these factors in making a finding of frivolousness to force a modest settlement. Also, there is no evidence, or anything in the record, that VDPP sought nuisance value settlements while pressing baseless infringement contentions.

### E. Volkswagen's Reference to Other Cases Should Not Affect this Case

Plaintiff's counsel agrees that other, unrelated cases exist where a court has issued sanctions. However, Volkswagen does not explain how any of those unrelated cases impact what was done in this case. Further, Volkswagen fails to inform the Court that *EscapeX v. Google*[91] is under appeal and might be modified. Volkswagen cites no convincing caselaw supporting the consideration of other unrelated cases in this case. Such consideration violates VDPP's due process rights and Ramey LLP's due process rights as they have not had a chance to respond to the unrelated party's conduct in the other cases.

### F. Volkswagen Conflates and Confuses Forfeiture

Volkswagen's Response to the Motion to Amend the Judgment asserts that VDPP forfeited

[90] *Evans v. Jeff D.*, 475 U.S. 717, 734, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *see Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369 (Fed. Cir. 2017).
[91] *EscapeX IP LLC v. Google LLC*, 2023 WL 5257691 (N.D. Cal. Aug. 16, 2023); Ramey Decl. at ¶19.

many of its arguments.[92] However, the case cited by Volkswagen, *Rollins v. Home Depot USA*[93] concerned a case at the summary judgment stage where the Fifth Circuit held that am alleged fact issue not raised before the district court is forfeited.[94] The *Rollins* court never implies that issues in a Rule 59(e) motion are forfeited if not brought previously before the district court. The *Rollins* court was simply stating the standard for rule 59(e). In fact, the *Rollins* court noted that even when issues are forfeited because they are raised for the first time on appeal or not briefed, there are exceptions, such an issue will be considered for the first time on appeal if "it is a purely legal matter and failure to consider the issue will result in a miscarriage of justice."[95] Here, the case is not on appeal and no issues are forfeited.

**G. Fees are Not Warranted**

Volkswagen failed to argue on the record that it did not infringe the features of any of the asserted claims of the Patents-in-Suit throughout these brief proceedings. VDPP litigated in a timely and reasonable manner. Fees are not to be awarded "as a penalty for failure to win a patent infringement suit."[96] This is not a case where VDPP litigated meritless positions but rather a case that is still in the pleading stage. VDPP was prepared to test the merits of its infringement position[97] and there is no evidence to the contrary. Even though the Court found the pleadings deficient, the sanction of dismissal was adequate and no further sanction under Section 285, Section 1927, the Court's inherent powers or otherwise is warranted.

**H. Sanctions Under §1927, the Court's Inherent Power are not Warranted.**

Volkswagen has made no showing that counsel for VDPP should be independently

---

[92] Doc. No. 40 at 6-8, 12, and 14.
[93] 8 F.4th 393, 396 (5th Cir. 2021).
[94] *Rollins*, 8 F.4th at 397–98.
[95] *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021)
[96] *Octane Fitness,* 572 U.S. at 548-49 (quoting *Park-In-Theatres, Inc. v. Perkins*, 190 F.2d 137, 142 (9th Cir. 1951)).
[97] Ramey Decl. at ¶8.

sanctioned. There is simply no "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court."[98] Here, the case was at the pleading stage. The Court dismissed the pleading. This is routine litigation and there is no evidence to the contrary. Volkswagen's request for sanctions against counsel for VDPP is designed to have a chilling effect on Ramey LLP and its ability to file lawsuits, is inappropriate and without legal basis. Volkswagen has presented no evidence to the Court that Ramey LLP's conduct (or the conduct of its lawyers) warrants sanction under Section 1927, the inherent power of the Court or otherwise. There simply no evidence to overcome the presumption that the lawsuit was filed in good faith.[99]

Ramey LLP has a mission of making patent litigation available to all patent owners with valid infringement claims. Ramey LLP is able to level the playing field by efficiently litigating patent infringement cases . Ramey LLP tries to make patent infringement litigation affordable for those patent infringement cases where the potential damages make the case unattractive to most firms. Ramey LLP believes all meritorious claims can be pursued and all intellectual property owners deserve representation. That Volkswagen finds itself accused of infringing patents is not a commentary on Ramey LLP but rather the business practices of Volkswagen.

## IV. Volkswagen's Apparent Fee Request is Unreasonable

Volkswagen does not make a specific fee request, but rather asks the Court to rule on the underlying motions first. Volkswagen appears to assert that it will seek at least $121,518.[100] However, Volkswagen does not explain what the total includes. Such an amount is unreasonable for a case that has not progressed past the pleading stage.

## V. CONCLUSION

---

[98] *Edwards v. Gen. Motors Corp.,* 153 F.3d 242, 246 (5th Cir.1998).
[99] *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017).
[100] Doc. No. 35 at 20.

Volkswagen's Motion fails to show: (1) that the plaintiff did not conduct an adequate pre-filing investigation or exercise due diligence before filing suit; or (2) that VDPP should have known its claim was meritless and/or lacked substantive strength. See *Bayer CropScience AG v. Dow AgroSciences LLC.*[101] Defendants have simply not proven an "exceptional case" or a case that is otherwise sanctionable by a preponderance of the evidence. For all the foregoing reasons, Defendants Motion for Fees should be denied.

Respectfully submitted,

**RAMEY LLP**

*/s/ William P. Ramey, III*
William P. Ramey, III
Texas State Bar No. 24027643
wramey@rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, TX 77006
(713) 426-3923 (telephone)

***Attorneys for VDPP, LLC***

[101] No. 12-256, 2015 WL 1197436, at *4 (D. Del. Mar. 15, 2015), aff'd, 851 F.3d 1302 (Fed. Cir. 2017).

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2024, a true and correct copy of the foregoing document was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the Court's local rules.

By: */s/ William P. Ramey, III*
William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **VDPP, LLC,** <br> **Plaintiff,** <br><br> **v.** <br><br> **VOLKSWAGEN GROUP OF AMERICA, INC.,** <br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Civil Action No. 4:23-cv-02961** <br><br><br> **JURY TRIAL DEMANDED** |

**DECLARATION OF WILLIAM P. RAMEY, III**

I, William Ramey, declare as follows:

1. My name is William P. Ramey, III. I am over the age of 21. I have personal knowledge of the facts contained herein, which are true and correct. If called as a witness, I could competently testify to these statements.

2. I am licensed to practice law in the state of Texas and am an attorney with the law firm of Ramey LLP. I represent the Plaintiff in the above-captioned lawsuit.

3. In addition to reliance on my highly competent staff and the other attorneys at the Ramey LLP firm, I also used resources including litigation support services Simon Sunatori and Ronald Karpf in preparing the infringement case against Volkswagen. Each of Dr. Karpf and Mr. Sunatori are valuable resources.

4. After receiving Defendant's letter of Septmber 29, 2023, my firm began to review its contents. Additionally, we engaged Dr. Ron Karpf and Simon Sunatori to help us craft responses to the infringement arguments. I felt the patent marking, Section 101 arguments, and errors in the complaint could be corrected in an amended complaint.

5. I was surprised when Volkswagen filed its Moiton to Dismiss without on October 13, 2023. Volkswagewn had not reached out to discuss the October 11, 2023 response until shortly before it filed it motion to dismiss. Looking at the timing now, counsel for Volkswagen was trying to direct a narrative for Defendant's Motion for Fees and responding to our response did not help their narrative.

6. Given the chance to engage after its response of Octovber 11, 2023, VDPP would have been willing to amend its complaint and correct the issue the parties could agree needed correcting. In fact, that is how it usually works, counsel work together to remove issues. However, Volkswagen's counsel were creating a narrative.

7. In my opinion, Volkswagen's September 29, 2023 letter mainly attached patent marking and patent claim eligibility. As both are legal issues and a patent is presumed valid no response was made to Volkswagen on those issues. However, we did respond with reasoning from our technical resources, that we agree with, on why our infringement positions were valid.

8. VDPP, LLC was prepared to test the merits of its case.

9. In preparing its Initial Disclosures, cousnel for VDPP reached out its contact for VDPP, Dr. Karpf in an effort to get copies of the licenses. We were told there were none. We asked that the search continue. We therefore served our initial disclosures specifying that we were continuing our search and would produce them later.[1]

10. Eventually, the client provided the licenses and they were produced.

11. Exhibit B is a true and correct copy of a claim chart of Claim 1 of U.S. Pat. No. 10,021,380 ("the '380 patent") against Volkswagen.

[1] Doc. No. 35-7 at 5.

12. Exhibit C to this Declaration is a true and correct copy of a letter to Meta Platforms, Inc.

13. Exhibit D to this Declaration is a true and correct copy of a letter to TTE Corporation.

14. Exhibit E to this Declaration is a true and correct copy of a letter to Acer America Corporation.

15. Exhibit F to this declaration is a trued and correct copy of an e-mail chain between counsel for Volkswagen and counsel for VDPP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 8, 2024. ________________

William P. Ramey, III

# EXHIBIT C

RAMEY LLP

April 12, 2024

Meta Platforms, Inc.

c/o CSC – Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, Texas 78701,

Dear Sir or Madam,

I write this letter to confirm our understanding of the settlement with VDPP, LLC in May of 2020 with Facebook, Inc. I am counsel for VDPP, LLC and authorized to act on its behalf. No action is needed by your company unless VDPP, LLC's understanding of the settlement agreement is incorrect.

It was my client's understanding that Facebook, Inc. (now Meta Platforms, Inc.) denied that it infringed any of the asserted claims in ***VDPP, LLC v. Facebook Technologies LL***C, Case No. 3:19-cv-04597. Therefore, Facebook would not have had any products to mark with the patent numbers from the asserted patents, including 9,426,452; 9,699,444; and, 9,948,92 and all reissues, reexaminations, continuations, continuations-in-part, and divisionals thereof, and any foreign or domestic patent issuing from any application claiming priority or deriving from or sharing a common priority claim, in whole or in part, to any of the foregoing; and all prior, current and future patents owned, held or controlled by Licensor throughout the world. ("VDPP Patents").

It is VDPP, LLC's further understanding that the end of litigation between Facebook and VDPP was not a license where Facebook was looking to sell a product under any of the VDPP Patents.

It is VDPP, LLC's further understanding that the end of litigation between Facebook and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and Facebook for patent infringement.

It is VDPP, LLC's further understanding that Facebook does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287.

VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.

713-426-3923
www.rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, TX 77006

If Meta Platforms disagrees with any of this letter and instead contends that it produced a patented article during the pendency of the VDPP Patents, please identify the patented article.

Sincerely,

William P. Ramey, III

# EXHIBIT D

RAMEY LLP

April 12, 2024

TTE Corporation

Xinpei Zhang
TTEE Corporation
9F, TCL Electronics Building, TCL International E City. No.l00l Zhongshanyuan Rd.
Nanshan District. Shenzhen

Dear Sir or Madam,

I write this letter to confirm our understanding of the settlement with VDPP, LLC in March of 2020 with TTE Corporation. I am counsel for VDPP, LLC and authorized to act on its behalf. No action is needed by your company unless VDPP, LLC's understanding of the settlement agreement is incorrect.

It was my client's understanding that TTE Corporation denied that it infringed any of the asserted claims in ***VDPP, LLC v. TTE Tech Inc.***, Case No. 3:19-cv-02019. Therefore, TTE would not have had any products to mark with the patent numbers from the asserted patents, including 9,426,452; 9,699,444; and, 9,948,92 and all reissues, reexaminations, continuations, continuations-in-part, and divisionals thereof, and any foreign or domestic patent issuing from any application claiming priority or deriving from or sharing a common priority claim, in whole or in part, to any of the foregoing; and all prior, current and future patents owned, held or controlled by Licensor throughout the world. ("VDPP Patents").

It is VDPP, LLC's further understanding that the end of litigation between TTE and VDPP was not a license where TTE was looking to sell a product under any of the VDPP Patents.

It is VDPP, LLC's further understanding that the end of litigation between TTE and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and TTE for patent infringement.

It is VDPP, LLC's further understanding that TTE does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287.

VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.

If TTE disagrees with any of this letter and instead contends that it produced a patented article during the pendency of the VDPP Patents, please identify the patented article.

Sincerely,



William P. Ramey, III

# EXHIBIT E

RAMEY LLP

April 12, 2024

Acer America Corporation

General Counsel
Legal Department
333 W. San Carlos Street, #1500
San Jose, VCA 95110

Dear Sir or Madam,

I write this leAcerr to confirm our understanding of the settlement with VDPP, LLC in March of 2020 with ACER Corporation. I am counsel for VDPP, LLC and authorized to act on its behalf. No action is needed by your company unless VDPP, LLC's understanding of the settlement agreement is incorrect.

It was my client's understanding that ACER Corporation denied that it infringed any of the asserted claims in ***VDPP LLC v. Acer Am. Corp.***, 3:19-cv-4571. Therefore, ACER would not have had any products to mark with the patent numbers from the asserted patents, including 9,426,452; 9,699,444; and, 9,948,92 and all reissues, reexaminations, continuations, continuations-in-part, and divisionals thereof, and any foreign or domestic patent issuing from any application claiming priority or deriving from or sharing a common priority claim, in whole or in part, to any of the foregoing; and all prior, current and future patents owned, held or controlled by Licensor throughout the world. ("VDPP Patents").

It is VDPP, LLC's further understanding that the end of litigation between ACER and VDPP was not a license where ACER was looking to sell a product under any of the VDPP Patents.

It is VDPP, LLC's further understanding that the end of litigation between ACER and VDPP was entered into to terminate litigation and prevent future litigation between VDPP, LLC and ACER for patent infringement.

It is VDPP, LLC's further understanding that ACER does not believe it produces any product that could be considered a patentable article under 35 U.S.C. §287.

VDPP, LLC believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287.

If ACER disagrees with this letter and instead contends that it produced a patented article during the pendency of the VDPP Patents, please identify the patented article.

713-426-3923
www.rameyfirm.com
5020 Montrose Blvd., Suite 800
Houston, TX 77006

Sincerely,

William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION**

| | | |
|---|---|---|
| VDPP, LLC, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| VOLKSWAGEN GROUP OF ) | § | Case No. 4:23-cv-02961 |
| AMERICA, INC., | § | |
| Defendant | § | |

DECLARATION OF RONALD S. KARPF

I, Ronald S. Karpf, declare:

1. My name is Ronald S. Karpf, and I am over the age of eighteen and competent to make this declaration. The facts stated herein are within my personal knowledge. If called upon, I could and would testify competently to them.

2. I am a US citizen.

3. I am a professional and I have a Master Degree from Pennsylvania State University in Mathematics, and a Master Degree and Ph.D degree from the American University (Washington DC) in mathematical statistics.

4. I am President of VDPP, LLC, and am 79 years of age. Except for my duties as President of VDPP, LLC, I am retired.

5. As part of pre-suit investigation, I ascertained the Surround View (aka Area View by Honda) system did stitch together several real-time camera views. Then, I ascertained that it had a flat-panel (LCD, LED, or OLED) display. That meant each pixel is made up of three (3) subpixels, one subpixel that just shows Red, one subpixel that just shows Greens and one subpixel that just shows Blue. Finally, I took parking guidelines, that are added to the video stitched image, as the bridge frame. According to the claim, the bridge frame is blended with the stitched image frame, but

it is not further displayed. This met all limitations in the clauses of US9426452.

6. During the pendency of the lawsuit, Volkswagen contended that the features of US9426452 have been commonplace in media broadcasts, sporting events, televisions, computers, movies, and video games for decades, and that US9426452 fail to recite an inventive concept. Simon Sunatori and I came up with Plaintiff's contentions for counter-arguments.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Ronald S Karpf

Executed May 6, 2024,

**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION**

| | | |
|---|---|---|
| **VDPP, LLC,**<br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF )<br>AMERICA, INC.,<br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 4:23-cv-02961 |

**DECLARATION OF SIMON SUNATORI**

I, Simon Sunatori, declare:

1. My name is **Simon Sunatori**, and I am over the age of eighteen and competent to make this declaration. The facts stated herein are within my personal knowledge. If called upon, I could and would testify competently to them.

2. I am a Canadian citizen.

3. I am a professional engineer and I have a Master of Engineering (Engineering Physics) degree from McMaster University in Hamilton, Ontario, Canada. I am a member of the Professional Engineers Ontario (PEO), and a senior member of the Institute of Electrical and Electronics Engineers (IEEE).

4. I have worked as senior integrated circuit designer for the CMOS standard cell library, as senior design system integrator for the GaAs cell library, and as UNIX systems administrator..

5. I have published articles in the Journal of Applied Physics. In 2017, I won the Grand Prize of Innovation150 Canadian Life Hacks Contest, organized by the Perimeter Institute for Theoretical Physics. In 2019, NASA Tech Briefs published my discovery "Anisotropic Electromagnetic Force Phenomena."

6. I have drafted and filed more than 60 patent applications as the sole inventor in various fields including electronics, magnetics, optics, dynamics, software, hardware, energy, safety, environment, medical, consumer products, sporting goods, fashion, etc.

7. I founded HyperInfo Canada Inc. in 1989 to pursue research and development on information processing and publishing technology as well as electromagnetic technology applications.

8. As part of pre-suit investigation, I examined US10021380 and US9426452. I established that Volkswagen 2020 Backup Camera System and Volkswagen Surround View System were released after US10021380's and US9426452's Priority dates. Then, I reviewed documents prepared by Dr. Ronald Karpf, and I gathered documents from Volkswagen's website in order to draft a claim chart that verifies infringement of certain claims of US10021380 and US9426452 by Volkswagen. I believe that the claim charts I prepared for the present litigation sufficiently show infringement by Volkswagen.

9. During the pendency of the lawsuit, Volkswagen contended that the features of US10021380 and US9426452 have been commonplace in media broadcasts, sporting events, televisions, computers, movies, and video games for decades, and that US10021380 and US9426452 fail to recite an inventive concept. Dr. Ronald Karpf and I came up with Plaintiff's contentions for counter-arguments.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May 5, 2024,

Simon Sunatori, P.Eng./ing.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| VDPP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.,<br><br>Defendant. | Case No. 4:23-cv-2961<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT VOLKSWAGEN GROUP OF AMERICA, INC.'S
REPLY IN SUPPORT OF MOTION TO DECLARE CASE EXCEPTIONAL**

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. The Case Was Objectively Baseless from the Start ..... 1

B. VDPP's Opposition Exacerbates the Exceptionality of the Case ..... 5

1. Ronald Karpf, VDPP's President, Gave False Information to Counsel on a Dispositive Issue ..... 5

2. No Presuit Investigation Was Done Encompassing VDPP's Eleven Settlement Agreements ..... 9

C. The Number and Type of Falsehoods in VDPP's Opposition Is Exceptional ..... 12

D. VDPP's Rule 59 Motion Vexatiously Adds Cost ..... 14

1. VDPP's Bare Legal Conclusions Are Not Well-Pled Facts ..... 15

2. VDPP's Purported Factual Disputes Are Irrelevant ..... 15

3. VDPP's Licensee Intent Fallacy Ignores Volkswagen's Arguments, the Court's Judgment, the Law, and the Facts ..... 16

4. VDPP's Policy Arguments Are Baseless ..... 17

5. VDPP's Reference to an Unasserted Patent Is Baseless ..... 17

E. VDPP's Settlement Demands and Other Litigation Confirm Exceptionality ..... 17

F. VDPP's Misplaced "Forfeiture" Arguments Do Not Avoid Forfeiture ..... 20

G. VDPP's Response Under 28 U.S.C. § 1927 Is No Response at All ..... 20

H. VDPP's Halfhearted Criticism of Volkswagen Leads Nowhere and Backfires ..... 22

I. Each Exceptionality Factor Supports Granting This Motion ..... 24

III. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases**

*AdjustaCam, LLC v. Newegg, Inc.*,
861 F.3d 1353 (Fed. Cir. 2017) ........ 1, 18

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*,
6 F.3d 1523 (Fed. Cir. 1993) ........ 2

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ........ passim

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
950 F.3d 860 (Fed. Cir. 2020) ........ passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........ 16

*Baker v. Urban Outfitters, Inc.*,
431 F. Supp. 2d 351 (S.D.N.Y. 2006) ........ 21

*Bell Alt. Corp. v. Twombly*,
550 U.S. 544 (2007)........ 16

*Blackbird Tech LLC v. Health in Motion LLC*,
944 F.3d 910 (Fed. Cir. 2019) ........ 18

*Chalumeau Power Sys. LLC v. Alcatel-Lucent*,
No. 11-1175, 2014 WL 4675002 (D. Del. Sept. 12, 2014)........ 11

*EscapeX IP LLC v. Google LLC*,
No. 22-cv-08711, 2023 WL 5257691 (N.D. Cal. Aug. 16, 2023)........ 19

*e-Watch Inc. v. Avigilon Corp.*,
No. H-13-347, 2013 WL 5231521 (S.D. Tex. Sept. 16, 2013)........ 16

*Falana v. Kent State Univ.*,
No. 5:08 CV 720, 2014 WL 3788695 (N.D. Ohio July 31, 2014)........ 9, 12

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*,
No. 15 Civ. 10154, 2023 WL 3815276 (S.D.N.Y. June 5, 2023)........ 8, 12

*Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*,
No. 14 C 8196, 2018 WL 4742066 (N.D. Ill. Oct. 2, 2018)........ 8, 12

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
No. 2:20-cv-2766, 2023 WL 5826978 (W.D. Tenn. Sept. 8, 2023)........ 19

*In re PersonalWeb Techs. LLC*,
85 F.4th 1148 (Fed. Cir. 2023) ........................................................................................ 1, 3, 10

*Inventor Hldgs., LLC v. Bed Bath & Beyond, Inc.*,
876 F.3d 1372 (Fed. Cir. 2017) ............................................................................................. 1, 3

*IPVX Patent Hldgs., Inc. v. Voxernet LLC*,
No. 5:13-cv-1708, 2014 WL 5795545 (N.D. Cal. Nov. 6, 2014)............................................ 19

*Iris Connex, LLC v. Dell, Inc.*,
235 F. Supp. 3d 826 (E.D. Tex. 2017)..................................................................... passim

*Kim Laube & Co., Inc. v. Wahl Clipper Corp.*
No. LA CV09-14, 2014 WL 12461044 (C.D. Cal. Mar. 17, 2014)......................................... 17

*Lans v. Digit. Equip. Corp.*,
252 F.3d 1320 (Fed. Cir. 2001) ....................................................................................... 1, 16, 21

*Lumen View Tech., LLC v. Findthebest.com, Inc.*,
24 F. Supp. 3d 329 (S.D.N.Y. 2014) ........................................................................................ 19

*Maxwell v. J. Baker Inc.*,
86 F.3d 1098 (Fed. Cir. 1996) ............................................................................................. 3, 15

*Micromesh Tech. Corp. v. Am. Rec. Prods., Inc.*,
No. C-06-6030, 2007 WL 2501783 (N.D. Cal. Aug. 30, 2007) ................................................. 8

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
726 F.3d 1359 (Fed. Cir. 2013) ....................................................................................... 8, 12, 17

*NetSoc, LLC v. Chegg Inc.*,
No. 18-cv-10262, 2020 WL 7264162 (S.D.N.Y. Dec. 10, 2020)............................................. 19

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014)............................................................................................................ 24, 25

*Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*,
No. 3:23-CV-791, 2024 WL 815553 (N.D. Tex. Feb. 27, 2024) ..................................... passim

*Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*,
No. 3:23-CV-791-N, 2023 WL 7184042 (N.D. Tex. Nov. 1, 2023) ...................................... 2, 9

*Parallel Iron LLC v. NetApp, Inc.*,
84 F. Supp. 3d 352 (D. Del. 2015)............................................................................................ 17

*Realtek Semiconductor Corp. v. Marvell Semiconductor, Inc.*,
No. C-04-4265, 2005 WL 3634617 (N.D. Cal. Nov. 21, 2005) ................................................ 8

*Realtime Data, LLC v. Actian Corp.*,
No. 6:15-cv-463, 2017 WL 11662033 (E.D. Tex. Apr. 4, 2017) ........................................ 3, 14

*Rollins v. Home Depot USA*,
8 F.4th 393 (5th Cir. 2021) ........................................................................................ 20

*Rothschild Connected Devices Innovations, LLC v. Guardian Protection Servs., Inc.*,
858 F.3d 138 (Fed. Cir. 2017) .................................................................................... 18

*Royal Oak Entm't, LLC v. Royal Oak, Mich.*,
486 F. Supp. 2d 675 (E.D. Mich. 2007)........................................................................ 22

*Shipping & Transit, LLC v. 1A Auto, Inc.*,
283 F. Supp. 3d 1290 (S.D. Fla. 2017) ........................................................................ 10

*Soar Tools, LLC v. Mesquite Oil Tools, Inc.*,
No. 5:19-CV-243-H, 2022 WL 1447946 (N.D. Tex. Feb. 9, 2022) .................................... 8, 12

*TechRadium, Inc., v. FirstCall Network, Inc.*,
No. H-13-2487, 2015 WL 862326 (S.D. Tex. Feb. 27, 2015).......................................... passim

*Traxcell Techs., LLC v. Huawei Techs. USA, Inc.*,
No. 2:17-cv-42, 2023 WL 2625948 (E.D. Tex. Mar. 24, 2023)............................................. 19

*Verna IP Hldgs., LLC v. Alert Media, Inc.*,
No. 6:21-cv-00422, 2023 WL 5918320 (W.D. Tex. Sept. 11, 2023) ...................................... 19

*Viavi Sols. Inc. v. Platinum Optics Tech. Inc.*,
No. 20-cv-5501, 2024 WL 1199022 (N.D. Cal. Mar. 19, 2024) ............................................ 10

*W. Heritage Ins. v. Robertson*,
224 F.3d 764, 2000 WL 992178 (5th Cir. 2000) ................................................................ 21

*WPEM, LLC v. SOTI Inc.*,
No. 2:18-CV-00156, 2020 WL 555545 (E.D. Tex. Feb. 4, 2020)................................. 7, 11, 19

*ZT IP, LLC v. VMware, Inc.*,
No. 3:22-CV-970, 2023 WL 1785769 (N.D. Tex. Feb. 6, 2023) .................................. 7, 11, 19

**Statutes**

28 U.S.C. § 1927 ........ passim

35 U.S.C. § 101 ........ 12

35 U.S.C. § 285 ........ passim

35 U.S.C. § 287 ........ passim

**Rules**

Fed. R. Civ. P. 41 ........ 23

Fed. R. Evid. 408 ........ 17

# I. INTRODUCTION

What began as a baseless lawsuit lacking adequate presuit investigation has spiraled further into exceptionality. VDPP admits that its president, Ronald Karpf, misstated the existence of eleven case-dispositive licenses—seven of which he signed. Dr. Karpf's declaration fails to address this. Nor does VDPP submit a declaration from the counsel who repeated this falsehood after Volkswagen thrice showed the licenses exist. Instead, VDPP raises a host of inaccurate statements and legal errors. This case was always exceptional, and now it is more so.

# II. ARGUMENT

## A. The Case Was Objectively Baseless from the Start

This case was frivolous when VDPP filed it. VDPP asserted a long-expired patent for which no relief was possible. But rather than confront the obvious futility of its case, VDPP just prolonged the litigation and lodged irrelevant arguments. This conduct is extraordinary.

For example, VDPP does not defend its initial demands for a "permanent injunction" and "future infringement" damages on an expired patent. Dkt. 35 at 2, 14 (quoting Dkt. 1 § V(f)). This relief is impossible. *Id.*; Dkt. 13 at 3, 5-6 (citing *Lans v. Digit. Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001)); Ex. A at 1-2. The Court agreed. Dkt. 33 at 9 (quoting *Lans* and explaining "VDPP does not dispute" this impossibility). VDPP then compounded the problem by echoing these baseless claims in its proposed amended complaint despite Volkswagen's repeated warnings. Dkt. 35 at 14 (quoting Dkt. 22-1 § VI.e). VDPP's response again ignores the matter. Dkt. 44. Such baseless claims support § 285 fees. *E.g.*, *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1361 (Fed. Cir. 2017); *In re PersonalWeb Techs. LLC*, 85 F.4th 1148, 1155 (Fed. Cir. 2023); *Inventor Hldgs., LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1377-78 (Fed. Cir. 2017).

More exceptional is VDPP's concerted indifference to the impossibility of presuit damages. Because the '452 patent expired and recites only nonmethod claims, VDPP needed

allege compliance with 35 U.S.C. § 287 to obtain this relief. Dkt. 33 at 7-9 (discussing, *inter alia*, *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523 (Fed. Cir. 1993); *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 876 F.3d 1350 (Fed. Cir. 2017) ("*Arctic Cat I*"); *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 950 F.3d 860 (Fed. Cir. 2020) ("*Arctic Cat II*")).

It was evident from the outset that VDPP could *never* allege marking compliance. The reason is simple: VDPP previously accused multiple devices of infringing the '452 patent, those cases ended in licenses, and none of the licensees marked the accused products under § 287. *Id.* The Court properly took judicial notice of VDPP's prior infringement allegations and settlements (*id.* at 8-9), which VDPP has never contested (*see* Dkt. 40 at 12 & n.4). Nor does VDPP dispute that its licensees failed to mark the identified products. *E.g.*, Dkt. 44 at 12. On these facts, VDPP could never—and did not—plausibly plead compliance with § 287. Dkt. 33 at 6-12.

VDPP's counsel knew of these defects. In another case decided before this one, VDPP's counsel had a complaint dismissed with prejudice for the same reason. *See infra* § II.B (discussing *Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*, No. 3:23-CV-791, 2024 WL 815553 (N.D. Tex. Feb. 27, 2024)). The dismissal issued weeks before VDPP responded to Volkswagen's motion to dismiss here. *Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*, No. 3:23-CV-791-N, 2023 WL 7184042 (N.D. Tex. Nov. 1, 2023). The court in *Ortiz* later awarded attorneys' fees under § 285 because the patentee (1) asserted expired patents that (2) were involved in prior litigation and (3) did not attempt to plead compliance with § 287. *Ortiz*, 2024 WL 815553, at *1. VDPP and its counsel did the same thing here, even *after* the *Ortiz* fees award. Dkt. 35 §§ III.A, B, E, F.

VDPP's two justifications for its behavior were unreasonable. At the pleading stage, VDPP's only defense was the NPE Fallacy—the idea that it need not comply with § 287 because it is a nonpracticing entity ("NPE") with "no product to mark." Dkt. 35 at 6, 9 (quoting Dkt. 22 at

5). This argument never worked. The marking requirements of § 287 apply to both a patentee *and its licensees*. *See, e.g.*, *Arctic Cat I*, 876 F.3d at 1366-68 ("A patentee's licensees must also comply with § 287."); *Arctic Cat II*, 950 F.3d at 864 (same); *Maxwell v. J. Baker Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996). VDPP knows this, citing these cases throughout this matter. *See* Dkt. 22 at 4, 5 n.5; Dkt. 37 at 4 nn.23-24, 5 n.25; Dkt. 44 at 8 & n.54. The licensee marking requirement is settled law, not "evolving," as VDPP alleges. Dkt. 44 at 3. Yet the NPE Fallacy never accounted for it. The Court thus correctly found VDPP's argument "irrelevant" and dismissed the case. Dkt. 33 at 8-10. It was exceptional for VDPP to take frivolous positions contrary to controlling law. *E.g.*, *Inventor Hldgs*., 876 F.3d at 1379-80; *PersonalWeb*, 85 F.4th at 1155.

VDPP's only other defense—first made after dismissal—is also groundless. VDPP now asserts that it need not comply with § 287 because its licensees may not believe they infringe the '452 patent. Dkt. 44 at 10-13. This new argument (the "Licensee Intent Fallacy") is wrong as well. First, no case supports it. VDPP cites no authority for the idea that a licensee's state of mind negates a patentee's prior allegations of infringement on the same patent. *See* Dkt. 44 at 10-13. VDPP points to *Realtime Data, LLC v. Actian Corp.*, No. 6:15-cv-463, 2017 WL 11662033 (E.D. Tex. Apr. 4, 2017), but that case just held that defendants bear the burden of "prov[ing] that a product is a patented article." *Id.* at *2. As Volkswagen explained in its Rule 59 response, *Arctic Cat I* expressly rejects that burden allocation. *See* Dkt. 40 at 10; *see also Arctic Cat I*, 876 F.3d at 1368. VDPP ignores this response and simply restates the wrong law again. Dkt. 44 at 10-11.

And while *Realtime* involved prior settlements, those litigations did not involve the same asserted patent. *Realtime*, 2017 WL 11662033, at *3. Here, VDPP's prior cases asserted the same claim of the same '452 patent. *See* Dkt. 13 at 7 (citing *VDPP LLC v. Facebook Techs., LLC*, No. 3:19-cv-4597, Dkt. 1 ¶ 15 (N.D. Cal.); *VDPP LLC v. Acer Am. Corp.*, 3:19-cv-4571, Dkt. 1 ¶ 16

(N.D. Cal.); *VDPP LLC v. TTE Tech., Inc.*, No. 5:19-cv-2019, Dkt. 1 ¶ 17 (C.D. Cal.)); Dkt. 23 at 3; Dkt. 33 at 8. VDPP's case is exceptional for never trying to explain how it could comply with § 287 when it accused products of infringing the same claim. *See Ortiz*, 2024 WL 815553, at *1-2 (exceptional for ignoring the "history of infringement actions involving the Asserted Patents").

Second, and related, VDPP's argument is exceptional for what it implies about VDPP's veracity. While ungrounded in law, VDPP's Licensee Intent Fallacy suggests that VDPP does *not* believe the identified products practice the '452 patent. *See* Dkt. 44 at 12-13. But by accusing these same products of infringement, VDPP represented to multiple federal courts that they *do*:

- "Facebook has made and sold and is making and selling the Portal, which *infringes claims of the '452 patent*." *Facebook*, Dkt. 1 ¶ 15 (emphasis added).
- "Acer has made and sold and is making and selling mobile devices, including the Liquid smartphones and Iconia One tablets, which *infringe claims of the '452 patent*." *Acer*, Dkt. 1 ¶ 16 (emphasis added).
- "TCL has made and sold and is making and selling more than 50 models of mobile phones and tablets under the 'Alcatel' brand that *infringe claims of the '452 patent*." *TTE*, Dkt. 1 ¶ 17 (emphasis added).

Each prior case asserted claim 2, as here. Dkt. 1-2 at 3-7. VDPP's Licensee Intent Fallacy thus stands in direct contrast to its prior representations to federal courts. Dkt. 13 at 7; Dkt. 23 at 3.

This glaring inconsistency makes VDPP's claims implausible and this case exceptional. While VDPP incorrectly states that Volkswagen "kn[e]w what was accused" and that VDPP performed an "infringement analysis" (Dkt. 44 at 5),[1] this was never the issue. The issue was § 287. Dkt. 13 at 6-9. VDPP has *never* tried to plausibly allege compliance with § 287 given its prior infringement allegations. VDPP's only answer was to ignore its licensees (the NPE Fallacy)

[1] VDPP's infringement "analysis" was nonsensical. It cited ChatGPT and claimed that any multistream video displayed on an LCD screen infringed the patent. Dkt. 1-2 at 4-7. But the '452 patent relates to 3D spectacles. Ex. R, 5:13-8:8. Volkswagen does not use 3D spectacles in its vehicles. *Id.* When the Court asked VDPP to explain its case, VDPP could not. *Id.*

or shift the focus to their state of mind (the Licensee Intent Fallacy). Both arguments are irrelevant. It is exceptional for VDPP to have brought and maintained this case contrary to its prior allegations of infringement without further explanation. *See Ortiz*, 2024 WL 815553, at *1-2.

### B. VDPP's Opposition Exacerbates the Exceptionality of the Case

After VDPP served initial disclosures omitting the required disclosure of its settlement agreements, Volkswagen raised this deficiency to VDPP. *See* Dkt. 35 § III.D. VDPP's counsel then falsely claimed: "As of this time we have no settlement agreements to disclose." *Id*. VDPP's opposition now makes matters worse. VDPP claims that its president, Ronald Karpf, stated that no settlement agreements existed. Dkt. 44 at 6. If VDPP is believed, Dr. Karpf misrepresented the facts. He knew of—indeed, *signed*—VDPP's settlement agreements. Worse still, this confirms VDPP's counsel did no presuit investigation to become aware of the settlement agreements. Both conclusions justify fees under § 285, § 1927, and the Court's inherent authority.

#### 1. Ronald Karpf, VDPP's President, Gave False Information to Counsel on a Dispositive Issue

According to VDPP, "in preparing its Initial Disclosures, counsel for VDPP reached out [*sic*] its contact for VDPP, Dr. Karpf in an effort to get copies of the licenses. Counsel was told he had none." Dkt. 44 at 6. This was false. There were eleven licenses. And Dr. Karpf knew it, having signed at least seven of them. *E.g.*, Ex. J at 8[2]:


/s/ Ronald S Karpf
By: Ronald S Karpf
Title: President, VDPP LLC
Dated: February 17, 2020

[2] *See also* Ex. K – Ex. Q. Exhibit P was produced without its signature page. The other three settlement agreements were signed by VDPP's predecessor company. *See* Ex. G – Ex. I.

Dr. Karpf's signing of these agreements is the sole business purpose of VDPP. *See* Ex. Y at 1 (VDPP's business is "MONETIZATION OF US PATENTS"). It is not credible to have denied their existence. This is especially so when every agreement proves the crux of Volkswagen's marking position. *See* Dkt. 35 at 1-2, 6-9, 12. Dr. Karpf's falsehood thus bore on a material issue VDPP was required to investigate by Court order. Dkt. 6 at 2 (§ 1(f)).

Remarkably, while Dr. Karpf signed a declaration accompanying VDPP's opposition, he never addresses this false statement. Dkt. 44-9. His declaration instead purports to address Volkswagen's reasoned concern that VDPP served a letter aided by artificial intelligence, Dkt. 44 at 5, but the declaration does not even do that.[3] It is remarkable—and exceptional—for Dr. Karpf's declaration to remain *silent* on the false statement that VDPP's counsel attributes to him.

It is similarly exceptional for the declaration of VDPP's counsel to repeat Dr. Karpf's falsehood without explanation. *See* Dkt. 44-2 ¶ 9. VDPP may or may not be right in generalizing that "[i]t is not uncommon for clients to not provide everything to their lawyers when first asked," Dkt. 44 at 7, but it is exceptional for a client to provide information it personally knows (or should know) is false on a matter at the heart of its business on a case-dispositive issue.

It is also false for VDPP to claim that "Jeff Kubiak was unaware that any licenses existed until queried by counsel for Volkswagen and he answered truthfully." Dkt. 44 at 6. It was not "truthful[]" that VDPP had no licenses. It had eleven. Ex. G – Ex. Q. Mr. Kubiak's statement is thus exceptional no matter how it is read. If Mr. Kubiak were "unaware that any licenses existed"—i.e., he did not know one way or the other—then he should not have stated that "we have *no settlement agreements to disclose*." Ex. F at 3 (emphasis added). And if Mr. Kubiak were

[3] Neither the Karpf declaration, Dkt. 44-9, nor the Sunatori declaration, Dkt. 44-10, denies or even acknowledges Volkswagen's concern about the use of AI in preparing this letter.

relying on Dr. Karpf's false statement about the absence of licenses, this confirms VDPP's counsel did not conduct an adequate presuit investigation. *See infra* § II.B.2. VDPP's prior litigations and settlements are a matter of public record. *See* Dkt. 13 at 7 (citing public settlements); Dkt. 23 at 2-3 (same). Any reasonable investigation would have uncovered them. *See, e.g.*, *WPEM, LLC v. SOTI Inc*., No. 2:18-CV-00156, 2020 WL 555545, at *4, *6 (E.D. Tex. Feb. 4, 2020), *aff'd*, 837 F. App'x 773 (Fed. Cir. 2020); *ZT IP, LLC v. VMware, Inc.*, No. 3:22-CV-970, 2023 WL 1785769, at *2 (N.D. Tex. Feb. 6, 2023) ("almost an objective impossibility" to not find public data). Both explanations support exceptionality, yet Mr. Kubiak did not submit a declaration on this issue.

Further, nowhere does VDPP acknowledge that Volkswagen told VDPP of these licenses long before this false statement. Volkswagen explained this *two months before Mr. Kubiak's statement* by letter. Ex. A at 2 (citing *Facebook*, *Acer*, and *TTE* settlements and licensed products). It did so again *two weeks later* in its motion to dismiss. Dkt. 13 at 7. And it did so again *one week* before counsel's statement by reply brief. Dkt. 23 at 2-3. Given this notice, it was *never* reasonable for counsel to rely on Dr. Karpf's false information. VDPP's past indifference to Volkswagen's notice and present characterization of this misinformation as "true" (Dkt. 44 at 6) underscores the exceptional behavior permeating this litigation.

Nor does VDPP deny that these disclosures were late. The Court's Case Management Order required VDPP's initial disclosures to disclose "any settlement agreements relevant to the subject matter of this action." Dkt. 6 at 2 (§ 1(f)). VDPP did not do so. *See* Dkt. 26 at 2 (explaining how "VDPP's initial disclosures are deficient" for this reason and that "VDPP has not yet remedied this deficiency"). This is exceptional. *See, e.g.*, *Ortiz*, 2024 WL 815553, *1-3 (exceptional for "fail[ing] to comply with the Court's discovery deadlines"); *Micromesh Tech. Corp. v. Am. Rec. Prods., Inc.*, No. C-06-6030, 2007 WL 2501783, at *6-7 (N.D. Cal. Aug. 30,

2007); *Realtek Semiconductor Corp. v. Marvell Semiconductor, Inc.*, No. C-04-4265, 2005 WL 3634617, at *7 (N.D. Cal. Nov. 21, 2005) (exceptional for "failure to comply with [] discovery obligations"). Indeed, VDPP's response touts the speed with which it located the licenses when it finally looked. Dkt. 44 at 7. This makes things worse. That VDPP easily found these licenses just proves there was no reason to ignore Volkswagen's prompts and disclose them late.

VDPP also suggests it diligently inquired about licenses, asserting that "[c]ounsel asked that the search continue," Dkt. 44 at 6, and "counsel for VDPP did not accept its clients [*sic*] first response," *id*. at 7. This too appears to be false by omission. The record suggests that VDPP's counsel did not investigate the existence of licenses (Ex. F at 1) until *after* Volkswagen's counsel showed they must exist (*id.* at 2-3). *See also* Dkt. 44 at 6 ("Jeff Kubiak was unaware that any licenses existed *until* queried by counsel for Volkswagen") (emphasis added). Nothing in VDPP's opposition or declarations indicates that VDPP's counsel investigated this issue before or after filing suit, despite Volkswagen's prior references to VDPP's lawsuits. *See* Ex. F at 2 (referencing "settlement-related filings for Facebook, TTE Technology, and Acer"); Ex. A at 2; Dkt. 13 at 7.

At bottom, VDPP misstated material information and proceeded with willful blindness to its existence. This behavior is exceptional. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1364, 1367 (Fed. Cir. 2013) (misrepresenting a date exceptional); *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, No. 15 Civ. 10154, 2023 WL 3815276, at *5 & n.4 (S.D.N.Y. June 5, 2023) (false statements about discovery activities exceptional); *Soar Tools, LLC v. Mesquite Oil Tools, Inc.*, No. 5:19-CV-243-H, 2022 WL 1447946, at *10 (N.D. Tex. Feb. 9, 2022) (party's "repeated refusal to correct [evidence] and its misrepresentations regarding [affiliate]'s ownership" is exceptional); *Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*, No. 14 C 8196, 2018 WL 4742066, at *8 (N.D. Ill. Oct. 2, 2018) (party's "multiple

misrepresentations through the litigation and trial support" is exceptional); *Falana v. Kent State Univ.*, No. 5:08 CV 720, 2014 WL 3788695, at *14-16 (N.D. Ohio July 31, 2014) (party's false statements "and falsification and alteration" of evidence is exceptional).

### 2. No Presuit Investigation Was Done Encompassing VDPP's Eleven Settlement Agreements

Because the '452 patent expired long before this case was filed, Dkt. 33 at 1-2, the focus of this case was always retrospective. VDPP could only hope to recover past damages. VDPP thus should have focused on limitations for such damages, including the marking statute, 35 U.S.C. § 287, and VDPP's failure to require its licensees to mark under that statute. But VDPP's counsel was unaware of its prior settlement agreements until Volkswagen's counsel raised the issue, months after the litigation was filed. Ex. F at 1-2. A reasonable presuit inquiry was not done.

Volkswagen explained that VDPP's presuit investigation was inadequate because it failed to generate awareness of VDPP's eleven prior settlement agreements. Dkt. 35 at 12-13. VDPP's opposition says *nothing* about a presuit inquiry on prior litigations and just reconfirms its counsel did not know about VDPP's licenses until after serving initial disclosures. Ex. F at 3 (claiming "no settlement agreements to disclose"). Volkswagen explained again that at least three prior cases resulted in licenses to the '452 patent. *Id*. at 1-2. Only then did VDPP commit to investigate. *Id*. at 1 ("Let me get back to you on this."). Numerous cases illustrate that this is exceptional.

Most notable is *Ortiz*, where VDPP's same counsel here represented the plaintiff. The plaintiff did not make products, but its previous litigations resulted in dismissals with prejudice that are "the equivalent of licenses." 2023 WL 7184042, at *3. The plaintiff was thus "responsible for making reasonable efforts to ensure the patented articles were marked and pleading compliance with the marking statute." *Id*. at *3-4. When the plaintiff failed to plead such facts, the case was dismissed with prejudice. *Id*. The court in *Ortiz* found the case exceptional because, as here,

"[t]he expired patents could not give rise to future damages, and [plaintiff] was apprised of the need to plead compliance with 35 U.S.C. § 287(a) to support its claim for pre-suit damages in [defendant]'s first motion to dismiss but failed to do so." *Ortiz*, 2024 WL 815553, at *1.

*Ortiz*'s timeline makes VDPP's conduct here untenable. In *Ortiz*, the defendant moved to dismiss on marking grounds on June 7, 2023 (two months before this case was filed), the case was dismissed with prejudice on this ground on November 1, 2023 (two weeks before VDPP's response to Volkswagen's motion to dismiss here), and VDPP's counsel was sanctioned for its lawsuit on February 27, 2024 (one month before the Court granted Volkswagen's motion to dismiss). VDPP's counsel thus knew that a patent's litigation and settlement history for an expired patent bear on the viability of a case. It ignored these red flags. Even after *Ortiz*'s sanction, VDPP's counsel continued to demand a monetary settlement from Volkswagen. *Infra* § II.E.

Other cases confirm the salience of a patent's litigation history. In *PersonalWeb*, the Federal Circuit affirmed a finding of exceptionality when a patentee sued eighty-five customers of a party the patentee had previously sued and dismissed with prejudice. 85 F.4th at 1152, 1157. To the Federal Circuit, the plaintiff's claims "were precluded" and "should not have been brought." *Id*. at 1157. This case presents similar concerns. Had VDPP investigated its prior litigations and learned its licenses did not require marking, this whole litigation should have been avoided.

Prior settlements are also relevant in a presuit investigation because they may yield a license defense. It is exceptional when a patentee fails to conduct a proper presuit investigation into prior licenses obviating a suit. *See, e.g.*, *Viavi Sols. Inc. v. Platinum Optics Tech. Inc.*, No. 20-cv-5501, 2024 WL 1199022, at *5 (N.D. Cal. Mar. 19, 2024) (exceptional when accused product was "expressly licensed under the settlement agreements"); *Shipping & Transit, LLC v. 1A Auto, Inc.*, 283 F. Supp. 3d 1290, 1298 (S.D. Fla. 2017); *Chalumeau Power Sys. LLC v. Alcatel-*

*Lucent*, No. 11-1175, 2014 WL 4675002, at *3 (D. Del. Sept. 12, 2014) (exceptional when defendant had license to asserted patent, plaintiff "executed the license," and plaintiff "had it from day one"), *aff'd*, 611 F. App'x 1008 (Fed. Cir. 2015). Here, any adequate presuit investigation would have uncovered an incurable marking failure. VDPP did not undertake this investigation.

A presuit investigation is especially inadequate if specific facts hint at the need to investigate an issue but that investigation does not occur. *See WPEM*, 2020 WL 555545, at *1, *3 (finding "such knowledge would have tipped off a reasonable plaintiff to evaluate" an issue); *ZT*, 2023 WL 1785769, at *2. VDPP's counsel knows this, as it litigated both *WPEM* and *ZT*. And here, VDPP had every reason to investigate VDPP's prior licenses, as the '452 patent was expired and VDPP could only recover past damages. No such investigation took place.

More broadly, the Court's decision in *TechRadium, Inc., v. FirstCall Network, Inc.*, No. H-13-2487, 2015 WL 862326 (S.D. Tex. Feb. 27, 2015) underscores the relevance of an asserted patent's prior litigation. In a first lawsuit, the Court construed certain patent claim terms, yet in a second lawsuit the plaintiff asserted a broad interpretation of a particular term that the Court rejected in the first suit. *Id.* at *1, *3. Because the plaintiff's counsel was aware of the prior construction and its significance in showing noninfringement, this supported exceptionality. *Id.* at *6-7. As *TechRadium* illustrates, prior litigation can be highly material to present litigation. For a case like VDPP's, where the focus is solely retrospective, a reasonable presuit investigation should have at least resulted in awareness of VDPP's prior settlements. It did not.

The record thus shows that as of November 30, 2023—more than three months after this case was filed—VDPP's counsel believed there were "no settlement agreements to disclose" despite the existence of eleven such agreements. This unawareness reveals the lack of a reasonable presuit investigation. This omission is worsened by the facts that VDPP's counsel had specific

reason to investigate the prior licenses, its own public case dockets referred to its prior settlements, and Volkswagen repeatedly notified VDPP of this issue. All the while, VDPP's president, Dr. Karpf, knew of the agreements. Only when pressed by Volkswagen did VDPP's counsel investigate, and then Dr. Karpf provided information he knew (or should have known) to be false. This is not "normal litigation." Dkt. 44 at 2. It is exceptional.

### C. The Number and Type of Falsehoods in VDPP's Opposition Is Exceptional

Beyond VDPP's misrepresentation on the existence of settlement agreements and Dr. Karpf's falsehood on the same point, VDPP's opposition presents numerous erroneous statements. These too are signs of exceptionality. *See, e.g.*, *Monolithic*, 726 F.3d at 1364, 1367 (false statements are litigation misconduct); *Focus Prods.*, 2023 WL 3815276, at *5 & n.4 (same); *Soar Tools*, 2022 WL 1447946, at *10 (same); *Halo Creative*, 2018 WL 4742066, at *8 (same); *Falana*, 2014 WL 3788695, at *14-16 (same).

VDPP asserts that "Volkswagen has taken every opportunity they could to increase costs for VDPP." Dkt. 44 at 1. This is untrue. Volkswagen served its September 29, 2023 letter and asked VDPP to dismiss the case *before* Volkswagen moved to dismiss. *See infra* § II.H. Volkswagen also requested a stay of discovery pending its motion to dismiss. *Id*. VDPP ignored nearly all of Volkswagen's letter and rejected a stay of discovery. *Id*.

VDPP claims that it responded "line by line" to Volkswagen's September 29, 2023 letter. Dkt. 44 at 5. This is untrue. VDPP's response addressed only a part of the issue of invalidity under 35 U.S.C. § 101. Ex. B. It wholly ignored Volkswagen's concerns regarding patent marking, indirect infringement, willful infringement, and venue. *See* Ex. A at 1-3, 7-8.

Volkswagen supposedly never gave VDPP the "opportunity prior to filing its motion to dismiss" to amend its complaint. Dkt. 44 at 6. This is untrue. After Volkswagen's September 29, 2023 letter, VDPP could have moved to amend its original complaint. VDPP did not do so, even

though it now agrees the original complaint "cannot stand without amendment." *Id*. at 9.

Regarding VDPP's service of discovery requests (twice) after the Court stayed discovery, VDPP complains that "Volkswagen does not show the Court VDPP's acknowledgement that it was early." Dkt. 44 at 7. This is untrue. VDPP cites its Ex. F, which is the same as Volkswagen's Ex. AA. Volkswagen did "show" this. VDPP just did not read it. VDPP's further contention that its paralegal "sent the requests again" is also untrue. Dkt. 44 at 7. The two sets of requests were signed by VDPP's counsel on different days. Dkt. 35 § III.G; *compare* Exs. T & U (Jan. 10, 2024), *with* Exs. W & X (dated Jan. 11, 2024 but served Jan. 12, 2024).

VDPP also asserts that, regarding its eleven prior settlement agreements, "no analysis of the licenses was performed." Dkt. 44 at 10. This is untrue. Volkswagen showed that all eleven agreements predated this litigation and, "[o]f the eleven agreements, ten did not address patent marking at all, and one expressly repudiated a duty to mark by the licensee." Dkt. 35 at 5-6.

According to VDPP, "Volkswagen identified only settlement agreements and no products" and "[a]s such, Volkswagen has not identified any 'specific unmarked product.'" Dkt. 44 at 11. This is untrue. Volkswagen and the Court identified specific products *VDPP itself* accused of infringing the '452 patent. Volkswagen did so in its September letter, motion to dismiss, and reply in support of the same. *See* Dkt. 13 at 7 ("Those cases involved alleged infringement of the '452 patent by products such as Facebook's Portal device, Acer's Liquid Smartphones and Iconia One tablets, and TTE's Alcatel mobile phones and tablets."); Dkt. 23 at 1-2; Ex. A at 2. The Court did likewise in its opinion dismissing the case. Dkt. 33 at 8. VDPP cannot claim "[t]here simply is no evidence that any of the litigations identified by Volkswagen were a license by VDPP to manufacture a patented article for or under VDPP's patents" when VDPP itself accused those products of infringing the '452 patent and licensed them. Dkt. 44 at 11; *see also supra* § II.A.

VDPP also misrepresents the law in stating that "[a]t least one other district court has recognized that . . . it is the defendant's responsibility to affirmatively identify and prove that a product is a patented article." Dkt. 44 at 11. The case VDPP cites for this proposition is *Realtime*. But as Volkswagen previously explained, this premise in *Realtime* is bad law because *Arctic Cat I* later rejected it. *Arctic Cat I*, 876 F.3d at 1368 ("[T]he patentee bears the burden to prove the products identified do not practice the patented invention."); *see* Dkt. 40 at 10. Despite this, VDPP's opposition cites *Realtime* again for the same erroneous point.

As a further example, the declaration of Simon Sunatori claims that "Volkswagen contended that the features of US10021380 and US9426452 have been commonplace in media broadcasts, sporting events, televisions, computers, movies, and video games for decades, and that US10021380 and US9426452 fail to recite an inventive concept."[4] Dkt. 44-10 ¶ 9. This is untrue vis-à-vis the '380 patent, which was never asserted and never even mentioned until VDPP's Rule 59 motion. *See* Dkt. 40 at 14-15. Volkswagen never made any contentions regarding that patent.

While "a minor mistake or two" does not make a case exceptional, it does when the sloppiness is "not minor or isolated." *Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 852 (E.D. Tex. 2017). Here, VDPP's mistakes have been pervasive. *See* Dkt. 35 §§ III, V.B. "Their collective import does make this case stand out." *Iris Connex*, 235 F. Supp. 3d at 852.

**D. VDPP's Rule 59 Motion Vexatiously Adds Cost**

In addition to its fee response (Dkt. 44), VDPP exacerbated the exceptionality of this case by filing a frivolous Rule 59 motion (Dkt. 37). There, VDPP made five scattershot arguments as to why the Court should amend its judgment. *Id.* But for the reasons explained in Volkswagen's response (Dkt. 40), each argument conflicts with the Court's judgment, controlling law, VDPP's

---

[4] The reference in Dr. Karpf's similar declaration to "Surround View (aka Area View by Honda)" is presumably a typo. Dkt. 44-9 ¶ 5.

own statements, and the purpose of Rule 59. *Id.* VDPP's fee opposition does not address these responses. *See* Dkt. 44 at 10-11. Instead, VDPP copies the flawed positions from its Rule 59 motion and ignores their defects. Thus, while VDPP complains that the Court should defer Volkswagen's motion until after it rules on VDPP's Rule 59 motion (Dkt. 44 at 1, 4-5), the Court can safely consider them together, as they raise identical arguments. Both papers further highlight the exceptionality of this case. *See TechRadium*, 2015 WL 862326, at *5.

**1. VDPP's Bare Legal Conclusions Are Not Well-Pled Facts**

For example, VDPP restates that its "amended complaint [] pleaded compliance with Section 287(a)" and includes a screenshot of the proposed amended complaint. Dkt. 44 at 9. VDPP included the same argument and screenshot in its Rule 59 motion. Dkt. 37 at 3-4 ("VDPP's Proposed Amended Complaint Alleges Compliance with §287(a)"). But as Volkswagen explained in its Rule 59 response, VDPP's allusion to meeting "all statutory requirements to obtain pre-suit damages" is a bare legal conclusion—a vague one at that—not a plausible fact. Dkt. 40 at 4-7. VDPP never addresses Volkswagen's or the Court's authority that such conclusory statements do not pass muster under § 287. *Id.*; *see also* Dkt. 33 at 4-5 (explaining how plausible allegations require "more than labels and conclusions" (internal citations omitted)). VDPP effectively just charges the Court with getting it wrong. "[S]eeking only to relitigate issues the court has already decided" warrants fees. *E.g.*, *TechRadium*, 2015 WL 862326, at *5.

**2. VDPP's Purported Factual Disputes Are Irrelevant**

Citing *Maxwell*, VDPP next copies the argument that dismissal is improper because § 287 presents "a fact question." Dkt. 44 at 10 (same argument as Dkt. 37 at 4-5). But as Volkswagen explained, *Maxwell* has nothing to do with this case. Dkt. 40 at 7-9. In *Maxwell*, substantial evidence supported a jury verdict when a licensee marked over 95% of its articles sold under a patent. 86 F.3d at 1111-12. *Maxwell* did not concern pleading standards and did not hold that

vague legal conclusions present "fact question[s]" forbidding dismissal. Dkt. 40 at 7-9. "[L]egal conclusion[s] couched as a factual allegation" do not suffice, even for factual matters. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Alt. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Here, VDPP needed to raise nonconclusory factual allegations making alleged compliance with § 287 plausible. It did not. As the Federal Circuit and district courts have held, it is proper to dismiss complaints under § 287 in these circumstances. *See* Dkt. 40 at 7-8 (citing cases); Dkt. 33 at 9-10 (citing *Lans*, 252 F.3d at 1328; *e-Watch Inc. v. Avigilon Corp.*, No. H-13-347, 2013 WL 5231521, at *3 (S.D. Tex. Sept. 16, 2013)). VDPP addresses none of this authority.

**3. VDPP's Licensee Intent Fallacy Ignores Volkswagen's Arguments, the Court's Judgment, the Law, and the Facts**

VDPP next repeats the Licensee Intent Fallacy from its Rule 59 motion almost verbatim. *Compare* Dkt. 37 at 5-7, *with* Dkt. 44 at 10-13. This argument fails for the same reasons above (*see supra* § II.A) and in Volkswagen's Rule 59 response (Dkt. 40 at 9-13). For example, VDPP's argument conflicts with controlling law. Selling covered products with "no obligation to mark" does not satisfy § 287, irrespective of a licensee's subjective beliefs. *See Arctic Cat II*, 950 F.3d at 864-65; *Arctic Cat I*, 876 F.3d at 1366-67. The argument also contradicts the facts, as VDPP's eleven licenses impose no marking obligation. *See* Dkt. 37. Nor do VDPP's postjudgment letters to its licensees on irrelevant matters make this case less exceptional. *See* Dkt. 40 at 9-13.

VDPP's opposition just makes things worse. For example, VDPP now states that Volkswagen conducted "no analysis of the licenses" and "identified only settlement agreements and no products." Dkt. 44 at 10-11. As discussed above, both statements are false. *See supra* § III.C. Volkswagen *did* analyze the licenses, and *none* of them require marking. *See, e.g.*, Dkt. 35 at 1-2 (no license requires marking), 6 (same), 7-8 (same), 9 (same), 12 (same). And both Volkswagen and the Court *did* identify unmarked products. *See* Dkt. 33 at 8; Dkt. 13 at 7; Dkt. 23

at 1-2; Ex. A at 2; Dkt. 37 at 12; Dkt. 40 at 11. VDPP ignores all of this. These misstatements support a fee award. *E.g.*, *Monolithic*, 726 F.3d at 1367.

#### 4. VDPP's Policy Arguments Are Baseless

VDPP's policy arguments again repeat its Rule 59 motion. *Compare* Dkt. 37 at 8-9, *with* Dkt. 44 at 13-14. Not only do these arguments fail for the same reasons in Volkswagen's Rule 59 response (Dkt. 40 at 13-14), but they are illogical. No "policy" permits VDPP to assert baseless claims, engage in misconduct, and maintain exceptional cases. 35 U.S.C. § 285.

#### 5. VDPP's Reference to an Unasserted Patent Is Baseless

VDPP concludes by copying from its Rule 59 motion and calling this case unexceptional because VDPP "could have" asserted a different patent. Dkt. 44 at 14-15; *see also* Dkt. 37 at 9 (trying to assert the '380 patent). This is nonsensical. That VDPP "could have" asserted a different patent with different claims does not make this case less exceptional. Dkt. 40 at 14-15. The law does not concern itself the infinite number of things VDPP "could have" done. It deals with what VDPP actually did. Dkt. 35. And what VDPP did was exceptional.

### E. VDPP's Settlement Demands and Other Litigation Confirm Exceptionality

VDPP complains that its settlement demands under Fed. R. Evid. 408 are improper in an exceptionality motion. Dkt. 44 at 15. VDPP is incorrect. "Rule 408 does not apply in this context." *Parallel Iron LLC v. NetApp, Inc.*, 84 F. Supp. 3d 352, 359 (D. Del. 2015). Because Volkswagen relies on VDPP's settlement demands to show exceptionality, not to "prove the amount of a disputed claim," Rule 408 is irrelevant. *Id*. at 359-60; *see also Kim Laube & Co., Inc. v. Wahl Clipper Corp*., No. LA CV09-914, 2014 WL 12461044, at *8 (C.D. Cal. Mar. 17, 2014) (finding plaintiff's settlement demands germane, "not to prove liability, but 'for another purpose'––to support Defendant's contention that Plaintiffs pursued their misappropriation claims in bad faith."), *aff'd*, 594 F. App'x 682 (Fed. Cir. 2015); Fed. R. Evid. 408(b).

Volkswagen cites VDPP's settlement demands to show that VDPP sought only nuisance amounts. These demands, coupled with frivolous litigation positions and litigation misconduct, indicate exceptionality. *See* Dkt. 35 at 15-16 (citing *AdjustaCam*, 861 F.3d at 1361-62; *Blackbird Tech LLC v. Health in Motion LLC*, 944 F.3d 910, 916 (Fed. Cir. 2019); *TechRadium*, 2015 WL 862326, at *6; *Iris Connex*, 235 F. Supp. 3d at 850). VDPP does not disagree on the law but disagrees that it took frivolous positions or engaged in misconduct. Dkt. 44 at 16. But as discussed above, VDPP's case was frivolous from the start (*see supra* § II.A), VDPP and its counsel made false statements about its settlement agreements (*see supra* § II.B), and VDPP's counsel advanced numerous erroneous positions throughout the case (*see supra* § II.C; *see* Dkt. 35 §§ III.A-B & III.D-G). Given VDPP's frivolous arguments and "unreasonable manner of litigation," its nuisance-level damages demands are probative of exceptionality. *AdjustaCam*, 861 F.3d at 1362.

VDPP's settlement demands are especially probative after *Ortiz*. *Ortiz* ordered attorneys' fees on February 27, 2024, on the same issue central to this case—failure to mark by an NPE's licensees. 2024 WL 815553, at *1. VDPP's counsel knew of this because they represented the patentee in *Ortiz*. Despite this knowledge, VDPP's counsel *made another settlement demand* three weeks later to Volkswagen, on March 21, 2024. Ex. Z at 1. It is hard to imagine stronger evidence of subjective bad faith and, as discussed below, a stronger need for deterrence.

VDPP's numerous other litigations, and the separate litigations in which its counsel's conduct has led to § 285 liability, are also relevant. Contrary to VDPP's belief, Dkt. 44 at 17, these cases bear on two issues. First, VDPP has filed 21 cases asserting the '452 patent, accusing a wide assortment of technologies—a sign of vexatious conduct indicating exceptionality. *See* Dkt. 35 at 16-17 (citing *Rothschild Connected Devices Innovations, LLC v. Guardian Protection Servs., Inc.*, 858 F.3d 1383, 1389 (Fed. Cir. 2017); *Iris Connex*, 235 F. Supp. 3d at 850; *IPVX*

*Patent Hldgs., Inc. v. Voxernet LLC*, No. 5:13-cv-1708, 2014 WL 5795545, at *7 (N.D. Cal. Nov. 6, 2014)). When paired with VDPP's "fail[ure] to engage in reasonable pre-suit investigation," the pattern of these lawsuits shows VDPP engaged in nuisance litigation. *See Hawk Tech. Sys., LLC v. Castle Retail, LLC*, No. 2:20-cv-2766, 2023 WL 5826978, at *4-5 (W.D. Tenn. Sept. 8, 2023). "The boilerplate nature of [VDPP]'s complaint, the absence of any reasonable pre-suit investigation, and the number of substantially similar lawsuits filed within a short time frame" confirms exceptionality. *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 24 F. Supp. 3d 329, 336 (S.D.N.Y. 2014), *aff'd*, 811 F.3d 479 (Fed. Cir. 2016). VDPP does not address this.

Second, the numerous cases in which VDPP's counsel has incurred § 285 liability are relevant to the need for deterrence against similar conduct in future cases. *See* Dkt. 35 at 17-18 (citing *WPEM*, 2020 WL 555545; *NetSoc, LLC v. Chegg Inc.*, No. 18-cv-10262, 2020 WL 7264162 (S.D.N.Y. Dec. 10, 2020); *ZT*, 2023 WL 1785769; *EscapeX IP LLC v. Google LLC*, No. 22-cv-08711, 2023 WL 5257691 (N.D. Cal. Aug. 16, 2023); *Traxcell Techs., LLC v. Huawei Techs. USA, Inc.*, No. 2:17-cv-42, 2023 WL 2625948 (E.D. Tex. Mar. 24, 2023); *Ortiz*, 2024 WL 815553; *Verna IP Hldgs., LLC v. Alert Media, Inc.*, No. 6:21-cv-00422, 2023 WL 5918320 (W.D. Tex. Sept. 11, 2023)). VDPP does not respond other than to note one case is on appeal. Dkt. 44 at 17. VDPP's counsel has not been deterred from filing cases lacking a presuit investigation. *See ZT*, 2023 WL 1785769, at *3 (speaking of VDPP's counsel here: "a previous warning about certain pre-filing failures aids the Court in finding frivolousness, motivation, and the need to advance considerations of compensation and deterrence").

As these cases illustrate, deterrence can only be achieved here through a finding of liability under both § 285 and § 1927, together with the Court's inherent power. Any less remedy, history proves, fails to achieve deterrence. "For such a deterrent to mean something it must reach the

person or entities that cause or contribute materially to the exceptional nature of the case." *Iris Connex*, 235 F. Supp. 3d. at 845. Indeed, Volkswagen explained that VDPP appears to be a shell company that can quickly dissipate any assets it has to avoid liability under § 285. Dkt. 35 at 19. VDPP's opposition, including its declaration from Dr. Karpf, are *silent* on this concern. The prospect of VDPP shielding itself from a § 285 award emphasizes the need for deterrence, including under § 1927 and the Court's inherent authority. *See Iris Connex*, 235 F. Supp. 3d. at 846 ("The lack of deterrence caused by empty shell plaintiffs negates the incentive to vigorously defend against meritless claims when there are no practical means by which to recover costs.").

**F. VDPP's Misplaced "Forfeiture" Arguments Do Not Avoid Forfeiture**

VDPP's "forfeiture" arguments are not an opposition to Volkswagen's motion. Dkt. 44 at 17-18. They are an untimely reply in support of VDPP's Rule 59 motion, for which VDPP never filed a reply. Stanger still, VDPP addresses only one case (*Rollins*) among many that Volkswagen cited for the routine proposition that "Rule 59(e) motions cannot present arguments that 'could, and should, have been made before the judgment issued.'" Dkt. 40 at 8. VDPP does not attempt to assert the nonforfeiture of any particular argument raised in its Rule 59 motion. Simply stating "no issues are forfeited" does not make it so. *See id*. at 6-15. Arguments which "could, and should, have been made before the judgment issued" are forfeited at the Rule 59 stage. *Rollins v. Home Depot USA*, 8 F.4th 393, 396 (5th Cir. 2021). VDPP does not point to any argument that could not have been raised or give any reason why forfeiture would not apply. Dkt. 44 at 17-18. These arguments are thus forfeited in VDPP's Rule 59 motion. Dkt. 40 at 8-9, 13-14 (collecting cases).

**G. VDPP's Response Under 28 U.S.C. § 1927 Is No Response at All**

VDPP's two-paragraph response to Volkswagen's request for fees under 28 U.S.C. § 1927 (Dkt. 44 at 18-19) is no response at all. The first paragraph consists only of unexplained legal conclusions that "no evidence" supports the request, and the second just states Ramey LLP's

"mission." *Id.* Absent is any response to the arguments Volkswagen raised.

For example, VDPP's counsel never denies that VDPP is undercapitalized to satisfy a § 285 award. *See* Dkt. 35 at 19; *supra* § II.E. Nor does VDPP's counsel deny that it has a stake in the case and that a fee award against VDPP alone would have no deterrent effect. *Id.* VDPP's counsel does not justify its inadequate presuit investigation. Dkt. 35 at 19; *supra* § II.B. Counsel admits it did not find easily-located licenses obviating its suit until instructed by Volkswagen. *See supra* § II.A., II.B. Nor does counsel deny it disclosed these licenses late in violation of Court orders. *Id.* Counsel also ignored controlling precedent—such as *Arctic Cat I*, *Arctic Cat II*, and *Lans*—and was indifferent to the legal impossibility of presuit damages and postsuit relief. *See supra* § II.A, II.B, II.D. Instead, counsel continued litigating despite familiarity with the issues and being sanctioned for similar conduct in another case. *See supra* § II.B., II.E (discussing *Ortiz*); *see also Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 363 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2d Cir. 2007) (granting § 1927 fees when "clear statutory language preclud[ed]" damages and counsel was familiar on "this point of law" because "he had previously litigated this precise question (and lost)"). Counsel never denies that it sought nuisance-level settlements. *See supra* § II.E. Counsel just incants legal standards without explaining how they apply to this case. Dkt. 44 at 16-17. Even now, counsel's primary defense is that its prior claims for patent infringement may lack a good faith basis. *See supra* § II.A, II.D. This contention is remarkable.

Each consideration individually merits an award of fees under § 1927 and the Court's inherent power. *See, e.g.*, *W. Heritage Ins. v. Robertson*, 224 F.3d 764 (Table), 2000 WL 992178, at *5 (5th Cir. 2000) (awarding § 1927 fees for frivolous claims, bad faith, and nuisance settlements); *Baker*, 431 F. Supp. 2d at 363-67 (frivolous claims and withholding evidence); *Iris Connex*, 235 F. Supp. 3d at 843, 858-59; *Royal Oak Entm't, LLC v. Royal Oak, Mich.*, 486 F. Supp.

2d 675, 679-80 (E.D. Mich. 2007). That *all* of them exist here confirms the need for this remedy.

Finally, VDPP's response makes matters worse. As explained, VDPP's response contains false statements (*see supra* § II.C), admits it did not investigate its case until after filing suit (§ II.B), and defends maintaining the case after it was reasonable to do so (*see supra* §§ II.A.-II.E). While VDPP's counsel touts its mission in representing patent owners (Dkt. 44 at 19), this does not grant free reign to do as counsel pleases. Inattention and falsehoods are not zealous advocacy.

To the extent the Court has any reservations about the appropriateness of fees under § 1927 or its inherent authority, Volkswagen does not object to an evidentiary hearing into the activities of VDPP, its President, and its counsel, including whether VDPP could satisfy a judgment of attorneys' fees. *See Iris Connex*, 235 F. Supp. 3d at 832-33, 863 (doing the same when an NPE was a shell corporation, fees under § 285 alone would have no deterrent effect, and finding non-party actor jointly and severally liable under its inherent power).

**H. VDPP's Halfhearted Criticism of Volkswagen Leads Nowhere and Backfires**

VDPP complains that "Volkswagen has taken every opportunity they could to increase costs for VDPP." Dkt. 44 at 1. The record proves the opposite.

VDPP—not Volkswagen—added unnecessary costs by filing a Rule 59 motion that does not try to comport with that rule. *See supra* § II.D; Dkt. 40. It is thus backwards for VDPP to cry foul when Volkswagen did not agree to effectively stay its earlier-filed motion based on VDPP's meritless, after-arising Rule 59 paper. Dkt. 44 at 1. Indeed, VDPP's fee response copies its Rule 59 paper almost verbatim, confirming the Court can resolve the issues together. *Supra* § II.D. Further, VDPP's request for delay vacillates on whether postponement is needed "[t]o conserve judicial resources" or as a "courtesy." Dkt. 44 at 4-5. Volkswagen provided the courtesy of a two-week extension to respond to the exceptionality motion, Dkt. 38, just as Volkswagen agreed to a two-week extension to respond to its motion to dismiss, Dkt. 19. VDPP forgets both extensions.

VDPP's "increase costs" argument also backfires. Volkswagen served its September 2023 letter on the complaint's marking deficiencies (and others) to *avoid* wasteful litigation. The letter confirmed the case was "frivolous" and asked VDPP to dismiss it. Ex. A at 1, 8. Volkswagen again asked VDPP to hold a discussion or "dismiss the case" on October 4, 2023, after VDPP failed to respond to the letter. Ex. C at 3. Volkswagen sent additional emails on October 6, 2023 and October 11, 2023, again seeking to have the case dismissed. *Id*. at 2. On October 11, 2023, VDPP's counsel said it was busy with "summary judgment briefing last week" and later that day provided its "written response" to Volkswagen's letter. *Id*. at 1-2. This "written response," Ex. B, failed to address most of the issues Volkswagen raised, including marking. *Id*. This forced Volkswagen to file its motion to dismiss two days later. Dkt. 13. Had VDPP paid attention to Volkswagen's letter, Volkswagen's motion—and all litigation activity—would have been mooted. Indeed, VDPP could have dismissed its case at any time before the Court's ruling on the motion. Fed. R. Civ. P. 41(a)(1)(A)(i). Despite the litany of reasons for dismissal staring VDPP in the face—*Arctic Cat I* and *II*, Volkswagen's letter, VDPP's eleven settlement agreements, the *Ortiz* case where VDPP's counsel faced the same issue, etc.—VDPP just plowed ahead.

VDPP's "increase costs" argument backfires for another reason. In preparing for the Initial Case Management Conference, *see* Dkt. 6, Volkswagen proposed to VDPP "that the parties jointly move to stay all discovery in the case pending a ruling on the motion to dismiss." Ex. F. at 11. VDPP *rejected* this proposal. *Id*. at 10 ("We opposed [*sic*] your requested relief."); *see also id*. at 7 ("stay of discovery pending a ruling on the MTD - we do not agree to a stay"). Far from increasing costs for the parties, Volkswagen sought to reduce costs. *See also id*. at 7 (reflecting Volkswagen's proposals to eliminate email discovery and set numerical limits on discovery). VDPP took the opposite approach by demanding unnecessary discovery.

VDPP also points out that the case was short-lived and that Volkswagen's exceptionality motion is longer than its motion to dismiss. Dkt. 44 at 2. Yet the brevity of the case and Volkswagen's motion to dismiss (just eleven pages) show how frivolous this case was. *See Ortiz*, 2024 WL 815553, at *1-2; *Micromesh*, 2007 WL 2501783, at *2. VDPP's inability to assert a viable claim based on its expired patent is not complex. It is a basic pleading failure as confirmed by Federal Circuit precedent. That this pleading failure arose due to VDPP's ignorance of its own licenses, false statements about them, and extensive inattention and misconduct, made this § 285 briefing lengthier by comparison. VDPP's actions are not chargeable to Volkswagen.

**I. Each Exceptionality Factor Supports Granting This Motion**

As the Court has explained, courts consider exceptionality based on "the totality of the circumstances." *TechRadium*, 2015 WL 862326, at *5 (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). "[T]he most commonly cited ways to establish exceptionality include evidence showing that the plaintiff failed to conduct an adequate prefiling investigation or to exercise due diligence before filing suit; the plaintiff knew or should have known that its claim was meritless or lacked substantive strength; the plaintiff initiated the litigation to extract settlements from defendants to avoid costly litigation; the plaintiff proceeded in bad faith; or litigation misconduct." *Id.* at *6. Each factor is present here.

VDPP's own opposition and declarations show that it failed to conduct a reasonable presuit investigation. *See supra* § II.B.2. VDPP asserted an expired patent despite eleven settlement agreements precluding presuit damages (including some referenced in public case dockets) and another litigation (*Ortiz*) addressing the same issue. *Id.* VDPP's counsel either knew or should have known that this case was meritless—VDPP could never explain a basis in law for its initial NPE Fallacy or post-hoc Licensee Intent Fallacy. *See supra* § II.A. VDPP's opposition shows that it is well-aware of the "high costs of patent infringement litigation," Dkt. 44 at 17, but wielded

this to extract nuisance-level settlements from Volkswagen and other defendants. *See supra* § II.E. VDPP's bad faith is shown from Dr. Karpf's falsehood about the existence of its eleven settlement agreements and its refusal to drop this case even after Volkswagen presented VDPP with case-dispositive precedent on marking and VDPP's prior settlements. VDPP filed its opposition to Volkswagen's motion to dismiss two weeks after the same issues in *Ortiz* resulted in a dismissal with prejudice, and VDPP even made a settlement demand to Volkswagen three weeks after *Ortiz* resulted in attorneys' fees. *See supra* §§ II.B.2, II.E. Lastly, VDPP's misconduct ranges from a material false statement from its president (*supra* § II.B.1), to false and sloppy statements from its counsel (*supra* §§ II.B.1, II.B.2, II.C; Dkt. 35 §§ III.A-E, III.G), to its refusal to drop baseless legal positions (*supra* § II.A; Dkt. 35 §§ III.E-F), to its failure to follow Court orders and appear for a hearing (Dkt. 35 §§ III.F-G). This "totality of the circumstances," considered in the aggregate, is more than exceptional. *TechRadium*, 2015 WL 862326, at *5; *Octane Fitness*, 572 U.S. at 554.

## III. CONCLUSION

For the reasons above and in its motion (Dkt. 35), Volkswagen respectfully requests that the Court grant the motion and award Volkswagen its attorneys' fees incurred in defense.

Dated: May 15, 2024

Respectfully submitted,

TRENT & TAYLOR, LLP

By: /s/ *T. Christopher Trent*
T. Christopher Trent
Federal ID No. 14244
State Bar No. 20209400
919 Milam, Suite 1500
Houston, TX 77002
(713) 222-2323 – Telephone
(713)222-2226 - Fascimile
Email: ctrent@trent-law.com

**ATTORNEY-IN-CHARGE FOR DEFENDANT VOLKSWAGEN GROUP OF AMERICA, INC.**

OF COUNSEL

Elliot C. Cook (pro hac vice)
Joseph M. Schaffner (pro hac vice)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street, 8th Floor
Reston, VA 20190-6023
(571) 203-2700 – Telephone
elliot.cook@finnegan.com
joseph.schaffner@finnegan.com

**COUNSEL FOR DEFENDANT VOLKSWAGEN GROUP OF AMERICA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system pursuant to the Federal Rules of Civil Procedure. Parties may access this filing through the Court's system.

*/s/ T. Christopher Trent*
T. Christopher Trent

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| VDPP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.,<br><br>Defendant. | Case No. 4:23-cv-2961<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL** |

**DEFENDANT VOLKSWAGEN GROUP OF AMERICA, INC.'S
ATTORNEYS' FEES SUBMISSION PURSUANT TO DKT. 47**

**TABLE OF CONTENTS**

I. NATURE AND STAGE OF PROCEEDING .................... 1

II. ISSUE TO BE RULED ON AND SUMMARY OF ARGUMENT .................... 1

III. LEGAL STANDARD .................... 1

IV. ARGUMENT .................... 2

A. Counsel's Discounted Rates Are Reasonable .................... 2

B. The Amount Worked Is Reasonable and Necessitated by VDPP's and Its Counsel's Behavior in This Litigation .................... 7

1. Fees for the Entire Litigation Are Warranted .................... 7

2. The Hours Expended Throughout the Litigation Are Reasonable .................... 10

C. The Lodestar Calculation .................... 11

D. The *Johnson* Factors Further Support the Reasonableness of Volkswagen's Total Fees .................... 12

E. Volkswagen Does Not Seek Costs .................... 14

F. Volkswagen Respectfully Reserves the Right to Recover Appellate Fees, Should VDPP or Mr. Ramey File an Appeal .................... 14

V. CONCLUSION .................... 14

# TABLE OF AUTHORITIES

**Cases**

*Adhikari v. Daoud & Partners*,
No. 4:09-cv-5904782, 2017 WL 5904782 (S.D. Tex. Nov. 30, 2017) ...... 5

*Bear Ranch, LLC v. Heartbrand Beef, Inc.*,
No. 6:12-cv-14, 2016 WL 3549483 (S.D. Tex. June 30, 2016) ...... 6

*Blackbird Tech LLC v. Health in Motion LLC*,
944 F.3d 910 (Fed. Cir. 2019) ...... 9

*Blum v. Stetson*,
465 U.S. 886 (1984) ...... 2

*BMC Software, Inc. v. IBM Corp.*,
No. H-17-2254, 2022 WL 3156220 (S.D. Tex. Aug. 8, 2022) ...... 3, 4, 5

*Casey v. City of Cabool, Mo.*,
12 F.3d 799 (8th Cir. 1993) ...... 6

*Chaparral Tex., L.P. v. W. Dale Morris, Inc.*,
No. H-06-2468, 2009 WL 455282 (S.D. Tex. Feb. 23, 2009) ...... 12

*Chevron Intell. Prop. LLC v. Sariel Petroleum LLC*,
No. H-18-158, 2020 WL 12442010 (S.D. Tex. July 23, 2020) ...... 5, 7, 10, 14

*CliniComp Int'l, Inc. v. Cerner Corp.*,
No. 17-cv-2479, 2023 WL 2604816 (S.D. Cal. Mar. 22, 2023) ...... 3, 6

*Commercial Law League of Am., Inc. v. George, Kennedy & Sullivan, LLC*,
No. H-07-315, 2007 WL 2710479 (S.D. Tex. Sept. 14, 2007) ...... 2, 6, 7, 10

*Doe v. Eisenberg*,
No. H-16-1149, 2021 WL 4310601 (S.D. Tex. July 23, 2021) ...... 5

*Facebook, Inc. v. Power Ventures, Inc.*,
No. 8-cv-5780, 2017 WL 3394754 (N.D. Cal. Aug. 8, 2017) ...... 3, 6

*Farrar v. Hobby*,
506 U.S. 103 (1992) ...... 2, 13

*Gabbanelli Accordions & Imports, L.L.C. v. Hohner, Inc.*,
No. H-12-0381, 2014 WL 6674145 (S.D. Tex. Nov. 24, 2014) ...... 10, 11

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017) ...... 7, 8, 9

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) .......... 13

*In re Chesapeake Energy Corp.*,
567 F. Supp. 3d 754 (S.D. Tex. 2021) .......... 4

*In re Syngenta Prods. Liab. Litig.*,
No. 4:23-cv-3031, 2024 WL 2835167 (S.D. Tex. May 20, 2024) .......... 4, 5

*Inventor Hldgs., LLC v. Bed Bath & Beyond, Inc.*,
876 F.3d 1372 (Fed. Cir. 2017) .......... 14

*J.A. Masters Invs. v. Beltramini*,
No. H-20-4367, 2023 WL 4712324 (S.D. Tex. July 24, 2023) .......... 10, 11

*Johnson v. Ga. Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) .......... 2, 12, 13

*Kiva Kitchen & Bath, Inc. v. Cap. Distrib., Inc.*,
681 F. Supp. 2d 807 (S.D. Tex. 2010) .......... 10

*La. Power & Light Co. v. Kellstrom*,
50 F.3d 319 (5th Cir. 1995) .......... 1

*Large Audience Display Sys., LLC v. Tennman Prods., LLC*,
745 F. App'x 153 (Fed. Cir. 2018) .......... 9

*McClain v. Lufkin Indus., Inc.*,
649 F.3d 374 (5th Cir. 2011) .......... 6

*Migis v. Pearle Vision, Inc.*,
135 F.3d 1041 (5th Cir. 1998) .......... 1, 2, 12

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
726 F.3d 1359 (Fed. Cir. 2013) .......... 8, 9

*N. Atl. Operating Co. v. Mike's Worldwide, LLC*,
No. H-16-3685, 2018 WL 3388299 (S.D. Tex. July 11, 2018) .......... 4, 5

*Nitsch v. DreamWorks Animation SKG Inc.*,
No. 14-cv-4062, 2017 WL 2423161 (N.D. Cal. June 5, 2017) .......... 6

*NuVasive, Inc. v. Alphatec Holdings, Inc.*,
No. 3:18-cv-347, 2020 WL 6876300 (S.D. Cal. Mar. 20, 2020) .......... 5, 6

*Orthopaedic Hosp. v. Encore Med., LP*,
No. 3:19-cv-970, 2021 WL 5449041 (S.D. Cal. Nov. 19, 2021) .......... 3

*Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*,
No. 3:23-CV-791 (N.D. Tex. Apr. 23, 2024) .................................................................... 11, 12

*Pacheco v. Mineta*,
448 F.3d 783 (5th Cir. 2006) .................................................................................................. 14

*Prospect Cap. Corp. v. Emmon*,
No. 08-cv-3721, 2010 WL 2594633 (S.D.N.Y. June 23, 2010) ................................................ 3

*Prospect Energy Corp. v. Dallas Gas Partners, LP*,
No. H-10-1396, 2011 WL 5864292 (S.D. Tex. Nov. 22, 2011) ................................................. 3

*Quantlab Techs. Ltd. (BVI) v. Godlevsky*,
317 F. Supp. 3d 943 (S.D. Tex. 2018) ....................................................................................... 9

*Saizan v. Delta Concrete Prods. Co.*,
448 F.3d 795 (5th Cir. 2006) ............................................................................................ 10, 11

*Sierra Club v. Energy Future Holdings Corp.*,
No. W-12-CV-108, 2014 WL 12690022 (W.D. Tex. Aug. 29, 2014)........................................ 5

*TechRadium, Inc. v. FirstCall Network, Inc.*,
No. H-13-2487, 2015 WL 862326 (S.D. Tex. Feb. 27, 2015)................................... 1, 2, 11, 12

*Thabico Co. v. Kiewit Offshore Servs., Ltd.*,
No. 2:16-cv-427, 2017 WL 4270743 (S.D. Tex. Sept. 26, 2017)............................................... 9

*Therasense, Inc. v. Becton, Dickinson & Co.*,
745 F.3d 513 (Fed. Cir. 2014) ................................................................................................. 14

*TransAm. Inv. Grp., Inc. v. Hamilton*,
No. H-12-1102, 2014 WL 3867687 (S.D. Tex. Aug. 6, 2014)........................................... 10, 11

*Veasey v. Abbott*,
No. 2:13-cv-193, 2020 WL 9888360 (S.D. Tex. May 27, 2020) ......................................... 7, 13

*Von Clark v. Butler*,
916 F.2d 255 (5th Cir. 1990) .............................................................................................. 2, 12

*Walker v. City of Mesquite*,
313 F.3d 246 (5th Cir. 2002) ................................................................................................... 10

*Wells Fargo Bank v. Konover*,
No. 3:05-cv-1924, 2014 WL 3908596 (D. Conn. Aug. 8, 2014)................................................ 3

*Wi-LAN v. Sharp Elecs. Corp.*,
No. 15-cv-379, 2022 WL 1224901 (D. Del. Apr. 25, 2022) ................................................ 3, 5

*Yufa v. TSI Inc.*,
No. 09-cv-1315, 2014 WL 4071902 (N.D. Cal. Aug. 14, 2014) ........ 6

*Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*,
50 F.3d 253 (3d Cir. 1995) ........ 6

**Statutes**

28 U.S.C. § 1927 ........ 8

35 U.S.C. § 285 ........ 8, 11, 14

35 U.S.C. § 287 ........ 8

**Rules**

Fed. R. Civ. P. 59 ........ 8

## I. NATURE AND STAGE OF PROCEEDING

The Court dismissed this case with prejudice and entered final judgment on March 27, 2024. Dkt. 33; Dkt. 34. On July 11, 2024, the Court issued a Memorandum and Order finding VDPP and its counsel liable for Volkswagen's attorneys' fees. Dkt. 47.

## II. ISSUE TO BE RULED ON AND SUMMARY OF ARGUMENT

Volkswagen respectfully submits this proof of the amount and reasonableness of its attorneys' fees. Volkswagen's goals for this submission are twofold—first, to achieve a prompt and just resolution for this case; and second, to avoid unnecessary disputes for the Court. Volkswagen thus applies various discounts resulting in a fees total lower than the law and record allow. For example, Volkswagen applies its counsel's 2023 billing rates to 2024, cuts paralegal time entirely, omits July 2024 time, and further applies a 10% discount to moot any conceivable objection VDPP or its counsel may make. Volkswagen seeks compensation for just the time of its two lead attorneys (one partner, one of counsel), and its single local counsel. After discounts, the total of these fees is $207,543.60. This value does not seek to maximize Volkswagen's recovery, but as discussed below, reflects the fair, equitable, and reasonable redress for defending this case.

## III. LEGAL STANDARD

Courts use a two-step process to compute attorneys' fee awards. *TechRadium, Inc. v. FirstCall Network, Inc.*, No. H-13-2487, 2015 WL 862326, at *9 (S.D. Tex. Feb. 27, 2015) (citing *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)). First, courts calculate a "lodestar" by multiplying a reasonable hourly rate for the participating lawyers by a reasonable number of hours spent on the case. *Id.* (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995)). Second, courts consider whether to adjust the lodestar based on the twelve

*Johnson* factors.[1] *Id.* (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). Courts give "special heed" to the degree of success obtained and the experience, reputation, and ability of counsel. *Migis*, 135 F.3d at 1047 (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992); *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990)). In assessing adjustments, Courts consider whether the attorneys exercised billing judgment. *TechRadium*, 2015 WL 862326, at *9.

## IV. ARGUMENT

For the reasons discussed below, Volkswagen seeks recovery of $207,543.60 for its attorneys' fees in defending this case. This amount is reasonable.

### A. Counsel's Discounted Rates Are Reasonable

The first step in calculating the lodestar involves determining a reasonable hourly rate for the attorneys who worked on the case. *Commercial Law League of Am., Inc. v. George, Kennedy & Sullivan, LLC*, No. H-07-315, 2007 WL 2710479, at *4 (S.D. Tex. Sept. 14, 2007). A reasonable hourly rate reflects "the prevailing market rates in the relevant community." *Id.* (quoting *Blum v. Stetson*, 465 U.S. 886, 895 (1984)). The table below sets forth the rates of the three attorneys—two lead counsel and one local counsel—who billed time to this case:

| Attorney | Title | Year Barred | Discounted Rate |
|---|---|---|---|
| Elliot C. Cook | Partner (Lead) | 2008 | $979 |
| Joseph M. Schaffner | Of Counsel (Lead) | 2013 | $825 |
| T. Christopher Trent | Partner (Local) | 1991 | $600 |

[1] These factors include "(1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *TechRadium*, 2015 WL 862326, at *9 (quoting *Migis*, 135 F.3d at 1047).

For the reasons explained below and in Volkswagen's accompanying declarations (Exs. A, B), these rates are reasonable.

First, rates paid by sophisticated clients are "presumptively reasonable." *BMC Software, Inc. v. IBM Corp.*, No. H-17-2254, 2022 WL 3156220, at *6 (S.D. Tex. Aug. 8, 2022) (quoting *Wells Fargo Bank v. Konover*, No. 3:05-cv-1924, 2014 WL 3908596, at *6 (D. Conn. Aug. 8, 2014)), *rev'd on other grounds*, 100 F.4th 573 (5th Cir. 2024); *see also, e.g.*, *Prospect Energy Corp. v. Dallas Gas Partners, LP*, No. H-10-1396, 2011 WL 5864292, at *6 (S.D. Tex. Nov. 22, 2011) ("The 'negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market.'") (quoting *Prospect Cap. Corp. v. Emmon*, No. 08-cv-3721, 2010 WL 2594633, at *4 (S.D.N.Y. June 23, 2010)); *Wi-LAN v. Sharp Elecs. Corp.*, No. 15-cv-379, 2022 WL 1224901, at *4 (D. Del. Apr. 25, 2022); *Facebook, Inc. v. Power Ventures, Inc.*, No. 8-cv-5780, 2017 WL 3394754, at *7 (N.D. Cal. Aug. 8, 2017) ("The reasonableness of the requested rates is strongly supported by the fact that these are the rates that counsel billed to [the client] and that [the client] has already paid.").

Here, the above rates reflect those Volkswagen—a sophisticated party—actually paid in 2023. *See* Ex. C; Ex. D; Ex. A ¶ 13; Ex. B ¶ 3. These rates include discounts Volkswagen received from lead counsel's standard rates. Ex. A ¶ 14. In fact, Volkswagen also agreed to higher rates for Mr. Cook and Mr. Schaffner in 2024. *Id.* ¶ 15. To simplify matters for the Court, however, Volkswagen's lodestar uses only the lower, discounted 2023 rates for the entire litigation. These discounts show counsel's rates are reasonable. *See CliniComp Int'l, Inc. v. Cerner Corp.*, No. 17-cv-2479, 2023 WL 2604816, at *3 (S.D. Cal. Mar. 22, 2023) (finding a rate reasonable in part due to a discount); *Orthopaedic Hosp. v. Encore Med., LP*, No. 3:19-cv-970, 2021 WL 5449041, at *14 (S.D. Cal. Nov. 19, 2021).

Second, counsel's rates are consistent with those billed and paid in similar lawsuits for attorneys of similar experience and skill in the relevant markets. *See* Ex. A ¶¶ 13-21; Ex. B ¶¶ 6-8. For example, data from PricewaterhouseCoopers ("PwC") on billing rates for intellectual property litigation confirms that counsel's rates are well within the norms for present-day patent litigation. Ex. E; Ex. A ¶¶ 18-21. In 2023, the median "standard" billing rate for an equity partner at firms comparable to Finnegan was [redacted] per hour, with a corresponding median "billed" rate of [redacted] per hour. Ex. E at 5-6. By comparison, Mr. Cook, an equity partner at Finnegan, had a standard billing rate of [redacted] per hour and a billed rate for Volkswagen of $979 per hour in 2023. Ex. A ¶ 19. Similarly, while the PwC data do not address Of Counsel such as Mr. Schaffner specifically, they do include data for nonequity partners, which are comparable. Ex. E at 9. The PwC data show that the median "standard" rate for nonequity partners in 2023 was [redacted] per hour, with a median "billed" rate (in 2022, with no data for 2023 shown) of [redacted] per hour. *Id.* By comparison, Mr. Schaffner's standard 2023 rate was [redacted] per hour, and his billed rate for Volkswagen was $825 per hour. Ex. A ¶ 21. This neutral and trusted data from PwC confirms the reasonableness of counsel's rates in this litigation. *See In re Syngenta Prods. Liab. Litig.*, No. 4:23-cv-3031, 2024 WL 2835167, at *3 (S.D. Tex. May 20, 2024).

Indeed, counsel's rates here comport with those this District has awarded in other complex litigations. *See, e.g.*, *N. Atl. Operating Co. v. Mike's Worldwide, LLC*, No. H-16-3685, 2018 WL 3388299, at *2 (S.D. Tex. July 11, 2018) ($840 in 2018 for intellectual property litigation (equivalent to $1,050 in 2024, adjusting for inflation)); *Syngenta*, 2024 WL 2835167, at *3 ($950 for class action litigation); *BMC*, 2022 WL 3156220, at *6 ($885 and $850 in 2022 for trade secret litigation (equivalent to $950 and $910 in 2024)); *In re Chesapeake Energy Corp.*, 567 F. Supp. 3d 754, 789-90 (S.D. Tex. 2021) ($1,250 for a bankruptcy case in 2021 (equivalent to $1,450 in

2024)), *vacated on other grounds*, 70 F.4th 273 (5th Cir. 2023); *Chevron Intell. Prop. LLC v. Sariel Petroleum LLC*, No. H-18-158, 2020 WL 12442010, at *2-3 (S.D. Tex. July 23, 2020) ($738 in 2020 for trademark litigation (equivalent to $895 in 2024)); *Doe v. Eisenberg*, No. H-16-1149, 2021 WL 4310601, at *2-3 (S.D. Tex. July 23, 2021) ($825 in 2021 for specialized litigation (equivalent to $950 in 2024)). That this District has awarded comparable fees in complex cases further confirms the propriety of counsel's fees here. *See Syngenta*, 2024 WL 2835167, at *3 (making a similar comparison); *BMC*, 2022 WL 3156220, at *6 (same).

Third, this Court and others have approved out-of-district counsel's rates when the case implicates federal issues of national import. *See, e.g.*, *Commercial Law*, 2007 WL 2710479, at *4-5 (approving rates in a trademark case "consistent with prevailing rates in Houston and Washington, D.C. for similar work performed by lawyers of a similar level of experience and qualification"); *Adhikari v. Daoud & Partners*, No. 4:09-cv-5904782, 2017 WL 5904782, at *14 (S.D. Tex. Nov. 30, 2017) (approving Washington, D.C. rates for a human rights case and explaining how "Washington, D.C.[ is] perhaps the most expensive legal market in the country"); *N. Atl.*, 2018 WL 3388299, at *2 (approving of a fee award in a trademark and copyright case when "[t]he rates [we]re customary for attorneys at large firms in New York and Houston" and "[t]he clients' fees were based on the attorneys' hourly rates"); *see also, e.g.*, *Wi-LAN*, 2022 WL 1224901, at *4 ("[T]he appropriate 'market' for assessing rates in a high-stakes patent litigation like the instant case is the market for national [] counsel who litigate patent cases in [the District]."); *NuVasive, Inc. v. Alphatec Holdings, Inc.*, No. 3:18-cv-347, 2020 WL 6876300, at *3 (S.D. Cal. Mar. 20, 2020); *Sierra Club v. Energy Future Holdings Corp.*, No. W-12-CV-108, 2014 WL 12690022, at *6 (W.D. Tex. Aug. 29, 2014). Where, as here, a party turns to out-of-district counsel for legal specialization, "the co-counsel's 'home' rates should be considered as a starting

point for calculating the lodestar amount." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 382 (5th Cir. 2011); *see also Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 260 (3d Cir. 1995); *Casey v. City of Cabool, Mo.*, 12 F.3d 799, 805 (8th Cir. 1993).

This case involved issues specific to patent law. *See* Dkt. 33 (dismissing the case with prejudice based on patent marking requirements under 35 U.S.C. § 287 and related caselaw). This District has recognized that patent cases can have "the highest rates among the trial bar." *Bear Ranch, LLC v. Heartbrand Beef, Inc.*, No. 6:12-cv-14, 2016 WL 3549483, at *5 (S.D. Tex. June 30, 2016); *see also Commercial Law*, 2007 WL 2710479, at *4 (referring to intellectual property as a "specialized field" of law). Other district courts have made similar observations. *See, e.g.*, *CliniComp*, 2023 WL 2604816, at *3; *NuVasive*, 2020 WL 6876300, at *3; *Yufa v. TSI Inc.*, No. 09-cv-1315, 2014 WL 4071902, at *5 (N.D. Cal. Aug. 14, 2014) ("[I]ntellectual property law requires specialized knowledge.").

Against this backdrop, counsel's rates here fall well within those approved for national law firms in patent cases. *See, e.g.*, *CliniComp*, 2023 WL 2604816, at *3 (finding partner rates of $1,465, $1,120, and $1,055 reasonable for a patent case); *NuVasive*, 2020 WL 6876300, at *3 (approving rates of $1,005, $885, and $860 in 2020 for patent litigation ($1,220, $1,070, and $1,040 in 2024)); *Facebook*, 2017 WL 3394754, at *7 (discussing approval of $1,200 and $870 for lead attorneys in 2017 ($1,530 and $1,115 in 2024)) (citing *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-cv-4062, 2017 WL 2423161, at *9 (N.D. Cal. June 5, 2017)). Finnegan has been consistently recognized as one of the nation's best intellectual property firms for litigation. *See* Ex. A ¶¶ 5-6. Because VDPP brought a federal patent suit against a large company, it is unsurprising that Volkswagen hired sophisticated patent counsel located in the same town as its corporate headquarters (Reston, Virginia). *See id.* ¶ 3.

Finally, to the extent VDPP or its counsel contests Volkswagen's counsel's rates and submits evidence of lower options, such evidence would not control. That other rates may exist does not make counsel's rates here *unreasonable*, let alone unreasonable *for this case*. The lodestar analysis accounts for "issues such as the nature of the litigation, the billing attorney's specific credentials, and the size of the attorney's firm," among other concerns. *Veasey v. Abbott*, No. 2:13-cv-193, 2020 WL 9888360, at *13-14 (S.D. Tex. May 27, 2020), *aff'd*, 13 F.4th 362 (5th Cir. 2021). Rote questionnaires of doubtful representativeness are also not probative. In *Veasey*, for example, this District declined to follow the rates of the 2015 State Bar of Texas Fact Sheet, noting its poor response rate, inability to account for case particulars, and age. *Veasey*, 2020 WL 9888360, at *13-14. The same is true here.

### B. The Amount Worked Is Reasonable and Necessitated by VDPP's and Its Counsel's Behavior in This Litigation

The second variable in the lodestar calculation is "the number of hours 'reasonably expended' by the attorneys." *Commercial Law*, 2007 WL 2710479, at *4; *see also Chevron*, 2020 WL 12442010, at *3. Here, the number of hours for which Volkswagen seeks compensation—231.1 hours—is reasonable and was necessitated by VDPP's refusal to dismiss the case early on.

#### 1. Fees for the Entire Litigation Are Warranted

To determine how much time counsel reasonably spent on a case for purposes of awarding attorneys' fees, a court must first identify the litigation stages and types of work for which compensation should be provided. *See, e.g.*, *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107-11 (2017). Volkswagen respectfully submits that it should be reimbursed for all attorney work performed in this litigation.

While fee awards generally "shift only those attorney's fees incurred because of the misconduct at issue," fees for an entire litigation are appropriate when "every cost of defense is

attributable [] to sanctioned behavior." *Goodyear*, 581 U.S. at 108, 110. Courts may thus award attorneys' fees for an entire case when a party's misconduct is so "extensive" that it "comprise[s] an abusive 'pattern' or a vexatious 'strategy' that [i]s 'pervasive' enough to infect [an] entire litigation." *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1369 (Fed. Cir. 2013). For instance, "if a court finds that a lawsuit, absent litigation misconduct, would have settled at a specific time—for example, when a party was legally required to disclose evidence fatal to its position—then the court may grant all fees incurred from that moment on." *Goodyear*, 581 U.S. at 110-11.

Here, VDPP and its counsel's behavior warrants an award of attorneys' fees for the entire litigation. *See* Dkt. 35 at 2-10 (discussing the case chronology). As the Court recognized in its Order awarding fees under § 285 and § 1927, VDPP and its counsel took "frivolous," "objectively unreasonable," "offensive," and legally "flawed" positions throughout the case. Dkt. 47 at 1-6. Before the case began, VDPP "fail[ed] to conduct an adequate investigation." *Id.* at 3. VDPP then sought impossible relief in its Complaint, demanding a permanent injunction and future damages on an expired patent, as well as past damages when it could not plausibly allege marking compliance under 35 U.S.C. § 287. *Id.* at 2. When Volkswagen informed VDPP of these errors early in the case (Dkt. 35, Ex. A at 1), VDPP persisted, forcing Volkswagen to brief the matter. *Id.*; *see also* Dkt. 13, Dkt. 23. VDPP then prolonged the litigation and "lie[d]" about the existence of eleven prior licensing agreements confirming VDPP's case was meritless. Dkt. 47 at 2-3, 5. Even after the Court agreed with Volkswagen on every point (Dkt. 33), VDPP filed a weak Rule 59 motion demanding improper relief (e.g., asserting a new cause of action) and raising irrelevant law. Dkt. 47 at 2-4. And all the while, VDPP litigated the case in an unreasonable manner—serving initial disclosures for an unasserted patent (*id.* at 2, 5), misstating facts (*id.* at 3, 5), serving

discovery after agreeing to stay it (*id.* at 5), and making repeated settlement demands far less than the cost of defense and unrelated to damages (*id.*). *See also* Dkt. 35 at 9-10; Dkt. 35-6 at 2; Dkt. 35-28 at 2. In short, this entire case did not need to happen, and "every cost of defense is attributable" to the behavior of VDPP and its counsel. *Goodyear*, 581 U.S. at 110.

Courts in this District and the Federal Circuit reimburse parties their full litigation expenses when similar conduct infects the entirety of proceedings. *See, e.g.*, *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 317 F. Supp. 3d 943, 949-50 (S.D. Tex. 2018) (awarding full litigation fees where sanctioned defendants' "defenses never had merit" and were based on "total misrepresentations of the truth"; "filed a stream of frivolous motions" and "undertook all manner of delaying actions to slow and sap the judicial process"; and engaged in "extensive spoilation of evidence," such that "[t]heir mendacity and obstinacy pervade[d] the litigation of all issues in th[e] case"); *Thabico Co. v. Kiewit Offshore Servs., Ltd.*, No. 2:16-cv-427, 2017 WL 4270743, at *2 (S.D. Tex. Sept. 26, 2017) (awarding a party "all of its attorney's fees" when a plaintiff's misconduct necessitated the "entire defense" of a case); *Blackbird Tech LLC v. Health in Motion LLC*, 944 F.3d 910, 914-19 (Fed. Cir. 2019) (affirming defendant's § 285 fee award for entire litigation when plaintiff filed patent infringement action grounded in "meritless" and "frivolous" claim construction and infringement positions; made several nuisance value settlement offers that defendant rebuffed; and failed and/or delayed in producing documents); *Monolithic*, 726 F.3d at 1369; *Large Audience Display Sys., LLC v. Tennman Prods., LLC*, 745 F. App'x 153, 153-58 (Fed. Cir. 2018) (affirming defendant's § 285 fee award for entire litigation where defendant "prevailed on every one of its key arguments" and plaintiff improperly attempted to avoid transfer of venue, pressed "objectively unreasonable" claim construction positions, and used defendant's privileged email to oppose defendant's fee motion). Consistent with these cases, and the Court's findings, Dkt. 47, the law

warrants compensating Volkswagen for all of its unnecessary expenditure of legal resources.

### 2. The Hours Expended Throughout the Litigation Are Reasonable

Once a court has identified the litigation stages and types of work for which a party should be compensated, it must determine whether the hours the party's attorneys expended during those stages or in performing that work were reasonable. *See Commercial Law*, 2007 WL 2710479, at *4; *see also Chevron*, 2020 WL 12442010, at *3. In assessing the reasonableness of hours billed, this Court and others have considered whether the party seeking fees exercised billing judgment. *See J.A. Masters Invs. v. Beltramini*, No. H-20-4367, 2023 WL 4712324, at *9 (S.D. Tex. July 24, 2023); *see also, e.g.*, *Walker v. City of Mesquite*, 313 F.3d 246, 251 (5th Cir. 2002); *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006); *Kiva Kitchen & Bath, Inc. v. Cap. Distrib., Inc.*, 681 F. Supp. 2d 807, 814 (S.D. Tex. 2010). "Evidence of hours written off"—and a concomitant reduction of attorneys' fees sought—"shows billing judgment." *Gabbanelli Accordions & Imports, L.L.C. v. Hohner, Inc.*, No. H-12-0381, 2014 WL 6674145, at *2 (S.D. Tex. Nov. 24, 2014); *see also TransAm. Inv. Grp., Inc. v. Hamilton*, No. H-12-1102, 2014 WL 3867687, at *2 (S.D. Tex. Aug. 6, 2014) ("Fee applicants have the burden of showing that they exercised billing judgment, by evidence, to the court of hours that have been written off.").

Here, the hours billed by Volkswagen's counsel are reasonable. Volkswagen staffed this case leanly, using just two lead counsel and one local counsel. From the start of this litigation through June 2024, Volkswagen's counsel billed a total of 256.8 hours: 141 hours billed by Elliot C. Cook, 102.6 hours billed by Joseph M. Schaffner, and 13.2 hours billed by T. Christopher Trent. Ex. A ¶ 22; Ex. B ¶ 4; *see also* Ex. C (invoices); Ex. D (invoices). These hours cover work researching, briefing, and presenting oral argument on Volkswagen's motion to dismiss; engaging in early discovery; developing defenses; researching and briefing Volkswagen's motion to declare this case exceptional under § 285; and researching and briefing VDPP's manifold Rule 59(e)

motion. Ex. A ¶¶ 22-32; Ex. B ¶ 3. Such hours are reasonable. *See, e.g.*, *Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*, No. 3:23-CV-791, ECF No. 46, at *2 (N.D. Tex. Apr. 23, 2024) (finding 261.7 hours of attorney time reasonable for a case dismissed for lack of marking under § 287—more hours than Volkswagen here despite not involving a Rule 59 motion).

This amount shows billing judgment. For purposes of this calculation, Volkswagen omits all time its counsel worked in July 2024—that is, time its attorneys dedicated to the preparation of this brief. Ex. A ¶ 23. Nor does Volkswagen seek any recovery for paralegal time. Moreover, as discussed below, Volkswagen seeks fees for only 90% of this 256.8-hour total (i.e., 231.1 hours), as it has applied a 10% reduction to the total amount of fees sought across the board to moot any conceivable objection from VDPP or its counsel. *See infra* § IV.C. Each of these significant adjustments demonstrate billing judgment and support a finding of reasonableness. *See Gabbanelli*, 2014 WL 6674145, at *2; *TransAm.*, 2014 WL 3867687, at *2.

### C. The Lodestar Calculation

Once a court determines the reasonable hourly rate and number of hours reasonably expended, it multiplies the reasonable hourly rate by the number of hours reasonably expended to arrive at the lodestar value. *See, e.g.*, *TechRadium*, 2015 WL 862326, at *9; *J.A. Masters*, 2023 WL 4712324, at *9. Here, the lodestar value is calculated as follows:

| Attorney | Discounted Rate | Hours Billed | Fees |
|---|---|---|---|
| Elliot C. Cook | $979 | 141 | $138,039.00 |
| Joseph M. Schaffner | $825 | 102.6 | $84,645.00 |
| T. Christopher Trent | $600 | 13.2 | $7,920.00 |
| **Total Fees** | | | $230,604.00 |
| **Total Fees with 10% Discount** | | | **$207,543.60** |

*See generally* Ex. A ¶¶ 22-32 (describing work done); Ex. B ¶ 3 (same); Ex. C (lead counsel invoices); Ex. D (local counsel invoices).

The lodestar value is $207,543.60. This value is presumptively reasonable. *See, e.g.*,

*Saizan*, 448 F.3d at 800 ("There exists a strong presumption of the reasonableness of the lodestar amount."); *Chaparral Tex., L.P. v. W. Dale Morris, Inc.*, No. H-06-2468, 2009 WL 455282, at *20 (S.D. Tex. Feb. 23, 2009) ("The lodestar is presumptively reasonable and should be modified only in exceptional cases." (citation omitted)). This value is also comparable to awards in other cases resolved in a similar manner. *See Ortiz*, ECF 46 (awarding nearly $162,000 in attorneys' fees for a case dismissed due to lack of marking without a Rule 59 motion).

Moreover, this value reflects significant billing judgment. As noted above (*see supra* § IV.A, § IV.B.2), Volkswagen's computation includes the following discounts to avoid disputes and achieve a swift resolution of this case:

- Discounted 2023 rates for Mr. Cook, Mr. Schaffner, and Mr. Trent;
- Rates frozen at their discounted 2023 levels for all attorneys for the entire litigation;
- All paralegal time cut entirely;
- Time spent in July 2024 cut entirely, including the time spent to prepare this submission; and
- An across-the-board 10% discount to obviate disputes for the Court.

Accordingly, the Court should award Volkswagen $207,543.60 in attorneys' fees.

### D. The *Johnson* Factors Further Support the Reasonableness of Volkswagen's Total Fees

Volkswagen's lodestar calculation is reasonable for the reasons discussed above. *See supra* § IV.A-IV.C. Nevertheless, to the extent VDPP incorrectly disputes this figure, the *Johnson* factors further support the reasonableness of the amount sought. Accordingly, whether the Court analyzes the pertinent facts as bearing on the lodestar calculation or *Johnson* adjustment, the result is the same—an award of $207,543.60 in attorneys' fees is reasonable.

Of the *Johnson* factors, courts give "special heed" to "the result obtained[] and the experience, reputation and ability of counsel." *Migis*, 135 F.3d at 1047 (citing *Von Clark*, 916 F.2d at 258); *see TechRadium*, 2015 WL 862326, at *9 (same). As the Supreme Court has explained,

"'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" *Farrar*, 506 U.S. at 114 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).

Here, Volkswagen achieved full success on every issue it pursued. In its motion to dismiss, Volkswagen sought a dismissal with prejudice due to (1) the impossibility of pre-suit damages under § 287 (Dkt. 13 at 5-9), (2) the impossibility of injunctive relief and post-suit damages due to the expiry of the '452 patent (*id.*), (3) the impossibility of indirect and willful infringement (*id.* at 9-10), (4) VDPP's improper venue allegations (*id.* at 10-11), and (5) the futility of amendment (*id.* at 6-9). The Court agreed with each argument. *See* Dkt. 33; Dkt. 47. As the Court reasoned, VDPP (1) could not obtain pre-suit damages due to a marking failure under § 287 (*e.g.*, Dkt. 47 at 1), (2) could not obtain injunctive or post-suit damages due to patent expiration (*id.*), (3) abandoned its indirect and willful infringement claims (Dkt. 33 at 10-11), (4) raised flawed venue allegations (Dkt. 47 at 3), and (5) could not amend its complaint due to demonstrable futility (Dkt. 47 at 4; Dkt. 33 at 11-12). The Court also agreed with Volkswagen to stay discovery, which VDPP initially opposed. *See* Dkt. 35 at 4, 8. The swift, total success of Volkswagen's positions further confirms the reasonableness of its requested fees.

The experience, reputation, and ability of counsel also supports the amount. Volkswagen's counsel were well qualified, experienced, credentialed, and prepared. *See* Ex. A ¶¶ 8-12; Ex. B ¶ 5. In the hearing on Volkswagen's motion to dismiss, for example, the Court complimented Volkswagen's briefing. *See* Dkt. 35-20 (Ex. R), at 13:11-12. These facts further confirm the reasonableness of the fee amount. *See Veasey*, 2020 WL 9888360, at *14 (considering these facts in its *Johnson* analysis).

Finally, to the extent VDPP raises any countervailing considerations under the *Johnson* factors—and Volkswagen is unaware of any—the discounts Volkswagen has provided would

already account for them. *See supra* § IV.C. There is no reason to detract from the rates, time, and across-the-board cuts Volkswagen has already incorporated into this submission.

### E. Volkswagen Does Not Seek Costs

As the prevailing party, Volkswagen is presumptively entitled to costs. *See* Fed. R. Civ. P. 54(d)(1); *Chevron*, 2020 WL 12442010, at *4 (quoting *Pacheco v. Mineta*, 448 F.3d 783, 793 (5th Cir. 2006)). To reduce disputes for the Court, Volkswagen does not seek its costs in this case.

### F. Volkswagen Respectfully Reserves the Right to Recover Appellate Fees, Should VDPP or Mr. Ramey File an Appeal

The Federal Circuit recognizes that "§ 285 'does not bar the trial court from awarding fees for the entire case, including any subsequent appeals.'" *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1380 (Fed. Cir. 2017) (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 745 F.3d 513, 517 (Fed. Cir. 2014)). Volkswagen thus reserves the right to recover any fees required to defend an appeal, should VDPP or its counsel choose to pursue one.

## V. CONCLUSION

For the reasons above, Volkswagen respectfully requests recovery of its attorneys' fees, from just two main counsel and one local counsel, in the amount of $207,543.60.

Dated: July 29, 2024

Respectfully submitted,

By: */s/ T. Christopher Trent*

T. Christopher Trent
State Bar No. 20209400
Federal ID No. 14244
TRENT & TAYLOR, LLP
919 Milam, Suite 1500
Houston, TX 77002
(713) 222-2323 – Telephone
(713) 222-2226 - Facsimile
ctrent@trent-law.com

**ATTORNEY IN CHARGE FOR DEFENDANT VOLKSWAGEN GROUP OF AMERICA, INC.**

**OF COUNSEL:**

Elliot C. Cook (pro hac vice)
Joseph M. Schaffner (pro hac vice)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street, 8th Floor
Reston, VA 20190-6023
(571) 203-2700 – Telephone
elliot.cook@finnegan.com
joseph.schaffner@finnegan.com

**ATTORNEYS FOR DEFENDANT**
**VOLKSWAGEN GROUP OF AMERICA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system pursuant to the Federal Rules of Civil Procedure. Parties may access this filing through the Court's system.

*/s/ T. Christopher Trent*
T. CHRISTOPHER TRENT

Appx1566-1654

Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **VDPP, LLC,**<br>**Plaintiff,** | |
| **v.** | **Case No. 4:23-cv-02961** |
| **VOLKSWAGEN GROUP OF AMERICA, INC.,**<br>**Defendant** | **Jury Trial Demanded** |

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiff VDPP, LLC in the above-named case, hereby appeals to the United States Court of Appeals for the Federal Circuit from:

- The Memorandum of Decision (Doc. No. 33) granting Defendant, Volkswagen Group of America, Inc.'s Motion to Dismiss (Docket No. 13).
- Final Judgment (Doc. No. 34).
- The Memorandum and Order (Doc. No. 47) granting Defendant Volkswagen Group of America, Inc.'s Motion for Attorneys' Fees (Doc. No. 35) finding Plaintiff VDPP, LLC and Willaim P. Ramey, III of Ramey LLP jointly and severally liable and denying Plaintiff's Motion to Amend the Judgment (Doc. No. 37).
- Any subsequent order that fixes the attorneys' fees assessed.[1]

Respectfully submitted,

**RAMEY LLP**

*/s/ William P. Ramey, III*
William P. Ramey, III
Texas State Bar No. 24027643
wramey@rameyfirm.com

[1] Any subsequent order will be addressed with an amended notice of appeal but this notice is being filed within 30 days of the denial of the motion to amend in an abundance of caution.

5020 Montrose Blvd., Suite 800
Houston, TX 77006
(713) 426-3923 (telephone)
(832) 900-4941 (fax)

***Attorneys for VDPP, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2024, a true and correct copy of the foregoing document was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the Court's local rules.

*/s/ William P. Ramey, III*
William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **VDPP, LLC,**<br>**Plaintiff,** | |
| **v.** | **Case No. 4:23-cv-02961** |
| **VOLKSWAGEN GROUP OF AMERICA, INC.,**<br>**Defendant** | **Jury Trial Demanded** |

**AMENDED NOTICE OF APPEAL**

Notice is hereby given that Plaintiff VDPP, LLC in the above-named case, hereby appeals to the United States Court of Appeals for the Federal Circuit from:

- The Memorandum of Decision (Doc. No. 33) granting Defendant, Volkswagen Group of America, Inc.'s Motion to Dismiss (Docket No. 13).
- Final Judgment (Doc. No. 34).
- The Memorandum and Order (Doc. No. 47) granting Defendant Volkswagen Group of America, Inc.'s Motion for Attorneys' Fees (Doc. No. 35) finding Plaintiff VDPP, LLC and Willaim P. Ramey, III of Ramey LLP jointly and severally liable and denying Plaintiff's Motion to Amend the Judgment (Doc. No. 37).
- The Memorandum and Order (Doc. No. 52) granting fee award.

Respectfully submitted,

**RAMEY LLP**

*<u>/s/ William P. Ramey, III</u>*
William P. Ramey, III
Texas State Bar No. 24027643
wramey@rameyfirm.com

5020 Montrose Blvd., Suite 800
Houston, TX 77006

(713) 426-3923 (telephone)
(832) 900-4941 (fax)

***Attorneys for VDPP, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2024, a true and correct copy of the foregoing document was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the Court's local rules.

*/s/ William P. Ramey, III*
William P. Ramey, III

**From:** Cook, Elliot
**To:** William Ramey
**Cc:** Schaffner, Joseph; Chris Trent; LitigationParalegals; Jeff Kubiak
**Subject:** Re: VDPP v. VGoA - 4:23-cv-2961 (S.D. Tex.) - Correspondence
**Date:** Friday, November 3, 2023 10:05:17 AM

Hello Bill,

VWGoA consents to the extension conditional on VDPP filing an opposition brief, not amending its complaint. Please confirm and then we are agreed.

Regards,
Elliot

> On Nov 3, 2023, at 10:42 AM, Cook, Elliot <Elliot.Cook@finnegan.com> wrote:
>
> Hello Bill,
>
> We'll talk with our client and get back to you as soon as we can.
>
> Regards,
> Elliot
>
>> On Nov 3, 2023, at 10:25 AM, William Ramey <wramey@rameyfirm.com> wrote:
>>
>> ***EXTERNAL* Email:**
>>
>> Hi Joe,
>>
>> We are going to file a motion for an extension of time of 2 weeks to respond to the attached motion. Can we list you as unopposed?
>>
>> Thanks,
>>
>> Bill
>>
>> ---
>>
>> **From:** Schaffner, Joseph <Joseph.Schaffner@finnegan.com>
>> **Sent:** Friday, September 29, 2023 2:30 PM
>> **To:** William Ramey <wramey@rameyfirm.com>
>> **Cc:** Cook, Elliot <Elliot.Cook@finnegan.com>; Chris Trent <ctrent@johnsontrent.com>
>> **Subject:** VDPP v. VGoA - 4:23-cv-2961 (S.D. Tex.) - Correspondence

Counsel,

On behalf of Volkswagen Group of America, Inc., please see the attached correspondence.

Regards,
Joe

**Joseph M. Schaffner**
Of Counsel
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
1875 Explorer Street, Reston, VA 20190
571.203.2725 | fax 202.408.4400 | joseph.schaffner@finnegan.com |
www.finnegan.com

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

<13. MTD 12b3 and 12b6.pdf>

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

**From:** William Ramey
**To:** Cook, Elliot
**Cc:** Schaffner, Joseph; Chris Trent; LitigationParalegals; Jeff Kubiak
**Subject:** RE: VDPP v. VGoA - 4:23-cv-2961 (S.D. Tex.) - Correspondence
**Date:** Friday, November 3, 2023 11:39:18 AM
**Attachments:** shield-advisory.png
chevron-light.png

External email

***EXTERNAL* Email:**

Thank you!

---

**From:** Cook, Elliot <Elliot.Cook@finnegan.com>
**Sent:** Friday, November 3, 2023 10:05 AM
**To:** William Ramey <wramey@rameyfirm.com>
**Cc:** Schaffner, Joseph <Joseph.Schaffner@finnegan.com>; Chris Trent <ctrent@johnsontrent.com>; LitigationParalegals <LitParalegals@rameyfirm.com>; Jeff Kubiak <jkubiak@rameyfirm.com>
**Subject:** Re: VDPP v. VGoA - 4:23-cv-2961 (S.D. Tex.) - Correspondence

Hello Bill,

VWGoA consents to the extension conditional on VDPP filing an opposition brief, not amending its complaint. Please confirm and then we are agreed.

Regards,
Elliot

> On Nov 3, 2023, at 10:42 AM, Cook, Elliot <Elliot.Cook@finnegan.com> wrote:
>
> Hello Bill,
>
> We’ll talk with our client and get back to you as soon as we can.
>
> Regards,
> Elliot
>
> > On Nov 3, 2023, at 10:25 AM, William Ramey <wramey@rameyfirm.com> wrote:
> >
> > ***EXTERNAL* Email:**
> >
> > Hi Joe,

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **VDPP, LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 4:23-cv-02961** |
| **v.** | ) | |
| | ) | |
| **VOLKSWAGEN GROUP OF** | ) | |
| **AMERICA, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

**VDPP, LLC's EMERGENCY MOTION TO SET BOND AND STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL**

VDPP, LLC ("VDPP") respectfully moves this Court for an Order staying enforcement of the Court's Memorandum and Order[1] awarding a sanction in the favor of Volkswagen Group of America, Inc. ("Volkswagen") in the amount of $207,543.60 against William P. Ramey, III and VDPP, LLC, pending appeal. VDPP respectfully requests that the Court expedite the briefing on this matter and require Volkswagen's response by October 15, 2024 as Volkswagen is seeking to enforce the Judgment.[2]

## I. INTRODUCTION AND RELEVANT FACTS

VDPP filed its Complaint in this case on August 11, 2023[3] alleging that Volkswagen infringes claims of U.S. Patent No. 9,46,452 (the "'452 patent").

Volkswagen filed a motion to dismiss alleging that VDPP failed to comply with the marking statute, §287(a).[4] The Court dismissed, with prejudice, VDPP's complaint on March 27, 2024.[5]

[1] Doc. No. 52.
[2] Ex. B, to the Declaration of William P. Ramey, III ("Ramey Decl.").
[3] Doc. No. 1.
[4] Doc. No. 13.
[5] Doc. No. 33.

On April 10, 2024, Volkswagen filed its motion for attorneys' fees.[6] This Court granted that motion and sanctioned VDPP under Section 285 for the attorneys' fees incurred by Volkswagen and William P. Ramey, III, jointly and severally, under Section 1927.[7] On August 13, 2024, this Court determined the sanction awarded to be $207,543.60.[8] VDPP appealed both the Order Dismissing the case[9] and the Sanction Order.[10]

On October 3, 2024, the Clerk for the United States District Court for the Southern District of Texas issued an Abstract of Judgment against VDPP, LLC and William P. Ramey, III in the full amount of the sanction.[11] On October 4, 2024, Casey King sent an e-mail on behalf of Christopher Trent forwarding discovery requests and asking if a bond was going to be sought and advising that Volkswagen intends to proceed with execution of the judgment.[12] On October 8, 2024, William P. Ramey, III conferred with Elliot Cook, counsel for Volkswagen, about agreeing to a stay of execution without bond or Volkswagen not opposing a showing that William P. Ramey, III is objectively facially able to respond to the money judgment as an alternate to bond. However, Mr. Cook responded that Volkswagen would be prejudiced if it did not require the full bond and would not agree to Mr. Ramey's alternate to bond.[13]

## II. APPLICABLE LEGAL STANDARDS

Rule 62 of the Federal Rules of Civil Procedure governs the stay of proceedings to enforce a judgment.[14] The enforcement of a money judgment must accord with the procedure of the state

---

[6] Doc. No. 35.
7 Doc. No. 47.
8 Doc. No. 52.
9 Doc. No. 50.
10 Doc. No. 53.
11 Doc. No. 56.
12 Ex. A, to the Ramey Decl..
[13] Ramey Decl. at ¶6.
14 Fed. R. Civ. P. 62.

where the court is located.[15]

The Fifth Circuit recognizes the purpose of a supersedeas bond is to preserve the status quo while protecting the non-appealing party's rights pending appeal.[16] So "absent a stay under Rule 62, a prevailing party may seek to enforce a judgment pursuant to Rule 69."[17] Rule 62 further provides that "[i]f a judgment is a lien on the judgment debtor's property under the law of the state where the court is located, the judgment debtor is entitled to the same stay of execution the state court would give."[18] Until 2014, the Fifth Circuit interpreted the "judgment is a lien" language in Rule 62(f) as allowing a judgment debtor could invoke a state stay of execution law because the judgment creditor was otherwise afforded sufficient security under state law.[19] However, in 2014, the Fifth Circuit held that the recordation of an abstract of judgment in Texas was more than a ministerial act and thus Rule 62(f) did not apply.[20]

The Fifth Circuit recognizes two scenarios in which a judgment debtor may be relieved from posting a full supersedeas bond pending appeal. "First, the requirement that an appellant post bond may be waived in situations where the losing party objectively demonstrates a present financial ability to facilely respond to a money judgment and presents to the court a financially secure plan for maintaining the same degree of solvency during the period of the appeal. Contrariwise, if the judgment debtor's present financial condition is such that the posting of a full bond would impose an undue financial burden, the court similarly is free to exercise a discretion to fashion some other arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment

[15] Fed. R. Civ. P. 69(a)(1); Andrews v. Roadway Exp. Inc., 473 F.3d 565, 568 (5th Cir. 2006).
[16] *Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1190–91 (5th Cir. 1979).
[17] *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 771 F.3d 301, 303 (5th Cir. 2014).
[18] Fed. R. Civ. P. 62(f).
[19] *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 771 F.3d 301, 307 (5th Cir. 2014) (dissenting opinion *citing Castillo v. Montelepre, Inc.,* 999 F.2d 931, 942 (5th Cir.1993)).
[20] *MM Steel, L.P.*, 771 F.3d at 306.

creditor. The court went on to provide that "[i]f the full security supersedeas bond requirement is to be waived, however, it is the burden of the moving party to objectively demonstrate the reasons for such a departure.[21]

Service of a writ of execution or garnishment creates a lien on property subject to such writ of garnishment from the date of service of such writ.[22]

Under Texas law, a judgment debtor must typically post security to suspend execution of the judgment during appeal of the judgment.[23] However, the Texas Supreme Court has held that an award of attorneys' fees that is punitive in nature is neither "compensatory damages" nor "costs," and thus requires a $0.00 bond.[24]

An award under Section 1927 is a sanction.[25]

## III. ARGUMENT

### A. William P. Ramey, III Requests this Court Set the Bond and Stay Enforcement

This Court should set the bond required at $249,602.32.[26] Further, William P. Ramey, III requests the Court accept evidence that he has the present financial ability to facilely respond to the money judgment for sanctions by providing a sealed copy of an account showing assets more than enough to cover the Judgment from this Court.[27] Exhibit B is a retirement account that contains assets sufficiently available to satisfy the Judgment.[28] Further, Mr. Ramey agrees not to

---

[21] *See, e.g., Poplar*, 600 F.2d at 1191.
[22] *Matter of T.B. Westex Foods, Inc.*, 950 F.2d 1187, 1192 (5th Cir. 1992).
[23] *See* Tex. Civ. Prac. & Rem. Code § 52.001 (Security for Judgments Pending Appeal).
[24] *See In re Nalle Plastics Family Ltd. Partnership*, 406 S.W.3d 168, 176 (ordering trial court to refund any moneys overpaid by the appellant as security towards attorneys' fees).The court in *Nalle Plastics Family* noted that some attorneys' fees may qualify as compensatory; for example, where an attorney has filed a breach-of-contract suit to collect attorneys' fees earned in an underlying case as damages. Id. at 174-75. But such is not the case here.
[25] *Id.*
[26] Which is $207,543.60 plus 20% and plus $250.
[27] Ex. B, to the Ramey Decl. (under seal).
[28] Ramey Decl. at ¶3.

transfer assets out of this account during the pendency of appeal, without Court Order.[29] Based on the assets shown and the plan, Mr. Ramey requests the Court set the bond at $249,602.32 and stay enforcement of the Judgment pending appeal based on Mr. Ramey's present financial ability to respond to the money judgment and the plan not to move the funds during the pendency of the appeal, absent Court Order.

The accounts shown are retirement accounts and Mr. Ramey would be substantially penalized by the Internal Revenue Service if required to move funds sufficient to cover the bond during the pendency of the appeals.[30] As the Court is allowed to exercise discretion to fashion an arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment creditor, requiring Mr. Ramey to leave the fund in the account, absent Court Order, provides adequate security to Volkswagen. Mr. Ramey is a member of the State Bar of Texas, admitted to this Court and maintains his principal office in the City of Houston. In short, Mr. Ramey is not fleeing the State nor is he avoiding the judgment. Rather, Mr. Ramey is seeking an alternate bond that does not penalize him during his appeals.[31]

The *Poplar* instructed that "[i]f the full security supersedeas bond requirement is to be waived, however, it is the burden of the moving party to objectively demonstrate the reasons for such a departure.[32] Mr. Ramey believes the plan set for the herein provides adequate assurances for Volkswagen. Mr. Ramey requests the Court adopt this alternate to full bond, set bond and stay execution based on his objective evidence and the plan.

---

[29] Ramey Decl. at ¶¶3-4.
[30] Ramey Decl. at ¶¶7-8.
[31] Ramey Decl. at ¶8.
[32] *See, e.g.,* Poplar, 600 F.2d at 1191.

Mr. Ramey is only providing the bond for securing his appeal of the Section 1927 award and is not bonding the judgment against VDPP or agreeing to pay any portion of VDPP's potential liability under the Judgment.

**B. A Writ of Execution is a Judgment Lien and Would Trigger Rule 62(f)'s Texas-Bond Requirement.**

If the Court is not satisfied with Mr. Ramey's financial ability to satisfy the judgment, VDPP provides that as a basis for setting the bond at $0.00 and issuing a stay of execution, once Volkswagen converts the Judgment into a writ of execution or garnishment, Rule 62(f) is satisfied as a writ of execution or garnishment is a judgment lien on the covered property.[33] Therefore, immediately upon issuance of writ of execution or writ of garnishment from this Court, Texas law would apply for setting the bond, as the writ is a judgment lien.[34] Thus, the bond should be set at $0.00 and an automatic stay of enforcement should issue.

Further, the Fifth Circuit has noted that courts should afford deference to the manifest desire of the Texas Legislature, which is to afford judgment debtors in Texas the ability to suspend execution of a money judgment by posting a supersedeas amount that excludes any punitive or exemplary damages.[35] Under Texas law, a judgment debtor must typically post security to suspend execution of the judgment during appeal of the judgment.[36] The amount of security must equal to the sum of: (1) ***compensatory damages*** awarded in the judgment; (2) interest for the estimated duration of the appeal; and (3) ***costs*** awarded in the judgment.[37] However, the Texas Supreme

[33] *Matter of T.B. Westex Foods, Inc.*, 950 F.2d at 1192.
[34] *See, e.g., id*.
[35] *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 771 F.3d 301, 303–04 (5th Cir. 2014); *Castillo v. Montelepre, Inc.*, 999 F.2d 931, 942 (5th Cir. 1993).
[36] *See* Tex. Civ. Prac. & Rem. Code § 52.001 (Security for Judgments Pending Appeal).
[37] *Id.* at § 52.006(a) (emphases added).

Court has held that an award of attorneys' fees that is punitive in nature is neither "compensatory damages" nor "costs" under the bond requirements of CPRC § 52.[38]

Unlike compensatory damages, the sanction under Section 1927 penalties are intended, principally, to punish and deter certain actions rather than to compensate Volkswagen. The purpose of a supersedeas bond, to preserve the *status quo,* and is met in this cause by setting a supersedeas amount that includes compensatory damages, interest during the estimated pendency of the appeal, and costs awarded by the judgment. Further, *MM Steel, L.P. v. JSW Steel (USA) Inc.*[39] did not address a purely punitive sanction award and thus setting a bond equal to the amount of the compensatory damages, costs and interest is appropriate in this case, or a bond of $0.00 and an automatic stay of execution.

Here, just like the attorneys' fees awarded in *Nalle Plastics Family*, the Judgment consists entirely of attorneys' fees in connection with a sanction.[40] Therefore, the Judgment against Mr. Ramey is entirely punitive and not compensatory within the meaning of CPRC § 52.[41] Accordingly, no supersedeas appeal bond is required under Texas law. Therefore, as an alternate basis, this Court should set the bond required to stay enforcement at $0.00 during the pendency of the appeals[42] and automatically stay enforcement upon the Court issuing a writ of execution or garnishment in favor of Defendant.

**C. Alternatively, Ramey Requests An Additional 45 Days to Bond the Judgment**

---

[38] *See In re Nalle Plastics Family Ltd. Partnership*, 406 S.W.3d 168, 176 (ordering trial court to refund any moneys overpaid by the appellant as security towards attorneys' fees).The court in *Nalle Plastics Family* noted that some attorneys' fees may qualify as compensatory; for example, where an attorney has filed a breach-of-contract suit to collect attorneys' fees earned in an underlying case as damages. *Id.* at 174-75. But such is not the case here.
[39] 771 F.3d 301, 303–04 (5th Cir. 2014).
[40] Doc. No. 50 and Doc. No. 53.
[41] *In re Nalle Plastics Family Ltd. Partnership*, 406 S.W.3d at 174, 176.
[42] And William P. Ramey, III's appeals.

If the Court does not agree that Mr. Ramey's alternate bond plan suffices and the Court does not agree that the issuance of a writ of execution or garnishment would be a judgment lien that would invoke Rule 62(f), Mr. Ramey requests an additional 45 days to obtain bond and a stay of execution during that extension.

## VI. CONCLUSION

VDPP, LLC and William P. Ramey, III respectfully pray this Court set bond and enter an order staying enforcement of this Court's Judgment during the pendency of the appeals. In the alternative, Plaintiff request an additional 45 days to obtain bond and a stay of enforcement during that time.

Respectfully submitted,

**Ramey LLP**

By: <u>*/s/ William P. Ramey, III*</u>
William P. Ramey, III
Texas Bar No. 24027643
5020 Montrose Blvd., Suite 800
Houston, Texas 77006
(713) 426-3923 (telephone)
(832) 900-4941 (fax)
wramey@rameyfirm.com

***Attorneys for VDPP, LLC***

## CERTIFICATE OF CONFERENCE

I confirm that I conferred with counsel for Defendant on October 8, 2024, via phone. Several issues were discussed and Defendant is opposed to this Motion and the relief requested.

<u>*/s/ William P. Ramey, III*</u>
William P. Ramey, III

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that all counsel of record who have appeared in this case are being served today, with a copy of the foregoing via the Court's CM/ECF system.

*/s/ William P. Ramey, III*
William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **VDPP, LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 4:23-cv-02961** |
| **v.** | ) | |
| | ) | |
| **VOLKSWAGEN GROUP OF** | ) | |
| **AMERICA, INC.,** | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

**DECLARATION OF WILLIAM P. RAMEY, III**

I, William Ramey, declare as follows:

1. My name is William P. Ramey, III. I am over the age of 21. I have personal knowledge of the facts contained herein, which are true and correct. If called as a witness, I could competently testify to these statements.

2. I am licensed to practice law in the state of Texas and am an attorney with the law firm of Ramey LLP. I represent the Plaintiff in the above-captioned lawsuit.

3. Exhibit A is a true and correct copy of an e-mail from opposing counsel providing that they would begin enforcement proceedings.

4. Exhibit B is a true and correct copy of a statement of an investment account.

5. I agree to leave the funds in the investment account until such time as the appeals are concluded.

6. On October 8, 2024, I conferred with Elliot Cook, counsel for Volkswagen, about agreeing to a stay of execution without bond or Volkswagen not opposing a showing that William P. Ramey, III is objectively facially able to respond to the money judgment as an alternate to bond. However, Mr. Cook responded that Volkswagen would be prejudiced if it did not require the full bond and

would not agree to my alternate to bond. I asked Mr. Cook how Volkswagen would be prejudiced but he did not provide an answer.

7. The accounts shown are retirement accounts and I would be substantially penalized by the Internal Revenue Service if required to move funds sufficient to cover the bond from the investment accounts during the pendency of the appeals.

8. I am a member of the State Bar of Texas, admitted to this Court and maintains his principal office in the City of Houston. I am not fleeing the State nor am I avoiding the judgment. Rather, I am seeking an alternate bond that does not penalize me during my appeals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 8, 2024. ______________

William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **VDPP, LLC,**<br>**Plaintiff,** | |
| **v.** | **Case No. 4:23-cv-02961** |
| **VOLKSWAGEN GROUP OF AMERICA, INC.,**<br>**Defendant** | **Jury Trial Demanded** |

**CORRECTED NOTICE OF APPEAL**

Notice is hereby given that Plaintiff VDPP, LLC and William P. Ramey, III, in the above-named case, hereby appeals to the United States Court of Appeals for the Federal Circuit from:

- The Memorandum of Decision (Doc. No. 33) granting Defendant, Volkswagen Group of America, Inc.'s Motion to Dismiss (Docket No. 13).
- Final Judgment (Doc. No. 34).
- The Memorandum and Order (Doc. No. 47) granting Defendant Volkswagen Group of America, Inc.'s Motion for Attorneys' Fees (Doc. No. 35) finding Plaintiff VDPP, LLC and Willaim P. Ramey, III of Ramey LLP jointly and severally liable and denying Plaintiff's Motion to Amend the Judgment (Doc. No. 37).
- Any subsequent order that fixes the attorneys' fees assessed.[1]

Respectfully submitted,

**RAMEY LLP**

*/s/ William P. Ramey, III*
William P. Ramey, III
Texas State Bar No. 24027643
wramey@rameyfirm.com

[1] Any subsequent order will be addressed with an amended notice of appeal but this notice is being filed within 30 days of the denial of the motion to amend in an abundance of caution.

5020 Montrose Blvd., Suite 800
Houston, TX 77006
(713) 426-3923 (telephone)
(832) 900-4941 (fax)

***Attorneys for VDPP, LLC and William P. Ramey, III***

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, a true and correct copy of the foregoing document was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the Court's local rules.

*/s/ William P. Ramey, III*
William P. Ramey, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **VDPP, LLC,**<br>**Plaintiff,** | |
| **v.** | **Case No. 4:23-cv-02961** |
| **VOLKSWAGEN GROUP OF AMERICA, INC.,**<br>**Defendant** | **Jury Trial Demanded** |

**CORRECTED AMENDED NOTICE OF APPEAL**

Notice is hereby given that Plaintiff VDPP, LLC and William P. Ramey, III, in the above-named case, hereby appeals to the United States Court of Appeals for the Federal Circuit from:

- The Memorandum of Decision (Doc. No. 33) granting Defendant, Volkswagen Group of America, Inc.'s Motion to Dismiss (Docket No. 13).
- Final Judgment (Doc. No. 34).
- The Memorandum and Order (Doc. No. 47) granting Defendant Volkswagen Group of America, Inc.'s Motion for Attorneys' Fees (Doc. No. 35) finding Plaintiff VDPP, LLC and Willaim P. Ramey, III of Ramey LLP jointly and severally liable and denying Plaintiff's Motion to Amend the Judgment (Doc. No. 37).
- The Memorandum and Order (Doc. No. 52) granting fee award.

Respectfully submitted,

**RAMEY LLP**

*/s/ William P. Ramey, III*
William P. Ramey, III
Texas State Bar No. 24027643
wramey@rameyfirm.com

5020 Montrose Blvd., Suite 800
Houston, TX 77006

(713) 426-3923 (telephone)
(832) 900-4941 (fax)

***Attorneys for VDPP, LLC and William P. Ramey, III***

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, a true and correct copy of the foregoing document was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the Court's local rules.

*/s/ William P. Ramey, III*
William P. Ramey, III